|  | **DEPARTMENT OF HOMELAND SECURITY**<br>**Federal Emergency Management Agency**<br>**Office of Professional Responsibility**<br><br>**REPORT OF INVESTIGATION** | **1. CASE NUMBER**<br>20200490 |
|---|---|---|
| | | **2. PREPARED BY**<br># Tenant, Michael K |
| | | **3. REPORT NUMBER**<br>001 |

**4. TITLE**
Gretchen CARREIRO, Project Specialist/Contracting Officer Representative (COR), FEMA

**5. FINAL RESOLUTION**

| **6. STATUS**<br>Closing Report | **7. TYPE OF REPORT**<br>Investigative Findings | **8. RELATED CASES** |
|---|---|---|

**9. ALLEGED VIOLATION(S)**
Failure to Perform Official Duties
Failure to Disclose Waste, Fraud, Abuse and Corruption to Appropriate Authorities

**10. SYNOPSIS**
On July 23, 2020, the Federal Emergency Management Agency (FEMA), Office of Professional Responsibility (OPR) received an email and attachments from the U.S. Department of Homeland Security (DHS) Office of Inspector General (OIG), complaint number C2008614, forwarding a complaint from Cyberricade Contractor Barry Angeline, against Vice President, ATCS PLC Timothy Cole McCormick.  The complaint against McCormick alleged the issues relating to contract JSFE80-16-A-0004, Task Order 70FB8018F00000070 were brought to the attention of Contracting Officer Representative (COR) Gretchen CARREIRO who ignored the concerns about the contract.

On July 28, 2020, the case was assigned to OPR Investigator Michael K. Tenant for investigation. Investigator Tenant conducted interviews and reviewed evidence concerning the alleged contract mismanagement. Investigator Tenant obtained and reviewed internal and external documents and conducted interviews as part of the investigation. The allegations Gretchen CARREIRO failed to perform her official duties and failed to disclose fraud, waste, abuse and corruption to appropriate authorities was **UNFOUNDED.**

| **11. CREATED BY**<br># Tenant, Michael | Michael K. Tenant *Digitally signed by Michael K. Tenant Date: 2021.02.04 14:45:43 -05'00'* | **12. COMPLETION DATE**<br>2/4/2021 | **13. ORIGIN OFFICE**<br>OPR |
|---|---|---|---|
| **14. APPROVED BY**<br># Deane, Eric | | **15. APPROVED DATE** | **16. TELEPHONE** |

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, DEPARTMENT OF HOMELAND SECURITY, TOGETHER WITH A COPY OF THIS DOCUMENT.

THIS DOCUMENT CONTAINS INFORMATION REGARDING CURRENT AND ON-GOING ACTIVITIES OF A SENSITIVE NATURE. IT IS FOR THE EXCLUSIVE USE OF OFFICIAL U.S. GOVERNMENT AGENCIES AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY. IT CONTAINS NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF THE DEPARTMENT OF HOMELAND SECURITY.

FEMA - C000001

DISTRIBUTION OF THIS DOCUMENT HAS BEEN LIMITED AND FURTHER DISSEMINATIONOR EXTRACTS FROM THE DOCUMENT MAY NOT BE MADE WITHOUT PRIOR WRITTEN AUTHORIZATION OF THE ORIGINATOR.

|  | **DEPARTMENT OF HOMELAND SECURITY**<br>**Federal Emergency Management Agency**<br>**Office of Professional Responsibility**<br><br>**REPORT OF INVESTIGATION**<br>**CONTINUATION** | **1. CASE NUMBER**<br>20200490 |
| | | **2. PREPARED BY**<br># Tenant, Michael |
| | | **3. REPORT NUMBER**<br>001 |

**NARRATIVE**

On July 23, 2020, FEMA (OPR) received a complaint that originated from Barry Angeline, Contractor, Cyberricade, who alleged Gretchen CARRIERO, failed to perform her official duties as a COR by not taking action after an allegation of fraud, waste and abuse was brought to her attention **(EXHIBIT 1)**. On July 23, 2020, the DHS OIG declined the matter and referred it to the FEMA OPR for investigation **(EXHIBIT 2)**.

**[INVESTIGATOR'S NOTE**: This investigation was one of many which originated by these complaints being looked at in parallel investigations by the DHS OIG, DHS Whistleblower Unit and OPR.  This investigation identified and focused on the actions of COR Gretchen CARRIERO.**]**

**[INVESTIGATOR'S NOTE: According to the Lean Six Sigma Institute (LSSI),  LSS provides knowledge and guidance on implementing continuous improvement, culture change, methodologies, and tools to achieve significant improvements in speed and quality in providing product and services to their customers.]**

*Interview of Mark Rozycki, Contractor*

On August 5, 2020, Investigator Michael K. Tenant conducted an interview with  Mark Rozycki, Contractor via Microsoft Teams (MT) audio. Prior to the interview, Rozycki reviewed and signed a Non-Disclosure Agreement (NDA) and returned a signed Official Declaration form after his interview **(EXHIBIT 3)**. The following is a summary of the information provided by Rozycki:

- Rozycki was an independent contractor for FEMA in Puerto Rico (PR) in June 2018 as a Lean Six Sigma (LSS) Blackbelt. Rozycki's team in PR utilized the best practice of LSS methodology for structured strategic and tactical continuous process improvement.  Rozycki said he led a team in the implementation of the LSS methodology to support performance analysis and aggressive improvement objectives for the Hurricane Maria Recovery Effort (DR-4339) and was in this position from June 2018 until May 2019.
- Rozycki said the statement of work (SOW) for contract JSFE80-16-A-0004, Task Order 70FB8018F00000070, was "systemically mismanaged in several areas involving contract deliverables by FEMA and ATCS, the prime contractor hired to provide LSS services at DR-4339.
- Rozycki reviewed the SOW after being on-site for about a month and realized in July 2018 that some of the work he and his LSS team were tasked with, was not in compliance with the project or the SOW.  Rozycki said the SOW did not match what FEMA wanted the LSS contractors to accomplish and that the SOW had to match what the Chief of Staff (COS), Ana Bonilla, was asking to be done.

FEMA - C000002

- Rozycki developed a presentation to point out the discrepancies, notified Bonilla and the Program Manager, whose name he did not recall, and explained how the SOW was supposed to operate. Rozycki recalled having to explain it to Bonilla because she (Bonilla) did not have experience with government contracts.
- Rozycki reported FEMA staff mismanaged and wasted funds on DR-4339 through non-adherence to the SOW; specifically, the LSS team was forced to ignore the SOW deliverables and was directed to provide work outside the scope of the contract.
- Rozycki reported between April 2018 and October 2019, "FEMA staff" (whom he could not specify) at the JRO at DR-4339 directed the LSS team's activities in "unsound and wasteful practices",  which he advised were too numerous to list.

[INVESTIGATOR'S NOTE: It was determined that ATCS provided LSS services under contract JSFE80-16-A-0004, Task Order 70FB8018F00000070 at DR-4339, Hurricane Maria.]

*Interview of Jeff Wykosky, Contractor*

On August 10, 2020, Investigator Michael K. Tenant conducted an interview of Jeff Wykosky, Contractor via MT audio. Prior to the interview, Wykosky reviewed and signed an NDA and returned a signed Official Declaration form after his interview (EXHIBIT 4). The following is a summary of the information provided by Wykosky:

- Wykosky worked as a lead technical Master Black Belt, LSS expert contractor for FEMA from October 14, 2018 until June 14, 2019.
- Wykosky said LSS is a certification program that works to teach an organization about their processes and tries to find ways to improve efficiency.  According to Wykosky, FEMA was "really in bad shape when it came to running its processes and making it work" at DR-4339.
- Wykosky said leadership at DR-4339, Mike Byrnes, Federal Coordinating Officer (FCO), wanted LSS implemented but Bonilla had no understanding and no way to support what was needed for LSS. Wykosky emphasized, in his experience, LSS is typically brought into an organization when things are not going well, when companies are losing money, and change is needed.
- Wykosky said, in his experience, LSS was ideal for DR-4339 because he observed people placed in positions without the requisite experience and training to do the job,  There were no process descriptions of how things were supposed to progress and there were no processes in place for continuity in workflow.
- Wykosky observed FEMA management, specifically Bonilla and Tamaris Aldarondo (LSS Quality Control) ignore the blatant things at the disaster that were not running well, changed reports to hide how bad things were from senior management (Byrnes), and did not allow the LSS contractors to brief Byrnes directly about what was going wrong.
- Wykosky recalled Bonilla identified herself to him as the COR during a random conversation and claimed to be responsible for the implementation of the contract.

*Interview of Barry Angeline, Contractor, Cyberricade*

On August 11, 2020, Investigator Michael K. Tenant conducted an interview of Barry Angeline, Contractor with Cyberricade via MT audio. Prior to the interview, Angeline reviewed and signed an NDA and returned a signed Official Declaration form after his interview (EXHIBIT 5). The following is a summary of the information provided by Angeline:

- Angeline was a Contractor for Cyberricade, sub-contracting on behalf of Novaces, a sub-contractor to ATCS.  Angeline advised he instructed a consistent body of knowledge to identify processes within an organization to improve productivity
- Angeline advised he provided LSS training for FEMA at DR-4339 in PR from July 8, 2018 to May 24, 2019.
- Angeline arrived in PR and reviewed the SOW provided to him by Louis Alavares, LSS Project Manager at the time **(EXHIBIT 6).** Angeline said Alavares was in PR for 3 months prior to his arrival.  Angeline recalled the SOW required him to hire Master Black Belts (MBB) with specific experiences and qualifications to complete the projects requested within a set timeline, however, this was not possible due to FEMA's structure.
- Angeline observed Alavares assign contractors to projects outside of the SOW to try to meet timelines.
- Angeline said he realized how off-track the contractors were, reported the information to Bonilla, and provided a presentation to her, Alavares, and Peter DeJong, a  Project Manager for ATCS, in an attempt to get the program back on track.
- After the presentation, Alavares resigned.  Bonilla asked him (Angeline) "what optics could be done" to get back on track.  According to Angeline, Bonilla instructed him to put a program in place for a sustainable process that would have FEMA staff trained and proficient in LSS after the contract ended.
- Angeline said this demand was different from the SOW, as the original SOW had no requirement to train, mentor, certify, etc.  Angeline said these new demands expanded the scope of the SOW and doubled or tripled  the original requirements of the SOW.
- Angeline said Bonilla opted for a full deployment of the LSS program and he warned her that an implementation on this scale would take approximately 2 years to implement.
- Angeline said ATCS was not able to comply with these new needs and subcontracted the requisite tasks to four second-tier subcontractors, who in turn subcontracted to three third-tier subcontractors.
- Angeline requested Bonilla change the SOW and she ignored his requests up until the end of the contract
- Angeline said he made repeated attempts to contact Gretchen CARREIRO and she ignored all emails related to contract irregularities.

*Interview of William Haveman, Contractor for Judge Group*

On August 12, 2020, Investigator Michael K. Tenant conducted an interview of William Haveman, Contractor via MT audio. Prior to the interview, Haveman reviewed and declined to provide a signed NDA. Haveman returned a signed Official Declaration form after his interview **(EXHIBIT 7).** The following is a summary of the information provided by Haveman:

- Haveman worked for the Judge Group, sub-contractor to Guide House, sub-contractor to ACTS, on DR-4339.
- Haveman's duties included working in PR from May 2018 through June 2019 to conduct training in LSS, build a culture of LSS, map all processes being used in FEMA, and incorporate everything into one process guided by the LSS concepts.
- Haveman observed non-adherence to the SOW by LSS contractors who worked on DR-4339.  Haveman observed contractors who were initially hired as trainers and consultants end up acting as project consultants.  Haveman said the contractors were told to complete a full launch

of the LSS training program as opposed to what was included in the SOW, which was to provide awareness training of LSS.
- Haveman said contractors were supposed to be MBBs to participate in this project and many of the subcontractors brought in were not of the MBB designation in LSS.
- Haveman said despite his efforts to inquire, he was not informed of who the named COR was on the contract and was consistently prevented by unnamed FEMA staff from completing his tasks with on the contract for a variety of personal reasons which he did not specifically name.
- Haveman insisted he perceived Bonilla and Aldarondo were only concerned with keeping any bad information away from Byrnes.

### Interview of Mark Woodhouse, Contractor with NOMUDA

On August 28, 2020, Investigator Michael K. Tenant conducted an interview of Mark Woodhouse, Contractor with NOMUDA via MT audio. Prior to the interview, Woodhouse reviewed and signed an NDA and returned a signed Official Declaration form after his interview **(EXHIBIT 8).** The following is a summary of the information provided by Woodhouse:

- Woodhouse worked as a contractor with NOMUDA, who subcontracted for CPI, who was a subcontractor for ATCS .
- Woodhouse was contracted to instruct and lead/support FEMA green belt and black belt teams on projects through the LSS series implementation at DR-4339 beginning in February 2019.
- Woodhouse said FEMA asked the LSS contractors to complete projects not covered under the SOW without revising it .
- Woodhouse said FEMA and ATCS (the prime contractor) were notified several times to have the SOW revised but took no action.
- Woodhouse reported, in his experience on a number of projects, he believed someone (possibly Bonilla or Aldarondo) in FEMA leadership was mismanaging contractors in the performance of their LSS duties by requiring them to perform work outside the SOW. Woodhouse stated he considered the mishandled of the contract by FEMA leadership gross mismanagement.
- Woodhouse never met or received notification as to who the COR was for his contract or SOW.

### Interview of Michael Oshaben, Contractor with ATCS

On August 28, 2020, Investigator Michael K. Tenant conducted an interview of Michael Oshaben, Contractor with ATCS via MT audio. Prior to the interview, Oshaben reviewed and signed an NDA and returned a signed Official Declaration form after his interview **(EXHIBIT 9).** The following is a summary of the information provided by Oshaben:

- Oshaben said he worked for ATCS as an employee at the time of LSS implementation for 15 months on the FEMA contract at DR-4339 from May 2018 – July 2019.
- Oshaben advised, during the LSS implementation, critical issues were identified.  FEMA management was not only notified, but was not receptive and actively worked against developed improvements that highlighted those flaws
- Oshaben accused FEMA management (who) of data manipulation in the Grants Manager (GM) system. Oshaben observed in GM a greater number of projects were reported as complete but were actually never completed.
- Oshaben observed FEMA employees (Program Analyst Eli Pushkarewicz and Tammy [Tamiris] Aldarondo) sabotage any improvement on every level of the management structure.

**FEMA - C000005**

- ATCS informed Oshaben that neither he nor the other LSS contractors could directly contact the FEMA COR for the contract and any problems had to be communicated through ATCS. As a result, Oshaben said LSS contractors were prevented from directly reaching out to the COR.
- Oshaben opined that ATCS just wanted to bill FEMA for compensation regardless of what the SOW required.
- Oshaben said he and others in the LSS team of contractors saw the SOW after being at DR-4339 for 4 or 5 months. Oshaben said once the contractors realized they were not following the SOW, they notified ATCS in writing in October or November 2018. Angeline asked ATCS to change the SOW to reflect the work being performed. Bonilla, Pushkarewicz, and Aldarondo were also notified but took no action to re-write the SOW.

*Interview of Justo Hernandez, Operational Coordination Division Director/SES*

On September 14, 2020, Investigator Michael K. Tenant and Investigator Mara Lederer conducted an interview of Justo Hernandez, SES, Operational Coordination Division Director, via MT audio. Prior to the interview, Hernandez reviewed and signed an NDA and returned a signed Official Declaration form after his interview **(EXHIBIT 10).** The following is a summary of the information provided by Hernandez:

- Hernandez served as a Team Leader and then Deputy FCO until July 19, 2019 at DR-4339 and coordinated the Federal response with the Governor in PR.
- Hernandez said ATCS was the prime contractor and Novaces was one of the subcontracting companies who provided LSS.
- Hernandez said Byrnes, the FCO at the beginning of the disaster, pushed to have LSS implemented at DR-4339, but (Hernandez) was not involved or engaged in the process to bring in LSS support.
- Hernandez observed FEMA personnel express frustration with LSS contractors because FEMA personnel were engaged in getting disaster assistance to the public while contractors were trying to understand every detail of the process. Hernandez believed frustration from FEMA personnel occurred because LSS contractors wanted them to stop what they were doing and engage with the contractors to illuminate bureaucracy.
- Hernandez observed frustration from the LSS contractors with FEMA personnel because contractors did not know FEMA processes, contractors were trying to learn the process in order to evaluate, and FEMA personnel staff did not engage with LSS contractors to explain everything.
- Hernandez believed FEMA staff did not have the time to sit down and lay out processes for contractors while simultaneously carrying out the mission of saving lives at the disaster.
- Hernandez opined resistance to the LSS implementation boiled down to having the right intentions but at the wrong time, meaning if the LSS team were knowledgeable of FEMA at a time other than recovery mode, LSS implementation may have worked.

**[INVESTIGATOR'S NOTE:** The case activity was temporarily suspended from September 24, 2020 until October 26, 2020 at the request of the DHS Whistleblower and Retaliation Unit to ensure coordination of simultaneous investigations. During this time, investigation determined Byrnes and Bonilla were no longer employed with FEMA and neither responded to requests for interviews. Two investigators interviewed Aldarondo because allegations were reported against him in FEMA OPR 20200564 and 20200565.**]**

*Interview of Tamiris Aldarondo, Program Analyst, Continuous Improvement Team, DR-4339*

FEMA - C000006

On October 27, 2020, Investigators Michael K. Tenant and Mara Lederer conducted an interview of Tamiris Aldarondo, Program Analyst, Continuous Improvement Team, via MT audio. Prior to the interview, Aldarondo reviewed and signed an NDA and returned a signed Official Declaration form after her interview **(EXHIBIT 11).** The following is a summary of the information provided by Aldarondo:

- Aldarondo served as the Team Lead on the Continuous Improvement Plan (CIP) Team when the LSS contractors started at DR-4339. In May or June 2019, Aldarondo  became the Acting CIP Unit Lead with an assigned additional responsibility of performing Task Monitor duties for the LSS contract.  Aldarondo noted she became the permanent Unit Lead after June 2020.
- Aldarondo  identified issues with LSS contractors' performance and conduct while on site and worked closely with ATCS Project Manager Victoria Colmenero to address work problems, such as deadlines, implementation processes and progress.).  However, Aldarondo said she did not want to have visibility in anything related to the internal decisions of the contract and anything else addressed by the COR.
- Aldarondo reported  instances of contractors not following protocols.  She believed they attempted to undermine her authority by going over her head to speak directly with the FCO or Chief of Staff. Aldarondo also reported contractors changed their duty station without permission and took credit for work completed by the Public Assistance (PA) Operations team. Aldarondo said the contractors' actions were part of a pattern of documented detrimental conduct.
- Aldarondo recalled members of the LSS contract team approached her directly with problems instead of going through their chain of command for resolution and assistance. Aldarondo often had to spend additional time to loop the LSS contract team management in on the issues brought to her attention.
- Aldarondo said she and Bonilla worked hard to help the LSS team develop training that was adaptable and compatible to the realities of a FEMA disaster operation; however, the LSS team insisted on forcing rigid requirements they used in the private sector.  These methods were incompatible with FEMA needs.
- Aldarondo said the main goal of the LSS training was to give FEMA employees some knowledge and tools for process improvement to be used where appropriate.  Training was not supposed to compete with priorities in field operations.

### *Interview of Gretchen CARREIRO, Program Specialist/COR*

On November 24, 2020 Investigators Michael K. Tenant and Mara Lederer conducted an interview of Gretchen CARREIRO, COR, via MT audio. Prior to the interview, CARREIRO reviewed and signed an NDA, a Warning Acknowledgement, a Weingarten's Rights form and returned a signed Official Declaration form after her interview **(EXHIBIT 12)**. The following is a summary of the information provided by CARREIRO:

- CARREIRO confirmed her duties were to oversee contracts from various agencies in her directorate. She was the COR from May 2018 through August 2019 in the implementation of LSS under FEMA Contact HSFE80-16-A-0004, Task Order 70FB8018F00000070.
- CARREIRO characterized her involvement as the COR for Coordinating and Planning Partners (CAPP)- 2 large businesses (ATCS and AECOM) joined with 27 smaller sub-contractors to provide services.  Services provided were covered under a Blanket Purchase Agreement (BPA).  In this instance, FEMA issued lots of task orders because work with CAPP

FEMA - C000007

was a very broad scoped BPA.  CARREIRO said she was the COR assigned to any task order issued off this BPA.

- CARREIRO said it was her job to get any "package" to the Contracting Officer (CO) for action.
- CARREIRO dealt with Rashaan Edwards, CO and Karley Hoyt, Contracting Specialist (CS). CARREIRO said, once the CO approves the task order package, it moved forward to be awarded to the contractor/vendor.
- CARREIRO said she was never notified by any LSS Contractor, sub-contractor, or other reporting party about any dramatic increase in the SOW.   Any increase/modification in the SOW would have to be officially approved by the CO. CARREIRO believed a SOW modification was done on the contract, however it was completed towards the end of the contract by the CO, Rahsaan Edwards, in July 2019.
- CARREIRO recalled she was contacted by an LSS contractor in January 2020 about unspecified issues "regarding federal acquisition regulations and gross mismanagement/possible fraud related to the contract" and forwarded the information to the Karley Hoyt and Armetia Cato, the new CO **(EXHIBIT 13)**. CARREIRO noted any allegation such as this was first sent to the CO for discussion and follow-up.
- CARREIERO said it was inappropriate to speak with any contractor directly because CORs do not directly interact with contractors working for FEMA. CARREIRO said, other than the emails she received after the contract ended, she did not recall being  contacted by a LSS contractor about any other issues during the implementation of LSS services.
- CARREIERO advised she was again contacted by Angeline via email. CARREIERO believed Angeline's email to her was inappropriate so she did not respond **(EXHIBIT 14).**

[**INVESTIGATOR'S NOTE**: According to CARREIRO, she forwarded the email contained in EXHIBIT 13 to Armetia Cato and Hoyt for action because Cato had taken over for Edwards as the CO and was now the new supervisor over Hoyt.]

*Interview of Rahsaan Edwards, Deputy Director*

On November 25, 2020, Investigators Michael K. Tenant and Kenneth Doyle conducted an interview of Rahsaan Edwards, Deputy Director, via MT audio. Prior to the interview, Edwards reviewed and signed an NDA and returned a signed Official Declaration form after his interview **(EXHIBIT 15).** The following is a summary of the information provided by Edwards:

- Edwards confirmed he is the Deputy Director for disaster and field operations for the Acquisitions Operations Division (AOD) and handled all disaster procurements.
- Edwards said he was the COR for FEMA Contract HSFE80-16-A-0004, Task Order 70FB8018F00000070 and his only duty was to award the contract.
- Edwards said a review of his incident report files for this contract indicated there were no modifications to the SOW other than adding funding and exercising options periods.  Edwards explained that exercising options periods, in layman's terms, meant  continuing funding for an ongoing project as it approached a deadline.
- Edwards said there was an email from the CO to the COR, dated August 21, 2019, with complaints from a team of LSS contractors about mismanagement of the SOW by FEMA and ATCS, violations of the prompt payment act, and mismanagement of funds.
- Edwards said this email exchange appeared in the file well after he left and after the contract at DR-4339 ended.  Edwards said he had nothing in his files prior to that email exchange.

FEMA - C000008

- According to Edwards, the LSS contract expired on June 30, 2019 as the government exercised its option to not renew at the end of a contract modification.

Investigator Tenant reviewed an email thread obtained through investigation that documented Angeline notifying Edwards of "multiple irregularities related the Federal Acquisitions Regulations and allegations of gross mismanagement and possible fraud" dated January 24, 2020.  Edwards advised Angeline he was no longer involved in the contract and did not have access to the files. The thread ended in March 2020 with Edwards frustrated not to have answers to his inquiries **(EXHIBIT 16).**

<u>Review of DHS Management Directive</u>

DHS Management Directives System, MD Number 0480.1, Ethics/Standards of Conduct, VI. Policy & Procedures, A, 5, 11 states in part, to ensure that every citizen can have complete confidence in the integrity of the Federal Government, each Federal employee must respect and adhere to the principles of ethical conduct set forth below. Employees should… 5. Put forth an Honest effort in the performance of their duties and 11. Disclose waste, fraud, abuse, and corruption to appropriate authorities **(EXHIBIT 17).**


**SUMMARY**

**Allegation 1: - Failure to Perform Official Duties - UNFOUNDED**

**Findings:** The investigation was unable to develop a preponderance of evidence to support that CARREIRO failed to perform her duties as a COR.  The contract in question ended in 2019. T CARREIRO was not notified about any improper actions during the active life of the contract and when she did receive allegations, she forwarded them to the responsible Contracting Officer.
 **Allegation 2: - Failure to disclose waste, fraud, abuse and corruption to appropriate authorities - UNFOUNDED**

**Findings:**  The investigation was unable to develop evidence to support that CARREIRO failed to disclose allegations of fraud, waste abuse or corruption to the responsible personnel. The LSS contract ended in 2019.    CARREIRO was not notified about any improper actions during the active life of the contract.  CARREIRO explained that CORs do not directly interact with contracted workers hired to provide services to FEMA. When CARREIRO received an email directly from a contract employee that read in part "…concerns that a contract under your watch has multiple irregularities related to the Federal Acquisition Regulations…Are we able to discuss?" , she forwarded that email to the person best suited to address and follow up on this matter, which was the Contracting Officer. CARREIRO declared any allegations of waste, fraud, abuse or irregularities with contracts were sent to the Contracting Officer for discussion and follow up actions as outlined in DHS Management Directives System, MD Number 0480.1, Ethics/Standards of Conduct, VI. Policy & Procedures, A, 11.

| | **DEPARTMENT OF HOMELAND SECURITY**<br>**Federal Emergency Management Agency**<br>**Office of Professional Responsibility** | **1. CASE NUMBER**<br>20200490 |
| --- | --- | --- |
| | | **2. PREPARED BY**<br># Tenant, Michael |

**FEMA - C000009**

|  | **REPORT OF INVESTIGATION**<br>**Exhibit List** | **3. REPORT NUMBER**<br>001 |
|---|---|---|

Exhibit 1    Notification of Complaint to OPR, dated February 4, 2020
Exhibit 2    DHS OIG Letter of Declination, dated July 23, 2020
Exhibit 3    Non-Disclosure Agreement, dated August 4, 2020, and Official Declaration  Form, dated August 6, 2020, signed by Mark Rozycki
Exhibit 4    Non-Disclosure Agreement, dated August 10, 2020, and Official Declaration Form, dated September 21, 2020, signed by Jeff Wykosky
Exhibit 5    Non-Disclosure Agreement, dated August 5, 2020, and Official Declaration Form, dated September 8, 2020, signed by Barry Angeline
Exhibit 6    Email accompanying SOW provided by Barry Angeline
Exhibit 7    Official Declaration Form, dated October 22, 2020, signed by William Haveman
Exhibit 8    Non-Disclosure Agreement, dated August 4, 2020, and Official Declaration Form, dated September 14, 2020, signed by Mark Woodhouse
Exhibit 9    Non-Disclosure Agreement, dated August 27, 2020, and Official Declaration Form, dated September 28, 2020, signed by Michael Oshaben
Exhibit 10  Non-Disclosure Agreement, dated September 11, 2020 , and Official Declaration Form, dated September 14, 2020 , signed by Justo Hernandez
Exhibit 11  Non-Disclosure Agreement, dated September 14, 2020 , and Official Declaration Form, dated September 28, 2020, signed by Tamiris Aldarondo
Exhibit 12  Non-Disclosure Agreement, Warning Acknowledgement Form, dated November 23, 2020 , and Official Declaration Form, dated November 25, 2020, signed by Gretchen CARREIRO
Exhibit 13  Email from Barry Angeline to Gretchen CARREIRO
Exhibit 14  Email from Barry Angeline to Gretchen CARREIRO
Exhibit 15  Non-Disclosure Agreement , dated November 23, 2020, and Official Declaration Form, dated November 25, 2020, signed by Rahsaan Edwards
Exhibit 16  January 2020 email thread between Barry Angeline and Rahsaan Edwards
Exhibit 17  DHS Management Directive (MD) 0480.1, Ethics/Standards of Conduct

**FEMA - C000010**

Text of Allegation of Fraud, Waste, Mismanagement and Abuse made by the LSS Team in Puerto Rico Contract HSFE80-16-A-0004

This is a Team complaint from Clifford McCabe (503-999-1234); Barry Angeline (703-994-6832), Jeff Wykosky (610-742-6472); Mark Rozycki (703-457-2270); Mark Woodhouse (770-843-7372); Mike Oshaben (202-674-1091) and William Haveman (810-247-0907).  The following issues relate to contract HSFE80-16-A-0004, Task Order 70FB8018F00000070.  The prime contractor is ATCS PLC. ATCS has both mismanaged this account and has possibly engaged in fraudulent activities.  These issues were brought to the attention of the CORs, Gretchen Carreiro and Rahsaan.  Both ignored our concerns about this contract.

The concerns can be summarized at follows:

1.  A dramatic increase was made to our statement of work.  The scope of our activities was more than doubled, yet repeated request to ATCS to modify the contract were ignored.  In fact, we were reprimanded for even bringing the issue up with FEMA and qwere ordered never to discuss it with them.  Similarly, the Chief of Staff for FEMA in Puerto Rico, refused to address the deviation from the SOW.  The deviation lasted from August 2018 through May 2019.  The team was forced to work at risk the entire time.

2.  ATCS routinely staffed the program with people who lacked the requirements set forth in the SOW.  The requirements for key personnel was explicit and they were ignored by ATCS in an effort to vastly increase profit margins.

3.  ATCS regularly violated the Anti-Deficiency Act.  Specifically, they forced team members to provide the government intellectual property (i.e., training, tools, and template) owned and generated by team members prior to this engagement.   The intellectual property was well outside the original SOW.  Some of the personally developed training materials were previously sold for over $100,000 to private companies.  On several occasions, ATCS falsely claimed they had the SOW adjusted to obtain intellectual property from team members.  This material could then be given to FEMA or used on future ATCS contracts.

4.  ATCS structured the contract with an excessive number of pass throughs.  The contract only 6-8 consultants on it.  Similar contracts usually use only one or two vendors.  ATCS used four subcontractors who in turn used an additional four subcontractors.  ATCS did not provide strategy, staffing intellectual property, tools, templates or software required.  They also did not manage the SOW nor did they pay contractor expenses or labor in a timely manner.  According to the FAR, when more than 70 percent of a contract is outsourced, justification needs to be made.  ATCS served almost exclusively as a disengaged pass-through entity.  The consultants and intellectual property were mostly provided by the third level sub=contractors.  While FEMA was being paid roughly $260/hour by FEMA, the actual consultants hired were sometimes only being paid as little as $75/hour.  The pass throughs profits equaled about 50 percent of the rates FEMA paid.

5.  ATCS had people doing back office support who were not doing any work on the contract.  Several people we had never heard of were accidentally found on the "call down list."  ATCS tried to hide this list after its release was discovered.

6.  ATCS padded the contract with unnecessary back office support.  Again, ATCS provided no training, staffing, strategy, and didn't manage the SOW.  The two people they sent to Puerto Rico lacked any qualifications and mainly did "busy work."  There was also considerable program management support.  It is estimated that the support I Puerto Rico and in the back office

February 4, 2020

**FEMA - C000011**

Text of Allegation of Fraud, Waste, Mismanagement and Abuse made by the LSS Team in Puerto Rico Contract HSFE80-16-A-0004

exceeded 500 hours per month.  For comparison, an almost identical contract worked on at the USMC typically billed about 100 hours per month in administrative support.

7.  ATCS colluded with another sub-contractor, Guidehouse.  We believe they traded heads on different contracts and attempted to influence and inflate billable hours on projects to benefit one another.  On more than one occasion, ATCS falsified reports to Senior Leadership to protect Guidehouse on other projects.  ATCS used our team's extensive knowledge of FEMA operations to gain competitive advantage on other contracts and create additional work for themselves.

8.  ATCS and FEMA both violated the Prompt Payment Act.  It was not uncommon to have expenses and pay for labor withheld for up to eight months.  Sometimes contractors' expenses totaled $40,000 without reimbursement.  ATCS actually tried to retain an employee who wanted to switch to independent contractor status by bragging that they willfully withheld independent contractor payments for 90 days to manage cash flow.  He said being an employee ensured he would be paid promptly.

9.  The is a high probability that ATCS withheld and manipulated an excessive amount pay by claiming it was withheld to pay the Puerto Rico Hacienda tax.  The amount withheld was likely inflated/skimmed.

February 4, 2020

**FEMA - C000012**

**Tenant, Michael**

| | |
|---|---|
| **From:** | Hotline <Hotline@oig.dhs.gov> |
| **Sent:** | Thursday, July 23, 2020 12:24 PM |
| **To:** | FEMA-Misconduct |
| **Subject:** | C20-FEMA-SNJ-08614 |
| **Attachments:** | C20-FEMA-SNJ-08614 - SummaryReport.pdf; C20-FEMA-SNJ-08614 - 25848_20200204204331_OIG9.pdf |



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security
### Washington, DC 20528 / www.oig.dhs.gov

The attached information is furnished for whatever administrative action or inquiry you consider appropriate.  Should your office take any administrative or personnel action in response to this information, you are requested to report the final result of that action within 30 business days of its conclusion.

If your review of this matter discloses evidence of previously unreported criminal misconduct that is reportable under Management Directive 0810.1, you are required to notify this office of that information before any additional investigative steps are taken.

1

FEMA - C000013

DEPARTMENT OF HOMELAND SECURITY
**Federal Emergency Management Agency**

## OFFICIAL DECLARATION

Name: Rozycki, Mark                    Position: Independent Contractor

Organizational unit assigned: Lean Six Sigma Huuricane Recovery Efforts Puerto Rico

Work phone: +1 (706) 457-2270    Email address: markrozycki@gmail.com

Work address:

### STATEMENT

Question:  Do you understand the non-disclosure agreement that you reviewed and signed?
Answer:  Yes, I do

Question:  Who is your current employer?
Answer:  Independent Contractor (1099 for FEMA while I worked with FEMA)

Question:  Briefly describe your duties.
Answer:  I started in PR in June 2018 as a Lean Six Sigma Blackbelt, by January 2019 I was the Program Manager for the Lean Six Sigma Team.  The team established the Lean Six Sigma (LSS) program that utilized the best practice LSS methodology for structured strategic and tactical continuous process improvement. Led a team in the implementation of the LSS methodology to support performance analysis and aggressive improvement objectives for the Hurricane Maria Recovery Effort set by FEMA's leadership. Operated in coordination with the FEMA senior leadership to analyze, monitor, and assess critical activities affecting recovery policy, organizational guidance, and developmental processes
Question:  How long have been in your current position?
Answer:  I was in this position for PR from June 2018 until May 2019
Question:  In your own words, describe the nature of your complaint.
Answer:  The main issues are that statement of work (SOW) for contract HSFE80-16-A-0004, Task Order 70FB8018F00000070, has been: systematically mismanaged in several areas involving contract deliverables by both FEMA and ATCS; ATCS PLC has engaged in illegal withholding of contracted funds to subcontractors, in violation of the Prompt Pay Act (PPA); and that FEMA Staff has engaged in unethical (possibly fraudulent) conduct regarding the tracking of expenditure of funds. The allegations we are making as a team included gross mismanagement of a financial contract, gross mismanagement of funds, abuse of authority for a contract or grant, EEO violations (lack of diversity and sensitivity on the part of FEMA managers Eli Pushkarawicz and Tamaris Aldarondo), violation of laws governing FARS, retaliation for making complaints by FEMA management in PR (Aldarondo and Director of the JFO- name unknown) and the prime contractor.
IIn June 2018 I asked the PM at the time, Luis Olivares if he had a copy of the contract's Statement of Work (SOW).  His comment to me was what is the Statement of Work. He was unable to provide the team with the SOW.  FEMA management nor the PM could provide us with a copy of the SOW. We looked for the SOW for one month and found it in July 20188. A team member and I reviewed the SOW to determine the contractual stipulations. I compared the SOW to what the team was being tasked to accomplish. We were not in compliance with what we were being asked to do on the project.  I notified my team and we developed a presentation to point out the discrepancies and to notify them that this would place us out of compliance.  I advised the Program Manager who was a FEMA hire and Ana Bonilla (Chief of Staff) and explained how the SOW is supposed to take place.

Initials: _____

FEMA - C000014

DEPARTMENT OF HOMELAND SECURITY
Federal Emergency Management Agency

## NON-DISCLOSURE NOTICE MEMORANDUM – NON-FEMA EMPLOYEES

You are assisting in an ongoing official inquiry being conducted on behalf of the Federal Emergency Management Agency (FEMA). As this inquiry is sensitive in nature, FEMA is requesting that you not disclose information relating to this official inquiry to any other person(s), except as may be appropriate under applicable law.

The disclosure of information related to this case could impede the investigation and hamper investigative efforts.

Your compliance with this non-disclosure notice is appreciated. These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.

Mark L. Rozycki
_____
Print Name

Mark L.
Rozycki

Digitally signed by Mark L.
Rozycki
Date: 2020.08.04 13:58:29
-04'00'
_____
Signature

08/04/2020
_____
Date

**FEMA - C000015**

Name:  Rozycki, Mark

Bonilla had no experience with government contracts and I explained what we could not do and what we were allowed to do, including what the SOW calls for.  Ms. Bonilla advised us what she wanted to be done and it conflicted with the SOW. During this time, Mr. Oliveras blindly fired or forced 4 contractors to resign which destabilized the team no cause for this action was shared and he did not have the authority to fire contractors.  I asked to speak with the COR or COTR. Neither could be identified.  Mr. Oliveras asked me what is a COR and a COTR. Two weeks later the prime contractor senior vice-president came to PR to speak with the team and have dinner (Tim McCormick).  I told Mr. McCormick that the SOW did not match what FEMA wanted us to accomplish. Adding the additional work would place the team 3-4 months behind schedule.  The team would need to develop training Green/Black Belt training that focused solely on the FEMA and the hurricane recovery efforts. McCormick told me not to talk to the COS or anyone else from FEMA about this anymore.  My team had to do what the COS asked us to do without any other pushback. In November 2018 a new program manager Raymond Kulish was sent to PR to make sure the SOW was appropriately amended to reflect what FEMA wanted to be done.  After performing briefly, Rock was fired; I was made the program manager.  After a year of these battles, nothing was getting done.

Waste, Fraud, Mismanagement
FEMA Staff has engaged in unethical (possibly fraudulent) conduct regarding the tracking of expenditure of funds. The first allegation involves mismanagement and waste through non-adherence to the SOW. In July 2018, the Chief of Staff, FEMA Office, Puerto Rico redirected that the LSS Team should provide work that would be outside the scope of the contract.
ATCS (Prime Contractor) specifically directed the LSS Team to ignore the SOW deliverables, made possible due to a lack of oversight on the ground by the COR, COTR, ATCS, or a combination of the three entities.

As a result, this allowed FEMA Staff at the JRO in Puerto Rico to direct the Team's activities in unsound and wasteful practices over the last year (Contract awarded in April 2018 through October 2019).
ATCS provided gross mismanagement of the contract to include neglecting contract oversight, providing unqualified personnel for positions outlined in the SOW, and we believe putting personnel on the contract for pay, which may have fraudulently been associated with the contract.
The third allegation through the neglect of the COR, COTR, FCO, and FEMA Staff is that FEMA has completely mismanaged the contract. Mismanagement of the contract began with the hiring of a local person as the Program Manager who was not qualified. As an example, he did not know who the COR and COTR were nor what they did.  He was unaware that there was a Statement of Work that directed our project.
In 2018, FEMA mandated a percentage of personnel working on the disaster, had to be local hires.  Very little to no experience skill sets were had by the local hires hired.  Our team of 7 were immersed in the FEMA processes of this disaster operation-many of the local hires who did not have FEMA disaster experience or construction experience.  With little training, they were sent out to do complete building inspections that could not be done with the level of training and lack of experience they had.  We held a class for school inspectors ( there were over 100 schools in PR)and discovered that hires were overly obese, working from crutches, and other handicaps that could not have the physical abilities to do what was required (climbing, extended standing, etc) to perform inspections.  There was also very high attrition/staff turnover.  It takes over 3 years to develop into level 1 management officials and 5 years to develop level 2 management

Initials: _____

FEMA - C000016

Name:  Rozycki, Mark

officials.  Within months of being hired, inexperience and ill-prepared local hires were promoted and expected to perform these tasks without the required skill sets

The LSS team had 50 projects for the recovery effort in the JRO conducted by the FEMA employees in PR.  The combined total of the projects ranged from 12 million to 100 million dollars.  Our team was terminated in favor of these projects being handled by the inexperienced FEMA staff.  We developed the digital site inspection tool which would have saved tens of thousands of dollars and hundreds of man-hours in the conduct of site inspections.

Retaliation:

The retaliation was taken immediately following going public as EEO complainants with Tamaris Aldarondo on May 17.  Messrs. Angeline and Rozycki were targeted since they led the effort to document violations. This led directly to their subsequent termination on May 23. This claim seeks to further extend these claims for the entire team whose contract was prematurely terminated less than a month later.

MMs. Aldarondo has suppressed the original email shown in section A1. We suspect that she was actively working with the prime contractor to retaliate against Messrs. Angeline and Rozycki. Therefore, on May 23, Mr. Angeline forwarded the email sent to Ms. Aldarondo to the Senior Leadership at FEMA. Several weeks later, the entire contract terminated. The timing is suspect for several reasons.

First, at a meeting with the chief of staff (Ana Bonilla) on April 23, four black belts presented their projects. She was so impressed that she gave them a standing ovation and stated that she would request all the Champions, currently sponsoring projects, to come to the final day of Blackbelt Training to see the final classroom presentations of the projects. This was to take place the following week on April 30.

In addition to the fore-mentioned EEO violations by Ms. Aldarondo, she also engaged in abuse of the program for her benefit. The EEO violations, coupled with documentation of the toxic work environment and program malfeasance, prompted the subsequent retaliation following disclosure on May 17. The EEO violations influenced her attitude towards the program and hostility towards our mission culminating in premature program termination. During the final week of training, Ms. Aldarondo, who was both a student and the leader of the group we reported to, was actively working with an ATCS representative to obtain a copy of the final exam for which she would be the beneficiary. It is important to note that Ms. Aldarondo had missed approximately 75% of the classroom instruction and had done very little towards the completion of her specific project.

She missed a whole week of instruction to study for her law school midterm exams. As part of the black belt course, she had a requirement to present her project to the class and FEMA leadership. Ms. Aldarondo would also have to take a required comprehensive examination after the last class. Her actions were:

• She requested, through ATCS, to move the testing out several months,
• She suggested that the course rigor be reduced;
• She suggested that the certification requirements be relaxed;
• She suggested that project completion requirements be reduced.
• She also had the review by the Champions, scheduled for the last day of class, eliminated.  These efforts were done to prevent embarrassment for her.  She was ranked last in the class.

At the end of each of the four-week instructional sessions, the students were given a class evaluation form to fill-out. This is an anonymous questionnaire to protect the student from any notion of retaliation. The students gave the class positive responses.

Initials: _____

**FEMA - C000017**

Name:  Rozycki, Mark

We asked the students to provide us with an anonymous end of course evaluation. They were overwhelmingly positive. To undermine the program, Ms. Aldarondo also
conducted a secret survey of the selected students we had taught and mentored. She refused to divulge the outcome of this survey. We later found out that the results were overwhelmingly positive. She declined to share the results with us. The narratives for both the training and the survey supported expanding the program. All indications by the students and chief of staff suggested the program was very well received.
Puerto Rico's Central Office for Recovery, Reconstruction, and Resiliency (COR3) also participated in the training, and on multiple joint projects. They were so impressed that they tried to organize a joint steering committee with FEMA leadership for Lean Six Sigma and wanted to initiate a similar program with our assistance.
Roughly 70 senior leaders at the recovery effort took an accelerated one-day Champions Training. Their evaluations were also extremely positive.
Ms. Aldarondo conducted a secret survey asking the people we mentored on our competence, responsiveness, knowledge, and mentoring capability as well as overall program effectiveness. When we learned of the study, she refused to share the results with us. Only through a recent FOIA request did we obtain the survey. Seventy-nine percent of the people surveyed said the program was "good" to "excellent" and said the program needed to be expanded and accelerated. Ms. Aldarondo withheld this report from FEMA Leadership since it would undermine her desire to terminate the program following our May 17 email.
The retaliatory sequence of events are as follows:

• On May 17, 2019, Ms. Aldarondo received an email notifying her that the team filed an EEO complaint due to her making frequent derogatory comments behind our backs to other program participants. This undermined our efforts and reduced program effectiveness. She sabotaged the program for two reasons: disrespect for our team due to our age, race, and gender and a need to demonstrate her lack of competence in the subject matter her program led.
• On May 23, 2019, ATCS released Barry Angeline and Mark Rozycki.
• June 15, 2019, the team contract was terminated. As a result of the contract termination, roughly 25 black belts (BB) would not be tested, which would eliminate Black Belt certification for the employees.

Additionally, the Greenbelt (GB) projects were left incomplete and eliminated any chance for GB certification. The result was wasting approximately roughly 6000 person-hours in class. The termination of fifty projects, many months of effort, and estimates of the net benefits for these projects ranged from $12M to $150M.


Abuse of Authority
It is important to highlight the composition of the Lean Six Sigma team.  The team was made up of seven Caucasian businessmen all over the age of 50.
In June 2018, the FEMA Continuous Improvement Process manager was  Eli Pushkarawicz. He was an extremely toxic leader.  His leadership was a combination of self-centered attitudes, motivations, and behaviors that had adverse effects on subordinates, the organization, and mission performance. His lack of concern for others and the.
He operated with an inflated sense of self-worth and from acute self-interest. He consistently used dysfunctional behaviors to deceive, intimidate, coerce, or unfairly punish others for getting what they want for themselves.
Instead of working as a collaborative team, Eli Pushkarawicz created a toxic environment where CIP members and other FEMA employees were not encouraged to work collaboratively

Initials: _____

FEMA - C000018

Name:  Rozycki, Mark

with LSS.

From the onset, the FEMA CIP Team Lead Eli Pushkarawicz was hostile to the LSS Team.  He often referred to us as "the old guys" and "that washed up a team of old guys," and the "straight old white guys."

Mr. Pushkarawicz continued to undermine the mission and obstruct all continuous improvement efforts through his lack of diversity insensitivity. Upon his transition to FEMA headquarters in November 2018. Ms. Tami Aldarondo assumed the responsibility for the FEMA CIP manager and assumed sole responsibility for the LSS team.

Ms. Aldarondo was a local hire.  As part of her day to day activities, she was named to be the COR for the Lean Six Sigma contract in Puerto Rico. It is important to mention this in that she does not have any continuous improvement process experience to include Lean Six Sigma (LSS) strategies.

When asked of Ms. Aldarondo was trained to be the Contracting Officer Representative, she would brush us off and essentially tell us that she was the COR.  Since November 2018, Miss Aldarondo has displayed a complete lack of understanding with regards to the LSS Statement of Work (SOW), tactical and strategic LSS operations, and the employment of LSS. On several occasions, Ms. Aldarondo referred to the LSS team as the "the old white guys" and "don't pay attention to the white guys; they have no credibility."  Many members of her team told the LSS team members in confidence the comments that she would make towards the team.

In December 2018, she was selected to attend the first LSS Black Belt training course in support of the recovery operations.  The premise for the training was to ensure that all LSS employees could provide Puerto Rico operations with a sustainable LSS program.

Black Belt training is a four-week program. To attain Six Sigma Black Belt certification, professionals require two finished projects with signed affidavits or two complete rapid improvement events with a signed affidavit.

The Six Sigma Black Belt certification generally takes between 1 to 3 months to study for and complete, depending on the organization you get your certification through. Training for FEMA is a four-month program with classes lasting five days per month. The certification consists of a theoretical element and a practical element. The full Lean Six Sigma certificate requires work in both a theoretical and practical element.

As cited earlier, Tamaris Aldarondo was selected to participate in the FEMA Black Belt training program. This training provides rigorous instruction in process improvement methodologies.  The selection criteria were strict owing to limited capacity.

She is also working full time on a law degree and is often seen working on school assignments while in LSS training.  On Monday of the third week of training, Miss Aldarondo said she could not attend the full week due to mid-terms.  Though this week was critical and involved instruction complex statistics, we committed to her that we would get her up to speed via three remedial training sessions, each lasting two hours.

The primary instructor for the Black Belt training course provided three two-hour review sessions after week three training.  These review sessions provided the students with a review of the statistics sessions that covered in week three of training.  Additionally, the LSS Team conducted a weekly standing meeting for all of the students to discuss their projects and training.

The LSS team conducted several separate two-hour sessions during walk-in consultations.  The training team also conducted over 20 hours of additional training.  During the first three weeks of training, Miss Aldarondo did not attend any of the additional training, although she missed almost three days of training in week three and another four days during weeks 1 and 2.

Also, each student has a project to complete.  She has made no progress on her project

Initials: _____

Name:  Rozycki, Mark

despite numerous efforts to help her.  She even tried to pass the project onto a colleague.  In short, she is ranked last in the Black Belt training.  When Miss Aldarondo was in training, she worked on her law school papers, emails, or spent time on the phone. Recently she approached our group and tried to delay taking the final exam by several months.  As the Manager for CIP and as the COR, she has tried to make the training less rigorous.

There exists a clear conflict of interest here.  As manager of the CIP group, she could influence changes to work products.  However, she is attempting to change the agreed-upon training and testing to prevent embarrassment for herself for her lack of effort as a student.  She even complained to the prime contractor delivering the training because it was "too hard."  We fear she will sabotage the program to prevent further embarrassment and reduce her workload.

In April 2019, she conducted an evaluation of the team "in secret."  She told her team not to mention that they were conducting this secret survey. According to her team, she said. "… those old white guys will be surprised by how they are not well respected.

The purpose of her evaluation was to ask how the LSS team conducted their projects and training.  Were they done professionally? Her sole purpose was from her questionnaires. Several members of the team stated that Ms. Aldarondo wanted to use these evaluations to derive detrimental comments.

We reminded her that she had received all the end of course evaluations.  The evaluations, all anonymous reflected well for the LSS team. She stated that "… perhaps the students were lying with regards to the evaluations."

During the first day of week 4, Miss Aldarondo left training at noon and returned to her office.  It should be noted that she had two employees who attended the Green Belt training, attended all the sessions, and passed their 90-question test with complex statistics questions.

The 2018-2022 Strategic Plan creates a shared vision for the field of emergency management.  The Lean Six team was diligent in their efforts to promote affirmative employment, a discrimination-free workplace.

The DHS Headquarters Equal Employment Opportunity (EEO) Office and FEMA strive to ensure a working environment for Headquarters employees that is free from any form of discrimination and supports them in fulfilling their mission to secure the homeland.  The success of any organization and the execution of its programs depend on effective leadership.

Diversity is an essential building block for any successful organization. Behaviors and attitudes of leaders throughout an organization shape and manage the culture of the work environment.  CIP leadership was toxic and insensitive to the diversity within their team. OOn May 17 at 3:01 pm, after sending the email cited above, a delivery receipt was obtained, but no read receipt. No mention was made of the email by Ms. Aldarondo, which was odd. On Monday, Victoria Colmenero met with Ms. Aldarondo for several hours. Ms. Colmenero's unethical actions and conflicts of interest are described in our second OIG complaint. The complaint is shown in Annex 2.

The relationship between the CIP team and ATCS was problematic at best. During the contract, ATCS routinely took actions that were out of compliance or would undermine the program for billing purposes. Attempts to identify/work with the COR/COTR were blocked. On several occasions, we were told by ATCS and FEMA that there was no COR/COTR or identified a FEMA manager as the COR/COTS.

Mr. Hui and Mr. McCormick were in Puerto Rico before I sent the email to Ms. Aldarondo. During our meetings that week, we had many discussions regarding the training, projects, etc. They commented that FEMA cited Mr. Angeline and Mr. Woodhouse on their superb

Initials: _____

FEMA - C000020

Name:  Rozycki, Mark _____

projects. During these meetings, there was never any mention of issues related to the burn rate.

On Friday, May 17, 2019, the FCO met with the Program Manager regarding the Statement of Work (SOW). The SOW did not include Black Belt training. Monday, May 20, Mr. Hui demanded that proprietary intellectual property (black belt training) that was not a part of the Statement of Work be handed over to him.

Mr. Hui claimed that Black Belt training was an addendum to the SOW. The SOW was not modified to include any training. It appears as if Mr. Hui was not telling the truth. Chris Rozycki, president of The CPI Group (sub-prime), demanded that we turn over intellectual property that belonged to a third-tier contractor, NoMuda Inc.

The intellectual property was developed before this engagement and not owned by The CPI Group. It fell well outside the SOW. Although he vociferously demanded that the intellectual property given to him, we reminded him that turning over the intellectual property violated the Anti-Deficiency Act. It was apparent that ATCS and the CPI Group were trying to secure the intellectual property that would be needed if the project was to move forward but could be lost following retaliatory action.

On Monday and Tuesday, May 20-21, Mr. Hui and ATCS were "scrambling" to fix the SOW. The project scope was dramatically expanded by FEMA, with no modifications approved by the COR. For nine months, we were ordered to ignore the non-compliant SOW. FEMA and ATCS became aware that this was part of the OIG complaint and began an effort to modify the SOW. These actions were highly unusual since we had brought up the SOW violations for nine months, and ATCS and FEMA refused to take corrective action.

On Tuesday, Mr. Hui scheduled an emergency trip to PR. This trip was highly irregular since he had just been in Puerto Rico less a week prior. During this week, Mr. Hui met with the team and informed us that the SOW was modified to include all training. According to him, "...the SOW was now compliant. "

The team found out that Mr. Hui provided us with misleading information and that the SOW was not changed. He also said the burn rate was way too high, and some people had to be released. There is no way the burn rate is too high. Since February 2019, our staff and our weekly hours had been reduced. If the burn rates were out of control, they would have been typically discovered many weeks or months in advance.

I was the first one released and was informed that I did not have enough experience. Oddly, I was the technical lead for most of the program, and I led the most projects and mentored the most people. I have twenty-five years' experience, and no performance issues ever were brought up. Furthermore, the new model for the recovery effort in Puerto Rico required expertise in process management and risk management. I was only one of two team members who had this expertise.

Instead of contacting my subcontractor, Novaces, to tell them I was to be released, Mr. Hui and ATCS released me without their knowledge. They were trying to move quickly, which is more typical of a firing.

During the discussion, I mentioned I was an OIG/EEO whistleblower. Mr. Hui said he didn't know that and proceeded with his scripted discussion. This is odd. Upon first hearing of me being a whistleblower, one would expect a change in facial expression, voice, maybe an insult, and a follow-up question. None of those occurred. He knew that I was a whistleblower.

I asked Mr. Hui when I needed to leave, and he said he said within the next hour. He informed me in the afternoon. Keep in mind, I had the most projects and of employees that I had been mentoring. To say that I was stunned was a mild understatement.

During my meeting with Mr. Hui, he stated on several occasions that this had to do with burn rates. If it were a burn rate issue and not a punitive action, I would have had time to notify people and delegate my responsibilities.

Initials: _____

FEMA - C000021

Name:  Rozycki, Mark

Oddly, Ms. Colmenero, who had no experience with Lean Six Sigma and an ATCS employee, stayed on the contract. She had no relevant experience per the SOW. The team had been informed that she would also be released, but this was not true. She has actively collaborated with FEMA in an unethical and secretive manner. On occasion, we had to lock her out of our shared drive. In April and May 2019, she deleted and altered files that could incriminate ATCS.

I was fired less than one week after announcing my whistleblower status, and two pay and expense cycles were delayed for five months. Before the retaliatory actions, no payments were ever late.

My last action at roughly 4:30 pm on the day I was released, May 23, was to inform the FCO (Tito Hernandez) and Deputy FCO Dominique Lenox, that our entire team was blowing the whistle.

I forwarded the email sent on May 17 to both. Before this forwarded email, only Ms. Aldarondo had been alerted. She and ATCS believed that by removing myself and Mark Rozycki quietly, that they could mitigate any other issues. This email significantly escalated the situation and would serve as a catalyst to pre-maturely terminate the contract several weeks later.

On July 1, Ivan Radovic, president of Novaces (the subcontractor I worked for), terminated my company's business relationship with them. He cited my complaints filed against FEMA as the reason. These complaints are protected, and retaliatory action is prohibited.

FEMA assured us that our complaints would be filed with the FEMA EEO office.

On May 29th and 30th, through a phone call and email exchange with Doug Gowdy, a FEMA employee in the EEO office, we learned that no such report had been filed by ATCS as promised. In July 2019, after learning that ATCS had not filed the EEO complaint as promised, Mr. Angeline and Mr. Rozycki filed additional charges on behalf of the team with the EEO Office, OIG, and the OIG Whistleblower Protection Unit in July of 2019.

It is believed Kwong Hui suppressed our complaint from being filed to protect future work with FEMA. Despite recording a complaint, Sheri Huntley persisted in claiming that a complaint had been filed. See the email thread below.

Question: Is there anything that I have not asked that you want to be included in this statement?
Answer:  No further comments at this time.




Violations of law governing FARS-




Question: Is there anything that I have not asked that you want included in this statement?
Answer:

**END OF STATEMENT**

I have read this statement. It is true, accurate and complete to the best of my knowledge and belief. I have been given an opportunity to make any corrections, additions, or deletions. I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.

Initials: _____

**FEMA - C000022**

Name:  Rozycki, Mark

Mark L.
Rozycki

Digitally signed by Mark L.
Rozycki
Date: 2020.08.06 14:04:51
-04'00'

08/06/2020

---

Signature | Date

Michael K Tenant

Investigator Name

Michael K.
Tenant

Digitally signed by Michael
K. Tenant
Date: 2020.08.06 15:44:10
-04'00'

Investigator's Signature

Initials: _____

**FEMA - C000023**

DEPARTMENT OF HOMELAND SECURITY
Federal Emergency Management Agency

## OFFICIAL DECLARATION

Name:  Wykosky, Jeff                                Position:   MBB - Master Black Belt

Organizational unit assigned:  FEMA - PR

Work phone:                        Email address:  Jwykosky@gmail.com

Work address:

### STATEMENT

Question: Do you understand the non-disclosure agreement that you reviewed and signed?
Answer:  Yes, it is pretty standard

Question: Who is your current employer?
Answer:  Retired primarily

Question:  Briefly describe your duties.
Answer: I started as a lead technical Master Black Belt, Lean Six Sigma- Because I am expert on this area. I started with Lean Six Sigma from 196 in GE when I was employed there. I was part of the team that implemented this in GE and made it a household name. I have worked in different organizations (AT&T, GE, SUN, USMC, DoD, Verizon ETC to implement this program.

Question: How long have been in your current position?
Answer:  I worked for FEMA about 8 months from 10/14/18 to 6/14/19

Question:  In your own words, describe the nature of your complaint.
Answer: I started in October 2018, FEMA was really in bad shape when it came to running its process and making things work. It was in desperate need of what Lean Six Sigma teaches about knowing your processes and how to make them work better. There was not a lot of understanding of how.  97% of work orders there stuck in the process for 200 plus days and non were coming out. The people on PR were not receiving funds.

The leadership in itself, with the exception of Mike Burns (who wanted to implement Lean Six Sigma), was onto on board. The Chief of Staff was responsible to implement this program with no understanding or support of what we needed to implement the program. The MBBs were trying to implement a program and leadership was worried about the color of the charts and the format of the presentation.(Rome was burning and leadership was playing the violin).

Lean Six Sigma is used in organizations where things are not going well, companies are losing money, and a change is needed.  PR was ideal for this because people were in positions without the requisite experience and or training to do the job.   There were lots of work that had to be done and because of the problems with staff and experience, work orders were all stuck and unable to progress. There did not ever appear to have a process description of how things were supposed to progress, no process continuity in the work flow.

One Example, I tried to find out why things kept getting stuck and during a site visit of the water tanks on the western side of the island and was totally amazed at the amount of FEMA staff (10 total) who had to go out on this site visit who had been pulled from all

Initials:

FEMA Form 115-045-005-002 (6/20)                                    Page 1 of

**FEMA - C000024**

DEPARTMENT OF HOMELAND SECURITY
## Federal Emergency Management Agency

## NON-DISCLOSURE NOTICE MEMORANDUM – NON-FEMA EMPLOYEES

You are assisting in an ongoing official inquiry being conducted on behalf of the Federal Emergency Management Agency (FEMA). As this inquiry is sensitive in nature, FEMA is requesting that you not disclose information relating to this official inquiry to any other person(s), except as may be appropriate under applicable law.

The disclosure of information related to this case could impede the investigation and hamper investigative efforts.

Your compliance with this non-disclosure notice is appreciated. These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.

Jeffrey J Wykosky

Print Name

8/10/2020

Signature                                    Date

**FEMA - C000025**

FEMA Form 115-045-005-005 (6/20)                                                    Page 1 of 1

**FEMA - C000026**

over the island to do this. It was such a waste of resources to have this many people do a simple inspection, I could not believe how much money was spent and how many people did the same thing. was an example of something not being done right and couldn't progress forward to the next step

Leadership blatant ignoring that things were not going well. Management would take the data that showed this and would change the reports to hide how bad things were from senior management. Management like Ana Bonilla (Chief of Staff) and Tamara Aldarondo ( who ran the Six Sigma Quality Group) would use staff not versed well in Six Sigma go and brief senior leadership and not allow us (the experts) to tell Leadership what was really going on.  I wrote a memo to give to Mike Burns to outline what I was seeing because I was sure he wasn't being informed about what was going on.  See attached.  I saw all of this in the first 4 or 5 months I was there.     After this, I was completed limited to being a Six Sigma Trainer by Tamara with the approval of Ana. I was told that Ana was the COR and had that responsibility for this contract. I was limited and unable to do what I had been sent to PR to implement by Ana and Tamara.  The program was successfully started with 60 senior trained and 40 LSS Belts doing projects.  Than the some team members were fired and the contract was ended abruptly. Please See attached for the timeline and email flow the outlines the issues after April 2019.


Question: Is there anything that I have not asked that you want included in this statement?
Answer:
  See attached documents.

Name:   Wykosky, Jeff

**END OF STATEMENT**

I have read this statement. It is true, accurate and complete to the best of my knowledge and belief. I have been given an opportunity to make any corrections, additions, or deletions. I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.

_____
Signature

9/21/2020
_____
Date

Michael K. Tenant   Digitally signed by Michael K. Tenant
Date: 2020.09.23 07:57:44 -04'00'

Michael K Tenant
_____
Investigator Name

_____
Investigator's Signature

Initials: _____

**FEMA - C000028**

DEPARTMENT OF HOMELAND SECURITY
Federal Emergency Management Agency

**OFFICIAL DECLARATION**

Name:  Angeline, Barry                                      Position:  _____

Organizational unit assigned:  _____

Work phone:  _____        Email address: barry.angeline@gmail.com  _____

Work address:  _____

Initials:  _____

**FEMA - C000029**

DEPARTMENT OF HOMELAND SECURITY
## Federal Emergency Management Agency

## NON-DISCLOSURE NOTICE MEMORANDUM – NON-FEMA EMPLOYEES

You are assisting in an ongoing official inquiry being conducted on behalf of the Federal Emergency Management Agency (FEMA). As this inquiry is sensitive in nature, FEMA is requesting that you not disclose information relating to this official inquiry to any other person(s), except as may be appropriate under applicable law.

The disclosure of information related to this case could impede the investigation and hamper investigative efforts.

Your compliance with this non-disclosure notice is appreciated. These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.

_BARRY Angeline_
Print Name

_[signature]_ _____ _8-5-2020_
Signature           Date

FEMA Form 115-045-005-005 (6/20)                                    Page 1 of 1

**FEMA - C000030**

Name:  Angeline, Barry

## STATEMENT

Question:Do you understand the non-disclosure agreement that you reviewed and signed?
Answer:  yes

Question: Who is your current employer?
Answer: I was working for my own company (Cyberricade), who was a subcontractor to Novaces, who subcontracted to the prime contractor ATCS while I was working on this contract for FEMA

Question:  Briefly describe your duties.
Answer: In my role, I instructed a consistent body of knowledge to identify processes within an organization to improve productivity.  The goal was to have the knowledge of this process implemented in the culture of FEMA to change its working culture and processes on other disasters and how to improve productivity.  We were assigned to train and mentor each group responsible

Question:How long have been in your current position?
Answer:  I worked for FEMA from 7/8/18 until 5/24/19

Question:  In your own words, describe the nature of your complaint.
Answer:
Non-Adherence to Statement of Work (SOW):
 Originally Louis Alavares was hired to lead the LSS program in April or May 2018(he had no experience in LSS and was messing up pretty bad).  The original SOW basically said to hire Master Black Belts with this experience and these qualifications, and all must complete these projects within this timeline- this was not doable based on FEMA structure. Louis had people doing projects outside of the SOW to try and get this task accomplished.  When I arrived, a review of the SOW showed how off-track we were in complying with this and the timeline- We reported this to Ana Bonilla, Chief of Staff, and she asked us to prepare a presentation to show how to get the program back on track. The presentation was given (Ana Bonilla, Peter DeJong, Louis, me, and another member were in attendance) in addition to Louis giving his own presentation as well.  Louis resigned the next day because his presentation was not well recv'd.  Ana Bonilla came to me and asked what could be done to get back on track; what options could be done. Ana Bonilla asked for a sustainable process and to have people trained and be proficient after our contract ended; this was completely different from the SOW- the original SOW had no training, no mentoring, no certification, no program office, no project management, etc. and would expand the scope by a factor of 2 to 3 times.  We had already wasted three months during Luis's tenure.  I presented several options to Ana and what was needed for each option.  Ana opted for the most comprehensive option which was essentially a deployment of a full LSS program.  These deployments can take up to two years to deploy, and we only had roughly one yea.  I told her what needed to be done and clearly spelled out what was needed, and Bonilla said this is what was wanted. Mark Rozycki and Mike Oshaben notified ATCS, and Tim McCormick was not happy.  He was upset that we even brought up the SOW with FEMA which was odd.  He did not want the SOW changed in any way. ATCS had never done a LSS deployment and had no strategy, intellectual property, qualified staff, tools, or templates to comply with the new requirements and the deployment of a program that was sustainable after we left.

 ATCS was not able to comply with these new needs and ended up subcontracting the requisite tasks to 4 second-tier subcontractors who in turn subcontracted to three third-tier subcontractors. We used our own intellectual property to flip the switch and get what was now wanted on track. FEMA was not paying us for this and when Bonilla was contacted to correct the SOW we were repeatedly ignored up to the end of the contract. I

Initials: _____

FEMA - C000031

Name: Angeline, Barry

was ignored.  My team and I were basically a broken record. ATCS was just acting as a pass through as were most of the second-tier subcontracting companies.  This is probably a FAR violation.  All the training and intellectual property was provided by the third-tier subcontractors.  By not paying us for these properties, FEMA violated the Anti-Deficiency Act. This would have been around the Feb or March timeframe. Notifications related to violations of the Anti-deficiency Act were conveyed to Raymond Kulisch, our program manager from Guidehouse, a second-tier subcontractor.  They were also conveyed to Tamiris Aldarondo who was the FEMA CIP team leader we reported to.  The intellectual property provided was worth several hundred thousand dollars and was not included in the SOW.  Upon termination of the contract, ATCS tried to obtain copies from Mark Woodhouse to give to FEMA and possibly use for future engagements.  We did not provide it to them. Guidehouse was alerted through their ethics hotline that Raymond Kulisch violated this act in March of 2020.


Unqualified personnel on the contact:
Dan McCabe notified Tamaris Aldarondo (project manager) in March 2019 that FEMA was getting gouged for paying for services to a prime contractor, had a second level subcontractor who passed it down to the 3rd level contractor to do all the work. Tamiris took no action. The main issues addressed with Tamiris were also filed in a separate whistleblower complaint and has been provided previously.  Its file name is OIG9.doc.)

Tamaris Aldarondo was close with a woman named Victoria Colmenero who worked for ATCS and ensured Colmenero was sent to PR on this contract. She should not have had influence in this decision as a FEMA employee. You were supposed to be a master black belt with 20 at least 20 years of experience. ATCS sent Edgar Eichelmann (fired because he did not know what he was doing), Jorge Vasquez (fired for incompetent and without the basic skills needed); [Tamaris Aldarondo also rehired Jorge several weeks later]; Raymond (Roc) Kulisch (sent specifically to protect the interests of Guidehouse Subcontractors and their ability to continue working other projects in FEMA); Kulisch did not fix the SOW and was there just to sanitize reports to ensure Guidehouse projects were protected–Peter DeJong, Clifford Dan McCabe, Mark Rozycki, and other names on the call-down list provided by ATCS that whose qualifications were not compliant with the SOW.  Two other people named Alice and Hector were also not compliant but had left before I was hired. In addition, multiple people on the call-down list we did not recognize.  Other's names we did recognize, but as mentioned earlier, they should
Have billed minimal hours since ATCS was providing virtually no back-office support. support (****)

FEMA mismanaged Contract through Neglect of COR, COTR, FCO, Staff:
Tamaris Aldarondo was colluding with Victoria to get an advanced copy of the final exam.  Tamiris was also one our students.  Her priority was her full-time law student work, and she missed over half of the training.  She used her position as the CIP lead to attempt to get an advanced copy of the exam.  She also worked the Victoria to dilute certification requirements because she was ranked last among roughly fifty students and did not want to be embarrassed.  She also made veiled threats to me on two occasions when she said, "it is in everyone's best interest for everyone to pass the exam."  Over a dozen private make-up sessions were scheduled to get Tamiris up to speed with her class, but she did not attend any.  We had to lock Victoria out of parts of our shared drive so she could not obtain a copy of the exam or answer key for fear she would pass it along to Tamiris ahead of time.  When Mark Rozycki notified Tim McCormick at ATCS of Tamiris's unethical behaviors, he was called an "asshole."  When I told Victoria that I would not change certification requirements or provide the answer key, she said I should look for a new job if I don't want to take care of the customer.

Initials: _____

FEMA - C000032

Name:  Angeline, Barry

We filed a whistleblower complaint specifically related to this abuse by Tamiris.  WE explicitly notified her of this on May 17 at 3pm.  Tamiris informed ATCS of what was coming in the complaints and I and Mark were suddenly let go under the fallacious claim that the due to increased burn rates on the contract.  Senior Leadership was notified of the whistleblower claim on my last day, May 23.  The program was prematurely terminated.

In addition, Tamiris had a secret study conducted by her t4eam members.  The study gauged the effectiveness of our LSS team.  Like the training evaluations, it was overwhelmingly positive.  Tamiris withheld this from us.  I obtained it through a FOIA request.  We believe she also withheld this positive document from senior leaders to undermine the program.  In addition, repeated attempts to learn who the COR and COTR were were ignored by Ana and Tamiris.  At one point, we were told that this contract doesn't have any.  I only confirmed who the COR was in August 202 after a FOIA request. It is Gretchen Carreiro.  She doesn't have a working FEMA phone and has ignored all emails related to contract irregularities both before and after the FOIA confirmed that she was the COR.

Question: Is there anything that I have not asked that you want included in this statement?
Answer: No

### END OF STATEMENT

I have read this statement. It is true, accurate and complete to the best of my knowledge and belief. I have been given an opportunity to make any corrections, additions, or deletions. I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.

_Barry Angeline_
Signature

9/8/2020
Date

Initials: _____

Name:   Angeline, Barry

Michael K. Tenant
Digitally signed by Michael K. Tenant
Date: 2020.09.08 12:20:27 -04'00'

Michael K Tenant
Investigator Name                                   Investigator's Signature

Initials: _____

**FEMA - C000034**

**Tenant, Michael**

| | |
|---|---|
| **From:** | bazor9198 <barry.angeline@gmail.com> |
| **Sent:** | Tuesday, August 11, 2020 4:57 PM |
| **To:** | Tenant, Michael |
| **Subject:** | The SOW for our contract |
| **Attachments:** | 2018 SOW LSS for DR4339PR_03.06.18.docx |

Attached is the SOW.  The language below are the key personnel requirements that were often not met.

Key personnel must possess the following qualifications:
- Master Black Belt certification with more than 10 years' experience leading LSS projects in a large organization in both the public and private sectors
- Experience applying agile and rapid prototyping best practices
- Experience delivering Six Sigma Yellow Belt and Green Belt training to non-technical federal audiences
- Experience with business processes in austere environments and across multiple locations

Sent from my iPhone

1

**FEMA - C000035**

Contract # HSFE80-16-A-0004                                       Task Order # XXXXXX-XX-X-XXXX

# Statement of Work
### CaPP Blanket Purchase Agreement (HSFE80-16-A-0004)

| General Information | | | |
|---|---|---|---|
| **Contract Number** | HSFE80-16-A-0004 | **Task Order Number** | TBD |
| **Contract Name** | CaPP – MOBIS BPA | | |
| Requesting Directorate | | Division/Branch | |
| **Task Order Name** | | | |
| **Period of Performance** | | **Start Date** | **End Date** |
| | | TBD | Award + 18 months |
| **Contacts** | **Name** | **Office Phone No.** | **Mobile Phone No.** |
| **FEMA COTR** | Sara Gray | 202-212-7922 | 540-539-0241 |
| **CaPP PM** | TBD | | |
| **FEMA Technical Monitor** | TBD | | |
| | | | |
| | | | |

## I.     Introduction

The Federal Emergency Management Agency (FEMA) Continuous Improvement Program is implementing a process improvement activity that will be key to FEMA compliance with Executive Order 13450 and HR 2142, the GPRA Modernization Act of 2010 and Office of Management and Budget (OMB) Circular A-50 and the IG Act.  This Performance Work Statement (PWS) establishes the requirement to acquire Lean Six Sigma (LSS) training services and project consultation to improve processes and address systemic issues throughout the agency.

Under Executive Order 13450, FEMA is required to define mechanisms for continuously improving the effectiveness and efficiency of agency processes. Under HR 2142 and the GPRA Modernization Act of 2010, FEMA is required to track and improve agency performance beginning in FY18 and submit performance plans consistent with the Act in FY13. The Master Black Belt LSS Contract Team will enable EO13450 and HR 2142 compliance by establishing a LSS program that utilizes best practice LSS methodology for structured strategic and tactical continuous process improvement. A LSS program that is integrated into strategic and tactical operational performance will be a key contributor to business and security performance. The Master Black Belt LSS Contract Team is responsible for designing and leading the implementation of the LSS methodology at FEMA's DR-4339-PR to support performance analysis and aggressive improvement objectives set by FEMA's DR-4339-PR leadership, including reducing costs, or improving service delivery, or both.  These services will provide FEMA with:

A.  LSS development of a disaster operations process assuring our systemic issues are aligned with Agency and Departmental strategic goals
B.  Develop, track, and report LSS program and project measures

**FEMA - C000036**

   C. The flexibility to develop Guidance, SOPs, and Job Aids as a result of the streamlined process
   D. The flexibility to provide LSS classroom training, (Yellow Belt and other personnel / practitioner levels as necessary)

## II.   Key Personnel

In order to perform the requirements of this Task Order, the Contractor must provide the professional skillsets to support the outlined tasks and activities.
Support personnel include (but are not limited to):

- Subject Matter Experts (in Lean Six Sigma)
- Project Manager

Key personnel must possess the following qualifications:

- Master Black Belt certification with more than 10 years' experience leading LSS projects in a large organization in both the public and private sectors
- Experience applying agile and rapid prototyping best practices
- Experience delivering Six Sigma Yellow Belt and Green Belt training to non-technical federal audiences
- Experience with business processes in austere environments and across multiple locations

It is strongly preferred that key personnel possess the following qualifications or attributes:

- Locally based near San Juan, PR
- Bilingual in English and Spanish
- Master's degree in Industrial Engineering, Operations Research, or a related discipline, in addition to more than 15 years of professional experience
- The team of contractors should include expertise in the following areas:
  - Communications and IT infrastructure
  - Water or Waste Water
  - Transportation
  - Power
  - Housing
  - Economics
  - Public Buildings
  - Health and Social Services
  - City Planning
  - Natural and Cultural Resources
  - Education
- Project manager certified as a Project Management Professional

## III.   Onsite Support

This task will require support at the Joint Field Office for DR-4339-PR, which is currently located in Guaynabo, PR, and at other locations, e.g., the four Branch Offices, all of which are located in Puerto Rico. Tasks may require intervals of continuous, extended hours, and an onsite presence.

**FEMA - C000037**

IV.     **Task Management**
The Contractor shall ensure that all tasks are performed in an efficient, accurate and timely manner, in compliance with the requirements of this document and project work plans.

V.      **Status Meetings**
The contractor shall meet with the COR, Project Manager, or Technical Monitor (TM) upon request to discuss task order/work plans and exchange information.  Additional meetings identified in the work plan will take place as scheduled.

VI.     **Activities and Tasks**
The Contractor shall provide contract and program management services, field consulting support, and LSS classroom training services to FEMA with the goal that FEMA will have completed self-supported LSS activities by Q4 2019 (FY19). Activities refer to the tasks and deliverables outlined below. Contractors may support one or more sectors. The resultant contract will include the following areas of Support:

- Task 1 – Develop Value-Add Process Map and single base process to include but are not limited to the 12 differing processes
- Task 2 –Lead LSS projects to Define, Measure, Analyze, Improve, and Control to include but are not limited to the 12 specific sector processes simultaneously; May lead LSS projects to Define, Measure, Analyze, Design, and Verify for relevant processes
- Task 3 - Possibly Develop Standard Operating Procedures and Job Aids for the streamlined processes
- Task 4 - Provide Yellow Belt or Green Belt training to JFO leadership and staff
- Task 5 – Provide regular status updates on level of completion across tasks 1-4.

Activities should be completed according to the following timeline:

**3-months**:
- Complete Design for Lean Six Sigma steps on the overall Sector Approach process.
- Complete Design for Lean Six Sigma steps on each of the applicable sector processes and other applicable sector processes
- Complete Design for Lean Six Sigma steps on Public Assistance Alternative Projects process
- Develop LSS Yellow Belt training curriculum
- Conduct initial training =LSS Yellow Belt Class sessions to Sector Leads, Deputy Sector Leads, RSF Field Coordinators, and the Advisory Group; instructor to participant ratio 2:24
- Upon 100% completion of the above leadership list, schedule one LSS Yellow Belt weekly session for applicable Sector designees (e.g. managers or supervisor level); instructor to participant ratio 2:24
- Develop instructor-led course evaluation forms for Yellow Belt or Green Belt training
- Administer instructor-led course evaluation forms following each class session and provide results to the FEMA project managers.

**6-months**:

**FEMA - C000038**

- Complete Define phase for the overall process.
- Complete Define phase for each sectors process. There are twelve sectors, with potential room for expansion.
- Complete Define phase for Public Assistance Alternative Projects process.
- Complete Measure phase for the overall process.
- Complete Measure phase for each sectors process. There are twelve sectors, with potential room for expansion.
- Complete Measure phase for Public Assistance Alternative Projects process.

**9-months:**
- Complete Analyze phase for the overall process.
- Complete Analyze phase for each sectors process. There are twelve sectors, with potential room for additional sector inclusion.
- Complete Analyze phase for Public Assistance Alternative Projects process.
- Complete Improve phase for the overall process.
- Complete Improve phase for each sectors process. There are twelve sectors, with potential room for additional sector inclusion.
- Complete Improve phase for Public Assistance Alternative Projects process.

**12-months:**
- Complete Control phase for the overall process.
- Complete Control phase for each sectors process. There are twelve sectors, with potential room for additional sector inclusion.
- Create SOPs for each of the 12 sectors and overall process, a total of 12 SOPs
- Create additional SOPs for sector roles as required
- Complete Control phase for Public Assistance Alternative Projects process

**15-months:**
- Complete Rapid Improvement Events on processes when necessary. Processes include overall Sector Approach process, the twelve sector processes, other applicable sector processes, and the Public Assistance Alternative Projects process.
- Create Job Aids on how to conduct all roles within each of the twelve sectors, with potential room for additional sector inclusion.

**18-months:**
- Complete Rapid Improvement Events on processes when necessary. Process include overall Sector Approach process, the twelve sector processes, and the Public Assistance Alternative Projects process.

VII.   **Deliverables**
Deliverables shall be specified at the task order level. All deliverables shall be submitted to FEMA in accordance with contract timeframes and/or schedules agreed upon between FEMA and the Contractor as indicated in each task order. Deliverables listed below, and further detailed in the corresponding tasks above, shall include, but are not limited to:
- Task 1 Deliverables

FEMA - C000039

- Value-Add Process Map and relevant Design for LSS deliverables for overall process and each of the 12 sectors (Completion Date: 3 months from award)
- Task 2 Deliverables for all 12 processes
  - Define Phase deliverables (Completion Date: 6 months from award)
    - Project Charter
    - SIPOC
    - Voice of the Customer plan
    - Communications Plan
    - Risk Analysis
    - Other relevant deliverables determined by SMEs
  - Measure Phase deliverables (Completion Date: 6 months from award)
    - Detailed process map
    - Data collection
    - Basic data analysis
    - Visual analysis
    - Process sigma level
    - Other relevant deliverables determined by SMEs
  - Analyze Phase deliverables (Completion Date: 9 months from award)
    - Fishbone diagram or affinity diagram
    - Cause and Effect Matrix
    - Pareto chart
    - Graphical tools to depict root cause
    - Select high priority root causes to address
    - Other relevant deliverables determined by SMEs
  - Improve Phase deliverables (Completion Date: 9 months from award)
    - Improvement strategy
    - Solution Identification
    - To-be process map
    - Modified FMEA
    - Pilot Test Plan
    - Pilot Results & Analysis
    - Implementation plan
    - Other relevant deliverables determined by SMEs
  - Control Phase deliverables (Completion Date: 12 months from award)
    - Transition plan
    - Control plan
    - Project documentation
    - Project close-out
    - Other relevant deliverables determined by SMEs
- Task 3 Deliverables for all 12 processes
  - Standards Operating Procedures and Job Aids
- Task 4 Deliverables
  - Develop Yellow Belt or Green Belt training curriculum (Completion Date: 3 months from award)
  - Develop instructor-led course evaluation forms for Yellow Belt or Green Belt training
- Task 5 Deliverables

FEMA - C000040

- Develop a weekly status update in MS Word (on decided upon date by the Technical Monitor) that includes tasks completed and issues identified during the week
- Develop a monthly report in MS Word (on decided upon date by the Technical Monitor) that includes a status of completion on the project timeline and a status of completion for each deliverable outlined in tasks 1-4

**VI.    Kick-Off Meeting / Project Plan**

The contractor shall meet with the Contracting Officer, COR and TM within 7 calendar days after award of the task order for a kick-off meeting.

The contractor shall provide a written Project Plan and Schedule within 14 calendar days after the kickoff meeting

**VII.    Period of Performance**

Eighteen (18) months from date of award.

**VIII.    Contractor Performance Measures**

Ultimately contract performance will be measured on their ability to meet the objectives of the JFO leadership, specifically their ability to have an impact on reducing costs, or improving service delivery, or both.

| Performance Measures | Required Outcomes | Standards for Excellence | Minimum Acceptable Levels | Surveillance Methods |
|---|---|---|---|---|
| The contractor shall produce an acceptable Work Plan that meets the requirements of the statement of work within the timeframe required. | The contractor shall produce an acceptable plan that clearly demonstrates achievable results within the timeframe indicated in the statement of work. | The contractor shall produce an acceptable plan that clearly demonstrates achievable results and exceeds expectations within a shorter timeframe than what is indicated in the statement of work. | The contractor produces an acceptable plan that meets the requirements of the statement of work within the timeframe required. | Review and acceptance of the work plan. |
| Internal systems and controls to ensure quality products and services. | Deliverables contain only minor technical errors, and are effective for intended purposes. Materials are delivered on time and contain all | Contractor's QA process prevents any technical errors in deliverables.  All materials including documents, plans and reports are submitted prior to due date, are clear, well-organized, contain all pertinent | All products are generally technically correct and generally appropriate for target audience. Draft deliverables are acceptable or require only minor revisions. All | 100% review of all deliverables, technical review of draft materials. Detailed review of reports and invoices. |

FEMA - C000041

Contract # HSFE80-16-A-0004                                    Task Order # XXXXXX-XX-X-XXXX

| Performance Measures | Required Outcomes | Standards for Excellence | Minimum Acceptable Levels | Surveillance Methods |
|---|---|---|---|---|
| | pertinent information. | information and provide innovative approaches or solutions. Invoices are supported by appropriate documentation. | reports are submitted on time and contain the information specified by contract. | |
| Acceptable deliverables that meet the requirements of the statement of work within the timeframe required. | The contractor shall produce deliverables that meet the requirements outlined in the SOW and discussed at the kick-off meeting. | The contractor shall produce deliverables that exceed expectations outlined in the SOW and discussed at the kick-off meeting, and in a timeframe shorter than indicated in the SOW. | The contractor produces acceptable deliverables that meet the requirements of the statement of work within the timeframe required. | 100% review of all final deliverables. |

FEMA - C000042

DEPARTMENT OF HOMELAND SECURITY
## Federal Emergency Management Agency

## OFFICIAL DECLARATION

Name:  Haveman, William                                    Position:

Organizational unit assigned:

Work phone:                              Email address:    whaveman6@gmail.com

Work address:

## STATEMENT

Question: Do you understand the non-disclosure agreement that you reviewed and signed?
Answer:  Yes

Question:  Who is your current employer?
Answer:  I worked for the Judge Group, a sub-contractor to Guide House; a sub-contractor to ACTS

Question:  Briefly describe your duties.
Answer: My duties were to go to PR and conduct training for Greenbelts in LSS to build a culture of Lean Six Sigma, map all of the processes being used in FEMA, and incorporate everything into one process guided by the LSS concept(s)

Question:  How long have been in your current position?
Answer:  I was in PR in that capacity for a little over a year; I arrived in May 2018 and left in June 2019

Question:  In your own words, describe the nature of your complaint.
Answer:
Non-Adherence to SOW: We were trainers and consultants and ended up being project consultants.  I was supposed to train greenbelts and ended up having to train black belts; I participated in project mapping and was told to stop and complete a full launch of the LSS training program as opposed to providing the awareness training, we were bought in to finish

ATCS Personnel on contract who were not qualified; The SOW said all consultants had to be master black belts to conduct the contract- ATCS subcontracted to Guide House and bought in black belts who were not of the master designation; ATCS bought in blackbelts but were not master designated.  Of the 8 people sent to handle this contract, not one was a direct employee of ATCS or Guide House- they were sub-contractors for another group.  ATCS did nothing primarily to facilitate the contract, other than billing the government for them having to get sub-contractors to get other sub-contractors to handle the workload. ATCS provided a staff members to work with FEMA and keep them appeased; report to FEMA in a format that masked problems on the ground that needed to be addressed; they were not even trained or versed in any LSS concepts or methodologies (Victoria Colmanero and Raymond Kulisch were staff members sent by ATCS for this purpose)

Lack of Oversight by COR and/or COTR: I never knew who the COR was and was told to report to Eli Pushkarewicz and Tamaris Aldarondo- neither identified themselves as the COR or COTR and I interacted mainly with Tammy.  Eli actively took steps to ensure I could not complete the job I was tasked with on this contract for a variety of personal reasons

Initials:  WJH

FEMA - C000043

Name: Haveman, William

FEMA Mismanagement of the Contract; FEMA was concerned with keeping any bad information from reporting to Mike Burn the problems we were having. Burn explicitly told us to report any problems with the contract to him personally and Eli actively stood in the way of this and demanded that any communications go through him before Burn and he would advise Burn not us.   Eli would scrutinize all of the presentations were attempted to report for grammatical errors, format, wording, substantial changes to content that changed meanings, etc. There was no way for us to succeed in this contract because Eli and Tammy aggressively worked against everything we did to spin this in a positive way to Burn.    Eli and Tammy went to Ana Bonilla, Chief of Staff, and fed her   bad information as well to keep this disinformation going to Burn. I have never seen a group of people work so hard to block the success of a program that could have changed the course of people's lives in PR who still don't have the basic buildings and resources that the US Gov't has overpaid millions and millions of dollars to get into place.   I participated in single site inspections with over 30 participants who were improperly trained and coordinated in their efforts when the inspection really needed 2 inspectors at best.  This group by ELI and Tammy wanted us to fail at something that Burn really pushed for and fought to get to PR to improve the processes.  Eli worked and was verbal in telling FEMA resources not to assist us in anything that we were trying to do; middle management stopped this from being implemented successfully in every way that they could. I was never notified who the COR or COTR was for this contract- my group begged for help to get this process corrected and eliminate the mismanagement but was rebuffed at every turn

Question: Is there anything that I have not asked that you want included in this statement?
Answer: No

## END OF STATEMENT

I have read this statement. It is true, accurate and complete to the best of my knowledge and belief. I have been given an opportunity to make any corrections, additions, or deletions. I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.

_William J Haveman_
Signature

9/14/2020
Date

Michael K Tenant
Investigator Name

Michael K. Tenant
Digitally signed by Michael K. Tenant
Date: 2020.10.22 08:50:44 -04'00'

Investigator's Signature

Initials: _____

FEMA - C000044

DEPARTMENT OF HOMELAND SECURITY
## Federal Emergency Management Agency

## NON-DISCLOSURE NOTICE MEMORANDUM – NON-FEMA EMPLOYEES

You are assisting in an ongoing official inquiry being conducted on behalf of the Federal Emergency Management Agency (FEMA). As this inquiry is sensitive in nature, FEMA is requesting that you not disclose information relating to this official inquiry to any other person(s), except as may be appropriate under applicable law.

The disclosure of information related to this case could impede the investigation and hamper investigative efforts.

Your compliance with this non-disclosure notice is appreciated. These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.

Mark T. Woodhouse
_____
Print Name

_____
Signature

08/04/2020
_____
Date

**FEMA - C000045**

DEPARTMENT OF HOMELAND SECURITY
**Federal Emergency Management Agency**

## OFFICIAL DECLARATION

Name: Woodhouse, Mark                    Position: Contractor/ Franchise Owner/Operator

Organizational unit assigned:

Work phone: +1 (770) 843-7372      Email address: mtwchw@msn.com

Work address:

## STATEMENT

Question: Do you understand the non-disclosure agreement that you reviewed and signed?
Answer:  Yes, it was pretty clear

Question:  Who is your current employer?
Answer:  Franchise Owner of Jersey Mikes in Ga; when I was a contractor with NOMUDA and worked on behalf of FEMA- they subcontracted to CPI- who was the subcontractor to ATCS

Question:  Briefly describe your duties.
Answer: My duties as a contractor were to instruct and lead/support FEMA greenbelt and black belt teams on project through the Lean Six Sigma series implementation.  I was the primary instructor and have been a Master Black Belt for 20 yrs.  I developed my own LSS mini-tab training on how to implement LSS and look at processes transaction wise, statistical side; I also taught other lean tools; I developed tests for green belt and black belt training and testing materials

Question:  How long have been in your current position?
Answer:  I have been doing Master Black Belt teaching for 20 years and have been teaching lean training for 25 years; I have taught in the private and military sectors

Question:  In your own words, describe the nature of your complaint.
Answer:  I was a fairly late arrival in PR and arrived in Feb 2019; as I see it, there were several problems.  FEMA was asking for things on the SOW and did not revise the SOW to reflect what they were asked for.  ATCS and FEMA were asked several times for this action and we were operating on good faith by doing the things asked for that weren't on the SOW.  This dragged on and on while we tried to support FEMA-  ATCS and FEMA were taking our material without compensation; There was no requisite knowledge to learn LSS without my group and in essence just took our proprietary teaching materials without paying for it.  ATCS tried numerous times to acquire the materials without compensation, nor did they have the requisite knowledge to review or teach the material. FEMA had people in leadership that mismanaged and undercut what we were trying to do; one in particular was Tamaris Aldarondo- her focus was more on obtaining her law degree than learning LSS during the classroom instruction.  Aldarondo was the leader of the CIP group and had no qualifications whatsoever to lead a continuous process team- she admitted that she was more focused on her law degree exams in class than learning the LSS processes. Aldarondo and her supervisor went so far as to stop all of the testing to get the black belt certifications and in essence wasted the time, effort, and teaching energies to the students in the class.  This process was just mismanaged horribly

Initials:

**FEMA - C000046**

Name:  Woodhouse, Mark

When I first arrived, I noticed we were 4 to 5 layers away from the head of the organization; as a trained unbiased team, we should have been reporting to the top of the FEMA leadership team.  The subordinate leaders purposely inserted themselves and denied us access to the head of the organization;  middle management made it very hostile and purposes stood in the way of implementing LSS to make FEMA better[middle leadership was Aldarondo and others- however, I only knew about her specifically]- in all my time, this was the worst experience I had with any  organization to make improvements.  Even ATCS did not have the requisite personnel with the experience required to implement LSS- ATCS had an agenda I never understood and it was not to effectively have us implement LSS and seemed to be in "cahoots" with middle management to keep this from getting effectively implemented; ATCS employee Victoria Colmenero and Aldarondo met frequently and seemed to do everything they could to keep this training off track.

The pay structure for work done on behalf of FEMA was always off-track and behind on paying the monies owed to us at the appropriate time for the work we did and had done.  Unlike every other government contract when I was paid like clock-work, FEMA was horrible at paying us when pay was due.  We had done all of this work and had not been paid- I even maxed out my personal credit card at the hotel I was staying at because FEMA was not paying ATCS, who didn't pay NOMUDA- it was horrible.  Eventually NOMUDA just paid us with their own funds in order to ensure we were compensated and final pay came months later after I was sent home. I think NOMUDA lost money on this and was not paid appropriately through that contractor to sub-contractor chain.  My understanding is that NOMUDA (a disabled veteran owned business) went out of business due to this.

The end result in all of this that many of the things requested in the expanded SOW never came to fruition.  As a whole, FEMA got folks green belt trained and passed their tests- however none were certified; black belts were never tested and therefore not certified.  There was no transformation to an efficient and effective organization and undercut the whole idea to help FEMA develop internal assets against ineffectiveness and creating new processes

We complained to DHS OIG and within days, two of our most vocal members were sent home; within weeks of the complaint being made, the rest of us were sent home to with no whistleblower protection


Question: Were you ever notified or informed of who was the COR and/or COTR on this contract?
Answer: No, as a matter of fact we asked numerous times of who they were; we were never told and did not know who they were and did not meet them


Question:  Did you ever reach out to either the COR and/or COTR with your concerns?
Answer: N/A



Question: Is there anything that I have not asked that you want included in this statement?
Answer: COR3 had two of their members in the Black Belt training, (Mosquera Mendez, Margarita, and Mendez Martinez, Roberto).  They were so happy, they wanted to stand up the program themselves and an executive steering committee with FEMA to keep it going.

There were times that members of the FEMA team had to miss classes.  To support this, I ran multiple make-up sessions.  Ms. Aldarondo didn't attend any of these weekly BB sessions or the dozen sessions we set up for her.  She made no progress on her project and tried to split it with Michelle Ortiz.  Her project was also sponsored by Ana and was the

Initials: _MW_

FEMA - C000047

Name:  Woodhouse, Mark

simplest project we had. In short, she was the poorest performing student in either Black Belt or Green Belt classes.


**END OF STATEMENT**

Name: <u>Woodhouse, Mark</u>

I have read this statement. It is true, accurate and complete to the best of my knowledge and belief. I have been given an opportunity to make any corrections, additions, or deletions. I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.

_____
Signature

<u>08/31/2020</u>
Date

Michael K. Tenant
Digitally signed by Michael K. Tenant
Date: 2020.09.14 08:19:24 -04'00'

<u>Michael K Tenant</u>
Investigator Name

_____
Investigator's Signature

Initials: _____

FEMA - C000049

DEPARTMENT OF HOMELAND SECURITY
## Federal Emergency Management Agency

## OFFICIAL DECLARATION

Name:  Oshaben, Michael                          Position:  Independent Contractor

Organizational unit assigned:

Work phone:  +1 (281) 772-4175      Email address: moshaben@yahoo.com

Work address:

### STATEMENT

Question:Do you understand the non-disclosure agreement that you reviewed and signed?
Answer:  I understand; no questions

Question:Who is your current employer?
Answer:  Self-employed contractors

Question:  Briefly describe your duties.
Answer: I worked for ATCS as an employee at that time on the Lean Six Sigma implementation team for the FEMA contract for about 15 mos

Question:How long have been in your current position?
Answer:  I was in PR from May 2018 through July 2019


Question:  In your own words, describe the nature of your complaint.
Answer:  The team was there to implement Lean Six Sigma and do projects.  During that time, there were management team working on a continuous improvement team that continually tried to keep us from doing our assigned tasks.  Completing projects in the beginning identified critical issues and we notified FEMA management of the defects. FEMA management does not like to publicize their defects and management from FEMA (Eli and Tamara-Tammy) did not want us to be successful in the implementation of Lean Six Sigma.  I believed it was an age gap difference because Eli and Tammy referred to us as "the grumpy old guys" or the "old guys" and did not want us to succeed.  Eli and Tammy sabotaged many projects we were trying to implement; For Example a site inspection tool we developed called a digital inspection tool was purposely refused by them because they wanted to do things their way and not ours.  It was based on a system for the recording of information for any type of site inspection. FEMA management specifically Eli, worked actively with IT to keep this project from being an accepted idea and practice just because it was different from what he thought.Eli had a connection with the IT managers and purposely provided information to them to keep them against the implementing this process and others we were trying to implement based on deficiencies we identified in data analysis and the benefits that could come from improving this and the organization. FEMA culture does not like to see what their defects were.  Eli was a transvestite and the IT manager he worked with was also a transvestite as well.  Eli was very anti-old white male and vocally spoke about how we didn't know how FEMA worked or what did we know about FEMA.  FEMA management manipulated the grants manager system which was reported to Congress to show more grants/projects had been completed/finished than what really was done.  I specifically worked on a project with the improvements in the water sector (improve or fix damage caused to water system) and there were issues with Congress not signing off on funding to provide to these projects.  The site inspections were not consistently written, or calculated- which could have been fixed with our digital site

Initials:  mjo

**FEMA - C000050**

Name:  Oshaben, Michael _____

inspection tool.  I worked with Angela Starr in this process because of how far behind in funding requests; 1.5 million dollars in grants approval was awarded in 2019 according to the tracker- these monies were uploaded in the system queue to make it appear to Congress that they were farther ahead in issuing grants without fully completing projects to where the funds were actually going to be used. These funds sat in the Grants Manager project worksheet queues for over 5 months and were never executed upon. It seemed to be a purposeful intent to mislead Congress about work progressions. FEMA management did not want to be exposed for not fulfilling their obligations in a timely manner.  The idea was that this was the FEMA way and this how FEMA operates- any ideas or directions that went away from that was sabotaged from every level of the management structure.

Question: Were you ever notified or informed of who was the COR and/or COTR on this contract?
Answer: We tried to find out who the COR was on a number of different times.   ATCS told me we could not contact the COR directly and relied on ATCS to contact the COR on our behalf. ATCS has worked with FEMA for many years and I don't know if they ever spoke to the COR.  ATCS does not always hire candidates specific to fulfilling the requirements for jobs they undertake.  In this contract, Master Black Belts under LSS were requested and ATCS only hired Black Belts, which did not fulfill the terms of the contract to begin with.  We started out with 4 Master Black Belts, 4 Black Belts- yet ATCS probably charged FEMA for 8 Master Black Belts.


Question:  Did you ever reach out to either the COR and/or COTR with your concerns?
Answer: We were prevented from directly reaching out to the COR by ATCS; Eli used to work with some of the ATCS management and had relationships with them.    I believe Eli was instrumental in ATCS being awarded this contract even though they had never done any LSS projects. ATCS did not understand LSS and even their project managers had no idea what to do. ATCS should not have ever been the prime contractor. ATCS eluded that they just wanted to bill hours to FEMA for the contract regardless of what the SOW called for.  As a result of my complaints about ATCS, ATCS did not give me the yearly end of year 2019 bonus I deserved and refused to match my 401K contributions. I was never formally fired as an ATCS employee so I should have been eligible for these benefits. I think this was in direct retaliation to speaking out about complaints against ATCS.
We did not see the SOW for the first 4 mos we were there. Once we saw it and realized we were not following the SOW, we requested ATCS to change the SOW to match what work we were doing in; In Oct-Nov 2018 we notified ATCS in writing that the SOW was not being followed and needed to be changed.   FEMA Management (Tamara Aldarondo, Ana Bonilla, Eli Pushkarewicz) was also notified but no action was taken to re-write the statement of work.    We wrote a proposal to assist in modifying this SOW- Ana Bonilla and Eli told us to go forward with our proposal but the SOW was not re-written in violation of contract law. A complaint was lodged to the DHS OIG in PR about what was going on in April 2019 and a review of all of the SOWs were being reviewed. We complained about everything that was going on and about 2 weeks later all of the sectors and SOW's in many of the sectors were halted to be reviewed and placed in compliance.  Once the complaints were made retaliations started; by April or May communication with us was shut off. We were not given any new work and Barry Angeline and Mark Rozycki were terminated despite the fact we were already short-staffed in the number of Master Black Belts who were needed on the contract. 8 were needed and we only had 5 working bodies (several of which were not even Master Black Belts). There was an active call-down list to work from if we were short staffed and the people on the list did not even fit the qualifications to come on board and help- these people were not qualified and I'm sure ATCS was charging FEMA the price for supplying Master Black Belts. By June, ATCS said the project lacked

Initials: ~~mjo~~

FEMA - C000051

Name:  Oshaben, Michael
funding and we were fired.

Initials:  mjo

**FEMA - C000052**

Name:  Oshaben, Michael

Question: Is there anything that I have not asked that you want included in this statement?
Answer: ATCS directly retaliated against me because they refused to pay me my 2019 year end bonus and 401K matching which I was entitled to because I was never informed when I was being terminated from employment.

**END OF STATEMENT**

I have read this statement. It is true, accurate and complete to the best of my knowledge and belief. I have been given an opportunity to make any corrections, additions, or deletions. I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.

_____  
Signature

09/28/2020  
Date

Michael K. Tenant  
Digitally signed by Michael K. Tenant  
Date: 2020.09.28 15:05:37 -04'00'

Michael K Tenant  
Investigator Name

Investigator's Signature

Initials:  mjo

FEMA - C000053

DEPARTMENT OF HOMELAND SECURITY
Federal Emergency Management Agency

## NON-DISCLOSURE NOTICE MEMORANDUM – NON-FEMA EMPLOYEES

You are assisting in an ongoing official inquiry being conducted on behalf of the Federal Emergency Management Agency (FEMA). As this inquiry is sensitive in nature, FEMA is requesting that you not disclose information relating to this official inquiry to any other person(s), except as may be appropriate under applicable law.

The disclosure of information related to this case could impede the investigation and hamper investigative efforts.

Your compliance with this non-disclosure notice is appreciated. These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.

Michael Oshaben
_____
                 Print Name

Michael
Oshaben

Digitally signed by Michael
Oshaben
Date: 2020.08.27 12:57:24
-05'00'
_____        08/27/2020
                 Signature                                   Date

FEMA Form 115-045-005-005 (6/20)                                              Page 1 of 1

**FEMA - C000054**

DEPARTMENT OF HOMELAND SECURITY
Federal Emergency Management Agency

## NON-DISCLOSURE NOTICE MEMORANDUM

You are assisting in an ongoing official inquiry being conducted on behalf of the Federal Emergency Management Agency (FEMA). As this inquiry is sensitive in nature, you are hereby instructed not to disclose information relating to this official inquiry to any other person(s), except as may be appropriate under applicable law.

Failure to comply with this directive may subject you to disciplinary action under appropriate charges, such as failure to follow instructions or interfering with or impeding an official investigation.

These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.


Justo Hernandez
_____
                    Print Name


JUSTO
HERNANDEZ

Digitally signed by JUSTO
HERNANDEZ
Date: 2020.09.11 14:13:05
-04'00'
_____    _____
            Signature                              Date

**FEMA - C000055**

DEPARTMENT OF HOMELAND SECURITY
Federal Emergency Management Agency

## OFFICIAL DECLARATION

Name:  Justo Hernandez                        Position:  Operational COordination Div Director

Organizational unit assigned: Field Ops Division

Work phone:  +1 (787) 306-0822    Email address:  Justo.Hernandez@fema.dhs.gov

Work address: 500 C Street SW room 300, Washington DC

### STATEMENT

Interview conducted on September 14, 2020 at 10:30am by Investigators Mara Lederer and Michael Tenant via Microsoft Teams (MT) video.

Q: Do you understand the non-disclosure agreement that you reviewed and signed?
A: Yes.

Q: What is your title, position/organizational unit/grade with FEMA?
A: Operational Coordination Division Director ( OCD) /Under Field Operations Division/ SES

Q: What is your work number?
A: 787-306-0822

Q: What is your work address?
A: 500 C Street SW room 300, Washington DC

Q: How long have you worked for FEMA?
A: Since 1989.

Q: What was your job title on DR4339 (Puerto Rico)?
A: I was a Team Leader at the beginning and then I became the Deputy FCO until July 29, 2019.

Q: What dates did you work on DR4339?
A: Two days prior to Hurricane Maria, but I don't recall the date until July 19, 2019.

Q: Briefly describe your duties on DR4339.
A: I was coordinating the Federal response with the Governor in Puerto Rico. I then became a responder and had to coordinate with all mayors. The first 3-4 months I was the Lead voice on the disaster and receiving information from HQ and then implementing this to the field. Then the first year I managed the disaster from response to recovery. Other FCO's were brought in.

Byrne ff

Q: On DR4339 (LSS/CIP program) the prime contractor was ATCS and Novaces was one of the subcontracting companies who provided Six Sigma training. Does this sound correct?
Before A: The FCO at one-point time was Mr. Michael Burn (he left the agency a couple months after me and went to work for Deloitte) was pushing for Lean Six Sigma training, but I don't know the details because I was not involved in this to engage in the sector approach. Ultimately, this ended at the sector level. There was frustration with the Lean Six Sigma company-in a disaster we had many people that we were trying to get response and getting assistance to those effected, a lot of engagement between the municipalities. Those at Lean Six Sigma wanted to know every detail of the process because they are not

Initials:  JH

FEMA Form 115-045-005-002 (6/20)                                                                Page 1 of 4

**FEMA - C000056**

Name:  Justo Hernandez

*Expected*

FEMA employees and doesn't understand the process because they felt they couldn't do their work. They wanted us to stop responding in order to provide the steps in the process. We tried to engage the Lean Six Sigma team in order to attempt to illuminate the bureaucracy. I spoke with one of the contractor Lead, but I don't remember his name, but this was more in passing. To be honest, my agenda was really busy. I was mostly involved with the Congressional members who visited.

Q: Does FEMA have any input into the hiring of subcontractors/subcontracting companies? If they don't, which party does (i.e. the prime contract etc). If they do, please explain this process.
A: The contracting officers in the regional office and supporting the JFO and HQ. I don't know who engaged in that contract. Someone in FEMA oversaw the contractors. I was very far removed from this process.

Q: Did DR4339 (LSS/CIP) run out of funds for a portion of the projects?
A: I don't know. If there was a lack of funding but needed the funding, all we need to do was to justify the need and work with the FCO and amend the contract. During this disaster I did approve funding for a project/obligation. It is very unlikely that we would run out of funding. If the FCO has already ordered for more funding, they have the authority to approve and delegate the additional funding. *I WAS MOVING MILLIONS Per hour I DOUBT WE WOULD RUN OUT OF MONEY ON ANY CONTRACT.*

Q: Who should I speak to regarding documentation pertaining to funding for DR4339, specifically the CIP program?
A: Brian Applebee Sr is the financial section chief-he is the comptroller and could access this information.

Q: Do you recognize the names Barry Angeline and Mark Rozycki? They worked for Novaces.
A: No.

Q: Are you aware if anyone directed others to take, recommend, or approve any personnel action, to take any personnel action against any employee because of the exercise of any appeal, complaint or grievance?
A: I would not know this; however, if I was aware, I would recommend termination of this employee. *This goes AGAINST OUr Core VAlues AS AN Agency.*

Q: Is there anything else you would like to add that I did not specifically ask you?
A: I don't have much visibility into this specific contract as I am many levels removed from the process.

Question:  Did you have any oversight of the project in Puerto Rico?
Answer: Not direct oversight, I knew they were working and tried to make the concept work

Question: Did you assign anyone in Puerto Rico to assist and oversee the project?  If so, who?
Answer: No, they worked directly for the CIP- I would not have the names of the direct personnel involved because CIP had over 300 people; I was just too far removed

Question: Did anyone overseeing the project in PR have any background knowledge about the LSS process?
Answer: I don't know

Initials: JH

FEMA - C000057

Name: Justo Hernandez

Question: Did you have any oversight of the project in Puerto Rico?
Answer: Not direct oversight, I knew they were working and tried to make the concept work

Question: Did you assign anyone in Puerto Rico to assist and oversee the project? If so, who?
Answer: No, they worked directly for the CIP- I would not have the names of the direct personnel involved because ~~CIP had over 300 people~~; I was just too far removed

_This action was Delegated. I had over 3000 folks working The event_

Question: Did anyone overseeing the project in PR have any background knowledge about the LSS process?
Answer: I don't know.

Question: Did you meet regularly with the contracted instructors for the LSS implementation process?
Answer: No, because I was always dealing with other stuff; they may have conducted a briefing once per week and then would meet directly with the FCO. I may have spoken with the guys on the LSS contracted twice for about 10 min conversation

Question: Did any of the LSS contracted instructors ever advise you about any problems they were having in carrying out their contracted services? Is so, what did they say?
Answer: Yes, it was all related to the frustration that they did not know FEMA and could not get staff engaged to explain all of FEMA process' in the middle of providing assistance to survivors; in the times I spoke with the contractors I always had competing priorities with accomplishing the mission of restoring power and providing services to the survivors; in the time I had, I told the Continuous Improvement Program people and told them to get _it Resolved. I intervene with Some Director, to see what was Preventing them from engaging and it was Time Constraints._

Question: Were you aware of or notified about any problems with the Statement of Work for this project?
Answer: No, I was not. The intent of the FCO was to use LSS to improve the elimination of process' and wanted to streamline the time from an inspection to reimbursement of funding; based on FEMA processes, look at each step of this process and improve how this worked to expedite the funding

Question: Were you ever notified or aware of any resistance to the LSS implementation process from FEMA management in Puerto Rico?
Answer: Yes, as previously described. _Right Process But wrong timing Response if the LSS were Knowledgable of FEMA, And it was Recovery, Maybe it would work_

Question: Do you know why the LSS implementation project ended?
Answer: I have a feeling that it was too hard to identify the steps we were following and how to map out and change each level of the process. The FEMA folks did not have time to sit down and lay out all of these processes while simultaneously carrying out the mission of saving lives at this disaster. _In the end I believe we Found our own way to expedite the Reimbursement for the Emergency._

**END OF STATEMENT**

Initials:

FEMA - C000058

Name:  Justo Hernandez

I have read this statement. It is true, accurate and complete to the best of my knowledge and belief. I have been given an opportunity to make any corrections, additions, or deletions. I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.

_____
                Signature

9/14/2020
                Date

_____
Mara Lederer
            Investigator Name

MARA F LEDERER  Digitally signed by MARA F
                LEDERER
                Date: 2020.09.14 17:11:19 -04'00'
_____
            Investigator's Signature

FEMA Form 115-045-005-002 (6/20)

Initials: JH

Page 4 of 4

FEMA - C000059

DEPARTMENT OF HOMELAND SECURITY
## Federal Emergency Management Agency

## NON-DISCLOSURE NOTICE MEMORANDUM

You are assisting in an ongoing official inquiry being conducted on behalf of the Federal Emergency Management Agency (FEMA). As this inquiry is sensitive in nature, you are hereby instructed not to disclose information relating to this official inquiry to any other person(s), except as may be appropriate under applicable law.

Failure to comply with this directive may subject you to disciplinary action under appropriate charges, such as failure to follow instructions or interfering with or impeding an official investigation.

These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.

Tamiris Aldarondo
_____
Print Name

TAMIRIS
ALDARONDO

Digitally signed by TAMIRIS
ALDARONDO
Date: 2020.09.17 13:00:29
-04'00'
_____                    09/17/2020
Signature                                            Date

FEMA - C000060

DEPARTMENT OF HOMELAND SECURITY
**Federal Emergency Management Agency**

**OFFICIAL DECLARATION**

Name: Tamiris Aldarondo    Position: Program Analyst

Organizational unit assigned: Continuous Improvement

Work phone: +1 (202) 538-2651    Email address: tamiris.aldarondo@fema.dhs.gov

Work address: 50 Carr. 165 Sector de Buchanan Parque Industrial Amelia Guaynabo, PR 00968-8024

**STATEMENT**

Interview was conducted by Investigators Mara Lederer and Michael Tenant on October 27, 2020 at 1pm via Microsoft Teams (MT) video.

Q: Do you understand the non-disclosure agreement that you reviewed and signed?
A: Yes.

Q: What is your title, position/organizational unit/grade with FEMA?
A: Program Analyst / Continuous Improvement/ GS13

Q: What is your work number?
A: (202) 538-2651

Q: What is your work address?
A: 50 Carr. 165 Sector de Buchanan Parque Industrial Amelia Guaynabo, PR 00968-8024, PR-165, Guaynabo, 00968, Puerto Rico
Q: Please briefly describe your duties on DR4339.
A: When the LSS team started: I was a Team Lead with the CIP and then the teams combined with the LSS team but I remained as a Team Lead. Eli was in the Unit Lead position for 9 months to 1 year. Dawn Dickerson then took over as a Unit Lead team after Eli for approximately 5 months. I took over as the Unit Lead of the LSS team in approximately November 2018.
As the Unit Lead: I oversaw the work was done, the CIP work done was made directly to the COS.  The Project Manager from the LSS team would accompany me to the COS was Victoria Colmenero and before her was Raymond "Rock" Kulish. These individuals were contractors but I cannot recall who they worked for but the prime contractor was ACTS.

*I was not the Unit Lead for LSS, I was the Acting CIP Unit Lead who had, as an added responsibility to be the task monitor for the LSS Contract. In this role, I reported to the COS.

Q: At what point did you oversee the LSS/CIP program?
A: Since Approximately November 2018, I have overseen this program. In May or June 2019 the LSS team due to many issues with the contractor's performance/conduct. I worked very closely with the prime contracting company regarding the LSS team and after many meetings with them, we didn't see any change, the prime contracting company said they were releasing who I assumed was Barry because he was not on the team after that.
-I told Kuang (ACTS) that I didn't want to know the details regarding what the prime contracting company was doing regarding their management of the contracting.
*Mr. Kwong mentioned that they were making changes in the team, in an effort to improve the areas we had been pointing out for over a year. I told Mr. Kwong that I appreciated his efforts, but I did not want to have visibility in anything related to the internal

Initials: TA

**FEMA - C000061**

Name:  Tamiris Aldarondo

decisions made with the contract and that anything related to that needed to be addressed with the COR.

-The issues were: When Eli was the Unit Lead he identified the same issues. They put together a remediation plan that the contracting company agreed to fix. I also identified some of the same
-Not following the chain of command, they undermined my authority and go above me and attempt to Schedule meetings with the FCO and COS. It was disruptive. They changed their duty station without permission (it was to be the JRO and they stopped showing up and wanted to work from the Call Center). They refused to report to the JRO even after being told to report to the JRO.
-Performance: they took credit that the PA Ops team completed the work. The PA Ops Team Lead complained and as a result the LSS had to apologize. The COS would ask for answers and could not provide answers.
-LSS would there to help us improve on FEMA's processes; however, they didn't want to learn how FEMA operated. They tried to run the program the way they would in private sector.
-I have emails between myself and Contracting Officer/COR/COS documenting conduct/ performance.
Q: What qualifications were required to oversee the program?
A: I was in an acting position initially. I asume: supervisory experience, public speaking, coordiantion, communication skills, strong writing skills. I would asume a bachelor's degree but I'm not sure. I have a bachelor's degree in international studies. I'm not aware of specific type of degree needed.

Q: Did you have the qualifications?
A: Based on my assumptions I believe I met the qualifications. I've exceed expectations. *I've been exceeding expectations for the past two years while in the CI Unit Lead Position, whether I was acting or formally in the position. The team and I also received a recognition from the FDRC during the 2 year anniversary All-Hands event and many senior leaders in Puerto Rico and HQ have recognized my work, specially my efforts in reestablishing the team after all the problems related to the LSS contractors and gaining trust from JRO stakeholders once again. For reference: Michael Icardi (HQ CIP)

Q: How did you get the position and who made the decisión?
A: The acting position I think came from the COS-Anna Bonila. Everyone prior to me (inlcuding Eli) was also in an acting position. The position was not posted until August 2020 to which I applied, interviewed and offered the position.
*Correction: the Unit Lead position was posted and interviewed around May/June 2020.

Q: Was anyone else considered for the acting position?
A: I'm not sure.

Q: Please provide me a copy of your resume.
A: I think I submitted a resume back prior to approximately November 2018.
-I Will provide a copy of my resume from August 2020 and the one I submitted prior to November 2018.

Q: You were enrolled in the LSS Black Belt class, correct? This class was during work hours and paid for by FEMA, correct?
A: Yes to this entire question.

Initials:  TA

FEMA - C000062

Name:    Tamiris Aldarondo _____


Q: What was Barry Angeline 's role in the LSS/CIP program?
A: He was one of the LSS instructors.

Q: What dates did Barry report to you?
A: Approximately November 2018 until May or June 2019.
*To clarify - Barry did not report to me directly, he reported to the LSS Program Manager/Lead, Rock. I was the Task Monitor.

Q: What were the dates Eli Pushkarewicz was assigned to DR4339 and what was his position?
A: He was the Unit Lead prior to Dawn Dickerson but I am not sure of the date.

Q: Did Eli have any input or involvement in the LSS/CIP program once he departed?
A: No, but Eli is a HQ employee and part of the CIP program and was deployed to Puerto Rico and returned to HQ. LSS team had to report to me but I oversaw both programs so Eli was my counterpart at HQ so we would discuss the CIP program. Eli did not have imput in the LSS program.

Q: Was it a requirement that Barry (or somoene from their team) speak to Chief of Staff (COS) Ana Bonilla Davila on a weekly basis?
A: Victoria and Rock were part of their team; however the LSS Team (experts) would not share information to Victoria and Rock. Those individuals accompanied me to meetings with the COS.
-It was outside my scope to tell Victoria or Rock about their internal processes because the LSS team didn't want to provide accurate information. We communicated all concerns with the Contracting Officer.
-I Will send documentation.
*It was not a requirement for someone from the LSS team to come to the COS meetings with me. It was something the COS and I decided to implement, so that the LSS lead/program manager could be more actively involved in representing their work.

Q: If Barry (or someone from his team) wanted to speak to leadership, what was the procedure?
A: They were aware their only communication was to go through Rock/Victoria.
* Their chain of command was through Rock/Victoria, but Barry and Mark often came to me directly and I would support in any way possible, while still looping in Rock/Victoria. They often came to me to try and discredit some of their team members or speak negatively about them. Barry, in particular, was known for trying to create problems and talking negatively about others. During a meeting with Mr. Kwong, he acknowledged this about Barry and mentioned they were working on correcting those issues.

Q: Part of the LSS course required you to pass tests as well as complete a project. Did you successfully complete the requirements for your certification?
A: No and I don't think 95% of those who attended met the requirements. The course was very detached from FEMA work. It was very time consuming and didn't fit into the FEMA program.
*The COS and I tried our best to help the LSS team develop a training that was adaptable and compatible to the realities of a FEMA disaster operation, but the LSS team insisted on forcing the rigid requirements they used in the private sector, which were often incompatible with our needs. It was definitely possible to learn the LSS tools and apply those to FEMA processes without using such a strict and time consuming methodology or

Initials:  TA

FEMA - C000063

Name:   Tamiris Aldarondo

requiring a certification. The unwillingness of the LSS team to learn about our Agency, be flexible, and adaptable made the completion of training  unrealistic for many in our field workforce.

Q: Did you attempt to change the requirements pertaining to the LSS certification process by requesting the test answers prior to taking the exam or requesting the project be optional?
A: There was a very large list of requirements. We tried to make the course to be more FEMA friendly to get full-time employees to take with a full-time workload.
-I did ask if they can make the course more FEMA friendly. The Project being optional was part of making this as friendly as posible for FEMA employees.
-Because the LSS team was leaving and it was agreed that the FEMA Training Department would administer the test. I asked them to send the answsers to the training team.

* Our main goal with this training was to give FEMA employees some knowledge and tools for process improvement, so that they could use those when appropriate. The traditional LSS projects often take between 4 to 6 months in addition to the 2-4 weeks of training. Taking that into consideration, on top of the fact that employees participating in the training already had their regular job duties and responsibilities, and given the changing priorities in the field, the requirements seemed unrealistic for our operation, and we wanted to make it as adaptable to our FEMA reality as possible.

Q: My understanding is you were enrolled in law school at the same time as you were enrolled in the LSS Black Belt training.  Did your law school attendence/coursework interfere with your ability to complete the necessary tasks for the Black Belt training?
A: No.
* I have been in Law School since I started working for FEMA and my course load is lower than the average student, specifically because my job is my priority. During this time, I have consistently exceeded expectations and been recognized by numerous supervisors for my work. For reference: Peter Danjcheck, Maggie Holmes, Alejandro de la Campa, Kelli Russo.

Q: Are you aware of any issues pertaining to or surrounding the LSS program on DR4339, specifically with Barry Angeline?
A: With Barry: raised his voice a lot, aggressive, he interrupted one of the CIP team member who was LSS trained and undermined what the employee was presenting.
-They made comments about my age constantly to me. He said things like: "I started doing this before you were born". They made similar commnets to Michelle Ortiz. I did speak to the COS and I was told to "grow some thick skin."
-I was trying to be more assertive and even when to ADR to develop my leadership skills.
-Barry and Mark would mention the type of weapons they used to use in the military. I never thought they would act on anything with weapons.

* Barry and Mark would mention the type of weapons they used in the military, as a response to me giving them assertive answers or directions. I perceived this as an act of intimidation, but also trusted that our JRO is a safe space and any violent behavior would not be tolerated.

Q: Did you ever make any comments to anyone regarding Barry's age, race or gender?
A: Absolutely not.

Initials:   TA

FEMA - C000064

Name:  Tamiris Aldarondo

Q: Did you ever refer to Barry as an "old white guy" and/or "don't pay attention to the white guys; they have no credibility"?
A: Absoltuely not. They actually refered to themselves in this manner.

Q: If you didn't, why would someone say you had?
A: I don't know.

Q: Do you recall playing an icebreaker with FEMA/contractors. The game was similar to Pictionary (you have to get your team to say the word on the card without saying the actual word) and someone was given the card "contractors". After the game you told the individual they should've said "A lot of old white guys." Do you recall this?
A: No. I don't remember playing that game.

Q: Why was Barry terminated from DR4339 and who terminated him?
A: I think it was an internal decisión made by the prime. The prime contractor would have but I don't know who.

Q: Was the entire team (contractors) terminated at the same time as Barry? If not, how was it decided Barry would be terminated?
A: I think Barry was terminated before the rest of the team, but I don't know how the decisión was made.

Q: Barry states he was terminated due to a lack of funding/experience. What can you tell me about this?
A: I am unaware of this. I thought it was because of conduct and performance.

Q: Do you recall Barry sending you an email dated May 17, 2019 that he (along with others), filed a whistleblower/EEO complaint?
A: Yes. It was the day after FEMA Operations decided to end the LSS contract. Deputy FCO , COS.

*Deputy FDRC, not Deputy FCO.


Q: What did you do after receiving this email? Who did you notify?
A: My chain of command: Dominic Lenox (Deputy FDRC) Federal Disaster Recovery Center.
*FDRC stand for Federal Disaster Recovery Coordinator

Q: Did you unreasonably interfere with Barry's ability to perform his work, or created an intimidating, hostile, or offensive work environment based on an individual's protected basis?
A: No, I can't imagine I was intimidating to him at all.

*Any decision made or instructions given, were solely based on conduct and performance. My attitude, personality, and actions inside and outside of work, have always been recognized for being diplomatic, inclusive, and understanding. For reference: Melissa Boudrye, Shirley Rivera.

Q: Do you feel you created a toxic environment and showed an insensitivity to the diversity within the CIP team?
A: Absolutely not.

Initials: __TA__

FEMA - C000065

Name:  Tamiris Aldarondo

Q: Did you harass/discriminate against the LSS team, specifically Barry?
A: Absolutely not.

Q: Do you believe the LSS team was treated differently because they were subcontractors
to the prime contracting company ATCS?
A: Not on my part.

Q: Do you have or did you have a personal relationship with anyone working for ATCS?
A: I went out to dinner with Victoria and other people once.

Q: Did Eli continue to have input/interactions with the LSS program once he left?
A: No input but yes to interaction.
* From what I remember, Eli only had interactions with me as he was my counterpart, not
with the LSS team.

Q: Did Eli ever make any comments to anyone regarding Barry's age, race or gender?
A: Absolutely not.

Q: Do you believe Eli discriminated/harassed the LSS team, specifically Barry Angeline?
A: Absolutely not.

Q: Who else do you suggest I speak to regarding the LSS/CIP program and Barry?
A: Eli, Dawn Dickerson, Anna Bonilla.
*Melissa Boudrye

Q: Were you ever advised that any LSS Contractor was not being paid for the use of
intellectual property?  If so, by who and when?
A: I'm not really sure; not that I can remember

Q: Were you ever advised that any LSS Contractor was not being paid for all of the
training being provided?  If so, by who and when?
A: No, not that I am aware of

Q: Were you the Project Manager for the LSS Contract?  When and how long?
A: No, that was an internal position from the contractors.  I am a program analyst and
was a task monitor for the LSS project; ensured work was being done and the contractors
showed up to work their hours

Q: Who gave you those duties?
A: It came with the Unit lead position

Q: What was you LSS understanding and/or experience prior to DR-4339?
A: I did not have any experience with LSS

Q: Were you ever told in March 2019 that FEMA was "getting gouged" for paying for
services to a prime contractor (ATCS), who was then passing the work down to 2nd and 3rd
tier sub-contractors for completion?  If so, by who?  When? What did you do?
A: I don't think anyone formally talked to me about LSS and how much they were making.
In casual conversations there may have been discussions about FEMA contracting and
overspending.  No one specifically told me about any contracting issues or money

Initials:  TA

**FEMA - C000066**

Name:  Tamiris Aldarondo

Q: Do you know a woman named Victoria Colmenero?  If so, how do you know her?
A: Yes, I only know her from being the project manager for the LSS team

Q: Did you have any role in Colmenro's placement by ATCS on the LSS contract?
A: Absolutely not, I only met her when she came down to that position

Q: Did you ever attempt to get or obtain an advanced copy of the LSS final exam?
A: No, I only requested a copy for training as I explained earlier. For me specifically, no
*As the supporting documentation (emails) will show, the request was to send the tests to the Training department so they could perform the test in the future, if needed. However,as far as I'm concerned, this was never utilized by FEMA.

Q:  Did you ever say to any LSS contractor, "it is in everyone's best interest for everyone to pass the exam?"  If so, why?
A: Not that I remember. I could have said I hope everyone passes or everyone learned something.  But I did not say anything with the connotation that everyone should pass

Q:  What was your role as the CIP Lead?
A: In 2019, my role was to oversee, monitor, and ensure all CI projects were completed by the team.  I supervised deadlines and monitored performance, ensured projects were reported to leadership overall as needed

Q: Did you ever use the role of CIP Lead for any other purpose?
A: Only for any other responsibilities I was assigned in my role.  It would have been detailed in my resume

Q:  Were make up sessions scheduled to keep you current in the LSS studies because of how many classes you missed? How many classes did you miss?  Why?
A: I honestly don't remember.  Make-up sessions and refresher were implemented for anyone; I don't know how many classes I missed, I don't think I missed any classes.  I would have only missed a class for priority meetings with leadership that superseded training
The Chief of Staff project I completed was presented to the Chief of Staff; after the LSS contractors left- my stakeholder did not implement the process I presented to the Chief of Staff

Q:  Did you ever call any LSS Contractor "an asshole" in response to a complaint about your behavior?
A: Absolutely not

Q:  Did you ever limit the duties of any LSS Contractor because of a memo written to Mike Burns outlining problems with the LSS Contract Implementation?
A: I was never told about any memo to Mike Burns

**END OF STATEMENT**

Initials:  TA

**FEMA - C000067**

Name:  Tamiris Aldarondo

I have read this statement. It is true, accurate and complete to the best of my knowledge and belief. I have been given an opportunity to make any corrections, additions, or deletions. I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.

TAMIRIS ALDARONDO JIMENEZ
Digitally signed by TAMIRIS ALDARONDO JIMENEZ
Date: 2020.10.28 14:37:52 -04'00'
_____
Signature

_10/28/2020_
Date

Mara Lederer
_____
Investigator Name

MARA F LEDERER
Digitally signed by MARA F LEDERER
Date: 2020.10.28 15:01:38 -04'00'
_____
Investigator's Signature

Initials:  __TA__

FEMA Form 115-045-005-002 (6/20)

Page 8 of 8

**FEMA - C000068**

DEPARTMENT OF HOMELAND SECURITY
Federal Emergency Management Agency

## NON-DISCLOSURE NOTICE MEMORANDUM

You are assisting in an ongoing official inquiry being conducted on behalf of the Federal Emergency Management Agency (FEMA). As this inquiry is sensitive in nature, you are hereby instructed not to disclose information relating to this official inquiry to any other person(s), except as may be appropriate under applicable law.

Failure to comply with this directive may subject you to disciplinary action under appropriate charges, such as failure to follow instructions or interfering with or impeding an official investigation.

These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.

Gretchen Carreiro
Print Name

GRETCHEN G CARREIRO

Digitally signed by GRETCHEN G CARREIRO
Date: 2020.11.23 11:44:32 -05'00'

Signature                          Date

FEMA - C000069

DEPARTMENT OF HOMELAND SECURITY
## Federal Emergency Management Agency

## WARNING ACKNOWLEDGEMENT

You are being interviewed as part of an official Department of Homeland Security, Federal Emergency Management Agency administrative investigation. This is not a criminal investigation. Neither your answers nor any information derived from them may be used against you in criminal proceedings, except to prosecute you for knowingly making false statements. You must answer these questions to the best of your ability. Failure to cooperate with this investigation, including your failure to answer any questions completely and truthfully, may result in disciplinary action, up to and including the termination of your employment.

Agency personnel responsible for conducting this investigation, or for taking action based on this investigation, may disclose the information contained in your statement to persons with a need to know that information, in accordance with routine uses identified in the Department of Homeland Security System of Records Notice, "Department of Homeland Security-DHS/ALL 020 Internal Affairs System of Records," 79 Fed. Reg. 23,361 (Apr. 28, 2014), including disclosure to decision-makers in a proposed disciplinary action, or as necessary in the course of any appeals or litigation arising from such an action.

You should have received, reviewed, and signed a Non-Disclosure Notice Memorandum as part of this official investigation. You may not disclose information about this investigation except as provided by the terms of the Non-Disclosure Notice Memorandum you signed.

By signing below, you acknowledge that you have read and understand this advisory, and that you understand that this is an official administrative investigation/inquiry.

Gretchen Carreiro
#### Employee Name (Print)

GRETCHEN G CARREIRO
Digitally signed by GRETCHEN G CARREIRO
Date: 2020.11.23 11:46:56 -05'00'

| Signature of Employee | Date | Time |

Michael K Tenant
#### Investigator Name (Print)

Michael K. Tenant
Digitally signed by Michael K. Tenant
Date: 2020.11.23 12:30:30 -05'00'

Signature of Investigator

FEMA - C000070

DEPARTMENT OF HOMELAND SECURITY
## Federal Emergency Management Agency

## OFFICIAL DECLARATION

Name: Carreiro, Gretchen                    Position: Program Specialist/COR

Organizational unit assigned: _____

Work phone: _____    Email address: gretchen.carreiro@fema.dhs.gov

Work address: 500 C Street, SW 2nd Floor, Washington, DC

### STATEMENT

Q: Did you understand the terms/conditions of the Non-Disclosure Notice Memorandum, Warning Acknowledgement, and Weingarten Rights forms that you reviewed, signed, and returned to me?
A: Yes,  I did

Q: How long have you worked for FEMA?
A:  I have worked for FEMA since 7/2011

Q: What is your current grade, title, employee type (Reservist, CORE, PFT)?
A:  GS-12/Program Specialist/COR (Contracting Officer Representative)/PFT

Q: Please briefly describe the duties of your position.
A: Main duties of my position are to oversee contracts from (for my directorate - ORR) agencies that I am assigned to

Q: How long have you held this position?
A:   Since 2012

Q: What is your work address?
A: 500 C St, SW 2nd Floor, Washington, DC

Q: Who is your current supervisor and what is his/her title?
A:  Ociel Nava, Branch Chief, ORR Doctrine Office

Q: I am investigating allegations of waste, fraud, abuse committed during DR-4339 in Puerto Rico from May 2018 through August 2019 in the implementation of Lean Six Sigma under FEMA Contact HSFE80-16-A-0004, Task Order 70FB8018F00000070. Were you the assigned Contract Officer Representative (COR)?
A: Yes, I was

Q: What was your involvement with the LSS Implementation project?
A: I am the overall COR for the Coordinating and Planning Partners (CAPP)-2 large businesses joined together with 27 smaller sub-contractors to provide services; made up of ATCS and AECOM) BPA (blanket purchase agreement)- we issue lots of task orders because it is a very broad scoped BPA and I am the COR assigned to any task order issued off of this BPA.  My involvement is that the package was put together and my job is to get it to the CO (Contracting Officer- was Rashaan Edwards; Karley Hoyt was the Contracting Specialist I dealt with mostly)- Once the CO approves the task order package, it moves forward to be awarded to the contractor/vendor

Initials: __GC__

**FEMA - C000071**

Name:  Carreiro, Gretchen


Q: Who was in the Contract Technical Representative ?
A: We don't use that term anymore; what we had on this task order was a FEMA Program Manager (PM) who oversees the hours and interacts with the contractors because I am never a SME for these requirements. Before invoices are approved a PM on the ground reviews and approves them. Program Managers cycled through this included: FOD (Field Operations Division) Office- Eli Pushkarewicz, Tamiris Aldarondo, Peter Danjczek (Peter came from the ORR Front Office)  - the last program manager After reviewing my email, I can recall two more FEMA PMs Ana Bonilla Davila who took over as PM after Eli Pushkarewicz and Luis Olivares Lugo who was actually FEMA PM prior to Eli Pushkarewicz.


Q: Were you ever notified of any of the following by any LSS Contractor, Sub-Contractor, or other reporting party:
Q: Dramatic Increase to the Statement of Work (SOW)?
A: No, because anything with the SOW would have had to be approved by the CO.  There were official tweaks to the SOW and that modification has to be officially approved by the CO, signed off by the CO and signed off on by the vendor


Q: Was any SOW modification requested?
A:I think  a modification was done towards the end of the contract- to make a lower level of effort – asking the contractors to do less.  Many of these things were passed on to Karly Hoyt- we at FEMA needed to give some type of training in LSS because the contractors would not have been around to do this for us forever; however, I have to check In reviewing my emails - In checking my emails I did find the SOW modification completed by the CS/CO. This SOW modification was agreed to by the FEMA Program and the CaPP and would have better served FEMA's needs.  I sent you the email which shows the signed modification and what updates were made to the SOW.

Q: That prime contractor, ATCS, staffed the program with unqualified personnel who lacked basic qualifications as specified under the contract requirements?
A: Eli was the first to say that ATCS/AECOM makes CAPP; was not doing what they were supposed to be doing- On 10/31/2018 I received an email from FEMA staff (Eli Pushkarewicz, FEMA PM) complaining about the performance of the contractors and their work I can provide emails from Eli
I was harassed by a contractor named Barry Angeline via email, starting in 4/10/2020 after the contract was over-it would not have been appropriate to speak with him directly; I spoke with Rashaan and Karley- (Rashann let me know) it had gone through the IG and lawyers and all was good- I do not believe I was ever contacted by any LSS contractor while the contract was ongoing about any issues-

Q: Please forward the emails, we discussed, with your declaration.
A: Okay. (I forwarded all emails that we discussed from Barry Angeline and Eli Pushkarewicz)

Q: When was the first time Angeline or another contractor contacted you?
A: N/A

Q: When did Mr. Angeline reach out to you (During, before, or after the contract)?
A: I do not recall. The date on the email where he harassed me was… On 4/10/2020, I believe after the contract was over. (read email to investigators)


Initials:  GC

Name:  Carreiro, Gretchen

Q:  That ATCS regularly violated the Anti-Deficiency Act through forcing contracted personnel to provide intellectual owned property (tools, training templates) outside of the SOW?
A: No, I was not. If anyone would have reached out to me, I would have taken this to the CO

Q: ATCS structured the contract to implement Lean Six Sigma implementations with an excessive number of pass-throughs  to execute the contract (ie use of 4 subcontractors who used 4 sub-sub/ contractors)?
A: I don't know anything about that, no.  ATCS just got the job done for us (FEMA) and it would have been on the up and up for them to do that.

Q: ATCS used staff paid for funds to implement LSS without working on the contract?
A: I never heard anything like that

Q: ATCS "padded the contract" to use office support staff who provided no work on the LSS implementation contract?
A: I have never heard that either

Q: ATCS colluded with sub-contractor GuideHouse to inflate billable hours on contract to benefit each other?
A: Never heard that before

Q: Are you aware of any FEMA staff members referring to any of the LSS Implementation team as "the grumpy old guys", "the old guys", "that washed up team of old guys", "straight old white guys" or any other words to that effect?
A:  I have heard tales of it- During a meeting of task orders with Program Manager Tim McCormick from ATCS mentioned that a  contractor had complained to him about being referred to in that manner; McCormick did not tell me what subcontractor he was referencing and/or who had referred to him in that manner.  From Day one the FEMA PMs seemed to be really unhappy with the work provided by the subcontractors

Q: Who do you think would have relevant information about these matters?
A: Other than those already named, no

Q: Is there anything else you would like to add?
A: I don't have anything else

**END OF STATEMENT**

I have read this statement. It is true, accurate and complete to the best of my knowledge and belief. I have been given an opportunity to make any corrections, additions, or deletions. I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.

Initials:  GC

FEMA - C000073

Name:  Carreiro, Gretchen
_____

GRETCHEN G
CARREIRO

Digitally signed by GRETCHEN
G CARREIRO
Date: 2020.11.25 10:46:52
-05'00'
_____
Signature

11/25/2020
_____
Date

Michael K Tenant
_____
Investigator Name

Michael K.
Tenant

Digitally signed by Michael
K. Tenant
Date: 2020.11.25 15:02:37
-05'00'
_____
Investigator's Signature

Initials:  GC

**FEMA - C000074**

**Tenant, Michael**

| | |
|---|---|
| **From:** | Carreiro, Gretchen |
| **Sent:** | Wednesday, November 25, 2020 12:23 AM |
| **To:** | Tenant, Michael |
| **Subject:** | FW: Contract irregularities/compliance violations (A Contractor from the Lovely CaPP LSS Task Order) |

-----Original Message-----
From: Carreiro, Gretchen
Sent: Tuesday, January 21, 2020 12:07 AM
To: Hoyt, Karley <karley.hoyt.2@fema.dhs.gov>
Cc: Cato, Armetia <Armetia.Cato@fema.dhs.gov>
Subject: FW: Contract irregularities/compliance violations (A Contractor from the Lovely CaPP LSS Task Order)

Good Morning Karley,

I received the below note from one of the contractors on the CaPP Lean Six Sigma task order.

I thought it best I send it to you.  I am not planning on responding to this gentleman.

Thank you!

Gretchen

-----Original Message-----
From: Barry Angeline <bazor10@yahoo.com>
Sent: Monday, January 20, 2020 11:17 AM
To: Carreiro, Gretchen <Gretchen.Carreiro@fema.dhs.gov>
Subject: Contract irregularities/compliance violations

Ms. Carreiro,

I have concerns that a contract under your watch has multiple irregularities related to the Federal Acquisition Regulations.  There is definitely gross mismanagement and possible fraud involved.  Are we able to discuss?

Regards,
Barry

Sent from my iPhone

1

**FEMA - C000075**

**Tenant, Michael**

---

| | |
|---|---|
| **From:** | Carreiro, Gretchen |
| **Sent:** | Wednesday, November 25, 2020 12:24 AM |
| **To:** | Tenant, Michael |
| **Subject:** | FW: Are you this bankruptcy person? |

**From:** bazor9198 <barry.angeline@gmail.com>
**Sent:** Friday, April 10, 2020 6:07 PM
**To:** Carreiro, Gretchen <Gretchen.Carreiro@fema.dhs.gov>
**Subject:** Are you this bankruptcy person?

How do you stay employed...I mean you don't have a working FEMA phone...no voice mail...you don't respond to emails even when someone says there is fraud involved..and apparently you filed for bankruptcy.  After 15 years of government consulting, you quite possibly could be the laziest and most useless person I have encountered. I am not exaggerating.  That is not an easy title to obtain.


On Apr 9, 2020, at 1:35 AM, bazor9198 <barry.angeline@gmail.com> wrote:


Mr. Carreiro,

Are you the COR for contract HSFE80-16-A-0004, task order 70FB8018F00000070?  The prime contractor was ATCS PLC.

If not, can you let me know who the COR is?

Thanks,
Barry Angeline

1

**FEMA - C000076**

DEPARTMENT OF HOMELAND SECURITY
Federal Emergency Management Agency

## NON-DISCLOSURE NOTICE MEMORANDUM

You are assisting in an ongoing official inquiry being conducted on behalf of the Federal Emergency Management Agency (FEMA). As this inquiry is sensitive in nature, you are hereby instructed not to disclose information relating to this official inquiry to any other person(s), except as may be appropriate under applicable law.

Failure to comply with this directive may subject you to disciplinary action under appropriate charges, such as failure to follow instructions or interfering with or impeding an official investigation.

These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.

Rahsaan Edwards
_____
                Print Name

RAHSAAN A
EDWARDS
                        Digitally signed by RAHSAAN
                        A EDWARDS
                        Date: 2020.11.23 11:44:48
                        -05'00'
_____          _____
                Signature                                   Date

**FEMA - C000077**

DEPARTMENT OF HOMELAND SECURITY
**Federal Emergency Management Agency**

**OFFICIAL DECLARATION**

Name:  Edwards, Rahsaan                          Position:  Deputy Director

Organizational unit assigned:

Work phone:                          Email address:  rahsaan.edwards@fema.dhs.gov

Work address: 500 C Street, SW Suite 3 NW 2903  Washington, DC

**STATEMENT**

Q: Did you understand the terms/conditions of the Non-Disclosure Notice Memorandum, Warning Acknowledgement, and Weingarten Rights forms that you reviewed, signed, and returned to me?
A: Yes

Q: How long have you worked for FEMA?
A:  I have worked for FEMA for 14 years and 3 mos

Q: What is your current grade, title, employee type (Reservist, CORE, PFT)?
A:  GS-15/Deputy Director/PFT

Q: Please briefly describe the duties of your position.
A: I am the Dep Dir for disaster and field operations for AOD (Acquisitions Operations Division); handle all disaster procurements

Q: How long have you held this position?
A:   2 months

Q: What is your work address?
A: 500 C Street, SW 3 NW 2903, Washington, DC

Q: Who is your current supervisor and what is his/her title?
A:  Brian McCreary/Dir of AOD

Q: I am investigating allegations of waste, fraud, abuse committed during DR-4339 in Puerto Rico from May 2018 through August 2019 in the implementation of Lean Six Sigma under FEMA Contract HSFE80-16-A-0004, Task Order 70FB8018F00000070. Were you the assigned Supervisory Contract Officer Representative (COR)?
A: No, I was the Contract Officer when that task order was awarded

Q: What was your involvement with the LSS Implementation project?
A: Contract Officer- my main duties was simply to award the contract

Q: Who was in the Contracting Officer Technical Representative-changed to Contracting Officers Representative-Gretchen Carreiro
/Project Manager ? PM name on the funding document is Carreirro's.  R Erickson is also listed in the system

Q: Were you ever notified of any of the following by any LSS Contractor, Sub-Contractor, or other reporting party:

Initials: _____

**FEMA - C000078**

Name: Edwards, Rahsaan

Q: Dramatic Increase to the Statement of Work (SOW)?
A: Hold on, I am looking through my incident report file.  I have one complaint not addressed to me notated.  I received this after I left the section in August 2019 and the complaints started coming in after that.  The complaint (exact date unknown) was from a congressional inquiry.  The answer to the question is no


Q: Was any SOW modification requested?
A: There are multiple modifications on the contract.  I am looking to see if there were any modifications to the statement of work. There was no change to any of the SOWs that I am naming: P-001 through P-006- I do not see anything other than adding funding and exercising options periods
P-006 changed operating locations.  Looking at P-007 it saying the no cost modification is to incorporate a revised SOW on 7/18/19 for equitable adjustments; it looks like the contractor asked for additional compensation for an adjustment to a previously agreed compensation- looks like a change in classes and change in location from the previous modification

Q: That prime contractor, ATCS, staffed the program with unqualified personnel who lacked basic qualifications as specified under the contract requirements?
A: On 8/21/19 there was an email from the CO (who took over from me- Carly Hoyt) to the COR about a team (LSS contractors) complaint with 3 allegations: SOW for contract has been systematically mismanaged by FEMA and ATCS, engaged in violations of the prompt payment act; mismanagement of funds by involved parties.  I have nothing in my files prior to this


Q:  That ATCS regularly violated the Anti-Deficiency Act through forcing contracted personnel to provide intellectual owned property (tools, training templates) outside of the SOW?
A: Prior to the 8/21/2019, I received no information about this while I was the CO
Depending on what the complaint is, the CO should go to Legal and COR to get a perspective on what must be done to address the complaint.  That would be the basic plan and reaction to something like this



Q: ATCS structured the contract to implement Lean Six Sigma implementations with an excessive number of pass-throughs  to execute the contract (ie use of 4 subcontractors who used 4 sub-sub/ contractors)?
A: No, usually in the contracting world, we deal with the primes (prime contractors). How the prime contractor staffs and carries out the contract is not something we get involved in on our side (FEMA contracting side)

Q: ATCS used staff paid for funds to implement LSS without working on the contract?
A: No


Q: ATCS "padded the contract" to use office support staff who provided no work on the LSS implementation contract?
A: No

Initials: _____

**FEMA - C000079**

Name:  Edwards, Rahsaan

Q: ATCS colluded with sub-contractor GuideHouse to inflate billable hours on contract to benefit each other?
A: No

Q: Are you aware of any FEMA staff members referring to any of the LSS Implementation team as "the grumpy old guys", "the old guys", "that washed up team of old guys", "straight old white guys" or any other words to that effect?
A: No sir

Q: Who do you think would have relevant information about these matters?
A: Other than Carly Hoyt, Gretchen Carreiro, and a former attorney for FEMA named Samantha Ahrendt

Q: Is there anything else you would like to add?
A: Looking through the emails from when the contract ended, 5/17/19 an email from Tamaris Aldarondo, Active Unit Lead in PR, to Carreiro was forwarded to me and Hoyt and I forwarded it to Legal. It summarized an interaction Aldarondo had with LSS Subcontractors who were questioning if the LSS Implementation Contract is going to be terminated. The email spoke to the government wishing to carry out the duties the contractors were being paid to do themselves with government employees.  Further review appears that the contract just expired.  The last modification for P-007 had an expiration date on it for 6/30/19.  Unless any further action is taken beyond that expiration date, the contract will just end at that point as no option points are guaranteed  **Please provide email chain regarding the end of this contract***

Additional questions and comments recorded

[Q: Still gave direction on how to handle it even though it was over?
A: Yes.

I was a team lead, but I transitioned to Carley. She was the signer.

Q: Can you find a specific email to say if it expired or what happened?

**END OF STATEMENT**

I have read this statement. It is true, accurate and complete to the best of my knowledge and belief. I have been given an opportunity to make any corrections, additions, or deletions. I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.

RAHSAAN A EDWARDS

Digitally signed by RAHSAAN A EDWARDS
Date: 2020.11.25 12:53:04 -05'00'

_____     _____
Signature                                               Date

Initials: _____

FEMA - C000080

Name:  Edwards, Rahsaan _____

Michael K. Tenant

Michael K Tenant _____ 
Investigator Name

Michael K. Tenant

Digitally signed by Michael K. Tenant
Date: 2020.11.25 15:04:52 -05'00'

_____
Investigator's Signature

Initials: _____

**FEMA - C000081**

**Tenant, Michael**

---

| | |
|---|---|
| **From:** | bazor9198 <barry.angeline@gmail.com> |
| **Sent:** | Tuesday, August 11, 2020 11:54 AM |
| **To:** | Tenant, Michael |
| **Subject:** | Fwd: Contract mismanagement/FAR violations |

Sent from my iPhone

Begin forwarded message:

> **From:** bazor9198 <barry.angeline@gmail.com>
> **Date:** March 30, 2020 at 10:17:23 PM EDT
> **To:** "Edwards, Rahsaan" <Rahsaan.Edwards@fema.dhs.gov>
> **Subject: Re:  Contract mismanagement/FAR violations**
>
> Are you furloughed?  I do. It even know what to say anymore.  Slackers!
>
> Sent from my iPhone

>> On Mar 30, 2020, at 7:24 PM, Edwards, Rahsaan <Rahsaan.Edwards@fema.dhs.gov> wrote:
>>
>>
>> Unfortunately no sir, I will probably not be back in my office for the next month or so.
>>
>>
>> Rahsaan Edwards | Chief | Information Technology | Office of the Chief Procurement Officer
>> Email: Rahsaan.Edwards@fema.dhs.gov | Office: 202-646-5786 | Mobile: 202-256-6648

>> **From:** bazor9198 <barry.angeline@gmail.com>
>> **Sent:** Monday, March 30, 2020 7:18:05 PM
>> **To:** Edwards, Rahsaan <Rahsaan.Edwards@fema.dhs.gov>
>> **Subject:** Re: Contract mismanagement/FAR violations
>>
>> Do you have a status?
>>
>> Sent from my iPhone

>>> On Mar 25, 2020, at 4:52 PM, Edwards, Rahsaan <Rahsaan.Edwards@fema.dhs.gov> wrote:

1

FEMA - C000082

I can check when we get back in the office. I do not currently have access to those files.


Rahsaan Edwards | Chief | Information Technology | Office of the Chief Procurement Officer
Email: Rahsaan.Edwards@fema.dhs.gov | Office: 202-646-5786 |
Mobile: 202-256-6648

---

**From:** bazor9198 <barry.angeline@gmail.com>
**Sent:** Wednesday, March 25, 2020 4:51:12 PM
**To:** Edwards, Rahsaan <Rahsaan.Edwards@fema.dhs.gov>
**Subject:** Re: Contract mismanagement/FAR violations

Mr. Edwards,

Can you let me know who does?  I was informed that it was Gretchen Carreiro, the. Rhonda Lane, and then you.

Thanks,
Barry

Sent from my iPhone


> On Mar 25, 2020, at 4:09 PM, Edwards, Rahsaan <Rahsaan.Edwards@fema.dhs.gov> wrote:
>
>
> Good Afternoon,
>
> Sorry for not responding to the original message, however I no longer manage that requirement.
>
>
> Rahsaan Edwards | Chief | Information Technology | Office of the Chief Procurement Officer
> Email: Rahsaan.Edwards@fema.dhs.gov | Office: 202-646-5786 | Mobile: 202-256-6648
>
> ---
>
> **From:** bazor9198 <barry.angeline@gmail.com>
> **Sent:** Wednesday, March 25, 2020 4:04:07 PM
> **To:** Edwards, Rahsaan <Rahsaan.Edwards@fema.dhs.gov>
> **Subject:** Re: Contract mismanagement/FAR violations
>
> Mr. Edwards,
>
> I left you a voice mail several weeks ago. Can you please contact me regarding the contract below.  My number

2

**FEMA - C000083**

is 703-994-6832.

Comtract HSFE80-16-A-0004, Task Order 70FB8018F00000070

ATCS PLC is the prime

Thanks,
Barry

Sent from my iPhone

On Jan 24, 2020, at 10:28 AM, bazor9198 <barry.angeline@gmail.com> wrote:

Mr. Edwards,

My team and I have concerns that a contract in your portfolio has multiple irregularities related to the Federal Acquisition Regulations.  There is definitely gross mismanagement and possible fraud involved.  Are we able to discuss?

Regards,

Barry

Sent from my iPhone

3

**FEMA - C000084**

**Department of Homeland Security**
**Management Directives System**
**MD Number: 0480.1**
**Issue Date: 03/01/2003**

# ETHICS/STANDARDS OF CONDUCT

# I.    Purpose

This directive establishes the Department of Homeland Security (DHS) policy on the ethical conduct and responsibilities of employees, and outlines the duties and responsibilities of ethics officials.

# II.   Scope

This DHS directive applies to all personnel employed by or detailed to all DHS organizational elements.  To the extent not inconsistent with the provisions of this directive, the structure and organization of the Standards of Conduct programs in organizational elements that transferred into DHS are continued except for the positions of "DAEO" and "Alternate DAEO" which are designated as DHS Deputy Ethics Officials with all authority not reserved to the DHS DAEO.

# III.  Authorities

This directive is governed by Executive Orders and national policy, such as:

A.    Executive Order (E.O.) 12674, Principles of Ethical Conduct for Government Officers and Employees.

B.    5 CFR Part 2635, Standards of Ethical Conduct for Employees of the Executive Branch.

# IV.  Definitions

A.    ***Designated Agency Ethics Official (DAEO)***:  The Legal Advisor for Ethics, Office of the General Counsel, is designated as the DAEO.

B.    ***Alternate DAEO***:  An attorney in the DHS Office of the General Counsel recommended by the Legal Advisor for Ethics and designated by the Secretary.

C.    ***Deputy Ethics Officials***:  DHS employees designated by the DHS DAEO pursuant to 5 C.F.R. § 2638.204.

MD # 0480.1

**FEMA - C000085**

D.      ***Agency Designee***:  Within DHS that term as used in 5 C.F.R. Part 2635 shall refer to the first-line supervisor of the employee whose interests are at issue.

E.      ***Employee***:  For purposes of this directive, "employee" includes Federal personnel employed by or detailed to DHS.

# V.    Responsibilities

A.      ***Designated Agency Ethics Official***: shall coordinate and manage the Department's ethics program as outlined in 5 CFR § 2638.203.

B.      ***Alternate DAEO***: shall serve in an acting capacity in the absence of the DAEO.

C.      ***Deputy Ethics Officials*** shall:

  1.     Administer the statutes, regulations, policies, and procedures governing the ethical conduct and responsibilities of employees within their components.

  2.     Ensure that prompt and effective action is taken where violations or potential violations of the ethics statutes or regulations are found.

  3.     Develop, implement, and disseminate policy and procedure on ethics matters.

  4.     Coordinate and oversee the conduct of the annual financial disclosure filing cycle.

  5.     Provide ethics advice to the officials and employees within their areas of responsibility.

  6.     Provide initial ethics orientation to new employees.

  7.     Provide mandatory annual ethics training to employees in covered positions.

D.      ***Supervisors*** shall:

  1.     Permit new employees a minimum of 1 hour of official duty time for the purpose of reviewing Part I of EO 12674 and 5 CFR Part 2635.

  2.     Ensure that employees who are responsible for filing financial disclosure reports receive at least 1 hour of annual ethics training.

MD # 0480.1

**FEMA - C000086**

3.      Request assistance where needed from appropriate ethics counselors in advising employees on ethics and conduct issues.

4.      Review employee notifications of outside work or activities to assist in determining if there is any conflict of interest with their official duties and responsibilities or the appearance thereof.

5.      Forward employee requests to conduct outside work for a prohibited source to the appropriate servicing ethics counselor.

6.      Report any potential conflict of interest situations to the respective ethics official for resolution.

E.      ***Employees*** shall:

1.      Be familiar and complying with the Standards of Ethical Conduct for Employees of the Executive Branch contained in 5 CFR Part 2635 and generally outlined in section 6, below, as well as any supplemental Departmental conduct and ethics regulations.  Employees are encouraged to refer to the Office of Government Ethics' World Wide Web site, http://www.usoge.gov, for access to ethics statutes, regulations, forms, and helpful informational materials.

2.      Consult with their supervisors and ethics officials on general questions regarding the applicability of the standards of conduct regulations.  On specific matters, and for guidance on questions of conflict of interest, employees are strongly encouraged to seek the advice and guidance of their ethics officials.

# VI.  Policy & Procedures

A.      ***Policy***: All employees will maintain especially high standards of honesty, impartiality, character, and conduct to ensure the proper performance of Government business and the continual trust and confidence of the citizens of the United States.  The conduct of employees must reflect the qualities of courtesy, integrity, and loyalty to the United States; a deep sense of responsibility for the public trust; promptness in dealing with and serving the public; and a standard of personal behavior that reflects positively upon and will be a credit to both employees and the Department.

MD # 0480.1

**FEMA - C000087**

These principles apply to official conduct as well as private conduct that affect in any way the ability of employees or the Department to effectively accomplish the work of the DHS.  To ensure that every citizen can have complete confidence in the integrity of the Federal Government, each Federal employee must respect and adhere to the principles of ethical conduct set forth below; 5 CFR Part 2635, Standards of Ethical Conduct for Employees of the Executive Branch; and other applicable laws.

Employees should:

1.    Place loyalty to the Constitution, the laws, and ethical principles above private gain as public service is a public trust.

2.    Not hold financial interests that conflict with the conscientious performance of duty.

3.    Not engage in financial transactions using nonpublic Government information or allow the improper use of such information to further any private interests.

4.    Not, except pursuant to such reasonable exceptions as are provided by regulation, solicit or accept any gift or other item of monetary value from any person or entity seeking official action from, doing business with, or conducting activities regulated by the Department, or whose interests may be substantially affected by the performance or nonperformance of the employees' duties.

5.    Put forth an honest effort in the performance of their duties.

6.    Not knowingly make unauthorized commitments or promises of any kind purporting to bind the Government.

7.    Not use public office for private gain.

8.    Act impartially and not give preferential treatment to any private organization or individual.

9.    Protect and conserve Federal property and not use it for other than authorized activities.

10.    Not engage in outside employment or activities, including seeking or negotiating for employment, that conflict with official Government duties and responsibilities.

11.    Disclose waste, fraud, abuse, and corruption to appropriate authorities.

- 4 -

MD # 0480.1
**FEMA - C000088**

- 5 -

12.    Satisfy in good faith their obligations as citizens, including all just financial obligations, especially those such as Federal, state, or local taxes that are imposed by law.

13.    Adhere to all laws and regulations that provide equal opportunity for all Americans regardless of race, color, religion, sex, national origin, age, or handicap.

14.    Endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards set forth in this directive. Whether particular circumstances create an appearance that the law or these standards have been violated will be determined from the perspective of a reasonable person with knowledge of the relevant facts.

B.    ***Procedures***:  Any behavior that reflects negatively upon DHS should be reported to the DAEO.

C.    ***Questions or Concerns Regarding the Process***:  Any questions or concerns regarding this directive should be addressed to the Legal Advisor for Ethics, Office of the General Counsel.

- 5 -

MD # 0480.1

**FEMA - C000089**