|  **DEPARTMENT OF HOMELAND SECURITY**<br>**Federal Emergency Management Agency**<br>**Office of Professional Responsibility**<br><br>**REPORT OF INVESTIGATION** | **1. CASE NUMBER**<br>20200564 |
|---|---|
| | **2. PREPARED BY**<br># Lederer, Mara |
| | **3. REPORT NUMBER**<br>001 |

**4. TITLE**
ELI PUSHKAREWICZ, Program Analyst, Guaynabo, PR

**5. FINAL RESOLUTION**

| **6. STATUS**<br>Closing Report | **7. TYPE OF REPORT**<br>Investigative Findings | **8. RELATED CASES** |
|---|---|---|

**9. ALLEGED VIOLATION(S)**
(1)     Inappropriate Comments
(2)     Hostile Work Environment (HWE)

**10. SYNOPSIS**
On August 17, 2020, the Federal Emergency Management Agency (FEMA) Office of Professional Responsibility (OPR) received an email with attachments from Barry Angeline alleging misconduct, specifically inappropriate comments pertaining to Angeline and the contractor's demographic group, against Program Analyst (PA) Eli PUSHKAREWICZ. On September 18, 2020, the Department of Homeland Security (DHS) Office of Inspector General (OIG) declined the matter and referred it to the FEMA OPR for investigation.

On August 31, 2020, the case was assigned to OPR Investigator Mara Lederer for investigation. Investigator Lederer obtained and reviewed internal and external documents and conducted interviews as part of this investigation. The investigation did find a preponderance of the evidence supported the allegation PUSHKAREWICZ made inappropriate comments towards Barry Angeline. As such, the allegation is **SUBSTANTIATED**.

During the course of the investigation, Angeline was unable to provide evidence of how PUSHKAREWICZ created a Hostile Work Environment (HWE).  As such, the allegation is **UNFOUNDED**.

| **11. CREATED BY**<br># Lederer, Mara    MARA F LEDERER *Digitally signed by MARA F LEDERER Date: 2020.12.04 07:38:43 -05'00'* | **12. COMPLETION DATE**<br>11/30/2020 | **13. ORIGIN OFFICE**<br>OPR |
|---|---|---|
| **14. APPROVED BY**<br># Arnone, Charles    CHARLES S ARNONE *Digitally signed by CHARLES S ARNONE Date: 2020.12.04 09:08:17 -05'00'* | **15. APPROVED DATE** | **16. TELEPHONE** |

FEMA - C000090

Case 3:26-cv-01340-CVR    Document 11-3    Filed 06/11/26    Page 2 of 167

FOR OFFICIAL USE ONLY                 SENSITIVE                      Page 2 of 12

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, DEPARTMENT OF HOMELAND SECURITY, TOGETHER WITH A COPY OF THIS DOCUMENT.

THIS DOCUMENT CONTAINS INFORMATION REGARDING CURRENT AND ON-GOING ACTIVITIES OF A SENSITIVE NATURE. IT IS FOR THE EXCLUSIVE USE OF OFFICIAL U.S. GOVERNMENT AGENCIES AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY. IT CONTAINS NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF THE DEPARTMENT OF HOMELAND SECURITY. DISTRIBUTION OF THIS DOCUMENT HAS BEEN LIMITED AND FURTHER DISSEMINATIONOR EXTRACTS FROM THE DOCUMENT MAY NOT BE MADE WITHOUT PRIOR WRITTEN AUTHORIZATION OF THE ORIGINATOR.

FEMA - C000091

FOR OFFICIAL USE ONLY                    SENSITIVE                              Page 3 of 12



| | |
|---|---|
|   **DEPARTMENT OF HOMELAND SECURITY**<br>**Federal Emergency Management Agency**<br>**Office of Professional Responsibility**<br><br>**REPORT OF INVESTIGATION CONTINUATION** | **1. CASE NUMBER**<br>20200564<br><br>**2. PREPARED BY**<br># Lederer, Mara<br><br>**3. REPORT NUMBER**<br>001 |

**NARRATIVE**

On August 17, 2020, FEMA OPR received an email with attachments from Barry Angeline alleging misconduct against PA Eli PUSHKAREWICZ **(EXHIBIT 1)**. Specifically, Angeline alleged PUSHKAREWICZ made inappropriate comments pertaining to his age, gender and race. On September 18, 2020, DHS OIG declined the matter and referred it to the FEMA OPR for investigation **(EXHIBIT 2)**.

*Interview with Contractor Barry Angeline*

On September 11, 2020, Investigator Mara Lederer interviewed FEMA contract employee Barry Angeline via telephone. Prior to the interview, Angeline reviewed and signed a Non-Disclosure Agreement and returned a signed Official Declaration after his interview **(EXHIBIT 3)**. The following is a summary of the information provided by Angeline:

- Angeline was a subcontractor to Novaces, which subcontracted to the prime contracting company ATCS on the FEMA contract in Puerto Rico.
- Angeline worked on site from July 8, 2018 until May 24, 2019.
- Angeline reported to PUSHKAREWICZ from August 2018 until November 2018.
- PUSHKAREWICZ referred to Angeline and the Lean Six Sigma (LSS) contractors as "…straight old guys," "the old guys," "that (sic) washed up team of old white guys" and the "straight old white guys."
- PUSHKAREWICZ instructed employees to write Angeline up for trivial issues such as failure to take enough notes when he was running the meeting.
- Angeline is unaware if PUSHKAREWICZ had input into the makeup of contracting personnel.
- PUSHKAREWICZ left Puerto Rico and returned to FEMA HQ in November 2018; however, continued to have interactions with management regarding the LSS program.
- PUSHKAREWICZ's nickname was the "destroyer."
- PUSHKAREWICZ did not unreasonably interfere with Angeline's work performance nor did he create an intimidating, hostile, or offensive work environment based on an individual's protected basis.

Angeline was a subcontractor to the prime contracting company ATCS working on the FEMA contract in Puerto Rico (DR4339). Angeline was tasked with training and mentoring of FEMA personnel enrolled in the LSS program. The goal of the program was to implement a process to assist to change the culture at FEMA as it related to improving productivity during disasters.

FOR OFFICIAL USE ONLY                    SENSITIVE

FEMA - C000092

FOR OFFICIAL USE ONLY                    SENSITIVE                    Page 4 of 12

While working as a contractor on the LSS program, Mark Rozycki (contractor) overheard PUSHKAREWICZ make statements regarding Angeline and the LSS team and referred to their gender, race, age and sexual orientation when he made statements such as: "the old guys", "go ask those straight old white guys on the LSS team", "that washed up team of old guys" and the "straight old white guys." Additionally, contractor David Barlow in Quality Control, overheard similar statements.

Angeline requested, through the Freedom of Information Act (FOIA), FEMA emails from several individuals to include PUSHKAREWICZ to ascertain if there was evidence of mismanagement or inappropriate conduct as it related to the LSS program **(EXHIBIT 4)**. Angeline was unable to provide evidence or documentation to support PUSHKAREWICZ instructing employees to write Angeline up for trivial issues.

PUSHKAREWICZ was known by the nickname the "destroyer" because he was known to sabotage a program. PUSHKAREWICZ did this to appear in a positive light to leadership when he "warned" leadership of issues; although Angeline offered no evidence to support this.

Although PUSHKAREWICZ left Puerto Rico in November 2018 and was no longer involved in the LSS program, Angeline believes PUSHKAREWICZ continued to have contact with Aldarondo in Puerto Rico. Angeline was unable to provide evidence to support this allegation.

**[INVESTIGATOR NOTE:** Angeline provided a large volume of emails and attachments; however, only documentation relevant to this investigation were included. All emails are located in the case folder.**]**

*Interview with Contractor Mark Rozycki*

On August 5, 2020, Investigator Michael Tenant interviewed FEMA contract employee Mark Rozycki. Prior to the interview, Rozycki reviewed and signed a Non-Disclosure Agreement and returned a signed Official Declaration after his interview **(EXHIBIT 5)**. The following is a summary of the information provided by Rozycki:

- The LSS team was comprised of seven Caucasian men over the age of 50.
- PUSHKAREWICZ created a toxic work environment when he discouraged CIP members and other FEMA employees to work collaboratively with the LSS team.
- PUSHKAREWICZ referred to the LSS team as "the old guys," that washed up team of old white guys" and the "straight old white guys."

*Interview with Contractor Michael Oshaben*

On August 28, 2020, Investigator Tenant interviewed FEMA contract employee Michael Oshaben. Prior to the interview, Oshaben reviewed and signed a Non-Disclosure Agreement and returned a signed Official Declaration after his interview **(EXHIBIT 6)**. The following is a summary of the information provided by Osahben:

- There was an age difference between the CIP group and the LSS team.

FOR OFFICIAL USE ONLY                    SENSITIVE

FEMA - C000093

- PUSKHAREWICZ referred to the LSS team as "the grumpy old guys" or the "old guys."
- PUSHKAREWICZ sabotaged many LSS projects to include the digital inspection tool.

PUSHKAREWICZ did not want the LSS project to succeed by failing to implement many projects to include the digital inspection tool because he wanted to do things his way and did not accept input from the LSS team. Oshaben did not provide evidence to support this statement.

<u>*Analysis of Emails*</u> **(EXHIBIT 7)**:

Investigator Lederer requested emails to ascertain if there were any correspondences regarding the LSS program. Investigator Lederer requested emails between August 1, 2018 and October 1, 2018 for the following individuals:

- Tamiris Aldarondo
- PUSHKAREWICZ
- Joanne Lucas
- Dawn Dickerson

Investigator Lederer requested emails between May 13, 2019 and May 31, 2019 for the following individuals:

- Aldarondo
- PUSHKAREWICZ
- Dominique Lenox
- Ana Bonilla
- Victoria Colmenero
- Jonathan Hoyes
- Justo "Tito" Hernandez
- Michelle Ortiz
- Christian Gomez
- Kevin Porter

The email request failed to produce emails from Lucas, Lenox, Colmenero, Hoyes, Ortiz or Gomez.

An analysis of the emails received yielded no pertinent information pertaining to the LSS program, discriminatory language or inferences.

<u>*Interview with Operational Coordination Division Director Justo Hernandez*</u>

On September 14, 2020, Investigators Lederer and Tenant interviewed Hernandez via Microsoft Teams (MT) video. Prior to the interview, Hernandez reviewed and signed a Non-Disclosure Agreement and returned a signed Official Declaration after his interview **(EXHIBIT 8)**. The following is a summary of the information provided by Hernandez:

FEMA - C000094

- Hernandez was the Team Leader on an unrecalled date at the beginning of DR4339 and later became the Deputy Field Coordinating Officer (DFCO) until July 19, 2019.
- Frustration existed at the sector level in Puerto Rico with the LSS contractors.
- Hernandez did not have direct oversight over the LSS program and cannot provide additional personnel to contact.

The LSS contractors wanted to know every detail of the process; however, as non-FEMA employees, they did not understand the process. Additionally, at the same time, FEMA was dealing with a disaster (Hurricane Maria) and there were many moving parts where employees did not have the time to explain every detail of the disaster process to the LSS contractors.

*Interview with Program Analyst Brenda Dorta*

On September 14, 2020, Investigator Lederer interviewed Dorta via telephone. Prior to the interview, Dorta reviewed and signed a Non-Disclosure Agreement and returned a signed Official Declaration after her interview **(EXHIBIT 9)**. The following is a summary of the information provided by Dorta:

- Dorta began as a Continuous Improvement (CI) Specialist and then became a Program Analyst/Continuous Improvement Program (CIP) on DR4339.
- A month after Dorta began, the LSS group became part of the CIP group.
- PUSHKAREWICZ was the Unit Lead until November 2018, when he left Puerto Rico.
- PUSHKAREWICZ continued contact with Acting Unit Lead Tamaris (Tami) Aldarondo once he ceased holding the Unit Lead position.
- Dorta does not believe PUSHKAREWICZ purposely attempted to "tank" or desire the LSS program fail; however, she believes more effort was necessary for the program to succeed due to the more technical and mathematical nature than PUSHKAREWICZ realized.
- Dorta did not overhear PUSHKAREWICZ use any words to negatively describe Angeline's race, gender or age.
- Dorta could not provide an opinion to whether PUSHKAREWICZ's conduct involved unreasonably interfering with Angeline's work performance, created an intimidating, hostile, or offensive work environment based on an individual's protected basis.

Dorta was unable to provide evidence or documentation to support PUSHKAREWICZ continued to have contact with Aldarondo regarding the LSS program.

*Interview with Program Analyst Tamiris Aldarondo*

On October 27, 2020, Investigators Lederer and Tenant interviewed Aldarondo via MT video. Prior to the interview, Aldarondo reviewed and signed a Non-Disclosure Agreement and returned a signed Official Declaration after her interview **(EXHIBIT 10)**. The following is a summary of the information provided by Aldarondo:

- PUSHKAREWICZ was the Unit Lead for the CIP; however, the dates are not known.
- PUSHKAREWICZ made no comments regarding Angeline's race, age or gender.

FEMA - C000095

- Once PUSHKAREWICZ left Puerto Rico in approximately November 2018 and returned to Headquarters (HQ), he no longer had input into the LSS program.
- There were many issues pertaining to the LSS program to include unprofessional behavior and work quality issues.
- The LSS contract was terminated effective May 16, 2019 in concurrence with the Chief of Staff's (COS's) office and the Deputy Recovery Director that the LSS contractors were not meeting the professional standards as well as delivering measurable outcomes.
- PUSHKAREWICZ did not interfere with Angeline's ability to perform his work, or create an intimidating, hostile, or offensive work environment based on an individual's protected basis.
- PUSHKAREWICZ did not create a Hostile Work Environment (HWE) and did not treat the LSS team differently because they were contractors.

The LSS team experienced performance and conduct related issues as outlined in FEMA Memorandums dated October 22, 2018 and May 24, 2019 **(EXHIBIT 11)**. The memorandums outlined the following issues:

- Unprofessional behavior.
- Work quality issues.
- Unsatisfactory customer service with JRO partners.
- The LSS team singlehandedly decided to change duty stations (Call Center Building) without direction given by anyone in FEMA.

**[INVESTIGATOR NOTE:** Investigator Tenant made multiple attempts to reach COS Bonilla for an interview; however, all attempts were met with negative results. Bonilla is no longer with FEMA.**]**

### *Interview with ORR Portfolio Manager Eli PUSHKAREWICZ*

On November 5, 2020, Investigators Lederer and Tenant interviewed PUSHKAREWICZ via MT video. Prior to the interview, PUSHKAREWICZ reviewed and signed a Non-Disclosure Agreement, Warning Acknowledgement Form, Weingarten Rights and returned a signed Official Declaration after his interview **(EXHIBIT 12)**. Pushkarewicz's Bargaining Unit representative, FEMA Inventory Management Specialist Charles Aitken, was present during the interview. Aitken reviewed and signed a Non-Disclosure Agreement **(EXHBIIT 13)**. The following is a summary of the information provided by Pushkarewicz:

- The COS made all decisions pertaining to the management of the LSS program to include staffing decisions.
- Decisions pertaining to the direction of LSS were made by the COS and FCO.
- By the end of July [2018], the LSS contractors were struggling and operational leadership was upset regarding the lack of project success three months into the program.
- From May 2018 until November 2018, PUSHKAREWICZ was assigned to the CIP; originally to provide coaching and mentoring for the Regional Continuous Improvement Coordinator and then as the CIP Unit Lead.

- PUSHKAREWICZ continued to review basic invoices and provided guidance to the COS and Aldarondo until January 2019.
- PUSHKAREWICZ continued to provide technical program guidance to Aldarondo as needed as PUSHKAREWICZ supports Regions I through IV.
- Neither the LSS group nor the prime contracting (ATCS) company's work was extended.
- The LSS group was not treated differently because they were subcontractors.
- PUSHKAREWICZ did not make comments pertaining to Angeline's age, race or gender to include the statements: "go ask those old white guys on the LSS team," "the old guys," "that washed up team of old guys" or the "straight old white guys."
- PUSHKAREWICZ attempted to foster an inclusive and collaborative environment between the CIP and LSS team.
- PUSHKAREWICZ advocated for the LSS contractors to include Angeline.
- PUSHKAREWICZ did not sabotage the LSS program.
- PUSHKAREWICZ did not interfere with Angeline's ability to perform his work, or create an intimidating, hostile, or offensive work environment based on an individual's protected basis.
- PUSHKAREWICZ did not create a Hostile Work Environment (HWE) and did not treat the LSS team differently because they were contractors.

The LSS contract had multiple issues to include **(EXHIBIT 14)**:

- Providing false and misleading analysis to Leadership.
- Falling asleep in meetings.
- Failed to complete tasks as requested by the COS.
- Unannounced visit to Supervisory Emergency Management Specialist John Boyle.

The LSS work "contract" was reviewed for renewal every 3 months and at that time the Finance and Administrative Section Chief reviewed the Statement of Work (SOW) and inquired about the success related to the SOW and judged if the contractors provided a cost benefit to the operation. During the initial stages of the work "contract" renewals, FEMA was inundated with needs to deliver critical recovery operation services due to Hurricane Maria and the LSS team wanted more time with Leadership to discuss moving basic function projects. These meetings took up valuable resources and did not benefit the operation. The LSS team felt they should be a priority to operational leadership; however, they failed to grasp how busy FEMA was at the time delivering mission critical services.

PUSHKAREWICZ is unaware of Angeline's age and encourages diversity and inclusiveness. PUSHKAREWICZ sees these as critical to a workplace environment. At some point, Angeline approached PUSHKAREWICZ and stated "they" felt like the CIP team did not like them. As a result, PUSHKAREWICZ scheduled a Happy Hour to bring the teams together; however, most of the team declined the invitation. PUSHKAREWICZ attempted to use the success of the LLS team to assist the CIP program to identify how to expand LSS to a service FEMA offered for large disaster events as seen in Texas. PUSHKAREWICZ provided opportunities for the LSS team to be coached and to learn from successful FEMA LSS practitioners and products **(See EXHIBIT 14)**.

FEMA - C000097

PUSKAREWICZ did write Angeline up for not taking enough notes during a meeting he ran. This stemmed from several conversations PUSHKAREWICZ had pertaining to prior meetings where LSS team members did not have a pen and paper where complex information was being discussed. The FCO stakeholders/advisors and program Subject Matter Experts (SME) brought this to PUSHKAREWICZ's attention. As a result of no notes taken by the LSS team, information was either misinterpreted or they forgot to follow through with commitments that were agreed upon.

PUSHKAREWICZ prevented the LSS team members from directly communicating with leadership as directed by the COS (Josephine Arcurio). Any programs and findings were reported to the FCO after vetted by the COS due to erroneous and incorrect information that was reported to the FCO **(See EXHIBIT 14)**.

*Interview with Program Analyst Christian Gomez*

On November 6, 2020, Investigator Lederer interviewed Gomez via MT video. Prior to the interview, Gomez reviewed and signed a Non-Disclosure Agreement and returned a signed Official Declaration after his interview **(EXHIBIT 15)**. The following is a summary of the information provided by Gomez:

- Gomez began working on DR4339 in March 2018 as a local hire for the LSS program; however, in August 2018 the LSS group transferred to the CIP program.
- From August 2018 until December 2018, the LSS group began reporting to the Lead, PUSHKAREWIZ.
- The LSS group was brought into DR4339 to teach tools to improve CIP processing.
- Gomez heard PUSHKAREWICZ refer to Angeline and the LSS team only as "old white guys" outside the office.
- PUSHKAREWICZ did not appear to want to put in the amount of work that was required to implement the LSS processes due to how different the processes were as compared to how CIP conducted business.
- Gomez could not comment if PUSHKAREWICZ's conduct unreasonably interfered with Angeline's work performance or created an intimidating, hostile, or offensive work environment based on an individual's protected basis.

The LSS group was brought to DR4339 to teach tools to improve CIP processing; however, initially it was established to teach awareness training but ultimately FEMA wanted the LSS group to provide "black belt" training which was more extensive and intensive. The overall demographic makeup of the CIP group was an age bracket in their 30s versus the age bracket of the LSS contracts were in their 50s or 60s. Gomez overheard PUSHKAREWICZ and Aldarondo, outside the office, talking about Angeline and the LSS team who filed lawsuits that they were discriminated against due to the race and age. They both interacted in the conversation and responded how they could be discriminated against because they are old white men.

There were differences in the knowledge base between the LSS and CIP groups which caused a lot of animosity between the teams. The LSS group was professional, methodical and scientific versus the CIP group who concentrated on a more social science and investigative approach. Because the training was intensive, it appeared PUSHKAREWICZ did not want to put forth

much effort to implement the LSS processes because the methods were so different. Gomez noticed once FEMA employees were in the LSS training class, they appeared to "slack off" and not take the training seriously. The LSS group was second guessed on every decision they made and there always seemed to be a conflict/issue.

*Interview with Public Assistant Program Manager*
*Evelyn Santiago Rivera (Santiago)*

On November 10, 2020, Investigator Lederer interviewed Santiago via MT video. Prior to the interview, Santiago reviewed and signed a Non-Disclosure Agreement and returned a signed Official Declaration after her interview **(EXHIBIT 16)**. The following is a summary of the information provided by Santiago:

- Santiago began working on DR4339 in April 2018.
- The LSS group joined the CIP group in approximately the summer 2018, which caused a poor work environment because the CIP group did not understand the methodology of LSS; however, it was not a hostile or toxic work environment.
- A generational difference between the CIP and LSS existed. The LSS group consisted of mostly males between the ages of 45 and 50 and the CIP group was younger.
- Santiago did not witness PUSHKAREWICZ make comments pertaining to Angeline's age, race or gender.
- PUSHKAREWICZ did not interfere with Angeline's ability to perform his work, or created an intimidating, hostile, or offensive work environment based on an individual's protected basis.
- Santiago does not believe PUSHKAREWICZ attempted to "tank" or make the LSS program fail.

*Conversation with Contractor Barry Angeline*

On November 23, 2020, Investigator Lederer contacted Angeline via email and telephone and requested witness David Barlow's contact information. Angeline explained, via telephone, Barlow has since passed away **(EXHIBIT 17)**.

**SUMMARY**

**Allegation #1:  - Inappropriate Comments- SUBSTANTIATED**

**Misconduct Findings:**  A preponderance of the evidence supports PUSHKAREWICZ made inappropriate comments.  Witnesses Gomez, Rozycki and Oshaben reported they overheard PUSHKAREWICZ make statements that were derogatory in nature regarding Angeline and the LSS team to include "the old white guys," "the straight old white guys," "the grumpy old guys" or the "old guys."

**Allegation #2:  - Hostile Work Environment- UNFOUNDED**

FEMA - C000099

| |
|---|
| **Misconduct Findings:** A preponderance of the evidence did not support that PUSHKAREWICZ created a hostile work environment. Angeline could not articulate how PUSKAREWICZ created a hostile work environment and acknowledged his actions did not involve a protected basis. |
| |
| |

FEMA - C000100

|  | **DEPARTMENT OF HOMELAND SECURITY**<br>**Federal Emergency Management Agency**<br>**Office of Professional Responsibility**<br><br><br>**REPORT OF INVESTIGATION**<br>**Exhibit List** | **1. CASE NUMBER**<br>20200564 |
|---|---|---|
| | | **2. PREPARED BY**<br># Lederer, Mara |
| | | **3. REPORT NUMBER**<br>001 |

1    Complaint received from Barry Angeline, dated August 17, 2020.
2    Declination of Charges by DHS OIG, dated September 17, 2020.
3    Non-Disclosure Agreement and Official Declaration signed by Barry Angeline, dated September 14, 2020.
4    Email from Barry Angeline to Investigator Lederer, dated August 31, 2020.
5    Non-Disclosure Agreement and Official Declaration signed by Mark Rozycki, dated August 6, 2020.
6    Non-Disclosure Agreement and Official Declaration signed by Michael Oshaben, dated September 28, 2020.
7    Analysis of Emails.
8    Non-Disclosure Agreement and Official Declaration signed by Justo Hernandez, dated September 14, 2020.
9    Non-Disclosure Agreement and Official Declaration signed by Brenda Dorta, dated September 22, 2020.
10   Non-Disclosure Agreement and Official Declaration signed by Tamaris Aldarondo, dated October 28, 2020.
11   Email and 3 attachments from Tamiris Aldarondo to Investigator Lederer, dated October 29, 2020.
12   Non-Disclosure Agreement, Warning Acknowledgement Form, Weingarten Rights Form, Official Declaration signed by Eli PUSHKAREWICZ, November 8, 2020.
13   Non-Disclosure Agreement signed by Charles Aitken, Jr, dated November 9, 2020.
14   Email and 13 attachments from Eli PUSHKAREWICZ to Investigator Lederer, dated November 5, 2020
15   Non-Disclosure Agreement and Official Declaration signed by Christian Bernard Gomez, dated November 6, 2020
16   Non-Disclosure Agreement and Official Declaration signed by Evelyn Santiago Rivera, dated September 10, 2020
17   Memorandum of Activity for Barry Angeline, dated November 23, 2020

FEMA - C000101

## Lederer, Mara

| | |
|---|---|
| **From:** | EDS (No-Reply) <DoNotReply@OIG.DHS.GOV> |
| **Sent:** | Thursday, August 20, 2020 7:29 AM |
| **To:** | FEMA-Misconduct |
| **Subject:** | DHS OIG Complaint Number C2022410 |

**Complaint Number:** C2022410
**Alleged Offender Name(s):** PUSHKAREWICZ, Eli (DHS Employee)
**Complainant Name:** Angeline, Barry

**DHS Component Submitting Point of Contact:**
**Contact Name:** Oscar Bonilla
**Email:** fema-misconduct@fema.dhs.gov
**Agency or Bureau:** Federal Emergency Management Agency (DHS)

**Summary of Allegation:** On August 17, 2020, OPR received an email and attachment from Mr. Barry Angeline, reporting alleged misconduct occurring from September 2018 to June 2019, involving Program Analyst (PA) Eli PUSHKAREWICZ (GS-14, PFT, BUE, ?Clearance), Washington, DC. The information OPR received indicates PA PUSHKAREWICZ has allegedly displayed discriminatory behavior towards a group of contractors. Below is an excerpt of the allegation received. "In May 2018, a process improvement team was sent to support the disaster recovery in Puerto Rico. The team had responsibility to execute a $10 million continuous improvement contract in support of the hurricane recovery operations in Puerto Rico. The team both led and executed their own LSS projects and trained local hires so that improvement efforts would be self-sustaining going forward. The contract was HSFE80-16-A-0004, with task order 70FB8018F00000070. ATCS PLC was the prime contractor. The core team was comprised of seven consultants from five different companies and reported into the lead of the FEMA Continuous Improvement Program (CIP) All members of the team were cis-gendered, straight, white, males over the age of fifty. From September 2018 through the termination of the program in June 2019, overt and covert discriminatory actions were taken by the managers of CIP due to bias against the team's demographic group. The behavior exhibited towards the LSS team dramatically differed from the behaviors shown towards the other members of the CIP team, none of whom were in the same demographic group. The claims of specific discriminatory actions are further bolstered by unusual staffing decisions and overtly hostile posts on social media or overheard comments by the first CIP manager, Eli Pushkarewicz. Early concerns about discriminatory actions were ignored by ATCS. A formal EEO complaint was filed with ATCS in May 2019. Assurances were made that the complaint would be transmitted to FEMA's EEO Office. However, unbeknownst to the team, leadership at ATCS quashed the complaint in order protect future business with FEMA. Communication alerting the final CIP team leader, Tamiris Aldarondo, about the EEO complaint, resulted in the swift termination of two team members who led the EEO efforts, Barry Angeline and Mark Rozycki. Shortly thereafter, Senior Leadership at FEMA became aware that the entire team had participated in EEO/whistleblower activity and the contract was quickly and prematurely terminated. The resulting hard and soft costs arising from early termination exceed $100 million. Because ATCS failed to file the initial complaint, the team resubmitted the EEO complaint multiple times after their demobilization."

You recently submitted an allegation to the DHS OIG via the DHS Connect Intranet. The DHS OIG Complaint number associated with your submission is: C2022410. Allegations received at the OIG are reviewed to determine if DHS OIG investigation, or referral to a more appropriate entity (to include your agency), is warranted. If the allegation you submitted does not fall within the scope of DHS OIG's jurisdiction, then that information may be forwarded to the appropriate agency or authority for their review. This notification is not an indication the allegation you submitted will be investigated by the DHS OIG or any other applicable investigating body. It is suggested that you maintain a copy of this message for your records.

FEMA - C000102

| | |
|---|---|
| **From:** | Barry Angeline |
| **To:** | FEMA-Misconduct |
| **Cc:** | Tenant, Michael |
| **Subject:** | Michael Tenent referral |
| **Date:** | Monday, August 17, 2020 2:15:45 PM |
| **Attachments:** | FEMA OPR EEO Retaliation.docx |

My name is Barry Angeline.  We are working with Mr. Tenant with complaints related to malfeasance on

The team members filing this complaint are: Clifford McCabe (503-999-1234); Barry Angeline (703-994-6832), Jeff Wykosky (610-742-6472); Mark Rozycki (703-457-2270); Mark Woodhouse (770-843-7372); Mike Oshaben (202-674-1091) and William Haveman (810-247-0907).

Mr. Tenant suggested that two aspect of our complaints would be better addressed by people in your area.  These areas involve EEOC and whistleblower retaliation villations..

The complaints deal with FEMA contract HSFE80-16-A-0004, Task Order 70FB8018F00000070.  This contract provided consulting services to FEMA for the Hurricane Maria disaster recovery.

Attached is our report documenting our complaint. It should be noted that the retaliation was for both filing an EEO complaint as well as four IG complaints related to waste fraud, abuse and mismanage.  My Tenant is addressing the IG complaint.

Please contact me at 703-994-6832 if you have any questions.

Best Regards,
Barry Angeline


Sent from my iPhone

FEMA - C000103

**From:** Hotline
**To:** FEMA-Misconduct
**Subject:** C2022410 (HLCN1597922765441)
**Date:** Friday, September 18, 2020 12:32:39 PM
**Attachments:** image001.png
image002.png
image003.png

Re:  Eli PUSHKAREWICZ; FEMA; Washington, DC



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security
Washington, DC 20528 / www.oig.dhs.gov

The attached information is furnished for whatever administrative action or inquiry you consider appropriate.  Should your office take any administrative or personnel action in response to this information, you are requested to report the final result of that action within 30 business days of its conclusion.

If your review of this matter discloses evidence of previously unreported criminal misconduct that is reportable under Management Directive 0810.1, you are required to notify this office of that information before any additional investigative steps are taken.

FEMA - C000104

DEPARTMENT OF HOMELAND SECURITY
Federal Emergency Management Agency

## NON-DISCLOSURE NOTICE MEMORANDUM – NON-FEMA EMPLOYEES

You are assisting in an ongoing official inquiry being conducted on behalf of the Federal Emergency Management Agency (FEMA). As this inquiry is sensitive in nature, FEMA is requesting that you not disclose information relating to this official inquiry to any other person(s), except as may be appropriate under applicable law.

The disclosure of information related to this case could impede the investigation and hamper investigative efforts.

Your compliance with this non-disclosure notice is appreciated. These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.

_Barry Angeline_
Print Name

_[signature]_                    8-5-2020
Signature                         Date

FEMA Form 115-045-005-005 (6/20)                                    Page 1 of 1

**FEMA - C000105**

DEPARTMENT OF HOMELAND SECURITY
Federal Emergency Management Agency

## OFFICIAL DECLARATION

Name:  Barry Angeline                          Position:  Contractor

Organizational unit assigned: N/A

Work phone:  +1 (703) 994-6832    Email address: bazor10@yahoo.com

Work address: 43374 Carys Brook Ct, Ashburn, VA 20147

### STATEMENT

Interview conducted on September 11, 2020 at 8am by Investigator Mara Lederer via telephone.

Q:  Do you understand the non-disclosure agreement that you reviewed and signed?
A:  Yes

Q: What is the best number to reach you?
A: 703-994-6832

Q:  Who is your current employer?
A:  I was working for my own company (Cyberricade), who was  a subcontractor to Novaces, who subcontracted to the prime contractor ATCS while I was working on this contract for FEMA

Q:  Briefly describe your duties.
A: In my role, I instructed a consistent body of knowledge to identify processes within an organization to improve productivity.  The goal was to have the knowledge of this process implemented in the culture of FEMA to change its working culture and processes on other disasters and how to improve productivity.  We were assigned to train and mentor each group responsible

Q:  When did you work for FEMA during the timeframe encompassing this complaint?
A:  I worked for FEMA from 7/8/18 until 5/24/19.

Q: How was it decided you would be the complainant in the investigation pertaining to retaliation, HWE and discrimination?
A: It is a team complaint, but I volunteered to take on the role as the main complainant.

Q: Please explain who the following individuals are as you made FOIA requests for emails:

Kevin Porter: He is an employee of ATCS. Although I didn't have much contact with him; however, he was called into the meeting when they released me from the contract after my May 17, 2019 email was sent to Tam that we (the team) were acting as Whistleblowers. The email was only sent to Tammy. He would be aware of retaliatory actions taken by ATCS and he acted as a witness to the situation.

Ana Bonilla-Davila: Chief of Staff and someone on the team would meet with her every Friday to provide an update/brief of the program's progress. Someone from FEMA (CIP-Continuous Improvement Program) had to also be present.

Dawn Dickerson: She was a FEMA employee who we reported to (team lead with CIP) but only

Initials: _____

Name:  Barry Angeline

reported to her for about a month (estimate: November 2018 to November 2018).
Justo "Tito" Hernandez: Was the Deputy FCO and at some point, he was FCO.


Q: According to the documentation you provided as a Memorandum for Record your reported
directly to Eli Pushkarewicz from June 2018 until November 2018. Is this correct?
A: No, we started reported to him August 2018 until November 2018.

Q: The customer was FEMA, the prime contractor was ATCS and your company, Cyberricade,
subcontracted to Novaces who subcontracted to ATCS. Is this correct?
A: Yes.

Q: Could ATCS decide to terminate a subcontractor's contract?
A: No. If anyone could have terminated the subcontractor's contract it would've been
Novaces. Novaces was unaware of my termination.  A letter sent by ATCS to Novaces
(President Ivan Radovic: 504-208-0609 and to Chris Rozycki – President of  CPI Group
904-612-2426) supposedly said I violated policy (a company policy-and I checked my
subcontract agreement and didn't see anything there) by going to the OIG/GAO (which I did
not do). Additionally, I did go to ATCS about my concerns regarding Tammy missing classes
and she attempted to change the testing requirements and attempted to get the final exam.
Tammy was also attending law school simultaneously and studied during work hours.

Q: How long was the contract awarded for as it relates to your dealings expected
(projected) length?
A: It should have gone through October 15, 2018; however, it would have been extended
another year.

Q: Could ATCS decide to terminate a subcontractor's contract?
A: No. If anyone could have terminated the subcontractor's contract it would've been
Novaces. Novaces was unaware of my termination.  A letter sent by ATCS to Novaces
(President Ivan Radovic: 504-208-0609 and to Chris Rozycki- President of  CPI Group
904-612-2426) supposedly said I violated policy (a company policy-and I checked my
subcontract agreement and didn't see anything there) by going to the OIG/GAO (which I did
not do). Additionally, I did go to ATCS about my concerns regarding Tammy missing classes
and she attempted to change the testing requirements and attempted to get the final exam.
Tammy was also attending law school simultaneously and studied during work hours.

Q:  In your own words, please explain why you filed a complaint with OPR against Eli.
A:
Retaliation: None
Discrimination: Mark Rozycki heard Eli say something like "go ask those straight old
white guys on the LSS team." "the old guys" and "that washed up team of old guys" and the
"straight old white guys."  Mark can provide the exact quote he heard.  I learned from
David Barlow (contractor) in Quality Control and several other contractors that they had
heard him refer to us in a similar way on several occasions. There is documentation that
I provided that includes Eli's Facebook posts that show his dislike for white, cis,
straight, older men.
HWE:
There were incidents (as provided in documentation) that occurred that caused a toxic
work environment, not necessarily a hostile work environment. Eli directed Dawn
Dickerson and Joann Lucas to essentially spy on us and write us up for trivial issues.
For example, I was written up because I wasn't taking enough notes; however, I was
running the meeting. Another incident was when Dawn Dickerson (FEMA) took a picture
inside the JRO when Dan McCabe's unlit/ unused cigar was next to a computer after hours.

*BA*

Initials: _____

Name:  Barry Angeline

Pictures are not allowed inside the JRO. I felt like there were roadblocks set up within the program which made getting the mission completed correctly and efficiently and this created a toxic environment. I have provided numerous examples related to Eli creating a toxic environment and when they occurred in the EEO complaint previously sent.

Initials: ___ BA

FEMA Form 115-045-005-002 (6/20)

Page 3 of 5

Name:  Barry Angeline

It is difficult to discern whether actions were taken because of our team (including me) or if Eli was attempting to stall the program.

Q: Why would Eli want to sabotage the program if he would look badly if the program doesn't do well?
A: I heard from Christian Bernhard Gomez that Eli's nickname is the "destroyer". He sabotages a program and then goes to leadership to "warn them" of what is happening, and he looks like he's the one who is turning around the program and that makes him look good. The reason he does this is because he's not qualified for a technical position which would cause him to do a lot more work than he is able to do based on his limited qualifications. I saw his qualifications on LinkedIn; however, there was no mention of an appropriate technical background (degree/training) as it would relate to the program he was in charge of at the time. Also, the approach he uses for "process improvement" are diametrically opposed to the way industry best practices say it should be done. Specifically, his approach lacks rigor, data analysis, change management, measurement, etc.

Q: How specifically did Eli discriminate against you?
A: Nothing specific; however, the Facebook posts in conjunction with the statements that were overheard that he allegedly made.

Q: How did Eli retaliate against you if you filed a complaint in 5/2019 but he was assigned to HQ in 11/2018?
A: He did not retaliate against me as he was at HQ and not in Puerto Rico working on this project. He should NOT have been involved anymore. I don't think this was the case. I would check emails between him and Tami after he left to determine the level of his involvement.

Q: Do you know if FEMA personnel, specifically Eli, had anything to do with the make up the subcontracting team members?
A: No.

Q: In the Memorandum for Record you highlighted the composition of the Lean Six Sigma Team as 7 Caucasian businessmen all over the age of 50. How exactly does this show discrimination by FEMA as you clearly articulated in the complaint that this group was the most qualified?
A: We were a mirror team to Eli's team initially. The overall treatment was different between us contractors vs the FEMA employees where our group was held to a higher standard as contractors. It is difficult to determine whether the treatment I received was due to the fact I was a contractor (subcontractor) or based on Eli's alleged personal views/opinions of my demographic group. I have provided related details in the EEO complaint previously sent.

Q: Did Eli direct others to take, recommend, or approve any personnel action, to take any personnel action against any employee because of the exercise of any appeal, complaint, or grievance right granted by any law, rule or regulation? And if he did, how?
A: No, he did not because I had not alerted Congress until about January which was about 2 months after he left. There is no indication that he had any involvement with the program once he left.

Q: Did Eli's conduct involve unreasonably interfering with your work performance, or created an intimidating, hostile, or offensive work environment based on an individual's protected basis? If he did, how?
A: As mentioned above, he created, in my opinion a toxic work environment.

Initials: _Bl_

Name:  Barry Angeline

Q: Documentation attached with your complaint included screenshots of Eli's Facebook account. The screen shots are of multiple posts that you allege show his hostility towards your demographic group (white, cis, straight men over 50). Was the purpose of including these posts to attempt to show Eli's bias towards a specific group of people?
A: Yes.

Q: Did you see anywhere on his Facebook profile/page/posts that mentioned he worked for FEMA, the US government or any threatening language?
A: No.

Q: What do you want to see happen as a result of this investigation?
A: He needs to be reprimanded in an appropriate way. I feel that he undermined the program and therefore wasted taxpayer money.

Q: Have you had any contact with Eli?
A: No.

Q: The emails you sent to me, are these the same emails/documents you provided to Investigator Mike Tenant? Do these emails/documents support retaliation or discrimination claims you have made in this complaint?
A: Yes, they are the same. They would not show anything to support retaliation/discrimination.

Q: You used the word whistleblower in documentation and within the complaint. What specifically are you referring to?
A: That documentation would not apply to Eli's investigation.

Q: You mentioned that you filed a complaint with DHS's OIG's office. When did you do this?
A: Retaliation: First week of June 2019
The other OIG complaints: April 8, 2019;  April 15, 2019; April 29, 2019

Q: You mentioned that while still in Puerto Rico, OIG agents spoke to individuals regarding your allegation. Did you speak to anyone and if you did who?
A: I spoke to S/A Jose Acosta, but I also spoke to 3 other agents but can't recall their names.

Q: What did the OIG tell you regarding your complaint?
A: They told me that it's not easily/readily provable allegations of waste, fraud, abuse and mismanagement.

Q: Who else do you feel I should speak to that would add information for this investigation?
A: Other than my co-workers and Peter DeJong, Christian Bernhard Gomes and Jorge Vasquez witnessed the toxic work environment (has pancreatic cancer)-240-281-8282.

Q: Is there anything else you would like to add that I did not ask you that you feel is relevant to the investigation at hand?
A: Yes. I want to add that Eli was not involved in the hiring of the subcontractors or the makeup of the subcontractors and therefore was not involved in the diversity of the team.


Also, this is related to the other investigation Mr. Tenant is conducting. In addition to not correcting the SOW, Ana Bonilla would not provide specific goals and objectives for our group.  Three other issues that we identified as critical to program success and project execution were also promised by Mike Byrne and Ana Bonilla, but they failed to

Initials: _____

FEMA - C000110

Name:  Barry Angeline

fulfill these commitments.  They were: 1. Not delaying the Champions'' Training since the other training and projects were dependent upon this, 2. Standing up an Executive Steering Committee to ensure the right project were selected, resourced, and best practices were shared across the JRO, and 3. an experienced Deployment Director was hired by FEMA to lead the program.

Also, it was routine for members of the team not to get paid for either expenses or labor for as long as five months. Sometimes team members would have up to $30k in expenses on their personal credit cards. This violates the Prompt Payment Act. One of the sub-contractors, NoMuda, a service-disabled veteran owned small business has gone out of business as a result.  I would talk to Mike Kozik to get more details. He is at 219-921-4826.

I would also suggest you speak with Jorge Vasquez (786-312-6183).  He was both a contractor and FEMA employee who reported to Tami. He also conducted the secret survey that was withheld from us.

Initials:

FEMA - C000111

Name:   Barry Angeline

### END OF STATEMENT

I have read this statement. It is true, accurate and complete to the best of my knowledge and belief. I have been given an opportunity to make any corrections, additions, or deletions. I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.

_Barry Angeline_
Signature

9/14/2020
Date

Mara Lederer
Investigator Name

MARA F
LEDERER

Digitally signed by MARA F
LEDERER
Date: 2020.11.23 10:34:53 -05'00'

Investigator's Signature

Initials: _____

FEMA Form 115-045-005-002 (6/20)

Page 7 of 5

**FEMA - C000112**

**Lederer, Mara**

| | |
|---|---|
| **From:** | bazor9198 <barry.angeline@gmail.com> |
| **Sent:** | Monday, August 31, 2020 12:22 PM |
| **To:** | Lederer, Mara |
| **Subject:** | Fwd: Form submission from: DHS FOIA / Privacy Act Request Submission Form |

FOIA request related to program sabotage and mismanagement.

:

**From:** WCM DHS <wcmmonitoring@dhs.gov>
**Date:** February 7, 2020 at 6:29:30 PM EST
**To:** barry.angeline@gmail.com
**Subject: Form submission from: DHS FOIA / Privacy Act Request Submission Form**
**Reply-To:** Homeland Security <fema-foia@fema.dhs.gov>

Submitted on Friday, February 7, 2020 - 18:29
Submitted by user: Anonymous
Submitted values are:

Select the DHS component you wish to submit your request to: :  Federal
Emergency Management Agency (FEMA)
Title:  Mr.
First Name: barry
Middle Initial:
Last Name: angeline
Suffix:
Email Address: ███████████████
Country: United States
Address 1: ███████████████
Address 2:
City: ██████

Zip Code: █████
Telephone Number: ████████
Fax Number:
Are you requesting records on yourself?  No
If yes, you must check the perjury statement:
By initialing here you are providing your electronic signature.:
Please describe the records you are seeking as clearly and precisely as
possible:
I am requesting emails related to the performance, contract execution, and
evaluation of the Lean Six Sigma Contractors working at the Puerto Rico Joint
Recovery Office. The contractors supported contract HSFE80-16-A-0004, Task
Order 70FB8018F00000070.  The prime contractor was ATCS PLC.  The program

1

**FEMA - C000113**

contractors were the Lean Six Sigma (LSS) group and reported into the Continuous Improvement Program (CIP).

I am requesting emails from August 1, 2018 through July 31, 2019. Please provide emails sent or received from the following people with FEMA email accounts:

Tamiris Aldarondo
Eli Pushkarewicz
Joann Lucas
Dawn Dickerson
Specific keywords to facilitate the search would be: ATCS, LSS, Lean Six Sigma, whistleblower. retaliation, EEO, discrimination, MBB, Master Blackbelt, Master Black Belt, BB, Blackbelt, Black Belt, GB, Greenbelt, Green Belt, Training, certification, BB exam, GB exam, Digital Site Inspection, DSI, Inspector General, OIG, IG, Whistleblower Protection Act, WPA, EEO, Equal Employment Opportunity

In addition to the previous keywords, please also provide emails related to or referencing the following people: Barry Angeline, Mark Rozycki, Dan McCabe, Bill Haveman, Mark Woodhouse, Jeff Wykosky, Mike Oshaben, Pieter DeJong, Bulent Sener

Please also prioritize finding any emails related to any derogatory remarks related to age, race, gender, or sexual orientation.  For example, any emails referencing some or all the words "straight," "old", "white guys" or any similar terms.
I am willing to pay fees for this request up to the amount of: $: 300
Select from the list below:  An individual seeking information for personal use and not for commercial use.
I request a waiver of all fees for this request.:
Please provide an explanation for your request for a fee waiver:
Please select and describe in detail if you believe your request warrants expeditious handling:
Please provide information to support your selection:

2

FEMA - C000114

DEPARTMENT OF HOMELAND SECURITY
Federal Emergency Management Agency

## NON-DISCLOSURE NOTICE MEMORANDUM – NON-FEMA EMPLOYEES

You are assisting in an ongoing official inquiry being conducted on behalf of the Federal Emergency Management Agency (FEMA). As this inquiry is sensitive in nature, FEMA is requesting that you not disclose information relating to this official inquiry to any other person(s), except as may be appropriate under applicable law.

The disclosure of information related to this case could impede the investigation and hamper investigative efforts.

Your compliance with this non-disclosure notice is appreciated. These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.

Mark L. Rozycki
_____
Print Name

Mark L.
Rozycki

Digitally signed by Mark L.
Rozycki
Date: 2020.08.04 13:58:29
-04'00'
_____          08/04/2020
Signature                                              Date

FEMA Form 115-045-005-005 (6/20)                                        Page 1 of 1

**FEMA - C000115**

DEPARTMENT OF HOMELAND SECURITY
## Federal Emergency Management Agency

## OFFICIAL DECLARATION

Name:  Rozycki, Mark                          Position:  Independent Contractor

Organizational unit assigned: Lean Six Sigma Huuricane Recovery Efforts Puerto Rico

Work phone:  +1 (706) 457-2270    Email address: markrozycki@gmail.com

Work address:

### STATEMENT

Question:  Do you understand the non-disclosure agreement that you reviewed and signed?
Answer:  Yes, I do

Question:  Who is your current employer?
Answer:  Independent Contractor (1099 for FEMA while I worked with FEMA)

Question:  Briefly describe your duties.
Answer:  I started in PR in June 2018 as a Lean Six Sigma Blackbelt, by January 2019 I was the Program Manager for the Lean Six Sigma Team.  The team established the Lean Six Sigma (LSS) program that utilized the best practice LSS methodology for structured strategic and tactical continuous process improvement. Led a team in the implementation of the LSS methodology to support performance analysis and aggressive improvement objectives for the Hurricane Maria Recovery Effort set by FEMA's leadership. Operated in coordination with the FEMA senior leadership to analyze, monitor, and assess critical activities affecting recovery policy, organizational guidance, and developmental processes
Question:  How long have been in your current position?
Answer:  I was in this position for PR from June 2018 until May 2019
Question:  In your own words, describe the nature of your complaint.
Answer:  The main issues are that statement of work (SOW) for contract HSFE80-16-A-0004, Task Order 70FB8018F00000070, has been: systematically mismanaged in several areas involving contract deliverables by both FEMA and ATCS; ATCS PLC has engaged in illegal withholding of contracted funds to subcontractors, in violation of the Prompt Pay Act (PPA); and that FEMA Staff has engaged in unethical (possibly fraudulent) conduct regarding the tracking of expenditure of funds. The allegations we are making as a team included gross mismanagement of a financial contract, gross mismanagement of funds, abuse of authority for a contract or grant, EEO violations (lack of diversity and sensitivity on the part of FEMA managers Eli Pushkarawicz and Tamaris Aldarondo), violation of laws governing FARS, retaliation for making complaints by FEMA management in PR (Aldarondo and Director of the JFO- name unknown) and the prime contractor.
IIn June 2018 I asked the PM at the time, Luis Olivares if he had a copy of the contract's Statement of Work (SOW).  His comment to me was what is the Statement of Work. He was unable to provide the team with the SOW.  FEMA management nor the PM could provide us with a copy of the SOW. We looked for the SOW for one month and found it in July 20188. A team member and I reviewed the SOW to determine the contractual stipulations. I compared the SOW to what the team was being tasked to accomplish. We were not in compliance with what we were being asked to do on the project.  I notified my team and we developed a presentation to point out the discrepancies and to notify them that this would place us out of compliance.  I advised the Program Manager who was a FEMA hire and Ana Bonilla (Chief of Staff) and explained how the SOW is supposed to take place.

Initials: _____

FEMA Form 115-045-005-002 (6/20)                                    Page 1 of 9

## FEMA - C000116

Name: Rozycki, Mark

Bonilla had no experience with government contracts and I explained what we could not do and what we were allowed to do, including what the SOW calls for.  Ms. Bonilla advised us what she wanted to be done and it conflicted with the SOW. During this time, Mr. Oliveras blindly fired or forced 4 contractors to resign which destabilized the team no cause for this action was shared and he did not have the authority to fire contractors.  I asked to speak with the COR or COTR. Neither could be identified.  Mr. Oliveras asked me what is a COR and a COTR. Two weeks later the prime contractor senior vice-president came to PR to speak with the team and have dinner (Tim McCormick).  I told Mr. McCormick that the SOW did not match what FEMA wanted us to accomplish. Adding the additional work would place the team 3-4 months behind schedule.  The team would need to develop training Green/Black Belt training that focused solely on the FEMA and the hurricane recovery efforts.  McCormick told me not to talk to the COS or anyone else from FEMA about this anymore.  My team had to do what the COS asked us to do without any other pushback. In November 2018 a new program manager Raymond Kulish was sent to PR to make sure the SOW was appropriately amended to reflect what FEMA wanted to be done.  After performing briefly, Rock was fired; I was made the program manager.  After a year of these battles, nothing was getting done.

Waste, Fraud, Mismanagement
FEMA Staff has engaged in unethical (possibly fraudulent) conduct regarding the tracking of expenditure of funds. The first allegation involves mismanagement and waste through non-adherence to the SOW. In July 2018, the Chief of Staff, FEMA Office, Puerto Rico redirected that the LSS Team should provide work that would be outside the scope of the contract.
ATCS (Prime Contractor) specifically directed the LSS Team to ignore the SOW deliverables, made possible due to a lack of oversight on the ground by the COR, COTR, ATCS, or a combination of the three entities.

As a result, this allowed FEMA Staff at the JRO in Puerto Rico to direct the Team's activities in unsound and wasteful practices over the last year (Contract awarded in April 2018 through October 2019).
ATCS provided gross mismanagement of the contract to include neglecting contract oversight, providing unqualified personnel for positions outlined in the SOW, and we believe putting personnel on the contract for pay, which may have fraudulently been associated with the contract.
The third allegation through the neglect of the COR, COTR, FCO, and FEMA Staff is that FEMA has completely mismanaged the contract. Mismanagement of the contract began with the hiring of a local person as the Program Manager who was not qualified. As an example, he did not know who the COR and COTR were nor what they did.  He was unaware that there was a Statement of Work that directed our project.
In 2018, FEMA mandated a percentage of personnel working on the disaster, had to be local hires.  Very little to no experience skill sets were had by the local hires hired.  Our team of 7 were immersed in the FEMA processes of this disaster operation-many of the local hires who did not have FEMA disaster experience or construction experience.  With little training, they were sent out to do complete building inspections that could not be done with the level of training and lack of experience they had.  We held a class for school inspectors ( there were over 100 schools in PR)and discovered that hires were overly obese, working from crutches, and other handicaps that could not have the physical abilities to do what was required (climbing, extended standing, etc) to perform inspections.  There was also very high attrition/staff turnover.  It takes over 3 years to develop into level 1 management officials and 5 years to develop level 2 management

Initials: _____

FEMA - C000117

Name:  Rozycki, Mark

officials.  Within months of being hired, inexperience and ill-prepared local hires were promoted and expected to perform these tasks without the required skill sets
The LSS team had 50 projects for the recovery effort in the JRO conducted by the FEMA employees in PR.  The combined total of the projects ranged from 12 million to 100 million dollars.  Our team was terminated in favor of these projects being handled by the inexperienced FEMA staff.  We developed the digital site inspection tool which would have saved tens of thousands of dollars and hundreds of man-hours in the conduct of site inspections.

Retaliation:
The retaliation was taken immediately following going public as EEO complainants with Tamaris Aldarondo on May 17.  Messrs. Angeline and Rozycki were targeted since they led the effort to document violations. This led directly to their subsequent termination on May 23. This claim seeks to further extend these claims for the entire team whose contract was prematurely terminated less than a month later.
MMs. Aldarondo has suppressed the original email shown in section A1. We suspect that she was actively working with the prime contractor to retaliate against Messrs. Angeline and Rozycki. Therefore, on May 23, Mr. Angeline forwarded the email sent to Ms. Aldarondo to the Senior Leadership at FEMA. Several weeks later, the entire contract terminated. The timing is suspect for several reasons.
First, at a meeting with the chief of staff (Ana Bonilla) on April 23, four black belts presented their projects. She was so impressed that she gave them a standing ovation and stated that she would request all the Champions, currently sponsoring projects, to come to the final day of Blackbelt Training to see the final classroom presentations of the projects. This was to take place the following week on April 30.
In addition to the fore-mentioned EEO violations by Ms. Aldarondo, she also engaged in abuse of the program for her benefit. The EEO violations, coupled with documentation of the toxic work environment and program malfeasance, prompted the subsequent retaliation following disclosure on May 17. The EEO violations influenced her attitude towards the program and hostility towards our mission culminating in premature program termination.
During the final week of training, Ms. Aldarondo, who was both a student and the leader of the group we reported to, was actively working with an ATCS representative to obtain a copy of the final exam for which she would be the beneficiary. It is important to note that Ms. Aldarondo had missed approximately 75% of the classroom instruction and had done very little towards the completion of her specific project.
She missed a whole week of instruction to study for her law school midterm exams. As part of the black belt course, she had a requirement to present her project to the class and FEMA leadership. Ms. Aldarondo would also have to take a required comprehensive examination after the last class. Her actions were:

• She requested, through ATCS, to move the testing out several months,
• She suggested that the course rigor be reduced;
• She suggested that the certification requirements be relaxed;
• She suggested that project completion requirements be reduced.
• She also had the review by the Champions, scheduled for the last day of class, eliminated.  These efforts were done to prevent embarrassment for her.  She was ranked last in the class.

At the end of each of the four-week instructional sessions, the students were given a class evaluation form to fill-out. This is an anonymous questionnaire to protect the student from any notion of retaliation. The students gave the class positive responses.

Initials: _____

FEMA - C000118

Name:  Rozycki, Mark

We asked the students to provide us with an anonymous end of course evaluation. They were overwhelmingly positive. To undermine the program, Ms. Aldarondo also
conducted a secret survey of the selected students we had taught and mentored. She refused to divulge the outcome of this survey. We later found out that the results were overwhelmingly positive. She declined to share the results with us. The narratives for both the training and the survey supported expanding the program. All indications by the students and chief of staff suggested the program was very well received.
Puerto Rico's Central Office for Recovery, Reconstruction, and Resiliency (COR3) also participated in the training, and on multiple joint projects. They were so impressed that they tried to organize a joint steering committee with FEMA leadership for Lean Six Sigma and wanted to initiate a similar program with our assistance.
Roughly 70 senior leaders at the recovery effort took an accelerated one-day Champions Training. Their evaluations were also extremely positive.
Ms. Aldarondo conducted a secret survey asking the people we mentored on our competence, responsiveness, knowledge, and mentoring capability as well as overall program effectiveness. When we learned of the study, she refused to share the results with us. Only through a recent FOIA request did we obtain the survey. Seventy-nine percent of the people surveyed said the program was "good" to "excellent" and said the program needed to be expanded and accelerated. Ms. Aldarondo withheld this report from FEMA Leadership since it would undermine her desire to terminate the program following our May 17 email. The retaliatory sequence of events are as follows:

• On May 17, 2019, Ms. Aldarondo received an email notifying her that the team filed an EEO complaint due to her making frequent derogatory comments behind our backs to other program participants. This undermined our efforts and reduced program effectiveness. She sabotaged the program for two reasons: disrespect for our team due to our age, race, and gender and a need to demonstrate her lack of competence in the subject matter her program led.
• On May 23, 2019, ATCS released Barry Angeline and Mark Rozycki.
• June 15, 2019, the team contract was terminated. As a result of the contract termination, roughly 25 black belts (BB) would not be tested, which would eliminate Black Belt certification for the employees.

Additionally, the Greenbelt (GB) projects were left incomplete and eliminated any chance for GB certification. The result was wasting approximately roughly 6000 person-hours in class. The termination of fifty projects, many months of effort, and estimates of the net benefits for these projects ranged from $12M to $150M.


Abuse of Authority
It is important to highlight the composition of the Lean Six Sigma team.  The team was made up of seven Caucasian businessmen all over the age of 50.
In June 2018, the FEMA Continuous Improvement Process manager was  Eli Pushkarawicz. He was an extremely toxic leader.  His leadership was a combination of self-centered attitudes, motivations, and behaviors that had adverse effects on subordinates, the organization, and mission performance. His lack of concern for others and the.
He operated with an inflated sense of self-worth and from acute self-interest. He consistently used dysfunctional behaviors to deceive, intimidate, coerce, or unfairly punish others for getting what they want for themselves.
Instead of working as a collaborative team, Eli Pushkarawicz created a toxic environment where CIP members and other FEMA employees were not encouraged to work collaboratively

Initials: _____

FEMA - C000119

Name:  Rozycki, Mark

with LSS.

From the onset, the FEMA CIP Team Lead Eli Pushkarawicz was hostile to the LSS Team.  He often referred to us as "the old guys" and "that washed up a team of old guys," and the "straight old white guys."

Mr. Pushkarawicz continued to undermine the mission and obstruct all continuous improvement efforts through his lack of diversity insensitivity. Upon his transition to FEMA headquarters in November 2018. Ms. Tami Aldarondo assumed the responsibility for the FEMA CIP manager and assumed sole responsibility for the LSS team.

Ms. Aldarondo was a local hire.  As part of her day to day activities, she was named to be the COR for the Lean Six Sigma contract in Puerto Rico. It is important to mention this in that she does not have any continuous improvement process experience to include Lean Six Sigma (LSS) strategies.

When asked of Ms. Aldarondo was trained to be the Contracting Officer Representative, she would brush us off and essentially tell us that she was the COR.  Since November 2018, Miss Aldarondo has displayed a complete lack of understanding with regards to the LSS Statement of Work (SOW), tactical and strategic LSS operations, and the employment of LSS. On several occasions, Ms. Aldarondo referred to the LSS team as the "the old white guys" and "don't pay attention to the white guys; they have no credibility."  Many members of her team told the LSS team members in confidence the comments that she would make towards the team.

In December 2018, she was selected to attend the first LSS Black Belt training course in support of the recovery operations.  The premise for the training was to ensure that all LSS employees could provide Puerto Rico operations with a sustainable LSS program.

Black Belt training is a four-week program. To attain Six Sigma Black Belt certification, professionals require two finished projects with signed affidavits or two complete rapid improvement events with a signed affidavit.

The Six Sigma Black Belt certification generally takes between 1 to 3 months to study for and complete, depending on the organization you get your certification through. Training for FEMA is a four-month program with classes lasting five days per month. The certification consists of a theoretical element and a practical element. The full Lean Six Sigma certificate requires work in both a theoretical and practical element.

As cited earlier, Tamaris Aldarondo was selected to participate in the FEMA Black Belt training program. This training provides rigorous instruction in process improvement methodologies.  The selection criteria were strict owing to limited capacity.

She is also working full time on a law degree and is often seen working on school assignments while in LSS training.  On Monday of the third week of training, Miss Aldarondo said she could not attend the full week due to mid-terms.  Though this week was critical and involved instruction complex statistics, we committed to her that we would get her up to speed via three remedial training sessions, each lasting two hours.

The primary instructor for the Black Belt training course provided three two-hour review sessions after week three training.  These review sessions provided the students with a review of the statistics sessions that covered in week three of training.  Additionally, the LSS Team conducted a weekly standing meeting for all of the students to discuss their projects and training.

The LSS team conducted several separate two-hour sessions during walk-in consultations.  The training team also conducted over 20 hours of additional training.  During the first three weeks of training, Miss Aldarondo did not attend any of the additional training, although she missed almost three days of training in week three and another four days during weeks 1 and 2.

Also, each student has a project to complete.  She has made no progress on her project

Initials: _____

FEMA - C000120

Name:  Rozycki, Mark _____

despite numerous efforts to help her.  She even tried to pass the project onto a colleague.  In short, she is ranked last in the Black Belt training.  When Miss Aldarondo was in training, she worked on her law school papers, emails, or spent time on the phone.  Recently she approached our group and tried to delay taking the final exam by several months.  As the Manager for CIP and as the COR, she has tried to make the training less rigorous.

There exists a clear conflict of interest here.  As manager of the CIP group, she could influence changes to work products.  However, she is attempting to change the agreed-upon training and testing to prevent embarrassment for herself for her lack of effort as a student.  She even complained to the prime contractor delivering the training because it was "too hard."  We fear she will sabotage the program to prevent further embarrassment and reduce her workload.

In April 2019, she conducted an evaluation of the team "in secret."  She told her team not to mention that they were conducting this secret survey. According to her team, she said. "… those old white guys will be surprised by how they are not well respected.

The purpose of her evaluation was to ask how the LSS team conducted their projects and training.  Were they done professionally? Her sole purpose was from her questionnaires.  Several members of the team stated that Ms. Aldarondo wanted to use these evaluations to derive detrimental comments.

We reminded her that she had received all the end of course evaluations.  The evaluations, all anonymous reflected well for the LSS team. She stated that "… perhaps the students were lying with regards to the evaluations."

During the first day of week 4, Miss Aldarondo left training at noon and returned to her office.  It should be noted that she had two employees who attended the Green Belt training, attended all the sessions, and passed their 90-question test with complex statistics questions.

The 2018-2022 Strategic Plan creates a shared vision for the field of emergency management.  The Lean Six team was diligent in their efforts to promote affirmative employment, a discrimination-free workplace.

The DHS Headquarters Equal Employment Opportunity (EEO) Office and FEMA strive to ensure a working environment for Headquarters employees that is free from any form of discrimination and supports them in fulfilling their mission to secure the homeland.  The success of any organization and the execution of its programs depend on effective leadership.

Diversity is an essential building block for any successful organization. Behaviors and attitudes of leaders throughout an organization shape and manage the culture of the work environment.  CIP leadership was toxic and insensitive to the diversity within their team.

OOn May 17 at 3:01 pm, after sending the email cited above, a delivery receipt was obtained, but no read receipt. No mention was made of the email by Ms. Aldarondo, which was odd. On Monday, Victoria Colmenero met with Ms. Aldarondo for several hours. Ms. Colmenero's unethical actions and conflicts of interest are described in our second OIG complaint. The complaint is shown in Annex 2.

The relationship between the CIP team and ATCS was problematic at best. During the contract, ATCS routinely took actions that were out of compliance or would undermine the program for billing purposes. Attempts to identify/work with the COR/COTR were blocked.  On several occasions, we were told by ATCS and FEMA that there was no COR/COTR or identified a FEMA manager as the COR/COTS.

Mr. Hui and Mr. McCormick were in Puerto Rico before I sent the email to Ms. Aldarondo. During our meetings that week, we had many discussions regarding the training, projects, etc. They commented that FEMA cited Mr. Angeline and Mr. Woodhouse on their superb

Initials: _____

FEMA - C000121

Name: Rozycki, Mark

projects. During these meetings, there was never any mention of issues related to the burn rate.

On Friday, May 17, 2019, the FCO met with the Program Manager regarding the Statement of Work (SOW). The SOW did not include Black Belt training. Monday, May 20, Mr. Hui demanded that proprietary intellectual property (black belt training) that was not a part of the Statement of Work be handed over to him.

Mr. Hui claimed that Black Belt training was an addendum to the SOW. The SOW was not modified to include any training. It appears as if Mr. Hui was not telling the truth.

Chris Rozycki, president of The CPI Group (sub-prime), demanded that we turn over intellectual property that belonged to a third-tier contractor, NoMuda Inc.

The intellectual property was developed before this engagement and not owned by The CPI Group. It fell well outside the SOW. Although he vociferously demanded that the intellectual property given to him, we reminded him that turning over the intellectual property violated the Anti-Deficiency Act. It was apparent that ATCS and the CPI Group were trying to secure the intellectual property that would be needed if the project was to move forward but could be lost following retaliatory action.

On Monday and Tuesday, May 20-21, Mr. Hui and ATCS were "scrambling" to fix the SOW. The project scope was dramatically expanded by FEMA, with no modifications approved by the COR. For nine months, we were ordered to ignore the non-compliant SOW. FEMA and ATCS became aware that this was part of the OIG complaint and began an effort to modify the SOW. These actions were highly unusual since we had brought up the SOW violations for nine months, and ATCS and FEMA refused to take corrective action.

On Tuesday, Mr. Hui scheduled an emergency trip to PR. This trip was highly irregular since he had just been in Puerto Rico less a week prior. During this week, Mr. Hui met with the team and informed us that the SOW was modified to include all training. According to him, "...the SOW was now compliant. "

The team found out that Mr. Hui provided us with misleading information and that the SOW was not changed. He also said the burn rate was way too high, and some people had to be released. There is no way the burn rate is too high. Since February 2019, our staff and our weekly hours had been reduced. If the burn rates were out of control, they would have been typically discovered many weeks or months in advance.

I was the first one released and was informed that I did not have enough experience. Oddly, I was the technical lead for most of the program, and I led the most projects and mentored the most people. I have twenty-five years' experience, and no performance issues ever were brought up. Furthermore, the new model for the recovery effort in Puerto Rico required expertise in process management and risk management. I was only one of two team members who had this expertise.

Instead of contacting my subcontractor, Novaces, to tell them I was to be released, Mr. Hui and ATCS released me without their knowledge. They were trying to move quickly, which is more typical of a firing.

During the discussion, I mentioned I was an OIG/EEO whistleblower. Mr. Hui said he didn't know that and proceeded with his scripted discussion. This is odd. Upon first hearing of me being a whistleblower, one would expect a change in facial expression, voice, maybe an insult, and a follow-up question. None of those occurred. He knew that I was a whistleblower.

I asked Mr. Hui when I needed to leave, and he said he said within the next hour. He informed me in the afternoon. Keep in mind, I had the most projects and of employees that I had been mentoring. To say that I was stunned was a mild understatement.

During my meeting with Mr. Hui, he stated on several occasions that this had to do with burn rates. If it were a burn rate issue and not a punitive action, I would have had time to notify people and delegate my responsibilities.

Initials: _____

**FEMA - C000122**

Name:  Rozycki, Mark

Oddly, Ms. Colmenero, who had no experience with Lean Six Sigma and an ATCS employee, stayed on the contract. She had no relevant experience per the SOW. The team had been informed that she would also be released, but this was not true. She has actively collaborated with FEMA in an unethical and secretive manner. On occasion, we had to lock her out of our shared drive. In April and May 2019, she deleted and altered files that could incriminate ATCS.

I was fired less than one week after announcing my whistleblower status, and two pay and expense cycles were delayed for five months. Before the retaliatory actions, no payments were ever late.

My last action at roughly 4:30 pm on the day I was released, May 23, was to inform the FCO (Tito Hernandez) and Deputy FCO Dominique Lenox, that our entire team was blowing the whistle.

I forwarded the email sent on May 17 to both. Before this forwarded email, only Ms. Aldarondo had been alerted. She and ATCS believed that by removing myself and Mark Rozycki quietly, that they could mitigate any other issues. This email significantly escalated the situation and would serve as a catalyst to pre-maturely terminate the contract several weeks later.

On July 1, Ivan Radovic, president of Novaces (the subcontractor I worked for), terminated my company's business relationship with them. He cited my complaints filed against FEMA as the reason. These complaints are protected, and retaliatory action is prohibited.

FEMA assured us that our complaints would be filed with the FEMA EEO office.

On May 29th and 30th, through a phone call and email exchange with Doug Gowdy, a FEMA employee in the EEO office, we learned that no such report had been filed by ATCS as promised. In July 2019, after learning that ATCS had not filed the EEO complaint as promised, Mr. Angeline and Mr. Rozycki filed additional charges on behalf of the team with the EEO Office, OIG, and the OIG Whistleblower Protection Unit in July of 2019. It is believed Kwong Hui suppressed our complaint from being filed to protect future work with FEMA. Despite recording a complaint, Sheri Huntley persisted in claiming that a complaint had been filed. See the email thread below.

Question: Is there anything that I have not asked that you want to be included in this statement?
Answer:  No further comments at this time.


Violations of law governing FARS-



Question: Is there anything that I have not asked that you want included in this statement?
Answer:

**END OF STATEMENT**

I have read this statement. It is true, accurate and complete to the best of my knowledge and belief. I have been given an opportunity to make any corrections, additions, or deletions. I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.

Initials: _____

**FEMA - C000123**

Name:  Rozycki, Mark
_____

Mark L.
Rozycki                    Digitally signed by Mark L.
                           Rozycki
                           Date: 2020.08.06 14:04:51
                           -04'00'                              08/06/2020
_____                      _____
                Signature                                              Date


Michael K Tenant                                Michael K.         Digitally signed by Michael
                                                Tenant             K. Tenant
                                                                   Date: 2020.08.06 15:44:10
_____       _____-04'00'_____
           Investigator Name                           Investigator's Signature


Initials: _____

FEMA - C000124

DEPARTMENT OF HOMELAND SECURITY
Federal Emergency Management Agency

## NON-DISCLOSURE NOTICE MEMORANDUM – NON-FEMA EMPLOYEES

You are assisting in an ongoing official inquiry being conducted on behalf of the Federal Emergency Management Agency (FEMA). As this inquiry is sensitive in nature, FEMA is requesting that you not disclose information relating to this official inquiry to any other person(s), except as may be appropriate under applicable law.

The disclosure of information related to this case could impede the investigation and hamper investigative efforts.

Your compliance with this non-disclosure notice is appreciated. These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.

Michael Oshaben
_____
Print Name

Michael Oshaben  
Digitally signed by Michael Oshaben
Date: 2020.08.27 12:57:24 -05'00'
_____        08/27/2020
Signature                                                      Date

FEMA Form 115-045-005-005 (6/20)                                      Page 1 of 1

**FEMA - C000125**

DEPARTMENT OF HOMELAND SECURITY
Federal Emergency Management Agency

**OFFICIAL DECLARATION**

Name:  Oshaben, Michael                          Position:  Independent Contractor

Organizational unit assigned:

Work phone:  +1 (281) 772-4175    Email address: moshaben@yahoo.com

Work address:

**STATEMENT**

Question:Do you understand the non-disclosure agreement that you reviewed and signed?
Answer:  I understand; no questions

Question:Who is your current employer?
Answer:  Self-employed contractors

Question:  Briefly describe your duties.
Answer: I worked for ATCS as an employee at that time on the Lean Six Sigma
implementation team for the FEMA contract for about 15 mos

Question:How long have been in your current position?
Answer:  I was in PR from May 2018 through July 2019

Question:  In your own words, describe the nature of your complaint.
Answer:  The team was there to implement Lean Six Sigma and do projects.  During that
time, there were management team working on a continuous improvement team that
continually tried to keep us from doing our assigned tasks.  Completing projects in the
beginning identified critical issues and we notified FEMA management of the defects.
FEMA management does not like to publicize their defects and management from FEMA (Eli
and Tamara-Tammy) did not want us to be successful in the implementation of Lean Six
Sigma.  I believed it was an age gap difference because Eli and Tammy referred to us as
"the grumpy old guys" or the "old guys" and did not want us to succeed.  Eli and Tammy
sabotaged many projects we were trying to implement; For Example a site inspection tool
we developed called a digital inspection tool was purposely refused by them because they
wanted to do things their way and not ours.  It was based on a system for the recording
of information for any type of site inspection. FEMA management specifically Eli, worked
actively with IT to keep this project from being an accepted idea and practice just
because it was different from what he thought.Eli had a connection with the IT managers
and purposely provided information to them to keep them against the implementing this
process and others we were trying to implement based on deficiencies we identified in
data analysis and the benefits that could come from improving this and the organization.
FEMA culture does not like to see what their defects were.  Eli was a transvestite and
the IT manager he worked with was also a transvestite as well.  Eli was very anti-old
white male and vocally spoke about how we didn't know how FEMA worked or what did we know
about FEMA.  FEMA management manipulated the grants manager system which was reported to
Congress to show more grants/projects had been completed/finished than what really was
done.  I specifically worked on a project with the improvements in the water sector
(improve or fix damage caused to water system) and there were issues with Congress not
signing off on funding to provide to these projects.  The site inspections were not
consistently written, or calculated- which could have been fixed with our digital site

Initials:  mjo

**FEMA - C000126**

Name:  Oshaben, Michael

inspection tool.  I worked with Angela Starr in this process because of how far behind in funding requests; 1.5 million dollars in grants approval was awarded in 2019 according to the tracker- these monies were uploaded in the system queue to make it appear to Congress that they were farther ahead in issuing grants without fully completing projects to where the funds were actually going to be used. These funds sat in the Grants Manager project worksheet queues for over 5 months and were never executed upon. It seemed to be a purposeful intent to mislead Congress about work progressions. FEMA management did not want to be exposed for not fulfilling their obligations in a timely manner.  The idea was that this was the FEMA way and this how FEMA operates- any ideas or directions that went away from that was sabotaged from every level of the management structure.

Question: Were you ever notified or informed of who was the COR and/or COTR on this contract?
Answer: We tried to find out who the COR was on a number of different times.   ATCS told me we could not contact the COR directly and relied on ATCS to contact the COR on our behalf. ATCS has worked with FEMA for many years and I don't know if they ever spoke to the COR.  ATCS does not always hire candidates specific to fulfilling the requirements for jobs they undertake.  In this contract, Master Black Belts under LSS were requested and ATCS only hired Black Belts, which did not fulfill the terms of the contract to begin with.  We started out with 4 Master Black Belts, 4 Black Belts- yet ATCS probably charged FEMA for 8 Master Black Belts.


Question:  Did you ever reach out to either the COR and/or COTR with your concerns?
Answer: We were prevented from directly reaching out to the COR by ATCS; Eli used to work with some of the ATCS management and had relationships with them.    I believe Eli was instrumental in ATCS being awarded this contract even though they had never done any LSS projects. ATCS did not understand LSS and even their project managers had no idea what to do. ATCS should not have ever been the prime contractor. ATCS eluded that they just wanted to bill hours to FEMA for the contract regardless of what the SOW called for.  As a result of my complaints about ATCS, ATCS did not give me the yearly end of year 2019 bonus I deserved and refused to match my 401K contributions. I was never formally fired as an ATCS employee so I should have been eligible for these benefits. I think this was in direct retaliation to speaking out about complaints against ATCS.
We did not see the SOW for the first 4 mos we were there. Once we saw it and realized we were not following the SOW, we requested ATCS to change the SOW to match what work we were doing in; In Oct-Nov 2018 we notified ATCS in writing that the SOW was not being followed and needed to be changed.   FEMA Management (Tamara Aldarondo, Ana Bonilla, Eli Pushkarewicz) was also notified but no action was taken to re-write the statement of work.    We wrote a proposal to assist in modifying this SOW- Ana Bonilla and Eli told us to go forward with our proposal but the SOW was not re-written in violation of contract law. A complaint was lodged to the DHS OIG in PR about what was going on in April 2019 and a review of all of the SOWs were being reviewed. We complained about everything that was going on and about 2 weeks later all of the sectors and SOW's in many of the sectors were halted to be reviewed and placed in compliance.  Once the complaints were made retaliations started; by April or May communication with us was shut off. We were not given any new work and Barry Angeline and Mark Rozycki were terminated despite the fact we were already short-staffed in the number of Master Black Belts who were needed on the contract. 8 were needed and we only had 5 working bodies (several of which were not even Master Black Belts). There was an active call-down list to work from if we were short staffed and the people on the list did not even fit the qualifications to come on board and help- these people were not qualified and I'm sure ATCS was charging FEMA the price for supplying Master Black Belts. By June, ATCS said the project lacked

Initials: ~~mjo~~

FEMA - C000127

Name:  Oshaben, Michael
funding and we were fired.

FEMA Form 115-045-005-002 (6/20)

**FEMA - C000128**

Name:   Oshaben, Michael
_____

Question: Is there anything that I have not asked that you want included in this statement?
Answer: ATCS directly retaliated against me because they refused to pay me my 2019 year end bonus and 401K matching which I was entitled to because I was never informed when I was being terminated from employment.


## END OF STATEMENT

I have read this statement. It is true, accurate and complete to the best of my knowledge and belief. I have been given an opportunity to make any corrections, additions, or deletions. I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.


_____          09/28/2020
Signature                                         _____
                                                     Date


                                                  Michael K. Tenant    Digitally signed by Michael K.
                                                                       Tenant
                                                                       Date: 2020.09.28 15:05:37 -04'00'
Michael K Tenant
_____          _____
Investigator Name                                      Investigator's Signature


Initials:  mjo
                                                                                   _____

FEMA Form 115-045-005-002 (6/20)                                          Page 4 of 3

**FEMA - C000129**

Email pull request made from August 1, 2018 through October 1, 2018 for Tamiris Aldarondo, Eli Pushkarewicz, Joanne Lucas and Dawn Dickerson. Email pull request made from May 13, 2019 through May 31, 2019 for Tamiris Aldarondo, Dominique Lenox, Eli Pushkarewicz, Ana Bonilla, Victoria Colmenero, Jonathan Hoyes, Justo "Tito" Hernandez, Michelle Ortiz, Christian Bernhard Gomez and Kevin Porter.

The following were the key words used in the search: whistleblower, retaliation, EEO (Equal Employment Opportunity), discrimination, OIG (DHS/Office of Inspector General), old white men, old guys, old men.

The email search/request failed to produce emails from Joanne Lucas, Dominique Lenox, Victoria Colmenero, Jonathan Hoyes, Michelle Ortiz and Christian Bernhard Gomez.

**Analysis of emails**

analysis of emails pertaining to Tamiris Aldarondo, Eli Pushkarewicz, Dawn Dickerson, Ana Bonilla, Justo "Tito" Hernandez and Kevin Porter did not disclose any discriminatory language or inferences.

FEMA - C000130

DEPARTMENT OF HOMELAND SECURITY
Federal Emergency Management Agency

## NON-DISCLOSURE NOTICE MEMORANDUM

You are assisting in an ongoing official inquiry being conducted on behalf of the Federal Emergency Management Agency (FEMA). As this inquiry is sensitive in nature, you are hereby instructed not to disclose information relating to this official inquiry to any other person(s), except as may be appropriate under applicable law.

Failure to comply with this directive may subject you to disciplinary action under appropriate charges, such as failure to follow instructions or interfering with or impeding an official investigation.

These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.

Justo Hernandez
_____
Print Name

JUSTO
HERNANDEZ

Digitally signed by JUSTO
HERNANDEZ
Date: 2020.09.11 14:13:05
-04'00'
_____          _____
Signature                                        Date

FEMA - C000131

DEPARTMENT OF HOMELAND SECURITY
Federal Emergency Management Agency

## OFFICIAL DECLARATION

Name: Justo Hernandez                      Position: Operational COordination Div Director

Organizational unit assigned: Field Ops Division

Work phone: +1 (787) 306-0822    Email address: Justo.Hernandez@fema.dhs.gov

Work address: 500 C Street SW room 300, Washington DC

### STATEMENT

Interview conducted on September 14, 2020 at 10:30am by Investigators Mara Lederer and Michael Tenant via Microsoft Teams (MT) video.

Q: Do you understand the non-disclosure agreement that you reviewed and signed?
A: Yes.

Q: What is your title, position/organizational unit/grade with FEMA?
A: Operational Coordination Division Director ( OCD) /Under Field Operations Division/ SES

Q: What is your work number?
A: 787-306-0822

Q: What is your work address?
A: 500 C Street SW room 300, Washington DC

Q: How long have you worked for FEMA?
A: Since 1989.

Q: What was your job title on DR4339 (Puerto Rico)?
A: T was a Team Leader at the beginning and then I became the Deputy FCO until July 29, 2019.

Q: What dates did you work on DR4339?
A: Two days prior to Hurricane Maria, but I don't recall the date until July 19, 2019.

Q: Briefly describe your duties on DR4339.
A: I was coordinating the Federal response with the Governor in Puerto Rico. I then became a responder and had to coordinate with all mayors. The first 3-4 months I was the Lead voice on the disaster and receiving information from HQ and then implementing this to the field. Then the first year I managed the disaster from response to recovery. Other FCO's were brought in.

Byrne H

Q: On DR4339 (LSS/CIP program) the prime contractor was ATCS and Novaces was one of the subcontracting companies who provided Six Sigma training. Does this sound correct?
A: The FCO at one-point time was Mr. Michael Burn (he left the agency a couple months after me and went to work for Deloitte) was pushing for Lean Six Sigma training, but I don't know the details because I was not involved in this to engage in the sector approach. Ultimately, this ended at the sector level. There was frustration with the Lean Six Sigma company-in a disaster we had many people that we were trying to get response and getting assistance to those effected, a lot of engagement between the municipalities. Those at Lean Six Sigma wanted to know every detail of the process because they are not

*Before H* (margin handwritten note)

Initials: JH

FEMA Form 115-045-005-002 (6/20)

Page 1 of 4

**FEMA - C000132**

Name:  Justo Hernandez

*Expected*

FEMA employees and doesn't understand the process because they felt they couldn't do their work. They wanted us to stop responding in order to provide the steps in the process. We tried to engage the Lean Six Sigma team in order to attempt to illuminate the bureaucracy. I spoke with one of the contractor Lead, but I don't remember his name, but this was more in passing. To be honest, my agenda was really busy. I was mostly involved with the Congressional members who visited.

Q: Does FEMA have any input into the hiring of subcontractors/subcontracting companies? If they don't, which party does (i.e. the prime contract etc). If they do, please explain this process.
A: The contracting officers in the regional office and supporting the JFO and HQ. I don't know who engaged in that contract. Someone in FEMA oversaw the contractors. I was very far removed from this process.

Q: Did DR4339 (LSS/CIP) run out of funds for a portion of the projects?
A: I don't know. If there was a lack of funding but needed the funding, all we need to do was to justify the need and work with the FCO and amend the contract. During this disaster I did approve funding for a project/obligation. It is very unlikely that we would run out of funding. If the FCO has already ordered for more funding, they have the authority to approve and delegate the additional funding. *I WAS MOVING MILLIONS PER hour I Doubt we would Run out of money on Any Contract.*

Q: Who should I speak to regarding documentation pertaining to funding for DR4339, specifically the CIP program?
A: Brian Applebee Sr is the financial section chief-he is the comptroller and could access this information.

Q: Do you recognize the names Barry Angeline and Mark Rozycki? They worked for Novaces.
A: No.

Q: Are you aware if anyone directed others to take, recommend, or approve any personnel action, to take any personnel action against any employee because of the exercise of any appeal, complaint or grievance?
A: I would not know this; however, if I was aware, I would recommend termination of this employee. *This goes Against our core Values As an Agency.*

Q: Is there anything else you would like to add that I did not specifically ask you?
A: I don't have much visibility into this specific contract as I am many levels removed from the process.

Question:  Did you have any oversight of the project in Puerto Rico?
Answer: Not direct oversight, I knew they were working and tried to make the concept work

Question: Did you assign anyone in Puerto Rico to assist and oversee the project?  If so, who?
Answer: No, they worked directly for the CIP- I would not have the names of the direct personnel involved because CIP had over 300 people; I was just too far removed

Question: Did anyone overseeing the project in PR have any background knowledge about the LSS process?
Answer: I don't know

Initials: JH

FEMA - C000133

Name: Justo Hernandez

Question: Did you have any oversight of the project in Puerto Rico?
Answer: Not direct oversight, I knew they were working and tried to make the concept work

Question: Did you assign anyone in Puerto Rico to assist and oversee the project? If so, who?
Answer: No, they worked directly for the CIP- I would not have the names of the direct personnel involved because CIP had over 300 people; I was just too far removed

*This action was I had over 3000 folks working the event Delegated.*

Question: Did anyone overseeing the project in PR have any background knowledge about the LSS process?
Answer: I don't know.

Question: Did you meet regularly with the contracted instructors for the LSS implementation process?
Answer: No, because I was always dealing with other stuff; they may have conducted a briefing once per week and then would meet directly with the FCO. I may have spoken with the guys on the LSS contracted twice for about 10 min conversation

Question: Did any of the LSS contracted instructors ever advise you about any problems they were having in carrying out their contracted services? Is so, what did they say?
Answer: Yes, it was all related to the frustration that they did not know FEMA and could not get staff engaged to explain all of FEMA process' in the middle of providing assistance to survivors; in the times I spoke with the contractors I always had competing priorities with accomplishing the mission of restoring power and providing services to the survivors; in the time I had, I told the Continuous Improvement Program people and told them to get *it Resolved. I intervene with some Director, to see what was preventing them from engaging and it was time constraints.*

Question: Were you aware of or notified about any problems with the Statement of Work for this project?
Answer: No, I was not. The intent of the FCO was to use LSS to improve the elimination of process' and wanted to streamline the time from an inspection to reimbursement of funding; based on FEMA processes, look at each step of this process and improve how this worked to expedite the funding

Question: Were you ever notified or aware of any resistance to the LSS implementation process from FEMA management in Puerto Rico?
Answer: Yes, as previously described. *Right Process But wrong timing Response if the LSS were Knowledgable of FEMA, And I was Recovery, maybe I would work*

Question: Do you know why the LSS implementation project ended?
Answer: I have a feeling that it was too hard to identify the steps we were following and how to map out and change each level of the process. The FEMA folks did not have time to sit down and lay out all of these processes while simultaneously carrying out the mission of saving lives at this disaster. *In the end I believe we found our own way to expedite the Reimbursement for the Emergency.*

**END OF STATEMENT**

FEMA Form 115-045-005-002 (6/20)

Initials:

Page 3 of 4

**FEMA - C000134**

Name:  Justo Hernandez

I have read this statement. It is true, accurate and complete to the best of my knowledge and belief. I have been given an opportunity to make any corrections, additions, or deletions. I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.

_____          9/14/2020
            Signature                              Date


Mara Lederer                               MARA F LEDERER   Digitally signed by MARA F
_____                            LEDERER
        Investigator Name              _____   Date: 2020.09.14 17:11:19 -04'00'
                                            Investigator's Signature


FEMA Form 115-045-005-002 (6/20)                                    Initials: _____
                                                                    Page 4 of 4


**FEMA - C000135**

DEPARTMENT OF HOMELAND SECURITY
Federal Emergency Management Agency

## NON-DISCLOSURE NOTICE MEMORANDUM – NON-FEMA EMPLOYEES

You are assisting in an ongoing official inquiry being conducted on behalf of the Federal Emergency Management Agency (FEMA). As this inquiry is sensitive in nature, FEMA is requesting that you not disclose information relating to this official inquiry to any other person(s), except as may be appropriate under applicable law.

The disclosure of information related to this case could impede the investigation and hamper investigative efforts.

Your compliance with this non-disclosure notice is appreciated. These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.

_Brenda L. Dorta_
Print Name

_[signature]_
Signature

_9/14/20_
Date

FEMA Form 115-045-005-005 (6/20)

Page 1 of 1

**FEMA - C000136**

DEPARTMENT OF HOMELAND SECURITY
Federal Emergency Management Agency

## OFFICIAL DECLARATION

Name: Brenda L. Dorta                    Position: Program Analyst

Organizational unit assigned: CIP

Work phone: +1 (787) 506-4990    Email address: brenda.dorta@gmail.com

Work address: Quintas Reales, R6 Princesa Ana, Guaynabo, PR 00969

### STATEMENT

Interview conducted on September 14, 2020 at 2:30pm via telephone by Investigator Mara Lederer.

Q: Do you understand the non-disclosure agreement that you reviewed and signed? A: Yes.

Q: What was your title, position/organizational unit/grade with FEMA?
A: I started as a Continuous Improvement Specialist and then changed to Program Analyst/ CIP/started as a 7 and then 9.

Q: The best number to reach you. A: 787-506-4990

Q: What is your address?
A: Quintas Reales, R6 Princesa Ana, Guaynabo, PR 00969

Q: When did you work for FEMA on DR4339? A: May 2018 until July 16, 2019.

Q: The complaint that was filed alleges a hostile work environment, discrimination and retaliation towards subcontractors working on the Lean Six Sigma (LSS) group on the LSS/ CIP on the FEMA contract. What can you tell me about this?
A: The environment there: there was a group of employees and then contractors. About a month after I started, the Lead of the LSS group left and the contractors became part of the CIP group. The group was not cohesive. Eli was the leader of CIP and over time some FEMA employees, including myself, became friendly with the contractors, including Barry Angeline. I know that many FEMA employees became annoyed regarding the amount of money the contractors were making. I cannot recall the date, but Tammy was playing an icebreaker with FEMA/contractors. The game was similar to Pictionary (you have to get your team to say the word on the card without saying the actual word) and I was given the card "contractors". Shortly after the game ended, she had me go to her desk (end of the long table): she said I should've said "A lot of old white guys." I'm not normally a shy person, I just looked at her and said nothing.
Five months after we began working together, people didn't want to work with the contractors. Tammy made comments the contractors made too much money and should be doing more work.

There was a position available, some were interviewed, including myself. Eli told me that I was chosen to be the Team Lead. but after a few months Michelle Ortiz was given the position in the acting position and she was never interviewed. Michelle did not have any experience in CIP as a manager. Michelle and Tammy were friends. Even though I was

FEMA - C000137

Name: Brenda L. Dorta

qualified as was engineer (FEMA) Evelyn Santiago Michelle was given the acting/now the position. Tammy had no idea how to do the job.
HWE: Not a welcoming environment for the contractors. Discrimination: see below and above regarding her statements.

Retaliation: When the LSS training started a test ultimately is given. Tammy didn't want to be embarrassed she wasn't ready to take the exam and her project was not full or complete project. Everyone in the class was assigned a contractor to help us with the course and project. I don't know who was assigned to Tammy. After that, Barry/LSS was required to give a test. As a result of this push back, Barry was the first to be terminated.

Q: Who oversaw DR4339 as it related to LSS/CIP at FEMA?
A: Eli was the unit lead and Tammy was a Team Lead and Eli eventually put her as the Acting Unit Lead until summer 2020 and now she is the Unit Lead.

Q: Were you aware of any ongoing concerns/issues pertaining to DR4339, specifically regarding Barry Angeline?
A: He was a contractor. He was older and white. A point of contention was the fact that Barry pushed forward with the agenda regarding LSS training and take the exam as well as a project.

Q: Did you overhear Tamiris (Tammy) Aldarondo Jimenez refer to subcontractors (employed with Novaces) Barry and Mark Rozycki as "old white guys" and "don't pay attention to the white guys; they have no credibility."?
A: It was not a secret that the contractors are old and make too much money. She made comments that she didn't like the way they smell, and that Barry was the least nice out of all of the contractors.

Q: Did you tell Barry Tammy referred to him as the above? A: Yes, I did but a few months after she said it.

Q: Do you believe Tammy discriminated against Barry?
A: Yes. I believe it was based on age. Barry was older and had plenty of experience. Additionally, Evelyn Santiago was 60+ who had 30 years of experience. Sandra has a master's in engineering and experience and Christian Bernard and Tammy chose Christian who was 24 and FEMA was his 1st job and had no experience and Vivian Kifflai who was around 25 and Even though she had a bit of experience in the field of work, she was not comparable to others of us.

Q: Did you overhear Eli Pushkarewicz refer to Barry as "the old guys", "that washed up team of old guys" and the "straight old white guys"?
A: No.

Q: Do you believe Eli discriminated against Barry?
A: He left DR4339 around November 2018 but even when he wasn't in Puerto Rico, he had constant contact with Eli to include Tammy. I can't explain why Eli would be involved in DR4339 but Eli's wife (Annie Cranston) knows a lot of people in high positions (i.e. she travels with the Assistant Administrator). He is very connected with COS, FCO.

Q: Did Tammy's conduct involve unreasonably interfering with Barry Angeline's work

Initials: BLD

Name:  Brenda L. Dorta

performance, or created an intimidating, hostile, or offensive work environment based on an individual's protected basis? If she did, how?

A: Yes. She wanted to always know what Barry/contractors were doing and always wanted a representative from CIP to watch over them in meetings. If they held a meeting with the COS Tammy had to be present. Because she didn't understand what the agenda was, she intended to prevent Barry (contractors) from moving forward until she got grasp of what was going on.

Q: Was there anything in writing stating the requirements for Unit Lead?

A: Eli stated that no one within FEMA group didn't have the experience to be the Unit Lead (although Evelyn was). As a result, Eli looked outside the group to hire someone. Currently, there are no requirements pertaining to an education requirement for the Unit Lead position. The only requirement needed 1 year of experience and Tammy had 1 year in the Acting position and after the year was up, they didn't change the posting to require education. Typically for a Unit Lead position and in a supervisory position, education is usually a requirement.

Q: Did Eli's conduct involve unreasonably interfering with Barry Angeline's work performance, or created an intimidating, hostile, or offensive work environment based on an individual's protected basis? If she did, how?

A: I cannot answer this.

Q: Do you feel that either Tammy or Eli attempted to "tank" or make the program fail for any reason?

A: Yes, because they didn't understand how LSS/CIP could work together. They didn't understand the tools used by LSS. LSS is more technical and mathematical. They felt like it was too much work to learn the technical side. I don't think they did it to make the contractors look bad and it was not Eli or Tammy's fault the program would fail.

Q: Did Tammy direct others to take, recommend, or approve any personnel action, to take any personnel action against any employee because of the exercise of any appeal, complaint, or grievance right granted by any law, rule or regulation? And if she did, how?

A: I do because at one point it was suggested that Tammy be given the answers to the test to study; however, Mark (Barry's boss) said absolutely not. Ultimately both Barry and Mark were released at the same time.

Q: Did Eli direct others to take, recommend, or approve any personnel action, to take any personnel action against any employee because of the exercise of any appeal, complaint, or grievance right granted by any law, rule or regulation? And if she did, how?

A: Not that I am aware of.

Q: Who else do you think I should speak to?

A: No.

Q: Is there anything else you would like to add that I did not ask you that you feel is relevant to the investigation at hand?

A: Not at this point.

**END OF STATEMENT**

Initials: BLD

FEMA - C000139  Page 3 of 4

Name:  Brenda L. Dorta

I have read this statement. It is true, accurate and complete to the best of my knowledge and belief. I have been given an opportunity to make any corrections, additions, or deletions. I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.

_____     9/22/20
            Signature                              Date

Mara Lederer                                         MARA F LEDERER   Digitally signed by MARA F LEDERER
_____                                              Date: 2020.09.22 14:53:18 -04'00'
        Investigator Name                          _____
                                                        Investigator's Signature

Initials:  BLD

FEMA Form 115-045-005-002 (6/20)

**FEMA - C000140** Page 4 of 4

DEPARTMENT OF HOMELAND SECURITY
Federal Emergency Management Agency

## NON-DISCLOSURE NOTICE MEMORANDUM

You are assisting in an ongoing official inquiry being conducted on behalf of the Federal Emergency Management Agency (FEMA). As this inquiry is sensitive in nature, you are hereby instructed not to disclose information relating to this official inquiry to any other person(s), except as may be appropriate under applicable law.

Failure to comply with this directive may subject you to disciplinary action under appropriate charges, such as failure to follow instructions or interfering with or impeding an official investigation.

These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.

Tamiris Aldarondo
_____
Print Name

TAMIRIS
ALDARONDO

Digitally signed by TAMIRIS
ALDARONDO
Date: 2020.09.17 13:00:29
-04'00'
_____
Signature

09/17/2020
_____
Date

FEMA Form 115-045-005-003 (6/20)

Page 1 of 1

**FEMA - C000141**

DEPARTMENT OF HOMELAND SECURITY
**Federal Emergency Management Agency**

**OFFICIAL DECLARATION**

Name: __Tamiris Aldarondo__          Position: __Program Analyst__

Organizational unit assigned: __Continuous Improvement__

Work phone: __+1 (202) 538-2651__   Email address: __tamiris.aldarondo@fema.dhs.gov__

Work address: 50 Carr. 165 Sector de Buchanan Parque Industrial Amelia Guaynabo, PR 00968-8024

**STATEMENT**

Interview was conducted by Investigators Mara Lederer and Michael Tenant on October 27, 2020 at 1pm via Microsoft Teams (MT) video.

Q: Do you understand the non-disclosure agreement that you reviewed and signed?
A: Yes.

Q: What is your title, position/organizational unit/grade with FEMA?
A: Program Analyst / Continuous Improvement/ GS13

Q: What is your work number?
A: (202) 538-2651

Q: What is your work address?
A: 50 Carr. 165 Sector de Buchanan Parque Industrial Amelia Guaynabo, PR 00968-8024, PR-165, Guaynabo, 00968, Puerto Rico
Q: Please briefly describe your duties on DR4339.
A: When the LSS team started: I was a Team Lead with the CIP and then the teams combined with the LSS team but I remained as a Team Lead. Eli was in the Unit Lead position for 9 months to 1 year. Dawn Dickerson then took over as a Unit Lead team after Eli for approximately 5 months. I took over as the Unit Lead of the LSS team in approximately November 2018.
As the Unit Lead: I oversaw the work was done, the CIP work done was made directly to the COS. The Project Manager from the LSS team would accompany me to the COS was Victoria Colmenero and before her was Raymond "Rock" Kulish. These individuals were contractors but I cannot recall who they worked for but the prime contractor was ACTS.

*I was not the Unit Lead for LSS, I was the Acting CIP Unit Lead who had, as an added responsibility to be the task monitor for the LSS Contract. In this role, I reported to the COS.

Q: At what point did you oversee the LSS/CIP program?
A: Since Approximately November 2018, I have overseen this program. In May or June 2019 the LSS team due to many issues with the contractor's performance/conduct. I worked very closely with the prime contracting company regarding the LSS team and after many meetings with them, we didn't see any change, the prime contracting company said they were releasing who I assumed was Barry because he was not on the team after that.
-I told Kuang (ACTS) that I didn't want to know the details regarding what the prime contracting company was doing regarding their management of the contracting.
*Mr. Kwong mentioned that they were making changes in the team, in an effort to improve the areas we had been pointing out for over a year. I told Mr. Kwong that I appreciated his efforts, but I did not want to have visibility in anything related to the internal

Initials:  __TA__

**FEMA - C000142**

Name: Tamiris Aldarondo

decisions made with the contract and that anything related to that needed to be addressed with the COR.

-The issues were: When Eli was the Unit Lead he identified the same issues. They put together a remediation plan that the contracting company agreed to fix. I also identified some of the same
-Not following the chain of command, they undermined my authority and go above me and attempt to Schedule meetings with the FCO and COS. It was disruptive. They changed their duty station without permission (it was to be the JRO and they stopped showing up and wanted to work from the Call Center). They refused to report to the JRO even after being told to report to the JRO.
-Performance: they took credit that the PA Ops team completed the work. The PA Ops Team Lead complained and as a result the LSS had to apologize. The COS would ask for answers and could not provide answers.
-LSS would there to help us improve on FEMA's processes; however, they didn't want to learn how FEMA operated. They tried to run the program the way they would in private sector.
-I have emails between myself and Contracting Officer/COR/COS documenting conduct/ performance.
Q: What qualifications were required to oversee the program?
A: I was in an acting position initially. I asume: supervisory experience, public speaking, coordiantion, communication skills, strong writing skills. I would asume a bachelor's degree but I'm not sure. I have a bachelor's degree in international studies. I'm not aware of specific type of degree needed.

Q: Did you have the qualifications?
A: Based on my assumptions I believe I met the qualifications. I've exceed expectations.
*I've been exceeding expectations for the past two years while in the CI Unit Lead Position, whether I was acting or formally in the position. The team and I also received a recognition from the FDRC during the 2 year anniversary All-Hands event and many senior leaders in Puerto Rico and HQ have recognized my work, specially my efforts in reestablishing the team after all the problems related to the LSS contractors and gaining trust from JRO stakeholders once again. For reference: Michael Icardi (HQ CIP)

Q: How did you get the position and who made the decisión?
A: The acting position I think came from the COS-Anna Bonila. Everyone prior to me (inlcuding Eli) was also in an acting position. The position was not posted until August 2020 to which I applied, interviewed and offered the position.
*Correction: the Unit Lead position was posted and interviewed around May/June 2020.

Q: Was anyone else considered for the acting position?
A: I'm not sure.

Q: Please provide me a copy of your resume.
A: I think I submitted a resume back prior to approximately November 2018.
-I Will provide a copy of my resume from August 2020 and the one I submitted prior to November 2018.

Q: You were enrolled in the LSS Black Belt class, correct? This class was during work hours and paid for by FEMA, correct?
A: Yes to this entire question.

Initials: TA

FEMA - C000143

Name:    Tamiris Aldarondo

Q: What was Barry Angeline 's role in the LSS/CIP program?
A: He was one of the LSS instructors.

Q: What dates did Barry report to you?
A: Approximately November 2018 until May or June 2019.
*To clarify – Barry did not report to me directly, he reported to the LSS Program
Manager/Lead, Rock. I was the Task Monitor.

Q: What were the dates Eli Pushkarewicz was assigned to DR4339 and what was his position?
A: He was the Unit Lead prior to Dawn Dickerson but I am not sure of the date.

Q: Did Eli have any input or involvement in the LSS/CIP program once he departed?
A: No, but Eli is a HQ employee and part of the CIP program and was deployed to Puerto
Rico and returned to HQ. LSS team had to report to me but I oversaw both programs so Eli
was my counterpart at HQ so we would discuss the CIP program. Eli did not have imput in
the LSS program.

Q: Was it a requirement that Barry (or somoene from their team) speak to Chief of Staff
(COS) Ana Bonilla Davila on a weekly basis?
A: Victoria and Rock were part of their team; however the LSS Team (experts) would not
share information to Victoria and Rock. Those individuals accompanied me to meetings with
the COS.
-It was outside my scope to tell Victoria or Rock about their internal processes because
the LSS team didn't want to provide accurate information. We communicated all concerns
with the Contracting Officer.
-I Will send documentation.
*It was not a requirement for someone from the LSS team to come to the COS meetings with
me. It was something the COS and I decided to implement, so that the LSS lead/program
manager could be more actively involved in representing their work.

Q: If Barry (or someone from his team) wanted to speak to leadership, what was the
procedure?
A: They were aware their only communication was to go through Rock/Victoria.
* Their chain of command was through Rock/Victoria, but Barry and Mark often came to me
directly and I would support in any way possible, while still looping in Rock/Victoria.
They often came to me to try and discredit some of their team members or speak negatively
about them. Barry, in particular, was known for trying to create problems and talking
negatively about others. During a meeting with Mr. Kwong, he acknowledged this about
Barry and mentioned they were working on correcting those issues.

Q: Part of the LSS course required you to pass tests as well as complete a project. Did
you successfully complete the requirements for your certification?
A: No and I don't think 95% of those who attended met the requirements. The course was
very detached from FEMA work. It was very time consuming and didn't fit into the FEMA
program.
*The COS and I tried our best to help the LSS team develop a training that was adaptable
and compatible to the realities of a FEMA disaster operation, but the LSS team insisted
on forcing the rigid requirements they used in the private sector, which were often
incompatible with our needs. It was definitely possible to learn the LSS tools and apply
those to FEMA processes without using such a strict and time consuming methodology or

Initials:    TA

FEMA - C000144

Name:   Tamiris Aldarondo

requiring a certification. The unwillingness of the LSS team to learn about our Agency, be flexible, and adaptable made the completion of training  unrealistic for many in our field workforce.

Q: Did you attempt to change the requirements pertaining to the LSS certification process by requesting the test answers prior to taking the exam or requesting the project be optional?
A: There was a very large list of requirements. We tried to make the course to be more FEMA friendly to get full-time employees to take with a full-time workload.
-I did ask if they can make the course more FEMA friendly. The Project being optional was part of making this as friendly as posible for FEMA employees.
-Because the LSS team was leaving and it was agreed that the FEMA Training Department would administer the test. I asked them to send the answsers to the training team.

* Our main goal with this training was to give FEMA employees some knowledge and tools for process improvement, so that they could use those when appropriate. The traditional LSS projects often take between 4 to 6 months in addition to the 2-4 weeks of training. Taking that into consideration, on top of the fact that employees participating in the training already had their regular job duties and responsibilities, and given the changing priorities in the field, the requirements seemed unrealistic for our operation, and we wanted to make it as adaptable to our FEMA reality as possible.

Q: My understanding is you were enrolled in law school at the same time as you were enrolled in the LSS Black Belt training.  Did your law school attendence/coursework interfere with your ability to complete the necessary tasks for the Black Belt training?
A: No.
* I have been in Law School since I started working for FEMA and my course load is lower than the average student, specifically because my job is my priority. During this time, I have consistently exceeded expectations and been recognized by numerous supervisors for my work. For reference: Peter Danjcheck, Maggie Holmes, Alejandro de la Campa, Kelli Russo.

Q: Are you aware of any issues pertaining to or surrounding the LSS program on DR4339, specifically with Barry Angeline?
A: With Barry: raised his voice a lot, aggressive, he interrupted one of the CIP team member who was LSS trained and undermined what the employee was presenting.
-They made comments about my age constantly to me. He said things like: "I started doing this before you were born". They made similar commnets to Michelle Ortiz. I did speak to the COS and I was told to "grow some thick skin."
-I was trying to be more assertive and even when to ADR to develop my leadership skills.
-Barry and Mark would mention the type of weapons they used to use in the military. I never thought they would act on anything with weapons.

* Barry and Mark would mention the type of weapons they used in the military, as a response to me giving them assertive answers or directions. I perceived this as an act of intimidation, but also trusted that our JRO is a safe space and any violent behavior would not be tolerated.

Q: Did you ever make any comments to anyone regarding Barry's age, race or gender?
A: Absolutely not.

Initials:  TA

FEMA - C000145

Name:  Tamiris Aldarondo

Q: Did you ever refer to Barry as an "old white guy" and/or "don't pay attention to the white guys; they have no credibility"?
A: Absoltuely not. They actually refered to themselves in this manner.

Q: If you didn't, why would someone say you had?
A: I don't know.

Q: Do you recall playing an icebreaker with FEMA/contractors. The game was similar to Pictionary (you have to get your team to say the word on the card without saying the actual word) and someone was given the card "contractors". After the game you told the individual they should've said "A lot of old white guys." Do you recall this?
A: No. I don't remember playing that game.

Q: Why was Barry terminated from DR4339 and who terminated him?
A: I think it was an internal decisión made by the prime. The prime contractor would have but I don't know who.

Q: Was the entire team (contractors) terminated at the same time as Barry? If not, how was it decided Barry would be terminated?
A: I think Barry was terminated before the rest of the team, but I don't know how the decisión was made.

Q: Barry states he was terminated due to a lack of funding/experience. What can you tell me about this?
A: I am unaware of this. I thought it was because of conduct and performance.

Q: Do you recall Barry sending you an email dated May 17, 2019 that he (along with others), filed a whistleblower/EEO complaint?
A: Yes. It was the day after FEMA Operations decided to end the LSS contract. Deputy FCO , COS.

*Deputy FDRC, not Deputy FCO.


Q: What did you do after receiving this email? Who did you notify?
A: My chain of command: Dominic Lenox (Deputy FDRC) Federal Disaster Recovery Center.
*FDRC stand for Federal Disaster Recovery Coordinator

Q: Did you unreasonably interfere with Barry's ability to perform his work, or created an intimidating, hostile, or offensive work environment based on an individual's protected basis?
A: No, I can't imagine I was intimidating to him at all.

*Any decision made or instructions given, were solely based on conduct and performance. My attitude, personality, and actions inside and outside of work, have always been recognized for being diplomatic, inclusive, and understanding. For reference: Melissa Boudrye, Shirley Rivera.

Q: Do you feel you created a toxic environment and showed an insensitivity to the diversity within the CIP team?
A: Absolutely not.

Initials:  TA

FEMA - C000146

Name:    Tamiris Aldarondo

Q: Did you harass/discriminate against the LSS team, specifically Barry?
A: Absolutely not.

Q: Do you believe the LSS team was treated differently because they were subcontractors to the prime contracting company ATCS?
A: Not on my part.

Q: Do you have or did you have a personal relationship with anyone working for ATCS?
A: I went out to dinner with Victoria and other people once.

Q: Did Eli continue to have input/interactions with the LSS program once he left?
A: No input but yes to interaction.
* From what I remember, Eli only had interactions with me as he was my counterpart, not with the LSS team.

Q: Did Eli ever make any comments to anyone regarding Barry's age, race or gender?
A: Absolutely not.

Q: Do you believe Eli discriminated/harassed the LSS team, specifically Barry Angeline?
A: Absolutely not.

Q: Who else do you suggest I speak to regarding the LSS/CIP program and Barry?
A: Eli, Dawn Dickerson, Anna Bonilla.
*Melissa Boudrye

Q: Were you ever advised that any LSS Contractor was not being paid for the use of intellectual property?  If so, by who and when?
A: I'm not really sure; not that I can remember

Q: Were you ever advised that any LSS Contractor was not being paid for all of the training being provided?  If so, by who and when?
A: No, not that I am aware of

Q: Were you the Project Manager for the LSS Contract?  When and how long?
A: No, that was an internal position from the contractors.  I am a program analyst and was a task monitor for the LSS project; ensured work was being done and the contractors showed up to work their hours

Q: Who gave you those duties?
A: It came with the Unit lead position

Q: What was you LSS understanding and/or experience prior to DR-4339?
A: I did not have any experience with LSS

Q: Were you ever told in March 2019 that FEMA was "getting gouged" for paying for services to a prime contractor (ATCS), who was then passing the work down to 2nd and 3rd tier sub-contractors for completion?  If so, by who?  When? What did you do?
A: I don't think anyone formally talked to me about LSS and how much they were making. In casual conversations there may have been discussions about FEMA contracting and overspending.  No one specifically told me about any contracting issues or money

Initials:    TA

FEMA - C000147

Name:   Tamiris Aldarondo

Q: Do you know a woman named Victoria Colmenero?  If so, how do you know her?
A: Yes, I only know her from being the project manager for the LSS team

Q: Did you have any role in Colmenro's placement by ATCS on the LSS contract?
A: Absolutely not, I only met her when she came down to that position

Q: Did you ever attempt to get or obtain an advanced copy of the LSS final exam?
A: No, I only requested a copy for training as I explained earlier. For me specifically, no
*As the supporting documentation (emails) will show, the request was to send the tests to the Training department so they could perform the test in the future, if needed. However,as far as I'm concerned, this was never utilized by FEMA.

Q:  Did you ever say to any LSS contractor, "it is in everyone's best interest for everyone to pass the exam?"  If so, why?
A: Not that I remember. I could have said I hope everyone passes or everyone learned something.  But I did not say anything with the connotation that everyone should pass

Q:  What was your role as the CIP Lead?
A: In 2019, my role was to oversee, monitor, and ensure all CI projects were completed by the team.  I supervised deadlines and monitored performance, ensured projects were reported to leadership overall as needed

Q: Did you ever use the role of CIP Lead for any other purpose?
A: Only for any other responsibilities I was assigned in my role.  It would have been detailed in my resume

Q:  Were make up sessions scheduled to keep you current in the LSS studies because of how many classes you missed? How many classes did you miss?  Why?
A: I honestly don't remember.  Make-up sessions and refresher were implemented for anyone; I don't know how many classes I missed, I don't think I missed any classes.  I would have only missed a class for priority meetings with leadership that superseded training
The Chief of Staff project I completed was presented to the Chief of Staff; after the LSS contractors left- my stakeholder did not implement the process I presented to the Chief of Staff

Q:  Did you ever call any LSS Contractor "an asshole" in response to a complaint about your behavior?
A: Absolutely not

Q:  Did you ever limit the duties of any LSS Contractor because of a memo written to Mike Burns outlining problems with the LSS Contract Implementation?
A: I was never told about any memo to Mike Burns

**END OF STATEMENT**

Initials:    TA

**FEMA - C000148**

Name: <u>Tamiris Aldarondo</u>

I have read this statement. It is true, accurate and complete to the best of my knowledge and belief. I have been given an opportunity to make any corrections, additions, or deletions. I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.

TAMIRIS ALDARONDO
JIMENEZ
Digitally signed by TAMIRIS
ALDARONDO JIMENEZ
Date: 2020.10.28 14:37:52
-04'00'
_____
Signature

<u>10/28/2020</u>
Date

<u>Mara Lederer</u>
Investigator Name

MARA F LEDERER
Digitally signed by MARA F
LEDERER
Date: 2020.10.28 15:01:38
-04'00'
_____
Investigator's Signature

Initials: <u>TA</u>

**FEMA - C000149**

| | |
|---|---|
| **From:** | Aldarondo, Tamiris |
| **To:** | Lederer, Mara; Tenant, Michael |
| **Subject:** | LSS Documentation |
| **Date:** | Thursday, October 29, 2020 12:43:48 PM |
| **Attachments:** | COS Office Optimization Toolkit.pdf |
| | RE_Green Belt In-Training Cert.pdf |
| | FW_LSS contract performance issues.pdf |
| | LSS Demob Mark and Barry.pdf |
| | LSS Green Belt File - DELETED.pdf |
| | LSS Contract Termination Memo.pdf |
| | Performance Evaluation 2019.pdf |
| | 4.10.2020TamirsAldarondoFederalResume..pdf |
| | RE_Survey - COS optimization.pdf |
| | LSS. Supporting Documentation.pdf |

Good afternoon,

I hope you're doing well. As requested, I'm attaching supporting documentation regarding the LSS Contractors. I'm outlining below what each one of the attachments includes. If there's anything else you need from me, please don't hesitate to ask.

- LSS Contract Termination Memo – Memo sent to Gretchen Carreiro stating reasons to request termination of this contract. Ultimately, I believe the contract was not formally terminated, the Agency decided to simply not renew. The COR can provide more details on that.
- LSS Supporting Documentation – This includes the Remediation Plan and Memo sent under Eli, as well as numerous emails regarding issues like unauthorized overtime, breaking chain of command, change of duty station, apology from Rock to Kristin Hodge due to the LSS team's inaccurate representation of their work, email where I specifically tell Mark and Victoria not to send the exams to me, Barry's unprofessional behavior brought to my attention by another team member, etc.
- Green Belt In-Training Cert – This is another email where I specifically request that exam and answer keys were provided to the Training Department, so that we could continue the certification if needed. That said, as far as I know, those documents were never used by FEMA
- LSS Demob Mark and Barry – Email where Victoria notified me that Mark and Barry had completed the check-out process and states that exam key was sent to Training Department.
- COS Optimization Toolkit  and RE Survey COS Optimization– This is the project I worked on for the BB Course, Michelle Ortiz was the Green Belt assigned to that project and we worked on it together. The methodology required by the LSS training would have taken months to complete, which is why many projects feel through the cracks, because the methodology wasn't adapted to a FEMA Recovery Operation environment. For that reason, we took a different approach and submitted our work to the COS, we did not receive formal feedback on its implementation and COS priorities shifted after that.
- LSS Green Belt File – Emails from a team member regarding the deletion of a file with all the Green Belt information around the time of Barry and Mark's demobilization.
- FW_LSS contract performance issues – Email forwarded from Gretchen Carreiro, were concerns were being discussed about contractor performance in 2018
- Performance Evaluation – My 2019 Performance Evaluation where I exceeded expectations in the role of Acting Unit Lead for CIP.
- 4.10.2020 Tamiris Aldarondo Federal Resume – This is my most recent resume, I haven't found one from 2018, but will keep searching through emails.

**FEMA - C000150**

Thank you,

**Tamiris Aldarondo**
DR 4339 - PR | Continuous Improvement Program
Unit Lead
Phone: 202-538-2651

Click here to request Continuous Improvement assistance
and for more information regarding our work supporting Puerto Rico's recovery

FEMA - C000151

| | |
|---|---|
| **From:** | Carreiro, Gretchen |
| **To:** | Aldarondo, Tamiris |
| **Subject:** | FW: LSS contract performance issues |
| **Date:** | Friday, May 24, 2019 8:19:55 AM |
| **Attachments:** | Memo_LSS Contractor Performance v6.docx |
| | RE Report.msg |
| **Importance:** | High |

Very important one….

Thank you!

Gretchen

**From:** Pushkarewicz, Eli
**Sent:** Friday, October 26, 2018 8:38 AM
**To:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>; Carreiro, Gretchen
<Gretchen.Carreiro@fema.dhs.gov>
**Cc:** Icardi, Michael <michael.icardi@fema.dhs.gov>; Mabry, Marshall
<Marshall.Mabry@fema.dhs.gov>
**Subject:** LSS contract performance issues
**Importance:** High

Gretchen,

Please see the attached memo outlining the performance issues related to the Lean Six Sigma
contractors. It was reviewed and approved by the FCO. Additionally I have included an email from
the JRO Equal Rights Office outlining a grievance that was filed by a FEMA employee who works in a
sector housed next to the contractor's table.

The FCO would like a plan regarding how they will remediate the grave performance issues by COB
today. He also wants to make clear that his interest in extending this opportunity is only due to the
previous good performance by the prime company. With your concurrence I would like to
immediately forward to Tim.

-Eli

**From:** Arcurio, Josie
**Sent:** Thursday, October 25, 2018 3:37 PM
**To:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>; Bonilla Davila, Ana
<ana.bonilladavila@fema.dhs.gov>; McRae, Maurice <maurice.mcrae@fema.dhs.gov>
**Cc:** Mabry, Marshall <Marshall.Mabry@fema.dhs.gov>; Fox, Russell <Russell.Fox@fema.dhs.gov>;
Arcurio, Josie <Josie.Arcurio@fema.dhs.gov>
**Subject:** RE: LSS contract performance issues
**Importance:** High

**FEMA - C000152**

Eli

I just spoke with Mike.  He thanks you for your excellent write up. FEMA has had a long standing good relationship and successes with this Contractor. It is the only reason he will afford them an opportunity (and he wants you to advise Tim as such) to rectify the issues as you outlined.  Since this is a HQ managed contract, Mike would like for you to meet with the Contractor and appropriate parties on the performance issues outlined.  He would like a plan from the Contractor within 24 hours, on how they plan to rectify all issues that are addressed.  He still may want the Contractor to come down, pending how the plan is presented.   Please provide Mike and I a report as soon as you receive it, and we will set up time to discuss further.

Please let me know if you have any questions
Thx
Josie

---

**From:** Pushkarewicz, Eli
**Sent:** Thursday, October 25, 2018 12:31 PM
**To:** Arcurio, Josie <Josie.Arcurio@fema.dhs.gov>; Bonilla Davila, Ana <ana.bonilladavila@fema.dhs.gov>; McRae, Maurice <maurice.mcrae@fema.dhs.gov>
**Cc:** Mabry, Marshall <Marshall.Mabry@fema.dhs.gov>; Fox, Russell <Russell.Fox@fema.dhs.gov>
**Subject:** FW: LSS contract performance issues

FSA

---

**From:** Tim McCormick <tmccormick@atcsplc.com>
**Sent:** Thursday, October 25, 2018 11:42 AM
**To:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>; Hui, Kwong <khui@atcsplc.com>; Perry Rhodes <prhodes@atcsplc.com>; Icardi, Michael <michael.icardi@fema.dhs.gov>; Carreiro, Gretchen <Gretchen.Carreiro@fema.dhs.gov>
**Subject:** RE: LSS contract performance issues

Eli,

Sounds good.  It will help to have Mike's feedback too.  Just let us know when you want to hold the meeting and we'll be there.

Thanks!

**Tim McCormick**
Vice President, Emergency Management Services & Water Resources
2553 Dulles View Drive, Suite 300 | Herndon, VA 20171
P: 703-430-7501 x138 | C: 703-887-1533 | F: 703-430-0889
**atcsplc.com** | **Facebook** | **LinkedIn** | **Twitter**

CLIENT ▪ EMPLOYEE ▪ COMPANY ▪ COMMUNITY

This email is only for the intended recipient, and may contain information that is privileged,

**FEMA - C000153**

confidential, or exempt from disclosure under law. If you received this message in error, or are not the intended recipient, please notify the sender and destroy this message.
- Title VI Compliance -

**From:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>
**Sent:** Thursday, October 25, 2018 11:31 AM
**To:** Kwong Hui <khui@atcsplc.com>; Perry Rhodes <prhodes@atcsplc.com>; Icardi, Michael <michael.icardi@fema.dhs.gov>; Tim McCormick <tmccormick@atcsplc.com>; Carreiro, Gretchen <Gretchen.Carreiro@fema.dhs.gov>
**Subject:** Re: LSS contract performance issues

Good day,

Mike Byrne has asked that we hold on meeting today until he has an opportunity to provide feedback related to performance. I will reschedule a meeting once he provides feedback, likely early next week.

Eli Pushkarewicz
Deployed to DR-4339-PR (CI Unit Lead)
Evaluation and Decision Support
National Preparedness Assessment Division
NPD|FEMA|DHS
Mobile Phone-202-304-9604
**The ATCS Herndon office is moving. Effective 10/29, our new address will be:**
**13861 Sunrise Valley Drive, Suite 200, Herndon, Virginia 20171**

FEMA - C000154



U.S. Department of Homeland Security
Region II
FEMA-4336-DR-PR
FEMA-4339-DR-PR
P.O. Box 70105
San Juan, P.R. 00936-8105

October 22, 2018

MEMORANDUM FOR:      Rashaan Edwards, Contracting Officer
                              Karley Hoyt, Contract Specialist
                              Gretchen Carreiro, COR

FROM:                      Eli Pushkarewicz
                                Evaluation and Decision Support
                              National Preparedness Assessment Division-FEMA

SUBJECT:              Lean Six Sigma Contract Performance

## Background

In April of 2018, FEMA procured a contract to employ individuals with Lean Six Sigma (LSS) certifications to assist with process improvement activities at the Puerto Rico Joint Recovery Office. Due to the complex scope of the recovery efforts, combined with implementation of a new field organizational structure, leadership envisioned utilizing LSS to provide technical assessment in standardizing processes, removing challenges, and increasing efficiency in service delivery. An initial contracting team was deployed in April. In May, the prime contractor deployed a new project lead to help guide the LSS team, because they did not have previous FEMA program exposure. In July, the Continuous Improvement (CI) Unit and Chief of Staff's office conducted a program review of all projects with the contractors. It was determined that most of the projects did not produce measurable outcomes for the recovery operations. LSS noted that they were also not aligned with the focus of the statement of work. The FEMA LSS Project Manager was replaced, and the LSS contractors conducted a self-assessment and reset of their team. To provide consistent direction, the LSS contractors were moved under the Continuous Improvement (CI) Unit as the CI staff had been providing support to the contractors since May.

## Performance Issues

The CI Unit, Chief of Staff, and FCO have met with the contractors frequently to communicate leadership intent, discuss the projects, and provide direction. Though there have been small LSS actions such as the CRC rapid improvement event and the LPM process improvement in PA Ops, that have resulted in improvements to recovery, to date there has not been any significant benefits reported. Below is a summary of the performance issues related to the LSS contracted staff that have not yet been remediated. Each bullet aligns with previous documentation of the issue and attempts to resolve with the contractors.

1

**FEMA - C000155**

**Challenges defining and meeting deliverable milestones and deadlines**
- FEMA has reiterated to the LSS contractors both verbally and in writing that all projects are required to have a project plan that is signed off on by all stakeholders in leadership positions. Additionally, that frequent stakeholder communications, for example tollgates, are required.
- Due to the inability of the contractors to communicate their project progress, effective after 10/5/2018 presentation to FCO, the CI Unit Lead and COS now requiring bi-weekly meetings with both the contractors and their stakeholders.
- Examples of deliverable issues:
  - The LSS team has not been able to define, communicate, and execute a project plan with clear deliverable dates for the Digital Site Inspections project, which began in June.
  - Both the annual plan and OKRs were approved by leadership as projects, but never executed as projects.
  - The COS requested an initial meeting with LSS stakeholders for 10/10 but it had to be rescheduled for 10/12.
    - LSS struggled to identify the stakeholders because many had demobilized since the initial plan and then they failed to ensure attendance as a result of waiting to do outreach until the morning of the initial meeting.
  - The LSS team struggles to balance multiple project deliverables and frequently misses deadlines when not reminded by CI Unit Lead or COS:
    - Examples:
      - They failed to submit LSS project information for incorporation into the objectives and key results OKRs) reporting tool by initial 10/12 date or extended deadline given of 10/15.
        - Contractors had been asked to provide the OKRs for their projects, and the JRO Objectives they aligned to. Instead of completing the task they created a measuring tool that did not meet the criteria of the request.
        - Contractors never reached out to discuss not being able to meet the deadline. When a status update was requested they stated it was no longer a priority and did not provide a timeline for completion. CI staff redirected them to continue defining the OKRs.

**Unprofessional behavior**
- Since April 2018, there have been several episodes of contracted staff acting unprofessionally and communicating their dissatisfaction about internal LSS issues to FEMA staff. These include:
  - Multiple contractors asking FEMA employees to make sure they had work so as not to get fired.
  - Four contractors, each separately, solicited multiple FEMA employees to intervene with their prime contractor to ensure they continued to be employed.  One contractor detailed how being notified he was targeted to demobilize would impact his mental health issues to CI employees leading to FEMA employees being involved in concerns over contractor safety. After each incident the contractor lead was directed to ensure

2

**FEMA - C000156**

contractors behaved professionally and that internal contractor staffing was handled without disruption to FEMA services.
- Incidents of verbal outbursts in front of FEMA staff including a CI Unit lead, Team Leaders and the Training Unit Lead.
- Multiple instances of a contractor being perceived as sleeping in meetings.

**Quality of work issues**
- Almost all LSS products have required significant time, proof reading and editing for structure and grammar by FEMA staff which detracts from being able to provide content guidance. Additionally, stakeholders have relayed the products they've received from LSS are not clear and hard to understand. The response provided by the contractors have been that they are not technical writers. Examples:
  - On 10/4 LSS was requested to provide an executive briefing to the FCO regarding progress on the measurable outcomes for their projects. The whole contract team spent a complete day (i.e. 10+ hrs.) working on a six-page report as their information was not already synthesized to report on project status and milestones.
    - LSS submitted their report after the deadline requested despite being told an extension would not be granted. Upon initial review, CI communicated that it did not meet the requirement as it was full of misspellings, grammar errors, and did not cover the information requested.
    - The lead contractor asked for it to be sent forward to the FCO and that he would still revise overnight.
    - The revised version was submitted the following day. It still had significant errors such as the FCO's name being misspelled, and the Digital Site Inspection project left off completely.
    - During the meeting LSS did not communicate a clear agenda, and information such as "site inspections will upload into Grants Manager" was a misreport of information to the FCO because Public Assistance SMEs already shared with LSS they did not support that action.
  - During weekly status briefings to the COS, the information reported by LSS does not match what is verbally briefed—another instance of misreporting.
- Several stakeholders have communicated that the products provided by LSS are not easy to comprehend, do not reflect accurate information being shared, and sometimes do not capture the original request.
  - Example: Even after multiple requests spanning several weeks, the products produced for the training project have not included the required information related to stakeholder coordination, target audience identification, and delivery schedule timing that would enable the project to be executed.
- Contractors often do not take notes in meetings with the stakeholders. This results in key information not being incorporated into or misrepresented in future product deliverables.
- CI leadership has communicated to the prime contractor that if the individuals deployed are not able to quality check their work, it is the expectation that the contractors will be able to seek support from their agency prior to submitting products that have not been proofed.

**Unsatisfactory customer service with JRO partners**
- Multiple customers have provided feedback that:

3

FEMA - C000157

- o Though they were eager to partner with LSS, after the first meeting they were not able to understand the approach and steps LSS would take to assist them. Several stated the information they received would not benefit the project.
- o Contractors were not able to communicate application of the LSS tools towards a measurable outcome.
- o Responses to inquiries or requests were not always responded to in a timely manner.
  - ▪ Example:
    - • Project sponsor J.B Cuartas relayed LSS did not provide a post meeting project scope by the date agreed upon with LSS. Then his email outreach to LSS was not responded to. After the CI Unit Lead reminded LSS, they sent a brief response, which J.B relayed did not match the parameters of his request.
    - • PA Policy Office rescinded the request to partner with LSS on 428 items.
    - • The FDRC and FDRO members of the FCO Advisory Group both stated that after meeting with LSS, they were not able to utilize any information or tools provided and were confused regarding LSS services.
- o Information relayed by programmatic experts at times was not interpreted or represented correctly by LSS staff.
  - ▪ Example:
    - • The analysis provided to Public Assistance and JRO leadership of the PW process was described by PA ops as being too generic to provide any benefit, and outdated or erroneous by the time it was produced.
    - • LSS contractors were not able to communicate with PA ops to synchronize if the Digital Site Inspection Pilot could connect to Grants Manger without direct intervention.
      - o To note PA Ops agrees there may be benefit to the project if data from the tool will be able to port via an excel into Grants Manager.
- • During project reviews LSS staff were often unable to name the individual stakeholders they were coordinating with. Additionally, they were not able to describe how they were communicating with the stakeholders to ensure customer satisfaction. Project status reports often listed key stakeholders by the wrong names or whom had demobilized weeks prior.
- • Projects and actions undertaken by Public Buildings and Water Sector contractors were often not included in LSS project reports, though frequently reminded by COS/CI that reports should provide complete visibility.

The adaption of Lean Six Sigma into a response and recovery setting, has been an ambitious undertaking aimed at equipping the field with tools to improve mission critical processes. Unfortunately, six months into the current contract, it is the perspective of the CI Unit in concurrence with the Chief of Staff's office that the contractors are not meeting the professional standards as well as delivering measurable outcomes. This has resulted in a tremendous burden placed on the FEMA staff and stakeholders to manage the quality and delivery of their products and activities. From a field perspective the JRO has exhausted most options aimed at directing LSS towards success. The only expected deliverable that leadership is still prioritizing is the LSS green and black belt training schedule. As the contract is facilitated from headquarters, your guidance in the appropriate next steps would be appreciated. Potential courses of action will be provided to the Chief of Staff.

4

FEMA - C000158

5

FEMA - C000159

## CAPP TASK ORDER 70 – PUERTO RICO LEAN SIX SIGMA SUPPORT

## REMEDIATION PLAN

### SUMMARY OF ISSUES

- This Remediation Plan is in response to concerns raised by FEMA's Program Office via email from Karley Hoyt (OCPO) dated October 31, 2018 and subsequently discussed during a meeting on November 1, 2018.
- Specific issues of concern were reviewed in the following areas:
  - Challenges defining and meeting deliverable milestones and deadlines
  - Unprofessional behavior
  - Quality of work issues
  - Unsatisfactory customer service with JRO partners

### OBSERVATIONS

- Highly specialized technical staff with unique expertise
  - MBBs
  - Highly-weighted towards commercial experience
  - Very limited FEMA experience
- Remarkably complex PR recovery environment
  - Magnitude of event and magnitude of damage
  - New, innovative approaches (sectors, 428, BBA)
- Initial FEMA LSS leadership
  - Personnel issues
  - Emphasized six sigma more than lean concepts
  - Delayed LSS training
- Limited disaster deployment experience among team
- Weak product QC protocols
- Poor writing/copy-edit skills
- Misunderstanding of working draft-level products vs. final-deliverable quality

### CATEGORIES OF ISSUES IDENTIFIED

- Project management (scope/schedule/follow-up/quality)
  - Compliance with all parts of requests
  - Thorough understanding of info provided by programmatic experts
  - Inaccurate info being shared/reported

**FEMA - C000160**

- Product quality
    - Overcomplicated products/translation to layman's terms
    - Poor quality control
    - Ineffective copy editing
- Professionalism
    - Proper workplace etiquette at all times; maintain decorum; set an example
    - Consultants are not FEMA employees (and thus are not part of the civil service).
    - Job security and pay practices are private.
- Customer service
    - Enhanced communications; routine notetaking and follow-up with partners/stakeholder
    - Efficiently overcoming obstacles that limit partnering
    - Reach-back support for domain expertise
- Self Sufficiency (per Eli Pushkarewicz)
    - Moving forward, the prime will ensure the contractors are self-sufficient in that the CI Unit will only be required to provide operational oversight and the COS office only strategic guidance and approval of projects.
    - LSS will no longer require the significant manpower and management actions that its current performance necessitates.

## STEPS UNDERTAKEN TO ADDRESS CONCERNS SO FAR

- Developed and executed "reset" for initiative
    - Developed training program
    - Better defined PR-tailored LSS processes
    - Refined project planning/reporting protocols
- Designated new lead MBB (Jeff Wykosky)
- Counseled staff to clarify expectations related to demeanor, behavior, project management, etc.
- Staff upgrades
    - Replaced BBs with MBBs
    - Eliminated problem personnel
- Deployed reporting/communications lead (Victoria Colmenero), focused on:
    - Tracking deadlines and project status
    - Preparing standard and ad hoc reports
    - Using clear and concise language and avoiding LSS jargon wherever feasible
    - Allows MBB staff to focus more on LSS activities

## ADDITIONAL PLANNED/PROPOSED STEPS

- Refine team structure and leadership
    - **LSS Team Leader** – Pieter de Jong will demob on November 16, 2018 due to health issues.  CaPP will propose a replacement within 3 to 5 days.  Replacement will focus on

FEMA - C000161

program and project management to improve the team's self-sufficiency.  Also responsible for robust weekly reports to COS and for periodic IPRs with FCO.

- o **Lead Master Black Belt** – Selected Jeff Wykosky to provide technical leadership and project management coaching/support.
- o **Reporting/Communications Lead** – Victoria Colmenero joined on November 5, 2018
- Enhance partnership with CIP with a focus on helping build a robust, sustainable LSS capability past October 2019
- Supplemental coaching/training for LSS staff [plan within 1 week, execution within 1 month]
  - o FEMA Consulting 101 (included expectations regarding professionalism)
  - o LSS project management tools and techniques (building on activities from reset)
- Enhance engagement of CaPP leadership with FEMA leadership
  - o Develop standard agenda for calls/meetings
  - o Prepare a standard call/meeting package that highlights the following and is distributed in advance:
    - ▪ Progress tracking
    - ▪ Challenges on projects
    - ▪ Challenges on overall engagement
    - ▪ Commitment/engagement of champions and participants
  - o Bi-weekly coordination call
    - ▪ Typical participants:
      - • FEMA:  CIP lead, COS, appropriate LSS champions
      - • CaPP:  PM/DPM, TO Manager, LSS Team Leader
  - o Monthly visits from CaPP leadership (as appropriate)

## DISCUSSION POINTS

- Engage FEMA LSS Champions
  - o Establish and maintain partnerships with newly trained champions
  - o Define responsibilities, including feedback on projects, feedback on engagement, coordination with sectors and across sectors, etc.
- Take steps to enhance partnership with PA Ops
- Continue to provide direct performance feedback
- Develop streamlined reporting/admin templates that satisfy the requirements of FEMA LSS Champions

FEMA - C000162

| | |
|---|---|
| **From:** | Pushkarewicz, Eli |
| **To:** | Bonilla Davila, Ana; Carreiro, Gretchen; Edwards, Rahsaan; Lane, Rhonda |
| **Cc:** | Aldarondo, Tamiris; Hoyt, Karley |
| **Subject:** | RE: CaPP Overtime |
| **Date:** | Monday, April 15, 2019 5:17:59 PM |
| **Attachments:** | August Monthly Report.msg |

Gretchen,

Thank you for reaching out. I am not aware of what the process was for hours prior to late July/ early August when LSS transferred completely under the CI Unit lead and I began seeing the documentation. Shortly after it came to me I had discussions with the Contractor Project Lead Pieter as FEMA was not receiving any monthly reports at the field level consistently. Then after prompting the initial reports were coming in without the hour/time breakdowns as seen from the attached. We instituted weekly reporting requirements as contractors struggled to report on their work, often even leaving off projects, being unable to quantify the work they were doing, and not articulating the time/resources required to accomplish the work. This is counter to your comment regarding: "The contractor has submitted a weekly report to the Technical Monitor of hours-by-person for deployed staff". This item was one of the areas covered under "Challenges defining and meeting deliverable milestones and deadlines" that was identified as part of the issues requiring the Prime contractor to submit the Remediation Plan on 11/7/18 and replace their project lead.

In reference to specific direction provided to the LSS Contract Project Lead Pieter De Jong related to contractor time:

- I am deeply concerned regarding the contractor statement that they were approved for unlimited OT by the FCO. It was **<span style="color:red">repeatedly</span>** told to them that they were not to take action directly from what he interpreted to be from the FCO (or Deputy FCO), and that any guidance or direction needed to be vetted through the COS/ CI Unit Lead ( in reference to the below mention of " hours directed by the FCO"). Additionally they were not supposed to be communicating with the FCO without the COS or CI present as there had been other misinterpretations by the contractors prior. Any changes to taskings or impact on scope were then to be sent back through the COR.

- Contractors could only work **up to** JRO business hours, which did not include weekends unless pre-approved.
  - After the Pieter made me aware that a contractor had worked significant OT programing a survey 123 app for a Digital Inspection project I reclarified that:
    - I expected him to manage his staff workload and to provide a request in writing for any OT external to the above mentioned business hours
    - If there was project requiring OT then he was to communicate what the skill/staff requirement was as we would look to source it through FEMA staff first, or analyze the cost/benefit of the request
    - His staff was not pre-approved to be in the JRO on weekends unless otherwise approved by CI and COS
    - Contractors were not approved to work remotely or in facilities other than

**FEMA - C000163**

the JRO unless pre-approved

This was provided to Pieter De Jong, though I am not sure what he communicated to his staff after I left the operation in October, or when he was replaced by a new contract lead. When the responsibilities transitioned to the JRO I communicated the above parameters. In addition when I was visiting the JRO in February their current Project Lead asked me about the direction and I explained that it had been communicated prior to them. If necessary I can dig through my emails tomorrow/weds to find communications related to the above.

-Eli

**Eli Pushkarewicz**
Analyst – Regional and Field Integration
NPAD Continuous Improvement Integration Branch
Eli.pushkarewicz@fema.dhs.gov | 202-304-9604
*Prefered pronouns: He or They*

Click here to find AARs, knowledge products, or give feedback on a disaster operation.

---

**From:** Bonilla Davila, Ana
**Sent:** Monday, April 15, 2019 5:01 PM
**To:** Carreiro, Gretchen <Gretchen.Carreiro@fema.dhs.gov>; Edwards, Rahsaan <Rahsaan.Edwards@fema.dhs.gov>; Lane, Rhonda <Rhonda.Lane@fema.dhs.gov>; Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>
**Cc:** Aldarondo, Tamiris <tamiris.aldarondo@fema.dhs.gov>; Hoyt, Karley <karley.hoyt.2@fema.dhs.gov>
**Subject:** RE: CaPP Overtime

Gretchen- good afternoon!

The issue of overtime and work during weekends has been brought to the COR and LSS team attention since Eli was the technical monitor. Eli can attest to that.

In addition we, CI and COS, continued to do the same during the review of **voucher 6 and 7**.
See attached email with reference **70FB8018F00000070-6**, with word files, addressing the facts of overtime, work during week-ends, work during rotation, voucher without hours break down, etc., in the review of vouchers 6 and 7.
All expectations related to work have been monitored and documented, with the COR Team, and

**FEMA - C000164**

with LSS team on site.

In addition, we are enclosing email from previous FCO, **Michael Byrne**, clarifying the statement from Contactors on the use of "unlimited overtime", brought up by Rhonda Lane, last Friday. That authorization was never granted, by FCO, COS or CI leadership.

Hope this clarifies the outstanding issues.
Regards,

Ana M. Bonilla Dávila
Chief of Staff
DR-4339-PR
ana.bonilladavila@fema.dhs.gov
cel: 202-812-5473

---

**From:** Carreiro, Gretchen
**Sent:** Monday, April 15, 2019 3:13 PM
**To:** Edwards, Rahsaan <Rahsaan.Edwards@fema.dhs.gov>; Lane, Rhonda <Rhonda.Lane@fema.dhs.gov>; Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>
**Cc:** Aldarondo, Tamiris <tamiris.aldarondo@fema.dhs.gov>; Hoyt, Karley <karley.hoyt.2@fema.dhs.gov>; Bonilla Davila, Ana <ana.bonilladavila@fema.dhs.gov>
**Subject:** RE: CaPP Overtime
**Importance:** High

Hello Eli,

Need your help, would you please clear up this matter, the below is my understanding from the contractor.

The contractor has submitted a weekly report to the Technical Monitor of hours-by-person for deployed staff since the beginning of the project in May 2018.  Specific protocols and requirements for approval of overtime on a weekly basis was provided to the contractor in February 2019.  Prior to February, the contractor was not made aware of specific requirements for pre-approval of OT.  Upon being made aware of the requirements, they worked in partnership with the Technical Monitor to meet these expectations.

Thank you!

Gretchen

---

**From:** Edwards, Rahsaan
**Sent:** Monday, April 15, 2019 1:26 PM
**To:** Lane, Rhonda <Rhonda.Lane@fema.dhs.gov>

FEMA - C000165

**Cc:** Carreiro, Gretchen <Gretchen.Carreiro@fema.dhs.gov>; Aldarondo, Tamiris <tamiris.aldarondo@fema.dhs.gov>; Hoyt, Karley <karley.hoyt.2@fema.dhs.gov>
**Subject:** RE: CaPP Overtime

No one can approve OT but the CO or the COR through coordination with the CO.

Gretchen or Karley were either of you aware of this OT?

**Rahsaan Edwards** | Team Lead | Expeditionary Branch | Office of the Chief Procurement Officer
Email:  Rahsaan.Edwards@fema.dhs.gov | Office: 202-646-5786 | Mobile: 202-256-6648



CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended only for the person or entity to which it is addressed and may contain confidential and /or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message. If you are the intended recipient but do not wish to receive communications through this medium, please advise me immediately.

---

**From:** Lane, Rhonda
**Sent:** Monday, April 15, 2019 12:58 PM
**To:** Edwards, Rahsaan <Rahsaan.Edwards@fema.dhs.gov>
**Cc:** Carreiro, Gretchen <Gretchen.Carreiro@fema.dhs.gov>; Aldarondo, Tamiris <tamiris.aldarondo@fema.dhs.gov>
**Subject:** FW: CaPP Overtime

I am currently doing a review of the invoices that have been submitted by CaPP and I have an issue I need your assistance with.  The invoices include OT.  I have been in touch with the head of the CI section, please see attached emails and the email below.  Perry Rhodes with CaPP is stating that the FCO told them to work as many hours as needed to get the job done (email from FCO says this is not true).  Tamiris Aldarondo says they were only approved for 50 per week and no weekend work.  The attached emails are back up on this.  I have also attached a spreadsheet I made for this invoice that shows the weekly totals on the hours tab.

How do you wish to handle this?

Thanks,

**FEMA - C000166**

**From:** Bonilla Davila, Ana
**Sent:** Friday, April 12, 2019 2:43 PM
**To:** Lane, Rhonda <Rhonda.Lane@fema.dhs.gov>; Aldarondo, Tamiris
<tamiris.aldarondo@fema.dhs.gov>
**Cc:** Carreiro, Gretchen <Gretchen.Carreiro@fema.dhs.gov>; Edwards, Rahsaan
<Rahsaan.Edwards@fema.dhs.gov>
**Subject:** Re: CaPP Overtime

Nothing in writing from the FCO or COS.
The area responsible for monitoring LSS actions was CI, as overlooked by COS.
FCO was not involved in monitoring contractor.

Get Outlook for iOS

**From:** Lane, Rhonda
**Sent:** Friday, April 12, 2019 3:12:29 PM
**To:** Aldarondo, Tamiris; Bonilla Davila, Ana
**Cc:** Carreiro, Gretchen; Edwards, Rahsaan
**Subject:** Re: CaPP Overtime

That is a good breakdown of the overtime hours. Do you have something in writing stating that.
Perry Rhodes is saying the FCO is the one who told them to work the number of hours needed to get
the job completed.

Rhonda Lane

**From:** Aldarondo, Tamiris
**Sent:** Friday, April 12, 2019 2:02:47 PM
**To:** Bonilla Davila, Ana; Lane, Rhonda
**Cc:** Carreiro, Gretchen; Edwards, Rahsaan
**Subject:** RE: CaPP Overtime

Good afternoon,

Thank you very much for your support with these vouchers. I truly appreciate the help! The
agreement with the LSS team was the following:

- Every team member must work at least 8 hours per day
- Teleworking is still not approved
- Working during rotations is not approved
- Working over the weekend is not approved unless requested and approved by CI Unit Lead
- Each team member is allowed a maximum overtime of 10 hours per week (for a total of 50
  hours per week)
- Team members can distribute those weekly 10 hours of OT as they see fit within each week
- Team hours cannot exceed the equivalent of 50 hours per week per team member

**FEMA - C000167**

- Team members on rotation cannot donate hours to other team members

As the CI Unit Lead overseeing the contractors, I never approved the team to "work as many hours as necessary to get the job done". Please let me know if this makes sense or if you need anything else from me.

Thank you,

**Tamiris Aldarondo**
DR 4339 - PR | Continuous Improvement Program
Acting Unit Lead
Phone: 202-538-2651

---

**From:** Bonilla Davila, Ana
**Sent:** Friday, April 12, 2019 12:12 PM
**To:** Lane, Rhonda <Rhonda.Lane@fema.dhs.gov>
**Cc:** Carreiro, Gretchen <Gretchen.Carreiro@fema.dhs.gov>; Edwards, Rahsaan <Rahsaan.Edwards@fema.dhs.gov>; Aldarondo, Tamiris <tamiris.aldarondo@fema.dhs.gov>
**Subject:** Re: CaPP Overtime

Will defer to Tami to answer, as she is handling day to day LSS monitoring.
Thanks!

Get Outlook for iOS

---

**From:** Lane, Rhonda
**Sent:** Friday, April 12, 2019 11:57:20 AM
**To:** Bonilla Davila, Ana
**Cc:** Carreiro, Gretchen; Edwards, Rahsaan; Aldarondo, Tamiris
**Subject:** CaPP Overtime

Good morning Ana,

I am reviewing the CaPP invoices and I rejected one of them because of the OT (and a few minor errors).  I just spoke to Perry Rhodes with CaPP and he stated that the FCO told them to work as many hours as necessary to get the job done.  He did state that they were told on 2/11/19 to reduce their hours to 40 and that lasted about a week, then they were told to go to 50 hours a week.

Do you have anything in writing that says they are not allowed to get OT?

Rhonda Lane
COR Tier III
701-595-4608

FEMA - C000168

| From: | Pushkarewicz, Eli |
|---|---|
| To: | Aldarondo, Tamiris |
| Subject: | Fwd: LSS contract performance |
| Date: | Monday, May 20, 2019 12:23:08 PM |
| Attachments: | 20181029 Weekly Report 29 Oct 2018 v4.pptx |
| | PARTICIPANTS FOR LSS CHAMPIONS" TRAINING v2.docx |

**From:** Pushkarewicz, Eli

**Sent:** Tuesday, October 30, 2018 6:26:46 AM

**To:** Carreiro, Gretchen

**Cc:** Mabry, Marshall

**Subject:** LSS contract performance

Gretchen,

I wanted to follow up and see if you have received any word from the CO/CS related to notification to the contract prime as I will need to provide the FCO in PR an update today. Also I have attached two products they submitted yesterday as more examples of low quality/below standard performance. Are you okay if I send this to Tim since it is a current deliverable that is supposed to have gone to the FCO today?

Key areas we were confused:

- completely redundant block in the Administrative Slide between current and future operations sections
- for the "Personnel Status" block, what personnel is being referred to—FEMA training personnel? Was that the request made; for it to be shown as a reference to the training group?
- for the "Challenges" block, are those true foreseeable challenges or milestone dates?
- a milestone falls on Thanksgiving Day
- the time for the Green Belt training is 10 days but a 2-week block with Black Belts is also included-need clarity on their total time commitment. Same with Black Belts: 20 days training but 2 week block with Green Belts
- In the word document names need to be proofed as for example Pat Hall is listed twice

Thank you for your assistance.

-Eli

**FEMA - C000169**

**From:** "Colmenero, Victoria (CTR)" <victoria.colmenero@associates.fema.dhs.gov>
**Date:** Tuesday, March 19, 2019 at 11:16:45 AM
**To:** "Rozycki, Mark (CTR)" <mark.rozycki@associates.fema.dhs.gov>, "Mccabe, Clifford (CTR)"
<clifford.mccabe@associates.fema.dhs.gov>
**Cc:** "STEARNS, LUZ" <luz.stearns@fema.dhs.gov>, "Kulisch, Raymond (CTR)"
<raymond.kulisch@associates.fema.dhs.gov>, "Aldarondo, Tamiris"

FEMA - C000170

<tamiris.aldarondo@fema.dhs.gov>
**Subject:** FW: Green Belt Training

Team,

Reminder! Tami's guidance is in the email below. She is coordinating with Training so we all are on the same page as far as who is not approved to attend GB training and who is. The roster moving forward is below.

Luis Seda and Carlos Barrios were never authorized to attend, and are <u>not</u> authorized to attend today, nor the rest of the week. We all need to do our part in maintaining the integrity of this and any roster in the future.

**Unauthorized:**
- **Carlos Barrios**
- **Luis Seda**

| # | NAME |
|---|------|
| 1 | Margarita Mosquera |
| 2 | Roberto Mendez |
| 3 | Pablo Santos |
| 4 | Maylene Perez |
| 5 | Rebecca Cintron |
| 6 | Marlene Garcia Cartagena |
| 7 | Gwendelyn Monge Acevedo |
| 8 | Robert Fernandez |
| 9 | Jorge Lopez Jimenez |
| 10 | Michelle Ortiz |
| 11 | Brenda Dorta Aguilar |
| 12 | Danna Planas Ocasio |
| 13 | Carlos Lefranc Garcia |
| 14 | Lourdes Cotto Negron |
| 15 | Lynda Torres |
| 16 | Andrea Soto Giraldo; if she wishes to return to class. |
| 17 | Omar Rodriguez |
| 18 | Vivian Kiflai |
| 19 | Carlos Santos Vazquez |
| 20 | Enid Alicea Ortiz |
| 21 | Efrain Sanchez |

Best,



**Victoria Colmenero**

EMS - Puerto Rico – LSS (CTR)

13861 Sunrise Valley Drive, Suite 200 | Herndon, VA 20171

O: 703-430-7500 | D:  | C: 571-328-2070

**atcsplc.com** | **Facebook** | **LinkedIn** | **Twitter**

**FEMA - C000171**

**CLIENT ▪ EMPLOYEE ▪ COMPANY ▪ COMMUNITY**

This email is only for the intended recipient, and may contain information that is privileged, confidential, or exempt from disclosure under law. If you received this message in error, or are not the intended recipient, please notify the sender and destroy this message.
- Title VI Compliance -

**From:** Aldarondo, Tamiris
**Sent:** Thursday, March 14, 2019 4:26 PM
**To:** Kulisch, Raymond (CTR) <raymond.kulisch@associates.fema.dhs.gov>; Colmenero, Victoria (CTR) <victoria.colmenero@associates.fema.dhs.gov>; Rozycki, Mark (CTR) <mark.rozycki@associates.fema.dhs.gov>
**Subject:** FW: Green Belt Training

Hi Rock, Victoria and Mark,

I hope you're doing well. Please ensure that the participants below are not present in next week's GB training as this has not been authorized and could bring us repercussions down the line. I am working with OCC and Sector leadership to determine if we can at least allow one of the participants to attend. (Efrain Sanchez is allowed)

- **Carlos Barrios** (Mark did not email him on 2/20)
- **Luis Seda** (works at PRCC; Mark did not email him on 2/20)

Best regards,

**Tamiris Aldarondo**
DR 4339 - PR | Continuous Improvement Program
Acting Unit Lead
Phone: 202-538-2651

FEMA - C000172

**From:** Pushkarewicz, Eli
**To:** Mabry, Marshall
**Cc:** Aldarondo, Tamiris
**Subject:** Fwd: LPN Narrative-Reworked
**Date:** Tuesday, December 11, 2018 9:16:46 AM

FSA see below. LSS replaces their project lead. Their new one is named Rock. I would appreciate your help in connecting with him and helping to make sure he is oriented and we avoid additional issues with PA ops. Thanks!
Eli Pushkarewicz
Deployed to DR-4339-PR (CI Unit Lead)
Evaluation and Decision Support
National Preparedness Assessment Division
NPD|FEMA|DHS
Mobile Phone-202-304-9604

**From:** Pushkarewicz, Eli
**Sent:** Monday, December 10, 2018 12:51:33 PM
**To:** Bonilla Davila, Ana; McRae, Maurice
**Cc:** Castano Sanchez, Maria; Rubio, Maite; Aldarondo, Tamiris
**Subject:** RE: LPN Narrative-Reworked

Yes I am. I had also sent them an email separately so they will be aware of the issue.

-Eli

**From:** Bonilla Davila, Ana
**Sent:** Monday, December 10, 2018 12:49 PM
**To:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>; McRae, Maurice <maurice.mcrae@fema.dhs.gov>
**Cc:** Castano Sanchez, Maria <maria.castanosanchez@fema.dhs.gov>; Rubio, Maite <maite.rubio@fema.dhs.gov>; Aldarondo, Tamiris <tamiris.aldarondo@fema.dhs.gov>
**Subject:** Re: LPN Narrative-Reworked

Eli- I'm at Nestle with both Rock and Victoria. Can arrange a conference call after we finish Champions training. Are you available around 4:30 PR time?

Get Outlook for iOS

**From:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>
**Sent:** Monday, December 10, 2018 1:33 PM
**To:** McRae, Maurice
**Cc:** Bonilla Davila, Ana; Castano Sanchez, Maria; Rubio, Maite; Aldarondo, Tamiris
**Subject:** RE: LPN Narrative-Reworked

Maurice,

FEMA - C000173

As Kristen mentioned in her email, she had expressed concern over the initial draft language. Once I was made aware I brought Rock and Victoria to meet with Angela and her immediately last Weds. Mike Oshaban had been working with Angela directly. From the discussion the take aways:

- LSS's primary stakeholder in the initial LPN request had been Water Sector leadership. This began before Kristen arrived at the JFO when there was no LPN process. As the process was put into place they provided analysis to PA ops that validated the process Kristen put in place to show it was addressing the issues identified with PW87. Angela in particular noted that she was appreciative of the LSS support and was working with Mike to see how they could partner as PA ops moves forward with other process implementation.
- Kristen is correct in that LSS was not working directly with her, as they had been working with Angela.
  - I sat with Rock and Victoria to discuss that they needed to engage Kirsten directly to ensure in the future she was aware of activities intersecting PA.
- Victoria revised the LPN language after the meeting and from the email exchanges Kristen appeared to have approved the revised language.

Prior to us discussing I am going to reach out to Victoria and Rock asap to see if there had been any difference in the email communication verse what Kristen had reviewed. Can we discuss tomorrow morning or late this afternoon?

-Eli

---

**From:** McRae, Maurice
**Sent:** Monday, December 10, 2018 11:56 AM
**To:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>
**Cc:** Bonilla Davila, Ana <ana.bonilladavila@fema.dhs.gov>; Castano Sanchez, Maria <maria.castanosanchez@fema.dhs.gov>; Rubio, Maite <maite.rubio@fema.dhs.gov>
**Subject:** FW: LPN Narrative-Reworked

Hello Eli,

This email communication is concerning in the least. Let's schedule a time to discuss.

Thanks,
Maurice

---

**From:** Hodge, Kristen
**Sent:** Monday, December 10, 2018 8:21 AM
**To:** McRae, Maurice <maurice.mcrae@fema.dhs.gov>
**Cc:** Starr, Angela (CTR) <angela.starr@associates.fema.dhs.gov>
**Subject:** RE: LPN Narrative-Reworked

Hello Maurice

**FEMA - C000174**

I'm not sure if you're the person I should be bringing this up to but I read the LSS success story that was sent out (V6 attached) and I'm very upset by what it states.  On Tuesday, Dec. 4, I received the draft of this document (V2 attached) and told Eli Pushkarewicz that it was completely inaccurate.  He brought 2 LSS representatives – Victoria Colmenero and Rock (Brock?.  Can't recall last name) – to speak with me and Angela Starr, LPN POC, at which time I made it clear to everyone that the draft success story was wholly inaccurate, that LSS had no input whatsoever in the LPN process, and it needed to be changed to better reflect LSS's involvement (which was only to measure the change rate of the LPN approvals).  Victoria Colmenero apologized for the misstatements in the V2 draft, sent the V4 draft (attached) for my review, which I "approved".

According to the opening paragraph in V6 of the Success Story (which was sent to All Hands), PA Ops  "...successfully used LSS to provide improved processes and improvement projects." and "... leveraged LSS capabilities for data and analysis support."  It further goes on to state that "PA-Ops coordinated with Continuous Improvement (CI) and LSS to identify root causes; they then took actions to remedy PW process challenges, which established the new LPN process.  PA-Ops collaborated with LSS to add a quantitative layer of awareness that could inform and validate the new process moving forward.  LSS charted the root causes,…, to help the Champion and Stakeholders better visualize and prioritize problem areas."

All of the above statements are false.  At no time did I coordinate with Continuous Improvement and LSS to identify root causes.  All root causes were identified by me and all actions to improve the LPN process were created and implemented by me within 2 weeks of my arrival to DR-4339.  I named Angela Starr in the PA Correspondence Unit the POC for LPNs, instructed her to monitor EMMIE for projects whose federal cost share would equal or be greater than $1 million, and once identified, to begin drafting the LPN matrices (and/or longer, more comprehensive OMB informational document for projects over $20 million) to accelerate the LPN process.  I also told her to work directly with Sector staff to flush out any discrepancies or confusion in the PWs to ensure the matrices/information document was clear.  It should also be noted that during HQ PA's visit to PR in Sept./Oct. 2018, I arranged a meeting between Angela and Seema Narine (HQ PA) to get additional guidance on the specific information HQ PA/OMB required on the matrices, etc.

I did have one meeting with LSS earlier in my PR deployment but that meeting provided zero guidance to me; it was sales pitch.  I want to state unequivocally that LSS and CI had no input whatsoever into the improved LPN process, nor did they provide any guidance or was any guidance sought from them to improve the LPN process.  In fact, LSS initially reached out to Angela, asked her to describe the LPN process, questioned its validity (per Angela's recollection), were given a copy of the LPN Dashboard (which was created in PA Ops), shown where to find the LPN Dashboard on the PR SharePoint site, which they used for their rate time analysis.  Angela did offer to work with LSS to integrate the LPN process into Grants Manager *after* they analyzed the current LPN process.

I consider myself to be the consummate team player.  But, I take offense when others use my and my teammates' hard work to further their own agendas and justify their existence.  When I spoke with LSS and Eli earlier this week, I thought everyone was in agreement that LSS and CI had no input into the LPN Process so it's rather upsetting to see the complete opposite being depicted, particularly since there are several people within PA Ops who have worked tirelessly to make this

FEMA - C000175

process a success.

Thank you for taking the time to read my email.  I hope you can understand my frustration.

Kristen

Kristen A. Hodge
340.626.6467 (M)
kristen.hodge@fema.dhs.gov

---

**From:** Colmenero, Victoria (CTR)
**Sent:** Wednesday, December 5, 2018 2:31 PM
**To:** Starr, Angela (CTR) <angela.starr@associates.fema.dhs.gov>; Hodge, Kristen
<Kristen.Hodge@fema.dhs.gov>
**Subject:** LPN Narrative-Reworked

Hi Kristen and Angela,

Thank you for your time today. I've reworked the narrative. I want you two to see it first before I
socialize to anyone else.  I've put the narrative in a context of PA-Ops' success story, which was
enhanced because of the application of LSS tools.  I hope this is more factual and represents your
group well and also motivates other sections to want to apply an LSS approach/tools.

LSS is supposed to be marketing themselves as a tool, a methodology, a capability, NOT a group of 8
individuals, so I've tried to be careful in referencing LSS as a person or a group. The idea is that LSS is
an initiative that will be self-sustaining after a slow transition over to FEMA.

I look forward to hearing from you,


Victoria A. Colmenero
Emergency Management Planner
victoria.colmenero@associates.fema.dhs.gov
571-328-2070

FEMA - C000176

| | |
|---|---|
| **From:** | Pushkarewicz, Eli |
| **To:** | Mabry, Marshall; Aldarondo, Tamiris |
| **Subject:** | Fwd: review of apology requested |
| **Date:** | Tuesday, December 11, 2018 9:14:30 AM |
| **Attachments:** | image001.png |

FSA
Eli Pushkarewicz
Deployed to DR-4339-PR (CI Unit Lead)
Evaluation and Decision Support
National Preparedness Assessment Division
NPD|FEMA|DHS
Mobile Phone-202-304-9604

**From:** Pushkarewicz, Eli
**Sent:** Tuesday, December 11, 2018 8:13:49 AM
**To:** Raymond Kulisch
**Subject:** Re: review of apology requested

That looks fine. Please touch base with Maurice and Ana to approve the course of action prior to sending.

Eli Pushkarewicz
Deployed to DR-4339-PR (CI Unit Lead)
Evaluation and Decision Support
National Preparedness Assessment Division
NPD|FEMA|DHS
Mobile Phone-202-304-9604

**From:** Raymond Kulisch <rkulisch@guidehouse.com>
**Sent:** Tuesday, December 11, 2018 7:52:21 AM
**To:** Pushkarewicz, Eli
**Subject:** review of apology requested

Eli,

Would you like to provide any suggestions for edits on this apology message? It is 9:00 AM here.  If I have not heard back from you by 10:00 AM PR time, I will send so that this issue can be addressed in a timely manner today.

Also, I believe we talked about a distribution list to copy included all that were on the email chain, specifically:

Eli Pushkarewicz,
Maurice McReae,
Ana Bonilla
Maria Castano
Maite Rubio

**FEMA - C000177**

Angela Starr
Tamiris Aldarondo
Victoria

Kristen Hodge,

Please accept my sincerest apologies for the erroneous communication that went out regarding the LPN project and the role that the LSS team played in creating the new process. As we discussed on the 5th, the LSS team's role was minor; only providing data analysis that validated the improved efficiency realized by the new processes developed and implemented by the PA OPS team. I understand your annoyance and exasperation upon seeing the post regarding your project when it was distributed. We met, came to an agreement on the fact that the process was the result of the hard work of PA OPS and PA OPS alone, and had even received your approval of the write up. It was my understanding that the version you approved was the one that would be distributed. Unfortunately additional edits were suggested and made between the office of the Chief of Staff and our writer which should have then been sent back to you for review and re-approval before being distributed. They were not. The main reason for this oversight was a rush to make a deadline to distribute the post. As the team lead, I will take responsibility for this mistake. To minimize the chance that a similar mistake will be made in the future, I will take two actions. First, I will provide guidance to our team that accuracy in all our communications is of the highest importance, and that the team's impact on projects or the extent of its participation should not be exaggerated for any reason. Second, I will institute a stronger review and approval process for team communications which will require process owners'/ stakeholders' approval of messages regarding their areas of responsibility.

Please let me know if you would like to meet to discuss this issue further.

Again, my sincerest apologies.



Raymond "Rock" Kulisch
703.801.3154
rkulisch@guidehouse.com
www.guidehouse.com

NOTICE: This email, including any attachments, is meant only for the intended recipient of the transmission and may contain confidential and/or privileged material. If you received this email in error, any review, distribution, dissemination or other use of this information is strictly prohibited. Please notify the sender immediately by return email and delete the messages from your systems. Guidehouse LLP is a consulting firm and not a certified public accounting firm.

FEMA - C000178

**From:**  Carreiro, Gretchen
**To:**  Aldarondo, Tamiris; Lane, Rhonda; Bonilla Davila, Ana; Woodard, Charles
**Subject:**  RE: LSS Concerns to communicate to Prime Contractor
**Date:**  Wednesday, April 3, 2019 1:14:39 PM

Good Afternoon Tamiris,

Thanks so much for summarizing the key points of Monday's meeting. I have set up a call with Tim McCormick, Capp PM (Prime), to discuss.  I will keep you all posted on that discussion.

Thanks again so very much!

Gretchen

**From:** Aldarondo, Tamiris
**Sent:** Tuesday, April 2, 2019 3:28 PM
**To:** Lane, Rhonda <Rhonda.Lane@fema.dhs.gov>; Carreiro, Gretchen <Gretchen.Carreiro@fema.dhs.gov>; Bonilla Davila, Ana <ana.bonilladavila@fema.dhs.gov>; Woodard, Charles <charles.woodard@fema.dhs.gov>
**Subject:** LSS Concerns to communicate to Prime Contractor

Good afternoon,

I hope you're doing well!

Thank you for your contributions during yesterday's conference call and your support in managing the LSS Contract/Vouchers moving forward. As I mentioned on the call,  I am including below the concerns that we would like to communicate to the Prime and would really appreciate your support with this. Gretchen, I believed you mentioned you could have this conversation with Tim, is that correct?

- Working location
    - As a contractor team attached to DR 4339, we need the LSS team to work from our JRO in order to provide oversight and approve worked hours. Although this was communicated to the LSS team leads (Raymond and Victoria), the team members insist on working from the Call Center. If the team absolutely needs to work from the Call Center, they will be required to sign in and out with our logistics POC, but we

**FEMA - C000179**

would like to avoid this as much as possible.

- Right-sizing
    - As our operation advances toward rightsizing, we are also evaluating the staffing requirements for the LSS team. With the release of Raymond Kulisch and Dan McCabe, we would like to request that **no** new team members are deployed to the disaster under this contract.

- Training
    - We have decided to pause on upcoming LSS trainings until we begin to see results that we can report to Senior Leadership from the active GB and BB projects. This will also give the MBB time to focus on coaching.
    - Given the focus on training and coaching, I would like to suggest that the team be reduced to 5 people by the end of May. Currently, there is only one person conducting the training, 2 working on DSI, 2 reporting, and the other four coaching the GB and BB. However, if the MBBs meet biweekly with each GB/BB, this is easily possible with only two coaches. I propose the 5 team member to be as follows:
        - 1 Reports Specialist
        - 1 DSI Specialist
        - 1 Trainer/Coach
        - 2 Coaches

Again, I appreciate your support with this and please feel free to reach out if you need anything else from me.

Thank you!

**Tamiris Aldarondo**
DR 4339 - PR | Continuous Improvement Program
Acting Unit Lead
Phone: 202-538-2651

FEMA - C000180

| **From:** | Aldarondo, Tamiris |
| **To:** | Carreiro, Gretchen; Lane, Rhonda |
| **Cc:** | Bonilla Davila, Ana |
| **Subject:** | RE: LSS Contract |
| **Date:** | Thursday, April 25, 2019 9:43:00 AM |

Good morning,

Thank you for your message Gretchen, that's very helpful as I was under the impression we shouldn't be discussing these things with them.

I would also like to share a concern regarding the team scheduling meetings with senior leadership. As you might  know, it has been communicated numerous times to the LSS Contractors that all meetings with Senior Leadership at the JRO need to be coordinated though the COS or myself as the CI Unit Lead. Regardless of this, Mark Rozycki, Tim McCormick, and other LSS representatives have continued to reach out to the Recovery Director and his executive assistant to request meetings directly and meeting with him privately without providing COS or myself visibility. This is causing miscommunication and misunderstandings which I have then have the responsibility to explain.

Please let us know how we should proceed and thank you very much for your support.

**Tamiris Aldarondo**
DR 4339 - PR | Continuous Improvement Program
Acting Unit Lead
Phone: 202-538-2651

Click here to find AARs, knowledge products, or give feedback on a disaster operation.

---

**From:** Carreiro, Gretchen
**Sent:** Thursday, April 25, 2019 9:33 AM
**To:** Aldarondo, Tamiris <tamiris.aldarondo@fema.dhs.gov>; Lane, Rhonda <Rhonda.Lane@fema.dhs.gov>
**Cc:** Bonilla Davila, Ana <ana.bonilladavila@fema.dhs.gov>
**Subject:** RE: LSS Contract

Good Morning Tamiris,

My apologies for just responding, I was out of the office yesterday.

Yes, sue thing, you may discuss the SOW with them and come to any conclusions you see fit as long as it is all within the scope of work.

If there is anything you are unsure about, please just let Rhonda or myself know and we can discuss or add the CO in if necessary.

Thanks so very much!

**FEMA - C000181**

Have a wonderful day,

Gretchen

---

**From:** Aldarondo, Tamiris
**Sent:** Wednesday, April 24, 2019 12:38 PM
**To:** Carreiro, Gretchen <Gretchen.Carreiro@fema.dhs.gov>; Lane, Rhonda <Rhonda.Lane@fema.dhs.gov>
**Cc:** Bonilla Davila, Ana <ana.bonilladavila@fema.dhs.gov>
**Subject:** LSS Contract

Good afternoon all,

I hope you're doing well! I have a few questions I'm hoping you can assist us with. The Prime contractor and another representative from the LSS Contract are at the JRO this week and are requesting meetings with the Chief of Staff and myself. What type of information are we permitted to discuss with them? Are we allowed to reach agreements? Can we discuss the SOW? Or should all of this be done through the COR?

Thank you!

**Tamiris Aldarondo**
DR 4339 - PR | Continuous Improvement Program
Acting Unit Lead
Phone: 202-538-2651

Click here to find AARs, knowledge products, or give feedback on a disaster operation.

FEMA - C000182

| | |
|---|---|
| **From:** | Aldarondo, Tamiris |
| **To:** | Boudrye, Melissa; Oshaben, Michael (CTR) |
| **Subject:** | Re: Areas for Potential Projects |
| **Date:** | Wednesday, May 15, 2019 11:09:33 AM |

Thank you Melissa. I've notified the LSS team lead and the contracting officer, again, that they are not to schedule meetings without including me.

Mike, if you have any questions send them my way or we can discuss tomorrow.

Get Outlook for iOS

**From:** Boudrye, Melissa
**Sent:** Wednesday, May 15, 2019 8:28:34 AM
**To:** Oshaben, Michael (CTR)
**Cc:** Aldarondo, Tamiris
**Subject:** Declined: Areas for Potential Projects
**When:** Wednesday, May 15, 2019 9:00 AM-9:30 AM.
**Where:** Melissa's Desk

Good Morning Mike,

I would like Tami to be a part of this conversation so I would like to reschedule this meeting for next week when we are both in the office.

Regards,

FEMA - C000183

| | |
|---|---|
| **From:** | Aldarondo, Tamiris |
| **To:** | Rozycki, Mark (CTR); Colmenero, Victoria (CTR) |
| **Cc:** | Santiago De Jesus, Guanina |
| **Subject:** | Black Belt Exam |
| **Date:** | Friday, May 17, 2019 1:10:00 PM |

Good morning Mark and Victoria,

I hope you're doing great! As we discussed during our last meeting with Dominique, we are developing an action plan to avoid stepping out of the Scope of Work with the Black Belt training. Therefore, our friends at the Training Department will be administering the LSS Black Belt exam. Please send the Back Belt exam and the answer key to Guanina and Dennis no later than Monday COB so that they can begin preparing.  If you have any directions that should come with the exam, please feel free to outline those for them. Do not send the exam to me, but give me confirmation that this has been completed.

If you have any questions or need any further directions, please communicate that to me directly.

 Thank you,

**Tamiris Aldarondo**
DR 4339 - PR | Continuous Improvement Program
Acting Unit Lead
Phone: 202-538-2651

Click here to find AARs, knowledge products, or give feedback on a disaster operation.

**FEMA - C000184**

| | |
|---|---|
| **From:** | Aldarondo, Tamiris |
| **To:** | Rozycki, Mark (CTR); Colmenero, Victoria (CTR) |
| **Date:** | Wednesday, May 15, 2019 11:01:56 AM |

Hi Mark and Victoria,

Just wanted to send you a friendly reminder to not schedule meetings with leadership without including me or without me being present. This has been mentioned before and discussed with the contracting officer multiple times, yet it continues to happen. Today Mike Oshaben tried scheduling a meeting with Melissa without including me, and she declined exactly because of that. If you have any questions about your current task, you can reach out to Michelle or myself and we'd be happy to help.

Thank you,

Get Outlook for iOS

FEMA - C000185

| | |
|---|---|
| **From:** | Ortiz, Michelle |
| **To:** | Aldarondo, Tamiris |
| **Subject:** | LSS details |
| **Date:** | Tuesday, May 21, 2019 3:57:15 PM |

Good Afternoon,

I wanted to provide more details on what happened with LSS last week and other situations I had been confronting with the LSS team.

I have been experiencing some issues with a particular member of the LSS Team – Barry Angeline. Prior to completing the Green Belt Training, Barry has attempted to mentor me on my Green Belt project. The approach has been very unfriendly and would impose certain meetings without prior notice. The green belt project charter for my project was never reviewed by Barry. Due to that, I given conflicting suggestions by each MBB.

As Acting Team Lead for the Continuous Improvement Unit, we have scheduled team trainings to provide knowledge and refreshers for the work that we do on a daily basis. On April 12, we scheduled a Pareto Training for the team and Barry Angeline approached the meeting room where the training was being held. He made a comment regarding Pareto and LSS tools. He asked in a sarcastic manner, "Didn't you just learn this in Green Belt training? Also, do you need to take this again?" It was very uncalled for and unnecessary to make such comments. It made the team feel uncomfortable.

I have been treated differently by several team members of LSS, when I approach them for assistance or to clarify any information regarding Green Belt. They make certain faces and act like I am not articulating myself well. I have been told comments such as, "when you were born I already had 20 years of experience."

Last Wednesday, May 15, just to elaborate a bit more on the below email, after Tami gave instructions to the LSS team via email on scheduling meetings with Senior Leadership and to make sure it was scheduled through CI Leadership. LSS had a meeting with HSS Black Belt Candidate in Conference room Old San Juan. Barry then approached me at my desk in a demanding way to attend this meeting that was being held. He mentioned, Tami stated that CI leadership ( Tami or myself) would have to be invited to any meeting LSS held. I explained to Barry I was working on a special project at the moment and asked what this meeting was being held for. I also clarified with Barry that CI leadership would not have to be present during Black Belt Candidates mentoring sessions. He then asked "What about Luis Amaro,  stating if I considered a TFL, leadership?" His approach was unprofessional and made me feel uncomfortable in front of team members. To my understanding, he didn't want to follow chain of command and approached me on the spot, while the stakeholder was waiting for the meeting to begin.

Respectfully,

**Michelle Ortiz**

DR 4339 - PR | Continuous Improvement Program
Continuous Improvement Specialist

**FEMA - C000186**

U.S. Department of Homeland
Security Region II
FEMA-4336-DR-
PR FEMA-4339-
DR-PR
P.O. Box 70105
San Juan, P.R. 00936-8105



May 24, 2019

MEMORANDUM FOR:      Rashaan Edwards, Contracting Officer
                    Gretchen Carreiro, COR

FROM:               Tamiris Aldarondo
                    Continuous Improvement Unit Lead - FEMA

SUBJECT:            Lean Six Sigma Contract Performance

**Background**

In April of 2018, FEMA procured a contract to employ individuals with Lean Six Sigma (LSS) certifications to assist with process improvement activities at the Puerto Rico Joint Recovery Office (JRO). In July 2018, the Continuous Improvement (CI) Unit and Chief of Staff's office conducted a program review of all projects with the contractors. It was determined that most of the projects did not produce measurable outcomes for the recovery operations. LSS noted that they were also not aligned with the focus of the statement of work.

In alignment with the Remediation Plan, LSS Green and Black Belt trainings were completed on May 3, 2019. This gave our operation the internal capabilities to implement LSS tools and conduct process improvement projects. Foreseeing this, and in an effort to be good stewards of taxpayer money, we began inquiring about the process for termination of contract on May 2. After careful consideration, Senior Leadership made the decision on May 15, 2019 and the formal request for termination was sent on May 16, 2019.

Although the request for termination is being done under the government convenience clause, there have been numerous concerns regarding the conduct and performance of the contractors that make up the LSS team. These concerns have been documented in various forms and communicated to the Contracting Officer Representative, Leadership at the Joint Recovery Office (JRO), and the LSS Team Leads. We outline those concerns below and have attached the supporting documentation.

1

**FEMA - C000187**

## I.    <u>Performance Issues</u>

Concerns regarding the LSS Team's performance have been existent and documented since 2018. The attached memo (attachment #1) submitted by previous Continuous Improvement Unit Lead, Eli Pushkarewicz, outlines the lack of compliance with the SOW and team member's unprofessional behavior.  We are attaching additional emails and documents that further support these concerns.

**Remediation Plan**
- According to Pushkarewicz, contractors struggled to report on their work, often leaving off projects, being unable to quantify the work they were doing, and not articulating the time/resources required to accomplish the work.
- The Prime contractor was required to submit the Remediation Plan on 11/7/18 and replace their project lead in order to tackle these issues.
- Specific areas of concern included in the Remediation plan were:
    - Challenges defining and meeting deliverable milestones and deadlines
    - Unprofessional behavior
    - Quality of work issues
    - Unsatisfactory customer service with JRO partners

- As of May 24, 2019, these concerns still remain. The LSS team's focus has been mostly on training and there has been no significant impact or progress on Master Black Belt projects.

    Documentation:
    Attachment # 1 - Memo
    Attachment # 2 - Remediation Plan
    Attachment # 3 to 5 - Emails from previous Unit Lead
    Attachment # 6 - SOW
    Attachment # 7 - SOW Review

**Green and Black Belt Training**

- **Coaching**
  The LSS Team members conducted training and coaching from January to May 2019. During that time, we were approached by various trainees with complaints about the contractors' work and behavior. Some of these were brought to our team by Luis Amaro, Dana Planas, Rangel Guerrero, Melissa Boudrye, and Liz Morales, which all of these are leadership personnel at the JRO. Based on the reported concerns, the Continuous Improvement team conducted a training assessment where trainees expressed the following:

    - "At times, coaches' attitudes have been perceived as patronizing"
    - "Some coaching sessions were a waste of time due to topics discussed"
    - "Coaches are just reaffirming ideas not providing constructive feedback"
    - "Support was not the expected. He should have sat with me and go over the project steps to facilitate the learning process; at least for the most important tools"
    - "Mark Woodhouse's communication was disrespectful and demeaning"
    - Coach transition was not well managed
    - Inconsistence guidance to trainees

FEMA - C000188

The Black and Green belt trainees are important stakeholders for the Continuous Improvement Unit. The lack of professionalism from the LSS Team required me to apologize on behalf of the contractors and affected our collaboration with some of these stakeholders.

- **Management**
  The LSS team was instructed to manage all aspects of the training, particularly the list of attendees, so that we could have control of who received this training and also be fair to our employees when assigning training slots. The team did not appropriately manage attendance, which led to Call Center employees attending class without being previously authorized to be there. This created numerous issues for the CI team, which we then had to course correct.

  - FEMA employees who signed up for training through the appropriate channels and received authorization to attend, were not allowed to attend Green Belt training because the class was at capacity, but Call Center employees who were not to attend, were allowed to be in the class.
  - Call Center employees are not necessarily funded or attached to DR-4339 which created bigger legal concerns that we had to discuss with our Legal Advisors.
  - I had to personally ask the Call Center supervisor to remove her employees from the training, which injured our working relationship as it made our team seem unprepared and unprofessional.

  Documentation: Attachment #7 - Green Belt trainees

- **Inaccurate and inappropriate reporting**
  The LSS Team consistently attempted to pressure FEMA employees by displaying and communicating the delays in their projects, sometimes sharing inaccurate information.
  - The LSS team provided the COS inaccurate information on employees' missing project charter, which the COS reported to the employees' supervisor. Their supervisor, Community Services Directorate Lead, stated that this information was inaccurate and demanded we do a diligent job before making claims of employees not complying with their projects. The COS had to apologize for the mistake.
  - The team continued producing reports which highlighted in red the employees who were falling behind on their projects. They were instructed numerous times before not to shame FEMA employees in this way, but to rather find a way to encourage them. The team insisted this was the way to get them to do the work and continued with the reporting style.

  Documentation: Attachment #8 and #9 – Communication with Directorate

II.    <u>**Inadequate stakeholder engagement**</u>
  The LSS team members have miscommunicated their accomplishments and/or attempted to take sole credit for work that was not their own. This deeply injured our relationships with some stakeholders and affected our colleagues' trust in our work and ethical standards.
  Some examples of these are:
  - PA Ops Large Project Notification – The team inaccurately reported their contributions and accomplishments to a project conducted mostly by the PA Ops team. The PA Ops lead was deeply offended by this and reported it to the Chief of Staff Office. The team was forced to

FEMA - C000189

apologize for this, and it also injured our relationship with them as they were reluctant to work with our team after this issue.

o Concept of Operations – During a meeting with Deputy Recovery Director, Mark Rozycki stated that the LSS team created the Concept of Operations. When asked if they had actually done them independently or collaborated with Kathryn Humphry, he emphasized that the LSS team did them. Mellissa Boudrye clarified that this had been a collaboration and that she was part of the process. I was personally also part of this process and have early emails with Kathryn that confirm she was leading this project, even before the team members deployed to this disaster.

Documentation: Attachment # 10 and 11 – LPN Project

III.    **Refusal to follow the chain of command**
The LSS team members have consistently circumvented the chain of command during the time I have been acting as Unit Lead for the Continuous Improvement Program (CI), from November 2018 until now. We outline some examples below.

- **Change of duty station**
The LSS team singlehandedly decided to change duty station and began working from the Call Center Building. This was not a direction given by me or anyone in FEMA. When instructed to report back to the JRO, the team ignored this and continued working from the Call Center. This was communicated numerous times verbally to Victoria Colmenero and Raymond Kulisch. It was also communicated in verbally and in writing to the COR.

Documentation: Attachment #12 – Duty Station

- **Meetings**
Although LSS team members have been instructed numerous times not to request meetings with leadership without providing CI visibility, they continue to do so. Having the LSS contractors schedule these meetings without going through the chain of command has caused, and is still causing, misunderstandings with our FEMA colleagues, which the CI team then has the responsibility of clearing up. This has also hurt our team's relationships in the operation and our stakeholder retention.

These concerns were communicated verbally to Victoria Colmenero, Raymond Kulisch, Tim McCormick, and Mark Rozycki. They were also communicated in writing to the COR, Mark Rozycki, and Michael Oshaben.

o The Executive Assistant for the FCO and the Recovery Director, Shirley Rivera, informed me of attempts from the LSS team members to schedule private meetings with her supervisors. She reached out to me to inquire why this was happening as those requests should be done by the CI Unit Lead.
o The team has also attempted to schedule private meetings with the Chief of Staff and Senior Advisor Melissa Boudrye.

4

FEMA - C000190

o   More recently, Mark Rozycki was instructed to send the LSS Black Belt exam to the training department, but to communicate any concerns or questions to me directly. The day after this email was sent, Mark met privately with Dennis Dougan, Training Department Lead, where he discussed my directions and expressed why he was not going to follow those.

Documentation
Attachment #13 - #16 - Meetings

- **Push back on directions**
  The push back on directions has been a consistent occurrence which continues to hinder our progress. The team has refused to follow directions when instructed to do things such as:
  - o   Modifying the LSS training so that participants can perform process improvement projects that adapt to our Operation's rhythm and needs.
  - o   Provide our Training Department a copy of the Black Belt exam
  - o   Remove red highlight on projects that have fallen behind schedule, so we are not shaming our FEMA employees who are taking on LSS training on top of their regular work duties.

  This was communicated verbally to Tim McCormick during a meeting on 4/25/2019.

- **Disrespectful attitude towards Continuous Improvement Leadership**.
  The overall attitude portrayed by the LSS Contractors toward the CI team leads has been disrespectful, demeaning, and condescending. We outline some examples of this below.

  - o   Mark Rozycki has made comments to me directly such as "I've been doing this longer than you have been alive". This was communicated verbally to the Chief of Staff, Ana Bonilla
  - o   Michelle Ortiz, CI Team Lead, has also reported the LSS team members telling her comments such as "When you were born I already had 20 years of experience".
  - o   On April 12, 2019 Barry Angeline rudely interrupted a Continuous Improvement team meeting and mocked the topic being presented by ex-LSS team member Jorge Vazquez. This made the presenter and the team members feel uncomfortable and disrespected
  - o   On May 15,2019 Barry Angeline approached Michelle Ortiz, CI Team Lead, and demanded she immediately attend a meeting with him, following a recent exchange where I reminded Mark Rozycki that CI Leads need to be included in meetings

  Documentation: Attachment #17 – TL Concerns

**II. Invoices**
The Chief of Staff and CI have reported numerous concerns with the LSS Contract invoices. These involve hours being claimed for employees that we have never had visibility over, unapproved overtime hours, and hours for employees that have previously demobilized from the operation. In addition, the team made alarming claims of being approved unlimited OT hours by the FCO. These concerns have been communicated to the COR.

FEMA - C000191

Documentation: Attachments #18-#20 – Invoices

The adaption of Lean Six Sigma into a response and recovery setting, has been an ambitious undertaking aimed at equipping the field with tools to improve mission critical processes. Unfortunately, over a year into the current contract, it is the perspective of the CI Unit in concurrence with the Chief of Staff's office and the Deputy Recovery Director that the contractors are not meeting the professional standards as well as delivering measurable outcomes. This has resulted in a tremendous burden placed on the FEMA staff and stakeholders to manage the quality and delivery of their products and activities. On the basis of the foregoing, DR-4339-PR would like to request the termination of the Capp MOBIS contract for LSS services.

FEMA - C000192

DEPARTMENT OF HOMELAND SECURITY
Federal Emergency Management Agency

## NON-DISCLOSURE NOTICE MEMORANDUM

You are assisting in an ongoing official inquiry being conducted on behalf of the Federal Emergency Management Agency (FEMA). As this inquiry is sensitive in nature, you are hereby instructed not to disclose information relating to this official inquiry to any other person(s), except as may be appropriate under applicable law.

Failure to comply with this directive may subject you to disciplinary action under appropriate charges, such as failure to follow instructions or interfering with or impeding an official investigation.

These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.

Eli Pushkarewicz
_____
Print Name

_____    _____
Signature                          Date

**FEMA - C000193**

DEPARTMENT OF HOMELAND SECURITY
## Federal Emergency Management Agency

## WARNING ACKNOWLEDGEMENT

You are being interviewed as part of an official Department of Homeland Security, Federal Emergency Management Agency administrative investigation. This is not a criminal investigation. Neither your answers nor any information derived from them may be used against you in criminal proceedings, except to prosecute you for knowingly making false statements. You must answer these questions to the best of your ability. Failure to cooperate with this investigation, including your failure to answer any questions completely and truthfully, may result in disciplinary action, up to and including the termination of your employment.

Agency personnel responsible for conducting this investigation, or for taking action based on this investigation, may disclose the information contained in your statement to persons with a need to know that information, in accordance with routine uses identified in the Department of Homeland Security System of Records Notice, "Department of Homeland Security-DHS/ALL 020 Internal Affairs System of Records," 79 Fed. Reg. 23,361 (Apr. 28, 2014), including disclosure to decision-makers in a proposed disciplinary action, or as necessary in the course of any appeals or litigation arising from such an action.

You should have received, reviewed, and signed a Non-Disclosure Notice Memorandum as part of this official investigation. You may not disclose information about this investigation except as provided by the terms of the Non-Disclosure Notice Memorandum you signed.

By signing below, you acknowledge that you have read and understand this advisory, and that you understand that this is an official administrative investigation/inquiry.


Eli Pushkarewicz
_____
Employee Name (Print)


_____  _____  _____
Signature of Employee                 Date              Time


Mara Lederer
_____
Investigator Name (Print)

MARA F LEDERER  Digitally signed by MARA F
_____  LEDERER
Signature of Investigator  Date: 2020.10.26 10:16:59
                           -04'00'

**FEMA - C000194**



# WEINGARTEN RIGHTS FORM

Weingarten Rights are mandated by law, and materialized from an actual case (National Labor Relations Board vs. J. Weingarten, Inc.) decided by the U.S. Supreme Court in 1975. The rights announced by the Court are as follows:

***Employees have the right to request that a representative be present at any investigatory meeting when the employee reasonably believes that disciplinary action might result from the investigation.***

## PROCESS

The employee may request a representative prior to the meeting or at any time during the meeting.

If the meeting is delayed or interrupted at the employee's request for a representative, then the meeting and subsequent questions should end and one of the following decisions must be reached:

Re-schedule the meeting to allow a representative to attend. A reasonable time period should be allowed.

Move forward with the investigation and take appropriate action without information from the employee.

Inform the employee that he/she has a choice to either voluntarily give up his/her rights to a representative and meet, or the meeting may or may not be re-scheduled and the employee's information not considered in the investigation.

## REPRESENTATIVE'S ROLE

A representative, if requested, must be given the opportunity to meet with the employee prior to the meeting. During the meeting, a representative may ask for clarification of questions, but may not tell the employee what to say.  Employee/Representative may request to consult in private during this meeting.

## INVOKEMENT OF WEINGARTEN RIGHTS

I choose to invoke my Weingarten Rights and request that a representative be present at the investigatory meeting. _____EP_____ (Employee Initials)

I do not request to invoke my Weingarten Rights. _____ (Employee Initials)

---

### ACKNOWLEDGEMENT OF RECEIPT OF YOUR WEINGARTEN RIGHTS

Eli Pushkarewicz
**Employee Name (Print)**                    **Employee Signature**

Charles A Aitken Jr                          CHARLES A AITKEN JR    Digitally signed by CHARLES A AITKEN JR
                                                                   Date: 2020.11.09 08:11:29 -05'00'
**Union Representative Name (Print)**         **Union Representative Signature**

---

**IMPORTANT NOTICE**

This document is intended solely for the official use of the Department of Homeland Security/Federal Emergency Management Agency or any entity receiving a copy directly from the FEMA Office of the Chief Security Officer (OCSO). This document remains the property of the OCSO, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security/FEMA, without prior authorization by the OCSO. Public availability of the document will be determined by the OCSO under 5 U.S.C. 552. Unauthorized disclosure of this document may result in criminal, civil, or administrative penalties.

FEMA - C000195

DEPARTMENT OF HOMELAND SECURITY
## Federal Emergency Management Agency

## OFFICIAL DECLARATION

Name:  Eli PUSHKAREWICZ                    Position:  ORR Portfolio Manager

Organizational unit assigned: OPPA-ERPD

Work phone:  +1 (202) 304-9604    Email address: eli.pushkarewicz@fema.dhs.gov

Work address: Usually 500 C Street but currently Telework due to COVID-19

### STATEMENT

Interview conducted on November 5, 2020 at 2pm via Microsoft Teams (MT) video by Investigators Mara Lederer and Michael Tenant.


Q: Do you understand the non-disclosure agreement that you reviewed and signed?
A: Yes.

Q: What is your title, position/organizational unit/grade with FEMA?
A:  I am the  ORR (Office of Response and Recovery)Portfolio Manager for ERPD (Enterprise Resourcing Planning Division), Analyst/ OPPA (Office of Program and Policy Analysis)-ERPD/ 14. During the time frame of the claims I would have been a CIP Analyst, emergency management specialist/ CIP-NPAD (National Preparedness Analytics Division)/ 13.

Q: What is your work number?
A: 202-304-9604

Q: What is your work address?
A: Usually 500 C Street but currently Telework due to COVID-19

Q: Please provide your Union Representative's information.
Charles Aitken
Executive Vice President, Local 4060
304-240-9861
Charles.Aitken@fema.dhs.gov
FEMA position Inventory Management Specialist, Logistics Division, MWEOC

Q: What dates were you assigned to DR4339 (Puerto Rico)?
A: *October 22-27 2017 for a hurricane Maria special project. Then December 16th 2017-February 2 2018 as Deputy Operations Section Chief. Then May 30th 2018 until October 12th 2018 off and on (with a long rotation in September). Then demobilized. I was sent back to lead a priority special project November 5th -18th. Then December 3-8 2018. Then February 26th- March 2nd on a special training project external to the PR operation.*

Q: What was your position/title?
A: October 2017: *Field Operation Directorate XO deployed to lead a new National Qualification System pilot program for State, Local, Territorial, and Tribal emergency management.
December 2017: Deputy Operations Section Chief
May 2018: Continuous Improvement Program. *Originally I was deployed to provide coach mentoring for the Regional Continuous Improvement Coordinator. I was then asked to stay on by the Chief of Staff and serve as the CIP Unit Lead for the operation.

Initials: _____

Name:  Eli PUSHKAREWICZ

November 2018: Special Project from Recovery Leadership at HQ
December 2018: Continuous Improvement Program (CIP) HQ asset providing support to the
Acting CIP Unit Lead.

Q: Were there specific qualifications needed for the position?
A: *I am a qualified Continuous Improvement Advisor. The CIP program includes knowledge
of a wide range of process improvement techniques. Additionally as a qualified IA Branch
Director I had extensive knowledge of disaster field operations, managing teams in field
settings, and managing projects with contractor support.
Initially the LSS contract was not part of the PR operation CIP Unit. It was set up
separate as a direct report to the Chief of Staff, with contractors and local hire FEMA
employees onboarded in April (prior to my deployment). The LSS program was having
performance issues and I was asked to help and mentor Luis Olivares Lugo, the FEMA
employee who was leading the unit that had the LSS contractors and LSS FEMA local hires
by the COS. He was a professor at the local PR university who was a certified LSS
blackbelt and whom taught LSS. I was informed by the COS that the contractors were
unhappy with his management ( to the point of ADR involvement)and that the disaster
operations leadership were not satisfied with the LSS contractor performance to date.
After meeting with the LSS contractors, the COS, and various disaster operational
stakeholders, it was identified that the contractors had no previous experience/knowledge
of highly technical FEMA programs and processes. Therefore the feedback stakeholders
provided was that the analysis being provided from the contractors was 1) inaccurate 2)
would require months of analysis whereas due to mission critical operational needs had to
be delivered in weeks or would no longer be relevant to the processes. I advised the COS
to request the Prime Contractor deploy a project lead who could assist the LSS
contractors in 1) providing a training plan to get the contractors up to speed on FEMA
and emergency management programs, processes, and policies so that they were not
dependent on FEMA staff to take large amounts of time to teach them fundamental program
knowledge while trying to balance hurricane maria response activities and 2) provide a
single project lead to management and oversight to the contractors. The Prime then
deployed Pieter Dejong. Shabbar Saifee, was deployed as an FCO Advisor and was suppose to
be providing general FEMA management coaching for the LSS contractor/local hire group but
demobilized in the June time frame. At that point I was asked by Josie Arcurio to play a
more direct role in supporting the program through coaching Luis who worked with Pieter
to manage the contractors. I worked with the contractors through Luis and Pieter, usually
in partnership with the COS during meetings. In mid June the contractors were still
struggling to scope any potentially successful projects. I requested that HQ CIP deploy
Sean Murphy, who was a lead LSS SME in the CIP program that had significant experience
facilitating Public Assistance LSS projects. He deployed and attempted to help coach the
contractors on how to communicate and engage FEMA PA staff, to facilitate making
connections for the contractors, and help them scope project charters ( a basic LSS tool
they should have been independently capable of). At this point I began inviting LSS
contractors into the FEMA CIP meetings and directed the members of the CIP team that they
were to help coach the LSS contractors and support the LSS projects within the sectors
they were assigned.

By the end of July the contractors were continuing to struggle and operational leadership
was very upset that there was not any project successes 3 months into the contractors
being on island. Per the COS direction I met with Luis and the contract team and asked
then to present their full projects for discussion. In that meeting the contractors
admitted that none of their projects had any impact on the operation and several had

Name:  Eli PUSHKAREWICZ

significant flaws in the assumed benefits that were being presented. An example was that Andrew Phillips Valor project stated a benefit of reduction in process steps that had no scientific logic nor validation with FEMA program SMEs. After the meeting I related the information to the COS. At this point the COS, LSS, and I were meeting weekly to review the LSS projects. The performance issues were sent to the COR and a meeting was set up with the LSS Prime the first week of August. During this time the LSS contractors expressed to the COS, myself, and members of the CIP team that they wanted to move under CIP. This resulted in the Chief of Staff requesting CIP integrate LSS into the unit.

- I have background in performance and continuous improvement.  All decisions for the management of the program came directly from the Chief of Staff (COS)-Lead COS Josephine Arcurio and then later Anna Bonilla. The goal of LSS: provide tools to Operations to be more efficient. * It was the goal of the LSS contract to provide technical expertise to help FEMA ensure the processes developed post Maria were efficient and effective in facilitating support to survivors and the commonwealth. Additionally to train FEMA staff to develop sustained LSS capabilities for the lifetime of the disaster recovery operation.

Q: What technical expertise did you possess to oversee this program?
A: I do have a base knowledge of LSS; however, the key of management were to make a clear, concise communication to the FCO and to make sure they had project management plan. -None of the contractors had a disaster background and had backgrounds in Department of Defense and how to understand the analysis of plans/interpreting information.
* Contractors lacked basic understanding of the fundementals of emergency management, disaster recovery policy/ processes, nor any experience operating in a quick pace, high intensity, complex disaster environment. I was identified to support LSS due to my proven track record in managing complex initiatives and disaster operations.

Q: My understanding is the LSS program reported to you from August 2018 until November 2018 and Dawn Dickerson (CIP-Team Lead) from approximately October 2018 until November 2018. Does this sound about right?
A: This is about right. * I was on rotation in September for several weeks. Direct Management were still made by COS.

Q: When did you cease having involvement in DR4339, specifically the LSS contract?
A: I did review basic invoices and providing guidance to COS and Tammy Aldarondo January 2019. When they reached out to me I would point them to the right person.* A transition plan was drafted in October with concurrence by the Region, COS, and FEMA HQ CIP leadership. I continued supporting invoice review till January. Additionally as my normal portfolio included support to Regions 1-4 I maintained routine communication with Tammi Aldarondo to provide technical program guidance as needed. This is the standard procedure that the CIP Regional & Field Integration Branch provide to all field operations.

Q: Who took over for you after you left?
A: Tammy and the COS took over LSS. * Initially Dawn Dickerson took over through October as lead. Then Marshall Mabry from R2 supported for several weeks. Then Tammy was designated as Acting Lead for CIP with the COS still providing direct oversight related to LSS activities.

Q: Did you have any input into Tammy becoming your replacement?
A: Yes.
-Prior to me coming on board she was in an Acting position *as a team lead and deputy.

Initials: _____

Name:  Eli PUSHKAREWICZ

She was a local hire.
-I gave my input but ultimately the COS made the decision. * Staffing decisions were made in consultation with the Region 2 Integration Branch Chief, HQ Region and Field Integration Section Chief, and PR DR 4339 COS.

Q: What qualifications did Tammy possess that made her the most qualified candidate?
A: She had taken the training in leadership, she had been involved with running the CIP (basic training) and developed a relationship with programs within the área.

Q: Was anyone else considered for the position?
A: Initially there were discussions if they wanted to deployed someone from HQ not in CIP, local; however, ultimately the COS made the decision. Additionally, key discussions were done with the Region. * Discussions were facilitated between the HQ program responsible for CIP, the Region, and the COS to identify if they wanted to deploy a resource from CIP, a manager from another program cadre, or Regional asset. The decision was made by the Region and COS that they would prefer to use Tami as she had demonstrated competency, and was well regarded by operational stakeholders and leadership.

Q: Were you aware of any issues pertaining to the LSS contract on DR4339?
A:-* Yes I was made aware of significant issues upon first arriving at the operation before LSS was broached as a potential program I was going to have to support. From day one I was made aware from several FCO Advisors (Hope Thompson, Kevin Snyder, John Boyle, Daniel Haile) and operational leadership/managers ( Maggie Holmes, Nancy Casper, Jo Girot, Ana Zapata,Josie Arcurio)that they perceived the LSS contractors to be causing significant issues by providing the FCO false and misleading analysis. Additionally that the contractors were rude and disorganized in their communications with the stakeholders. Several also noted unethical behavior such as the contractors verbally expressing their internal team drama to FEMA employees. * They initially blamed their faults on the FEMA staff member designated to manage them Luis. Then after he left they continued to struggle and blamed it on the two spanish speaking contractors who the project lead sent home. Then they continued to fail and blamed their contract project lead Pieter. He was then replaced. I was not present after this was was later told Barry and the other contractors blamed the new contractor project lead Rocky and he was also replaced.

-LSS falsified information to include stating they were successful within programs * Documentation of this has been provided via emails. In particular for the digital inspection program the contractors chose to ignore information provided by the FEMA Public Assistance (PA)SMEs(Irene Pan, Daniele Haile, Justin Fields). I arranged several meetings between the contractors and the FEMA PA SMEs to attempt to help the contractors move forward with the project. It had be one I was initially excited about as the contractors had presented it as an initiative that would significantly reduce the inspection time. However I quickly found out from the SMEs, which the contractors did confirm, the projections for how the process would reduce time and create efficiency were created from the contractor's conversations with low level PA workers in sectors. This was prior to testing the new tool so had absolutely no scientific merit, and the contractors could not defend when the PA SMEs questioned it. Additionally the contractors were told the the Grants Manager portal PA used would not be able to directly intersect with the digital app, so it would only import PDFs adding more steps to the process. The PA SMEs attempted to help the contractors understand that the grants manager portal was not specific to PR as it managed nationwide PA. As a major FEMA IT investment there were formal processes that would have to occur to vet any changes to allow the digital tool to

Initials: _____

Name:  Eli PUSHKAREWICZ

sync with Grants Manger do to government IT security policies. The contractors refused to listen. At this point I was under great pressure to find a project the LSS contractors could list as a success, since the FCO had put his and my reputation on the line connected to them, and 5 months into their contract they had nothing to justify their use on island. The PA SMEs also relayed they felt under pressure to make it appear successful even if it was not actually since the FCO was invested in LSS. I managed to get the SMEs to agree to pilot the program in 1 sector to identify if their was a time efficiency or quality of work that we could use to justify application operation wide. This resulted in the contractors agreeing, but then after many weeks of me trying to follow up ( the PA SMEs kept asking for pilot results) the contractors were only able to show limited and incomplete data from them trying the tool, not FEMA staff. Even then the time and quality of work did not show any benefit.

* I have provided documentation via email of performance and behavioral issues including but not limited to
-fell asleep in meetings.
-Aggressive/harassing language toward female CIP employees and in front of employed to the point that an claim was filed against them (including Bary's behavior) by employees from another sector that sat next to the LSS contractors.
-They were unprofessional with FEMA employees.
-I asked for a weekly report they left projects off these reports and asked the prime contract (ATCS) to come to Puerto Rico to put together a plan that would rectify their performance issues at the direction of the FCO (Mike Burn)*Mike Byrne.
-The LSS personnel (subcontractors) didn't accept the Lead Project Managers (both)and forced them to be replaced by the prime.
- The contract was awarded in stages-every 3 months it had to be renewed, when the*funding allotment ended at the last installment PR operational leadership chose not to renew because it was not proving to provide a benefit to the programs and multiple staff and COS were distracted and trying to make the program successful while being distracted from other work. * The Hurricane Maria operation was still trying to deliver critical recovery operations. It was taking large amount of leadership and program SME time to try to get the LSS contractors to be able to execute basic functions, let alone benefit the operation. Through-out my interactions with the LSS contractors,their answer to their lack of performance was they needed more time from leadership and SMEs. They believed they should be the priority of the operational leadership and did not understand how swamped FEMA staff were in delivering mission critical services.
-* After I had to inform the FCO that the contractors had been misleading him, and all of us, about their projects, I was asked gather information to document the issues with the COR/Prime. The FCO then demanded the Prime Tim Mccormick travel to PR to present a performance remediation plan. The FCO relayed that after the atrocious performance/ behavior of the LSS contractors he was only allowing a remediation plan to be presented because the Prime Contractor ACTS had previously always provided good service. After the contractors left the discussion the FCO asked me if we should just cut the program. At the time, though I new it was going to be hard work and a potential risk to my reputation I stated that I thought we should allow them a chance to improve performance based on the investment we had already made.I was part of the conversation in early August 2018-I was asked if we should cut the LSS program at that point; however, I said it would behoove us to "scrap" the LSS program because I felt it would be beneficial.
The contractors could not integrate and scope a purpose, falsifying information and reports of what products they produced and what they had done, were unprofessional towards FEMA stakeholders, aggressive and harassing language from the contractors towards FEMA team members, unable to provide reports of status of projects being worked on and

Initials: _____

FEMA - C000200

Name:   Eli PUSHKAREWICZ


completed, and overall chaos internally between LSS contractors and stakeholders acting within FEMA; ATCS was the prime contractor for the LSS implementation process; LSS was redirected to perform functions from executing projects to training and my job was to convince the FCO (Mike Burn* Byrne) on this idea; the LSS contractors themselves were all sub-contractors to ATCS; the lead project manager from ATCS was bought down to help this process along- The contract ended to my understanding because the contract was awarded in different phases and it was decided that it was not renewed for another 3 month commitment (contract was not funded for further performance; the work was not extended) because LSS was not providing any improvements as needed at the disaster and required too much oversight to make the project succeed to the detriment of the disaster mission; the contract was funded every 3 mos based on performance and cost to benefit.  I was a part of some of these conversations and my input was solicited in terms of keeping the project funded and ensure it was successful or not continue to fund it cut any further losses based on how it was affecting the operation.

Q: Do you have/did you have a personal relationship with anyone at ATCS? If you do, who and what is their position?
A: I don't have a personal relationship with anyone; however, I had conversations with Tim McCormack is a representative from ATCS and Huang (ATCS). These were usually in the presence of the COS and were limited to discussions related to the LSS project.

A complaint was received in our office pertaining to concerns regarding the DR4339, specifically the LSS contract. The complaint alleged you discriminated against the LSS team as well as created a HWE/toxic work environment. Allegations were also made you purposely sabotaged the LSS program.

Q: Did you ever make any comments to anyone regarding Barry's age, race or gender?
A: No. * I am not aware of how old Barry is, additionally I would absolutely not have. I take diversity and inclusivity as critical to a workplace and believe I have demonstrated that in PR when I required the CIP team to go through extensive training in civil rights/ diversity. Additionally I have a long record in FEMA in supporting/providing leadership to diversity/inclsivity initiatives. Through out the operation I was always clear to the contractors that if they had any issues with me or my team they should talk to the Prime contractor or the COR. At no point did I receive any feedback from a contractor, the prime project lead on site, the prime contractor Tim, or any FEMA staff related to any perceived discrimination or unsafe workplace. I would have immediately addressed it or requested support from the COS.

Q: Did you make the statement "go ask those old white guys on the LSS team" or refer to the LSS team as "the old guys", "that washed up team of old guys" or the "straight old white guys?"
A: Absolutely not. * I did not talk with the contractors alone nor did I engage in personal conversations during work hours so would not have known anyone's sexual orientation or age. Additionally I am white so am shocked that there would be any claim I would discriminate against my own race. The only conversations I ever had with the contracting group was when I received extremely negative feedback about their communications from both stakeholders and CIP staff. In those cases I did relay to the contractors that they needed to adapt to coordinating with 1) a civilian organization with a different structure/culture then DOD 2) working in a Puerto Rico office where they majority of the staff were Puerto Rican and therefore had some different cultural norms. I provided them the same information that FEMA provided to all staff who were deploying

Name:  Eli PUSHKAREWICZ

to the JFO from the mainland to enable them to integrate into a bilingual diverse workplace.

*When the LSS team was struggling Barry and Pieter approached me stating the contractors felt like they were not liked by the CIP team. In response I scheduled a Happy Hour and tried to bring the team together. Though most of the CIP team refused to go 2 staff: Christian and Desire Vincent did attend. I relayed to the contractors that evening, and other times, that their success was my reputation. I was their advocate with management. I would not have had those types of conversations in the workplace. * I did have a discussion with  Tammy and Dawn Dickerson when they were moving into the supervisory position that they needed to understand as young professionals they would be managing staff of all generations and background. Additionally that they had been peer level to most of the CIP staff and collaborators with the LSS contractors, so would have to adjust their approach moving into management. This did include discussion that their age could be negatively interpreted when/if providing feedback and directing staff. As such I recommended they ensure they were always professional, ensure there was no occasion for anyone to perceive they were preferential to younger staff whom had been their teamates. Additionally I advised them to ensure they were engaging the COS is there were any concerns as it was their responsibility to ensure a welcoming and diverse environment.

Q: If you didn't, why would someone say you had?
A: In April 2019—Tammy notified the contractors on site that they're contract was not going to be renewed. *Tammi that Barry told her that after being notified their contract would not be extended, that had reached out to OIG about fraud. Therefore as whistleblowers they could not be terminated. Evidentially once they left the Island, the LSS team went to the press about them stating their was fraud within the government. —* At this time Tammy and Anna Bonilla reached out to me about the issue and they asked me for documentation pertaining to past performance issues. * I provided documentation. —Once the press release came out, I was asked to provide talking points to address the press concerns from FEMA HQ. FEMA monitors social media/press so HQ Leadership in the Office of Response & Recovery and the National Preparedness Directorate were notified.

Q: Do you believe you discriminated against the LSS team, specifically Barry Angeline?
A: Absolutely not. *First as a subcontractor I did not communicate directly with Barry but almost exclusively in coordination with or through the Prime project leads Pieter or Rocky. Secondly, I frequently put my reputation on the line personally advocating for the LSS contractors, especially Barry after they had repeatedly upset FEMA staff they interacted with, attempting to help him succeed. * Third, Barry blamed the initial FEMA LSS manager Luis, then the project Lead Pieter, then the replacement Rocky for the atrocious performance. Lastly, decisions related to the direction of LSS were made by the FCO and COS ultimately. I provided guidance and daily coordination to the prime contract project lead (Pieter and Rocky)so had no ability to negatively impact Barry personally or professionally. Both the prime project leads and prime contractor can attest that on multiple occasions I relayed to them that I did not want to be involved in how they managed their LSS contractors or staffing decisions, only to review the work projects coming out of the team/into the team. As such I had no direct influence on any decisions they would have made related to Barry as they managed him.

Q: Do you believe the LSS team was treated differently because they were subcontractors to the prime contracting company ATCS?
A: No, they were treated in alignment with the law. *Coordination and performance came

Initials: _____

**FEMA - C000202**

Name:  Eli PUSHKAREWICZ

from the Project Lead on site and Prime contractor. * The HQ COR would have to discuss any performance issues with ATCS.

Q: Why did Tammy tell the contractors they're contract was not renewed?
A: They did not extend the work. The prime contract was also not extended on that task order.  * It is routine on disaster operations for the COS/Comptroller on the finance side to look into whether the contract was effective before adding additional funds. They look at the Statement of Work to see if they are meeting task requirements/deadlines.I provided examples of this via email.

Q: Did you write Barry Angeline up for not taking enough notes during a meeting he was running?
A: Yes. * That was a result of several conversations that I had repeatedly relayed to the contractor project lead Pieter and the contractors was a requirement of their jobs. I was told by * several of the FCO stakeholders/advisors and program SMEs that LSS personnel were going to meetings where complex information was being discussed without even a pen & paper. Then the contractors would either misinterpret the information later, or commit do actions they forgot about.* I started going to the meetings to check on this and in return ask about what occurred during these meetings. The COS and Dickerson provided them other examples where after meetings they did not track information correctly that then created errors in their materials or analysis. * I have provided emails regarding examples. In fact, I had been told that Barry had fallen asleep in a meeting that I was not present at. The FCO really wanted the LSS program to succeed and that is why FEMA staff and effort was given to support the contractor in succeeding; everything I ever had to do and efforts to support the LSS program were reported to the prime contractor (ATCS). *Due to Barry's falling esleep and the contractor's inability to track the projects/ communicate information I received multiple feedback from stakeholders that they were unprofessional and would "show up to just pitch LSS without making any actual contributions" *I provided email examples.
-* An example of me trying to help them was I had someone brought in from TX to give a presentation to LSS/CIP on how to take note taking. Additionally had tasked the FEMA CIP staff with going to the meetings to ensure the information was tracked and followed up on accurately. This added undo burden to the FEMA staff having to almost babysit the contractors. On several occasions I used one of my CIP staff Christian to go back and fix the contractor work products.

Q: Did your conduct involve unreasonably interfering with the LSS team (specifically Barry Angeline) work performance, or created an intimidating, hostile, or offensive work environment based on an individual's protected basis?
A: No.

Q: Do you have a social media page, specifically Facebook?
A: I do. * Investigators are welcome to access the account at any time.

Q: Does your Facebook page reference you are employed by FEMA?
A: Yes, it does.

Q: Are you known by the nickname the "destroyer?"
A: No. * I have never heard that or any other nicknames.

Initials:  EP

Name:   Eli PUSHKAREWICZ

Q: Did you sabotage the LSS program?
A: No, in fact I went out of my way to make it succeed. I have emails to show that I in fact think the LSS program is beneficial.* I have documents showing initially I was trying to use the success of the LSS team to help the CIP program identify how to expand LSS to a service we offered for large disaster events. At the time we were piloting it in PR and Texas. I provided opportunities for the LSS contractors to be coached/learn from successful FEMA LSS practitioners and products. (Janea Wright & Sean Murphy in person, Emily Martuscello via phone, and provided example project documentation to them. Since the operation I continued to advocate that though the LSS contractors were viewed as a failure, that FEMA would benefit from building LSS capabilities. *I provided emails regarding my collaboration with Mission Support to create an LSS certification program and that I led the initiative to integrate LSS as a CIP training requirement for all our field positions.
* I never wanted to take on the LSS program, and did it because I believed in the potential of the program. It was also made evident to me by program leadership that if I did not take it on and it failed the CIP program would be looked down on. I would counter that due to my agreeing to work with the contractors I was exposed to their hostile actions. This resulted in me navigating their unprofessional behavior.  I had to take on working 4-5 extra hours per day, often unpaid in my evenings to review and fix their information because they were inept/inaccurate. I am told both Tami and Dawn did also. Due to them I had damage to my professional reputation because I was tasked with advocating for them so was associated with each time they upset stakeholders through out the operation. Additionally I was put under extreme pressure by the FCO and COS. After Barry went to the media to make false allegations of FEMA Fraud, I was terrified that my association with their behavior/taint would be held against me. Additionally I know that Tami had been in tears on more then one occasion afraid for her job if she could not figure out how to make them succeed.

Allegations were made of a Hostile Work Environment (HWE) and discrimination against the LSS team by  Tamiris (Tammy) Aldarondo.

Q: Did you have any interaction regarding the LSS program with Tammy after you left DR4339? If you did, please explain?
A: I had a hands of approach and had contact with the COS and Tammy when they asked for guidance. I spoke to her often about  how she was doing.
-Even though I was not in Puerto Rico, I am part of program leadership* Even when I was in PR I had weekly calls with the CIP team in Texas to provide coaching/guidance to their team lead. At HQ I was part of the Regional & Field Section so had responsibility for Regions 1-4; however, the program is responsible for the overall technical guidance to make sure all locations were obtaining the need/tools they needed to succeed.
In a limited capacity for guidance or past documentation I had while I was involved- I chatted with Tammy regularly about how she was doing and coming along because she was a new leader at the disaster- I talked to her and other field continuous improvement coordinators; any person deployed to the field has support from the appropriate cadre in order to keep them on track and ensuring whatever mission is needed is successful in terms of CIP technical guidance; even though I was no longer there, CIP from HQ is still active and responsible for certain access to ensure the long term use of CIP gets the support it needed in Puerto Rico and in TX where it was being used for long-term recovery.

Initials:   EP

FEMA - C000204

Name:  Eli PUSHKAREWICZ

Q. Were you familiar with or have any background in LSS prior to DR-4339?
A: Yes, based on prior continuous improvement programs.  Also some exposure to LSS in other disaster sites I was a part of an research into LSS & Lean in other federal agencies; part of what CIP did was to develop more capabilities in continuous improvement. * I do not have a LSS certification.

Q: Were you familiar with the LSS Statement of Work (SOW) at DR-4339?
A: I became familiar with it * prior to when CIP integrated with it. After their first performance issue where they COS asked for a discussion with the Prime & COR the LSS contractors were asked to provide an analysis of why they were not being suceessful and how they were going to fix it * Barry was involved and the contractors proposed a "reset" They stated what the LSS team was doing was different from the SOW; training was not an aspect they were focusing on; they had phased deliverables they were not working on; many of the projects they were charged with could not be done because of being unable to integrate into FEMA processes. * At the meeting with the COS I asked the contractors why they had deviated from the SOW and they did not have any answer. Per COS/FCO decision the contractors were advised we accepted their new proposal and to reorient themselves to the SOW ( this was still when the contract was managed by Luis). The SOW was not changed from what they were asked to do* it was not different from their SOW duties; I was not there when the SOW was drafted;  * I was responsible for applying the reframing of duties the LSS team proposed as part of the "refesh" they designed to be in alignment with the SOW. This included primarily the redirection of their efforts to training FEMA staff. Additionally as time progressed and the contractors proved themselves incapable of delivering any successful process improvement deliverables outlined in the SOW the decision was made by the COS to at least try to get a successful training from them.* Any questions about the SOW should have been directed to the contracting officer or COR on site.

Q: Did you scrutinize LSS Projects prior to presentation to FEMA Leadership?  Is so, why?
A: In the beginning I did not * as it was not under me. Then when their products started causing significant drama, including program managers being furious products when to the FCO with extremely false analysis, I was asked to review/coach. Additionally though the COS directed the contractors not to try to meet with the FCO or send products to him without looping in the COS, I was asked to review all items first/always be present at meetings. *To note on disaster operations ALL contractors and FEMA program staff are required to vet information & products through management before going to the FCO. Frequently the contractors would directly ignore COS direction on this matter because they stated they "needed direct access to Senior Leadership & HQ Leadership" and caused complications I then had to rectify. Afterwards I worked directly  with FEMA staff members in presenting info to leadership; I then reviewed LSS products directly and assisted writing processes so that the information presented had the necessary guidance. * After the second poor performance meeting with the Prime I requested the Prime send a contractor to support the LSS team in making basic reports, analysis products, and communications. This was because they quality of their documents was atrocious, with extreme spelling errors, missing data, and sometimes not easily interpreted. I also met weekly with the COS to review the LSS products because they required a level of review/ editing that would never be tolerated from a FEMA employee.

Q:  Did you prevent any member of the LSS Team from communicating directly (any problems occurring with LSS implementation) with Mike Burn?  If so, why?
A: Yes, absolutely because it was out of scope.  I did this at the direct request of the

Initials:  EP

FEMA - C000205

Name: Eli PUSHKAREWICZ

Chief of Staff- Josephine Arcurio- any programs, findings, etc are reported to the FCO after being vetted by the Chief of Staff because erroneous and outright wrong information was being reported to the FCO, decisions were being made based on that aggregious informaiton, and causing further problems-  In essence the prime contractor's Project manager was supposed to be coordinating all products produced by the LSS contractors. Barry and other subcontractors were flagrantly insubordinate often times trying to violate the COS direction.

Q: Did you ever purposely impede the implementation of LSS?
A: Absolutely not.

Q: Were you ever notified about identified critical issues with completing projects by any member of the LSS team?  Is so, what was done?
A: Yes; but it depended on what the issue was.  If it was communication, conversations were had to improve the progress of implementation and remove any barriers to successful implemenation- fix whatever issue was stopping progress; I pulled any and all needed stakeholders together to address any impediments to success with the assistance of the Chief of Staff  and FCO when needed. * Additionally the contractors were provided frequent access to the COS and FCO where leadership asked them what was needed to remove any challenges. The contractors were never able to provide any actionable items for the FCO/COS that were not executed. Mostly they would just revert to trying to sell the concept of LSS to leadership, who we reminded them was already bought in to the concept.

Q:  Were you responsible for or have any knowledge about the sabotage of the implementation of a site inspection tool called "the digital inspection tool" by the LSS team? (meaning did you work with FEMA I.T. to keep the Project from being an accepted idea and practice)?
A: No, however that was the survey 1-2-3 I believed and wanted to be a successful Project with PA * I have detailed above and provided documentation via email that the technology was not able to be used in the manner in which they were trying to use it. * Public Assistance SME's such as Irene Pan and Daniel Haile can attest that I also attempted to work with PA to help the project. However this was yet another example where the contractors miss represented their work and could not deliver. Additionally they had been provided at one point direction to create a pilot for the program but proceeded to try and work in other sectors selling it without executing the project plan to ensure it was effective.* If it had succedded it would have been a great project, instead it was an example of LSS wasting alot of federal money and SME time because they refused to work with FEMA stakeholders as partners.

Q: Did you provide information to I.T. managers which convinced them not to implement any process improvements identified by the LSS team?
A: No. * I did not intersect with any I.T managers. I did try to connect mediate conversations with the PA SMEs on several occasions to see if there was a way to move the project forward. Additionally the LSS contractors were still trying to push the project after I demobilized so I stopped following the issues with it.

Q:  Did you encourage members of the CIP Team to not work collaboratively with members of the LSS Team?  If so, why?
A: Absolutely not; just the opposite I worked hard to get the two different staffs to work together and coordinate work.* It should be noted the LSS contractors, including Barry requested to merge with CIP in the beginning because they did not like working with

Initials: EP

FEMA - C000206

Name:   Eli PUSHKAREWICZ

their FEMA manager Luis. I even tasked the CIP team leads to have the CIP staff ensure all team members were using their work in sectors to help LSS identify and execute projects. There were several occasions such as an PL (large project) in the water sector where I did address the LSS team. In particular this was because the CIP staff member and water sector leadership came to me upset that the LSS staff were claiming credit for conducting the analysis/product that the CIP staff member created. *To note there was one LSS contractor Mike Oshabin who I did relay to the Prime contract project lead did receive positive feedback from stakeholders for some of his work validating their process improvements.

Q: Were you instrumental in any way with ATCS being awarded the contract to implement LSS at DR-4339?
A: No I was not. *The contract was actually a contract held by the Office of Response and Recovery (ORR)not specific to LSS. From what I was told the FCO Mike Byrne wanted the capability early on after Maria. This was before I even worked for CIP. He asked the Chief of HQ CIP Ashley Zohn and since CIP did not have contracting capabilities, she was somehow able to put it on a contract HQ had as a task order. The acquisitions package was worked by Allison Pfaendler, a LSS trained CIP staff member who had been deployed to the PR operation when FCO Byrne made the request. At some point in the drafting phase of the SOW I had been hired on with CIP. Ashley Zohn and Allison did have me take a look at some language in March that eventually went into the SOW since I had COR background. At the time I saw the language I was not aware that it was going to be a task order or any contractor it might be associated with. I never saw the final product and has no other involvement with how the LSS contract was stood up until I arrived in PR in may after the contract team had been established.

Q; Who was the COR for this contract?
A: * Gretchen.Carreiro was the COR and I provided emails with the CO information in it. I can also forward you the names of any COs that touched this contract.

Q: Is there anything else you would like to add that I did not specifically ask you?
A: From my perspective it upsets me that they thought there was HWE. The contractors went to the OIG and the public without working through the system. I was not in a position to manage the contractors. I've seen LSS be successful elsewhere * and I still believe that it can be important to the agency if there was competent LSS users. Personally my reputation has been damaged due to my association with the LSS contractors. Additionally the burden the dysfunction, stress, and excessive workload the contractors added to so many of the FEMA staff they intersected cannot be quantified. It was the duty of the Puerto Rico operation to discontinue funding the LSS contractors because they were waste of taxpayers dollars, intentionally misrepresenting their work, and detracting resources from the life sustaining recovery mission in PR. Due to how bad they tarnished people's association of LSS with their work, I have been told several program areas would protest the Agency ever attempting an LSS team in disaster operations again.

**END OF STATEMENT**

I have read this statement. It is true, accurate and complete to the best of my knowledge and belief. I have been given an opportunity to make any corrections, additions, or deletions. I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.

Initials: _____

**FEMA - C000207**

Name:  Eli PUSHKAREWICZ

ELI A
PUSHKAREWICZ
Digitally signed by ELI A
PUSHKAREWICZ
Date: 2020.11.08 20:57:16
-05'00'

<u>Signature</u>

11/08/2020

<u>Date</u>

Mara Lederer

<u>Investigator Name</u>

MARA F LEDERER
Digitally signed by MARA F
LEDERER
Date: 2020.11.09 08:30:44 -05'00'

<u>Investigator's Signature</u>

Initials: _____

FEMA - C000208

DEPARTMENT OF HOMELAND SECURITY
Federal Emergency Management Agency

## NON-DISCLOSURE NOTICE MEMORANDUM

You are assisting in an ongoing official inquiry being conducted on behalf of the Federal Emergency Management Agency (FEMA). As this inquiry is sensitive in nature, you are hereby instructed not to disclose information relating to this official inquiry to any other person(s), except as may be appropriate under applicable law.

Failure to comply with this directive may subject you to disciplinary action under appropriate charges, such as failure to follow instructions or interfering with or impeding an official investigation.

These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.

Charles A. Aitken Jr
_____
Print Name

Charles A. Aitken Jr.
_____
Signature

11/09/20
_____
Date

FEMA Form 115-045-005-003 (6/20)

Page 1 of 1

**FEMA - C000209**

**Lederer, Mara**

| | |
|---|---|
| **From:** | Pushkarewicz, Eli |
| **Sent:** | Thursday, November 5, 2020 6:47 PM |
| **To:** | Lederer, Mara |
| **Subject:** | Fw: 143 for Lean Six Sigma 3rd installment |
| **Attachments:** | 2018 SOW LSS for DR4339PR_03.06.18.docx |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Example that I mentioned, every time the contract was up for another funding phase the Finance and Admin Section Chief would review the SOW and ask about success related to the statement of work to judge if the contractors were providing a cost benefit to the operation.

---

**From:** Pushkarewicz, Eli
**Sent:** Friday, October 26, 2018 10:25 AM
**To:** Carreiro, Gretchen <Gretchen.Carreiro@fema.dhs.gov>
**Cc:** Mabry, Marshall <Marshall.Mabry@fema.dhs.gov>
**Subject:** FW: 143 for Lean Six Sigma 3rd installment

Gretchen,

Additionally we will need to discuss with Tim the "6 month report" that is required in the SOW. See Jon's email below.

-Eli

---

**From:** Reistroffer, Jon
**Sent:** Thursday, October 25, 2018 5:30 PM
**To:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>
**Cc:** York, Shane T <Shane.York@fema.dhs.gov>; Desire, Jean <jean.desire@fema.dhs.gov>
**Subject:** RE: 143 for Lean Six Sigma 3rd installment

Eli,

Does LSS have a progress report?

On the SOW at the six month point it states the contractor shall provide:
- Complete Define phase for the overall process.
- Complete Define phase for each sectors process. There are twelve sectors, with potential room for expansion.
- Complete Define phase for Public Assistance Alternative Projects process.
- Complete Measure phase for the overall process.
- Complete Measure phase for each sectors process. There are twelve sectors, with potential room for expansion.
- Complete Measure phase for Public Assistance Alternative Projects process.

1

**FEMA - C000210**

We may receive questions when we request the funding and want to be prepared.  Even a summary of activity would help.

Thank you,

Jon

---

**From:** Pushkarewicz, Eli
**Sent:** Thursday, October 25, 2018 4:53 PM
**To:** FEMA-DR-4336-4339-PR-Ordering <fema-dr-4336-4339-pr-ordering@fema.dhs.gov>
**Cc:** Edwards, Rahsaan <Rahsaan.Edwards@fema.dhs.gov>; York, Shane T <Shane.York@fema.dhs.gov>; Desire, Jean <jean.desire@fema.dhs.gov>; Reistroffer, Jon <jon.reistroffer@fema.dhs.gov>; Carreiro, Gretchen <Gretchen.Carreiro@fema.dhs.gov>
**Subject:** 143 for Lean Six Sigma 3rd installment

Please see attached.

-Eli

FEMA - C000211

Contract # HSFE80-16-A-0004                                    Task Order # XXXXXX-XX-X-XXXX

## Statement of Work
### CaPP Blanket Purchase Agreement (HSFE80-16-A-0004)

| General Information | | | |
|---|---|---|---|
| **Contract Number** | HSFE80-16-A-0004 | **Task Order Number** | TBD |
| **Contract Name** | CaPP – MOBIS BPA | | |
| Requesting Directorate | | Division/Branch | |
| **Task Order Name** | | | |
| **Period of Performance** | | **Start Date** | **End Date** |
| | | TBD | Award + 18 months |
| **Contacts** | **Name** | **Office Phone No.** | **Mobile Phone No.** |
| **FEMA COTR** | Sara Gray | 202-212-7922 | 540-539-0241 |
| **CaPP PM** | TBD | | |
| **FEMA Technical Monitor** | TBD | | |
| | | | |
| | | | |

## I.    Introduction

The Federal Emergency Management Agency (FEMA) Continuous Improvement Program is implementing a process improvement activity that will be key to FEMA compliance with Executive Order 13450 and HR 2142, the GPRA Modernization Act of 2010 and Office of Management and Budget (OMB) Circular A-50 and the IG Act.  This Performance Work Statement (PWS) establishes the requirement to acquire Lean Six Sigma (LSS) training services and project consultation to improve processes and address systemic issues throughout the agency.

Under Executive Order 13450, FEMA is required to define mechanisms for continuously improving the effectiveness and efficiency of agency processes. Under HR 2142 and the GPRA Modernization Act of 2010, FEMA is required to track and improve agency performance beginning in FY18 and submit performance plans consistent with the Act in FY13. The Master Black Belt LSS Contract Team will enable EO13450 and HR 2142 compliance by establishing a LSS program that utilizes best practice LSS methodology for structured strategic and tactical continuous process improvement. A LSS program that is integrated into strategic and tactical operational performance will be a key contributor to business and security performance. The Master Black Belt LSS Contract Team is responsible for designing and leading the implementation of the LSS methodology at FEMA's DR-4339-PR to support performance analysis and aggressive improvement objectives set by FEMA's DR-4339-PR leadership, including reducing costs, or improving service delivery, or both.  These services will provide FEMA with:

  A.  LSS development of a disaster operations process assuring our systemic issues are aligned with Agency and Departmental strategic goals
  B.  Develop, track, and report LSS program and project measures

**FEMA - C000212**

Contract # HSFE80-16-A-0004                    Task Order # XXXXXX-XX-X-XXXX

C. The flexibility to develop Guidance, SOPs, and Job Aids as a result of the streamlined process
D. The flexibility to provide LSS classroom training, (Yellow Belt and other personnel / practitioner levels as necessary)

## II.  Key Personnel

In order to perform the requirements of this Task Order, the Contractor must provide the professional skillsets to support the outlined tasks and activities.
Support personnel include (but are not limited to):

- Subject Matter Experts (in Lean Six Sigma)
- Project Manager

Key personnel must possess the following qualifications:

- Master Black Belt certification with more than 10 years' experience leading LSS projects in a large organization in both the public and private sectors
- Experience applying agile and rapid prototyping best practices
- Experience delivering Six Sigma Yellow Belt and Green Belt training to non-technical federal audiences
- Experience with business processes in austere environments and across multiple locations

It is strongly preferred that key personnel possess the following qualifications or attributes:

- Locally based near San Juan, PR
- Bilingual in English and Spanish
- Master's degree in Industrial Engineering, Operations Research, or a related discipline, in addition to more than 15 years of professional experience
- The team of contractors should include expertise in the following areas:
  - Communications and IT infrastructure
  - Water or Waste Water
  - Transportation
  - Power
  - Housing
  - Economics
  - Public Buildings
  - Health and Social Services
  - City Planning
  - Natural and Cultural Resources
  - Education
- Project manager certified as a Project Management Professional

## III.  Onsite Support

This task will require support at the Joint Field Office for DR-4339-PR, which is currently located in Guaynabo, PR, and at other locations, e.g., the four Branch Offices, all of which are located in Puerto Rico. Tasks may require intervals of continuous, extended hours, and an onsite presence.

FEMA - C000213

Contract # HSFE80-16-A-0004                                    Task Order # XXXXXX-XX-X-XXXX

**IV.  Task Management**

The Contractor shall ensure that all tasks are performed in an efficient, accurate and timely manner, in compliance with the requirements of this document and project work plans.

**V.  Status Meetings**

The contractor shall meet with the COR, Project Manager, or Technical Monitor (TM) upon request to discuss task order/work plans and exchange information.  Additional meetings identified in the work plan will take place as scheduled.

**VI.  Activities and Tasks**

The Contractor shall provide contract and program management services, field consulting support, and LSS classroom training services to FEMA with the goal that FEMA will have completed self-supported LSS activities by Q4 2019 (FY19). Activities refer to the tasks and deliverables outlined below. Contractors may support one or more sectors. The resultant contract will include the following areas of Support:

- Task 1 – Develop Value-Add Process Map and single base process to include but are not limited to the 12 differing processes
- Task 2 –Lead LSS projects to Define, Measure, Analyze, Improve, and Control to include but are not limited to the 12 specific sector processes simultaneously; May lead LSS projects to Define, Measure, Analyze, Design, and Verify for relevant processes
- Task 3 - Possibly Develop Standard Operating Procedures and Job Aids for the streamlined processes
- Task 4 - Provide Yellow Belt or Green Belt training to JFO leadership and staff
- Task 5 – Provide regular status updates on level of completion across tasks 1-4.

 Activities should be completed according to the following timeline:

**3-months**:

- Complete Design for Lean Six Sigma steps on the overall Sector Approach process.
- Complete Design for Lean Six Sigma steps on each of the applicable sector processes and other applicable sector processes
- Complete Design for Lean Six Sigma steps on Public Assistance Alternative Projects process
- Develop LSS Yellow Belt training curriculum
- Conduct initial training =LSS Yellow Belt Class sessions to Sector Leads, Deputy Sector Leads, RSF Field Coordinators, and the Advisory Group; instructor to participant ratio 2:24
- Upon 100% completion of the above leadership list, schedule one LSS Yellow Belt weekly session for applicable Sector designees (e.g. managers or supervisor level); instructor to participant ratio 2:24
- Develop instructor-led course evaluation forms for Yellow Belt or Green Belt training
- Administer instructor-led course evaluation forms following each class session and provide results to the FEMA project managers.

**6-months**:

**FEMA - C000214**

Contract # HSFE80-16-A-0004                              Task Order # XXXXXX-XX-X-XXXX

- Complete Define phase for the overall process.
- Complete Define phase for each sectors process. There are twelve sectors, with potential room for expansion.
- Complete Define phase for Public Assistance Alternative Projects process.
- Complete Measure phase for the overall process.
- Complete Measure phase for each sectors process. There are twelve sectors, with potential room for expansion.
- Complete Measure phase for Public Assistance Alternative Projects process.

**9-months:**
- Complete Analyze phase for the overall process.
- Complete Analyze phase for each sectors process. There are twelve sectors, with potential room for additional sector inclusion.
- Complete Analyze phase for Public Assistance Alternative Projects process.
- Complete Improve phase for the overall process.
- Complete Improve phase for each sectors process. There are twelve sectors, with potential room for additional sector inclusion.
- Complete Improve phase for Public Assistance Alternative Projects process.

**12-months:**
- Complete Control phase for the overall process.
- Complete Control phase for each sectors process. There are twelve sectors, with potential room for additional sector inclusion.
- Create SOPs for each of the 12 sectors and overall process, a total of 12 SOPs
- Create additional SOPs for sector roles as required
- Complete Control phase for Public Assistance Alternative Projects process

**15-months:**
- Complete Rapid Improvement Events on processes when necessary. Processes include overall Sector Approach process, the twelve sector processes, other applicable sector processes, and the Public Assistance Alternative Projects process.
- Create Job Aids on how to conduct all roles within each of the twelve sectors, with potential room for additional sector inclusion.

**18-months:**
- Complete Rapid Improvement Events on processes when necessary. Process include overall Sector Approach process, the twelve sector processes, and the Public Assistance Alternative Projects process.

VII.  **Deliverables**
Deliverables shall be specified at the task order level. All deliverables shall be submitted to FEMA in accordance with contract timeframes and/or schedules agreed upon between FEMA and the Contractor as indicated in each task order. Deliverables listed below, and further detailed in the corresponding tasks above, shall include, but are not limited to:
- Task 1 Deliverables

FEMA - C000215

- Value-Add Process Map and relevant Design for LSS deliverables for overall process and each of the 12 sectors (Completion Date: 3 months from award)
- Task 2 Deliverables for all 12 processes
  - Define Phase deliverables (Completion Date: 6 months from award)
    - Project Charter
    - SIPOC
    - Voice of the Customer plan
    - Communications Plan
    - Risk Analysis
    - Other relevant deliverables determined by SMEs
  - Measure Phase deliverables (Completion Date: 6 months from award)
    - Detailed process map
    - Data collection
    - Basic data analysis
    - Visual analysis
    - Process sigma level
    - Other relevant deliverables determined by SMEs
  - Analyze Phase deliverables (Completion Date: 9 months from award)
    - Fishbone diagram or affinity diagram
    - Cause and Effect Matrix
    - Pareto chart
    - Graphical tools to depict root cause
    - Select high priority root causes to address
    - Other relevant deliverables determined by SMEs
  - Improve Phase deliverables (Completion Date: 9 months from award)
    - Improvement strategy
    - Solution Identification
    - To-be process map
    - Modified FMEA
    - Pilot Test Plan
    - Pilot Results & Analysis
    - Implementation plan
    - Other relevant deliverables determined by SMEs
  - Control Phase deliverables (Completion Date: 12 months from award)
    - Transition plan
    - Control plan
    - Project documentation
    - Project close-out
    - Other relevant deliverables determined by SMEs
- Task 3 Deliverables for all 12 processes
  - Standards Operating Procedures and Job Aids
- Task 4 Deliverables
  - Develop Yellow Belt or Green Belt training curriculum (Completion Date: 3 months from award)
  - Develop instructor-led course evaluation forms for Yellow Belt or Green Belt training
- Task 5 Deliverables

FEMA - C000216

- Develop a weekly status update in MS Word (on decided upon date by the Technical Monitor) that includes tasks completed and issues identified during the week
- Develop a monthly report in MS Word (on decided upon date by the Technical Monitor) that includes a status of completion on the project timeline and a status of completion for each deliverable outlined in tasks 1-4

VI. **Kick-Off Meeting / Project Plan**
The contractor shall meet with the Contracting Officer, COR and TM within 7 calendar days after award of the task order for a kick-off meeting.

The contractor shall provide a written Project Plan and Schedule within 14 calendar days after the kickoff meeting

VII. **Period of Performance**
Eighteen (18) months from date of award.

VIII. **Contractor Performance Measures**
Ultimately contract performance will be measured on their ability to meet the objectives of the JFO leadership, specifically their ability to have an impact on reducing costs, or improving service delivery, or both.

| Performance Measures | Required Outcomes | Standards for Excellence | Minimum Acceptable Levels | Surveillance Methods |
|---|---|---|---|---|
| The contractor shall produce an acceptable Work Plan that meets the requirements of the statement of work within the timeframe required. | The contractor shall produce an acceptable plan that clearly demonstrates achievable results within the timeframe indicated in the statement of work. | The contractor shall produce an acceptable plan that clearly demonstrates achievable results and exceeds expectations within a shorter timeframe than what is indicated in the statement of work. | The contractor produces an acceptable plan that meets the requirements of the statement of work within the timeframe required. | Review and acceptance of the work plan. |
| Internal systems and controls to ensure quality products and services. | Deliverables contain only minor technical errors, and are effective for intended purposes. Materials are delivered on time and contain all | Contractor's QA process prevents any technical errors in deliverables. All materials including documents, plans and reports are submitted prior to due date, are clear, well-organized, contain all pertinent | All products are generally technically correct and generally appropriate for target audience. Draft deliverables are acceptable or require only minor revisions. All | 100% review of all deliverables, technical review of draft materials. Detailed review of reports and invoices. |

FEMA - C000217

Contract # HSFE80-16-A-0004                              Task Order # XXXXXX-XX-X-XXXX

| Performance Measures | Required Outcomes | Standards for Excellence | Minimum Acceptable Levels | Surveillance Methods |
|---|---|---|---|---|
| | pertinent information. | information and provide innovative approaches or solutions. Invoices are supported by appropriate documentation. | reports are submitted on time and contain the information specified by contract. | |
| Acceptable deliverables that meet the requirements of the statement of work within the timeframe required. | The contractor shall produce deliverables that meet the requirements outlined in the SOW and discussed at the kick-off meeting. | The contractor shall produce deliverables that exceed expectations outlined in the SOW and discussed at the kick-off meeting, and in a timeframe shorter than indicated in the SOW. | The contractor produces acceptable deliverables that meet the requirements of the statement of work within the timeframe required. | 100% review of all final deliverables. |

**FEMA - C000218**

**Lederer, Mara**

| | |
|---|---|
| **From:** | Pushkarewicz, Eli |
| **Sent:** | Thursday, November 5, 2020 8:21 PM |
| **To:** | Lederer, Mara |
| **Subject:** | FW: Action Items and minutes of 8.8 COS meeting |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

See below. As I mentioned though LSS technically was under CIP organizationally and that we provided FEMA & technical guidance, management decisions were through the COS & FCO. Below is my written direction to the contractors that they would be reporting directly to the COS without not through CIP.

**From:** Pushkarewicz, Eli
**Sent:** Thursday, August 9, 2018 10:03 PM
**To:** Olivares Lugo, Luis <Luis.OlivaresLugo@fema.dhs.gov>; DICKERSON, DAWN <dawn.dickerson@fema.dhs.gov>; De Jong, Pieter <pieter.dejong@associates.fema.dhs.gov>; Barry Angeline <bangeline@novaces.com>
**Subject:** RE: Action Items and minutes of 8.8 COS meeting

Thanks Pieter,

My additions would be:

- Expectations:
    - LSS contractors will begin reporting out their own information without FEMA CI "middleman". Examples are a weekly report due every Saturday, and the Monday COS meeting
    - Next week LSS will internally review programs and conduct the stakeholder mapping ( Barry mentioned). The FCO Advisory Group can be a link as needed.
    - When I return the following week LSS will present to the FCO the status of projects, course corrections, and the path moving forward
    - LSS will submit the Transportation pilot report as soon as data is available
    - Pieter will conduct any required performance assessments and execute any performance corrective actions internally
    - Contractors should be going to Pieter and Barry if they are asking for new projects, offering to assist, or are unhappy with their activities, not FEMA staff to ensure activities are aligned and prioritized.

Thank you all.

**From:** Olivares Lugo, Luis
**Sent:** Thursday, August 9, 2018 3:16 PM
**To:** DICKERSON, DAWN <dawn.dickerson@fema.dhs.gov>; De Jong, Pieter <pieter.dejong@associates.fema.dhs.gov>; Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>; Barry Angeline <bangeline@novaces.com>
**Subject:** RE: Action Items and minutes of 8.8 COS meeting

Pieter,

My comments included. Find attached.

**Luis Olivares**
Lead Project Manager – Master Black Belt
**Lean Six Sigma Programme** | DR-4336-PR & DR-4339-PR

1

**FEMA - C000219**

Department of Homeland Security | Federal Emergency Management Agency
(C) 202.701.8575 | (E)  luis.olivareslugo@fema.dhs.gov

---

**From:** DICKERSON, DAWN
**Sent:** Thursday, August 9, 2018 2:32 PM
**To:** De Jong, Pieter <pieter.dejong@associates.fema.dhs.gov>; Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>; Olivares Lugo, Luis <Luis.OlivaresLugo@fema.dhs.gov>; Barry Angeline <bangeline@novaces.com>
**Subject:** RE: Action Items and minutes of 8.8 COS meeting

Pieter,

Overall this is well captured from yesterday's meeting and what was discussed as steps forward. I have attached the document with my brief comments.

---

**From:** De Jong, Pieter
**Sent:** Thursday, August 9, 2018 10:22 AM
**To:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>; Olivares Lugo, Luis <Luis.OlivaresLugo@fema.dhs.gov>; Barry Angeline <bangeline@novaces.com>; DICKERSON, DAWN <dawn.dickerson@fema.dhs.gov>
**Subject:** Action Items and minutes of 8.8 COS meeting

See attachment:

Comments, revisions welcomed. Use track changes and I'll compile them for a final.

Best:

Pieter

FEMA - C000220

## Lederer, Mara

| | |
|---|---|
| **From:** | Pushkarewicz, Eli |
| **Sent:** | Thursday, November 5, 2020 6:55 PM |
| **To:** | Lederer, Mara |
| **Subject:** | Fw: LSS contract performance issues |
| **Attachments:** | Memo_LSS Contractor Performance v6.docx; RE: Report |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Example of an EEO complaint that was forwarded me by the COS as the claimant Barry and the contractor prime project lead Peiter demonstrated actions a FEMA employee in a near by sector felt unsafe being around. As I mentioned the aggressive and unprofessional communications behavior was a repeat issue with the contractors, including Barry.

---

**From:** Pushkarewicz, Eli
**Sent:** Friday, October 26, 2018 8:38 AM
**To:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>; Carreiro, Gretchen <Gretchen.Carreiro@fema.dhs.gov>
**Cc:** Icardi, Michael <michael.icardi@fema.dhs.gov>; Mabry, Marshall <Marshall.Mabry@fema.dhs.gov>
**Subject:** LSS contract performance issues

Gretchen,

Please see the attached memo outlining the performance issues related to the Lean Six Sigma contractors. It was reviewed and approved by the FCO. Additionally I have included an email from the JRO Equal Rights Office outlining a grievance that was filed by a FEMA employee who works in a sector housed next to the contractor's table.

The FCO would like a plan regarding how they will remediate the grave performance issues by COB today. He also wants to make clear that his interest in extending this opportunity is only due to the previous good performance by the prime company. With your concurrence I would like to immediately forward to Tim.

-Eli

---

**From:** Arcurio, Josie
**Sent:** Thursday, October 25, 2018 3:37 PM
**To:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>; Bonilla Davila, Ana <ana.bonilladavila@fema.dhs.gov>; McRae, Maurice <maurice.mcrae@fema.dhs.gov>
**Cc:** Mabry, Marshall <Marshall.Mabry@fema.dhs.gov>; Fox, Russell <Russell.Fox@fema.dhs.gov>; Arcurio, Josie <Josie.Arcurio@fema.dhs.gov>
**Subject:** RE: LSS contract performance issues
**Importance:** High

Eli
I just spoke with Mike. He thanks you for your excellent write up. FEMA has had a long standing good relationship and successes with this Contractor. It is the only reason he will afford them an opportunity (and he wants you to advise Tim as such) to rectify the issues as you outlined. Since this is a HQ managed contract, Mike would like for you to meet with the Contractor and appropriate parties on the performance issues outlined. He would like a plan from the Contractor within 24 hours, on how they plan to rectify all issues that are addressed. He still may want the Contractor to come

1

FEMA - C000221

down, pending how the plan is presented.   Please provide Mike and I a report as soon as you receive it, and we will set up time to discuss further.

Please let me know if you have any questions
Thx
Josie

---

**From:** Pushkarewicz, Eli
**Sent:** Thursday, October 25, 2018 12:31 PM
**To:** Arcurio, Josie <Josie.Arcurio@fema.dhs.gov>; Bonilla Davila, Ana <ana.bonilladavila@fema.dhs.gov>; McRae, Maurice <maurice.mcrae@fema.dhs.gov>
**Cc:** Mabry, Marshall <Marshall.Mabry@fema.dhs.gov>; Fox, Russell <Russell.Fox@fema.dhs.gov>
**Subject:** FW: LSS contract performance issues

FSA

---

**From:** Tim McCormick <tmccormick@atcsplc.com>
**Sent:** Thursday, October 25, 2018 11:42 AM
**To:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>; Hui, Kwong <khui@atcsplc.com>; Perry Rhodes <prhodes@atcsplc.com>; Icardi, Michael <michael.icardi@fema.dhs.gov>; Carreiro, Gretchen <Gretchen.Carreiro@fema.dhs.gov>
**Subject:** RE: LSS contract performance issues

Eli,

Sounds good.  It will help to have Mike's feedback too.  Just let us know when you want to hold the meeting and we'll be there.

Thanks!



**Tim McCormick**
**Vice President, Emergency Management Services & Water Resources**
2553 Dulles View Drive, Suite 300 | Herndon, VA 20171
P: 703-430-7501 x138 | C: 703-887-1533 | F: 703-430-0889
**atcsplc.com** | **Facebook** | **LinkedIn** | **Twitter**

CLIENT ▪ EMPLOYEE ▪ COMPANY ▪ COMMUNITY

This email is only for the intended recipient, and may contain information that is privileged, confidential, or exempt from disclosure under law. If you received this message in error, or are not the intended recipient, please notify the sender and destroy this message.
- Title VI Compliance -

---

**From:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>
**Sent:** Thursday, October 25, 2018 11:31 AM
**To:** Kwong Hui <khui@atcsplc.com>; Perry Rhodes <prhodes@atcsplc.com>; Icardi, Michael <michael.icardi@fema.dhs.gov>; Tim McCormick <tmccormick@atcsplc.com>; Carreiro, Gretchen <Gretchen.Carreiro@fema.dhs.gov>
**Subject:** Re: LSS contract performance issues

Good day,

FEMA - C000222

Mike Byrne has asked that we hold on meeting today until he has an opportunity to provide feedback related to performance. I will reschedule a meeting once he provides feedback, likely early next week.

Eli Pushkarewicz
Deployed to DR-4339-PR (CI Unit Lead)
Evaluation and Decision Support
National Preparedness Assessment Division
NPD|FEMA|DHS
Mobile Phone-202-304-9604
**The ATCS Herndon office is moving. Effective 10/29, our new address will be:**
**13861 Sunrise Valley Drive, Suite 200, Herndon, Virginia 20171**

FEMA - C000223

## Lederer, Mara

| | |
|---|---|
| **From:** | Mackert, Ronald |
| **Sent:** | Wednesday, October 24, 2018 8:12 AM |
| **To:** | Pushkarewicz, Eli |
| **Cc:** | Arcurio, Josie; McRae, Maurice |
| **Subject:** | RE: Report |

Eli,

The individual who came to the OER asked to remain anonymous and signed a Contact Release indicating she did not want to pursue EEO counseling.  She simply wanted someone to know about her concern.

Below is the basic description I can give you but the individual that spoke to our ERAD has a confidentiality right that must be honored.  I realize this may hinder your documentation of the matter, but I have no choice.  Please stop by and we can talk about the matter and how you might pursue it further.  Certainly, I would think the contractor would feel an obligation to investigate the matter, even from an anonymous source, and based on the finding, take whatever action is warranted.

Anonymous employee description : On 10/22/2018, a DR4339 employee alleged that Mr. De Jong (contractor) had been creating a hostile workplace environment between their employees. The employee alleged that FEMA employees witnessed how Mr. De Jong continuously yelled at his employees and almost had a fight with Mark Rozycki on 10/19/2018 at the JRO. Also, the employee alleged that few days ago, Mr. Barry Angeline took his bag and threw it to the hallway in response of Mr. De Jong requirements.  The employee stated that FEMA employees feel uncomfortable with these behaviors.

On 10/23/2018, the employee re-confirmed the facts about the discussion and the participants. The employee stated it was possible there was confusion about the dates but not the persons.  The employee physically identified Mr. De Jong and Mr. Rozycki. The employee also added that the contractor had several discussions and misbehaviors between them. The employee recalled that on 10/19/18, the contractors were moved from the work area where the FEMA employees were located.

That's it  for now.  I'll look forward to talking with you.

    Ron

    Ronald E. Mackert
    Lead, Office of Equal Rights
    (202) 304-5430
    Ronald.mackert@fema.dhs.gov

---

**From:** Arcurio, Josie
**Sent:** Monday, October 22, 2018 5:24 PM
**To:** Mackert, Ronald <Ronald.Mackert@fema.dhs.gov>
**Cc:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>; McRae, Maurice <maurice.mcrae@fema.dhs.gov>
**Subject:** Fwd: Report

Ron per our discussion for your review and for you to follow up with Eli thanks again

1

FEMA - C000224

**From:** McRae, Maurice
**Sent:** Monday, October 22, 2018 5:20:17 PM
**To:** Arcurio, Josie; Bonilla Davila, Ana; Pushkarewicz, Eli; Figueroa Salivia, Liani
**Cc:** Dickerson, Dawn; Lee, Alicia
**Subject:** RE: Report

Hello Eli,

I assume I need to be looped in on this issue that seems to be time-sensitive.

Thanks,
Maurice

**From:** Arcurio, Josie
**Sent:** Monday, October 22, 2018 5:07 PM
**To:** Bonilla Davila, Ana <ana.bonilladavila@fema.dhs.gov>; Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>; Figueroa Salivia, Liani <liani.figueroasalivia@fema.dhs.gov>
**Cc:** Dickerson, Dawn <dawn.dickerson@fema.dhs.gov>; McRae, Maurice <maurice.mcrae@fema.dhs.gov>; Lee, Alicia <Alicia.Lee@fema.dhs.gov>
**Subject:** Re: Report

No any validation should come from ERO

**From:** Bonilla Davila, Ana
**Sent:** Monday, October 22, 2018 5:05:25 PM
**To:** Arcurio, Josie; Pushkarewicz, Eli; Figueroa Salivia, Liani
**Cc:** Dickerson, Dawn; McRae, Maurice; Lee, Alicia
**Subject:** RE: Report

Liani Figueroa from ERO came over with the report of the complaint from an employee that wants to remain anonymous. I informed Dawn and then share the report with you.
I have not discussed it with the LSS leader.
If that is the way to validate, I can arrange meeting with Dawn and the LSS leader- Pieter De Jong and report back to all. Please advise.

**From:** Arcurio, Josie
**Sent:** Monday, October 22, 2018 4:55 PM
**To:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>; Bonilla Davila, Ana <ana.bonilladavila@fema.dhs.gov>; Figueroa Salivia, Liani <liani.figueroasalivia@fema.dhs.gov>
**Cc:** Dickerson, Dawn <dawn.dickerson@fema.dhs.gov>; McRae, Maurice <maurice.mcrae@fema.dhs.gov>; Lee, Alicia <Alicia.Lee@fema.dhs.gov>
**Subject:** RE: Report

Eli

Not sure if this has all been validated yet – Ana are you aware of any validation?

Thx

2

FEMA - C000225

Josie

---

**From:** Pushkarewicz, Eli
**Sent:** Monday, October 22, 2018 4:53 PM
**To:** Bonilla Davila, Ana <ana.bonilladavila@fema.dhs.gov>; Figueroa Salivia, Liani <liani.figueroasalivia@fema.dhs.gov>
**Cc:** Dickerson, Dawn <dawn.dickerson@fema.dhs.gov>; Arcurio, Josie <Josie.Arcurio@fema.dhs.gov>; McRae, Maurice <maurice.mcrae@fema.dhs.gov>; Lee, Alicia <Alicia.Lee@fema.dhs.gov>
**Subject:** Re: Report

Thank you for forwarding the report. I will ensure this is sent to the COR/CO immediately so that we can address it with the prime contractor.

-Eli

Eli Pushkarewicz
Deployed to DR-4339-PR (CI Unit Lead)
Evaluation and Decision Support
National Preparedness Assessment Division
NPD|FEMA|DHS
Mobile Phone-202-304-9604

---

**From:** Bonilla Davila, Ana
**Sent:** Monday, October 22, 2018 4:31:41 PM
**To:** Figueroa Salivia, Liani
**Cc:** Pushkarewicz, Eli; Dickerson, Dawn; Arcurio, Josie; McRae, Maurice; Lee, Alicia
**Subject:** RE: Report

Liani,
I'm forwarding your communication to Eli and Dawn, which are overseeing LSS Contractor's contract; and to COS team, for their visibility.
Thanks for your report.

Eli/Dawn- this should be added to your report to the Contracting Agent.
Thanks,

Ana M. Bonilla Davila
Chief of Staff - Trainee
Incident Complex – Puerto Rico
FEMA-4339-DR-PR
202-812-5473

---

**From:** Figueroa Salivia, Liani
**Sent:** Monday, October 22, 2018 4:17 PM
**To:** Bonilla Davila, Ana <ana.bonilladavila@fema.dhs.gov>
**Subject:** Report

Good afternoon Ana,

FEMA - C000226

As per your request, below is the summary of the allegations of one of our employees (NCR Sector) against the Sigma (CI contractor). The FEMA employee requested anonymity in the process.

On 10/22/2018, the complainant alleged that Mr. De Jong (contractor) has been creating a hostile workplace environment between their employees. The complainant alleged that FEMA employees witnessed how Mr. De Jong continuously yelled at his employees and almost had a fight with Mark Rozycki on 10/19/2018 at the JRO. Also, the complainant alleged that few days ago, Mr. Barry Angeline took his bag and threw it to the hallway in response of Mr. De Jong requirements. The complainant stated that FEMA employees feel uncomfortable with these behaviors.

ERAD provided the "Your Right to Equal Opportunity" form and explained the EEO process. The complainant decided not to enter on the EEO Process and asked the ERAD to inform the situation to the contractor's supervisor. The COS was informed about the situation and agreed to follow up. The EEO Contact Release form was signed.

No further action required.

If you have any questions, don't hesitate to contact me.

Best regards,


*Liani M. Figueroa Salivia*
Equal Rights Advisor
DR-4339-PR
(202) 340-7637
liani.figueroasalivia@fema.dhs.gov



*~Please consider the environment before printing this email~*

4

**FEMA - C000227**

**Lederer, Mara**

| | |
|---|---|
| **From:** | Pushkarewicz, Eli |
| **Sent:** | Thursday, November 5, 2020 6:12 PM |
| **To:** | Lederer, Mara |
| **Subject:** | Fw: LPN Narrative-Reworked |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Below is another example of a huge issue that arose. The COS asked the LSS contractors to provide a short paragraph about a success LSS had for the operation that could be sent by the COS to the whole operation to recruit staff to take the LSS training. The LSS contractors drafted a statement claiming work that they did not do. They had only attended meeting and provided general validation of work that had already been done by PA before their analysis was even complete. Upon reading this the COS directed me to fix the issue with a very upset Public Assistance Lead while also ensuring LSS could move forward with the classes. To note this was also a symptom that 7 months into the contractors being on island they could not demonstrate a successful project they completed that resulted in  improved FEMA services.

---

**From:** Pushkarewicz, Eli
**Sent:** Tuesday, December 11, 2018 8:16 AM
**To:** Mabry, Marshall <Marshall.Mabry@fema.dhs.gov>
**Cc:** Aldarondo, Tamiris <tamiris.aldarondo@fema.dhs.gov>
**Subject:** Fwd: LPN Narrative-Reworked

FSA see below. LSS replaces their project lead. Their new one is named Rock. I would appreciate your help in connecting with him and helping to make sure he is oriented and we avoid additional issues with PA ops. Thanks!
Eli Pushkarewicz
Deployed to DR-4339-PR (CI Unit Lead)
Evaluation and Decision Support
National Preparedness Assessment Division
NPD|FEMA|DHS
Mobile Phone-202-304-9604

---

**From:** Pushkarewicz, Eli
**Sent:** Monday, December 10, 2018 12:51:33 PM
**To:** Bonilla Davila, Ana; McRae, Maurice
**Cc:** Castano Sanchez, Maria; Rubio, Maite; Aldarondo, Tamiris
**Subject:** RE: LPN Narrative-Reworked

Yes I am. I had also sent them an email separately so they will be aware of the issue.

-Eli

---

**From:** Bonilla Davila, Ana
**Sent:** Monday, December 10, 2018 12:49 PM
**To:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>; McRae, Maurice <maurice.mcrae@fema.dhs.gov>
**Cc:** Castano Sanchez, Maria <maria.castanosanchez@fema.dhs.gov>; Rubio, Maite <maite.rubio@fema.dhs.gov>;

1

FEMA - C000228

Aldarondo, Tamiris <tamiris.aldarondo@fema.dhs.gov>
**Subject:** Re: LPN Narrative-Reworked

Eli- I'm at Nestle with both Rock and Victoria. Can arrange a conference call after we finish Champions training. Are you available around 4:30 PR time?

Get Outlook for iOS

---

**From:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>
**Sent:** Monday, December 10, 2018 1:33 PM
**To:** McRae, Maurice
**Cc:** Bonilla Davila, Ana; Castano Sanchez, Maria; Rubio, Maite; Aldarondo, Tamiris
**Subject:** RE: LPN Narrative-Reworked

Maurice,

As Kristen mentioned in her email, she had expressed concern over the initial draft language. Once I was made aware I brought Rock and Victoria to meet with Angela and her immediately last Weds. Mike Oshaban had been working with Angela directly. From the discussion the take aways:

- LSS's primary stakeholder in the initial LPN request had been Water Sector leadership. This began before Kristen arrived at the JFO when there was no LPN process. As the process was put into place they provided analysis to PA ops that validated the process Kristen put in place to show it was addressing the issues identified with PW87. Angela in particular noted that she was appreciative of the LSS support and was working with Mike to see how they could partner as PA ops moves forward with other process implementation.
- Kristen is correct in that LSS was not working directly with her, as they had been working with Angela.
  - I sat with Rock and Victoria to discuss that they needed to engage Kirsten directly to ensure in the future she was aware of activities intersecting PA.
- Victoria revised the LPN language after the meeting and from the email exchanges Kristen appeared to have approved the revised language.

Prior to us discussing I am going to reach out to Victoria and Rock asap to see if there had been any difference in the email communication verse what Kristen had reviewed. Can we discuss tomorrow morning or late this afternoon?

-Eli

---

**From:** McRae, Maurice
**Sent:** Monday, December 10, 2018 11:56 AM
**To:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>
**Cc:** Bonilla Davila, Ana <ana.bonilladavila@fema.dhs.gov>; Castano Sanchez, Maria <maria.castanosanchez@fema.dhs.gov>; Rubio, Maite <maite.rubio@fema.dhs.gov>
**Subject:** FW: LPN Narrative-Reworked

Hello Eli,

This email communication is concerning in the least. Let's schedule a time to discuss.

Thanks,
Maurice

---

**From:** Hodge, Kristen
**Sent:** Monday, December 10, 2018 8:21 AM

2

**FEMA - C000229**

**To:** McRae, Maurice <maurice.mcrae@fema.dhs.gov>
**Cc:** Starr, Angela (CTR) <angela.starr@associates.fema.dhs.gov>
**Subject:** RE: LPN Narrative-Reworked

Hello Maurice

I'm not sure if you're the person I should be bringing this up to but I read the LSS success story that was sent out (V6 attached) and I'm very upset by what it states. On Tuesday, Dec. 4, I received the draft of this document (V2 attached) and told Eli Pushkarewicz that it was completely inaccurate. He brought 2 LSS representatives – Victoria Colmenero and Rock (Brock?. Can't recall last name) – to speak with me and Angela Starr, LPN POC, at which time I made it clear to everyone that the draft success story was wholly inaccurate, that LSS had no input whatsoever in the LPN process, and it needed to be changed to better reflect LSS's involvement (which was only to measure the change rate of the LPN approvals). Victoria Colmenero apologized for the misstatements in the V2 draft, sent the V4 draft (attached) for my review, which I "approved".

According to the opening paragraph in V6 of the Success Story (which was sent to All Hands), PA Ops "…successfully used LSS to provide improved processes and improvement projects." and "…leveraged LSS capabilities for data and analysis support." It further goes on to state that "PA-Ops coordinated with Continuous Improvement (CI) and LSS to identify root causes; they then took actions to remedy PW process challenges, which established the new LPN process. PA-Ops collaborated with LSS to add a quantitative layer of awareness that could inform and validate the new process moving forward. LSS charted the root causes,…, to help the Champion and Stakeholders better visualize and prioritize problem areas."

All of the above statements are false. At no time did I coordinate with Continuous Improvement and LSS to identify root causes. All root causes were identified by me and all actions to improve the LPN process were created and implemented by me within 2 weeks of my arrival to DR-4339. I named Angela Starr in the PA Correspondence Unit the POC for LPNs, instructed her to monitor EMMIE for projects whose federal cost share would equal or be greater than $1 million, and once identified, to begin drafting the LPN matrices (and/or longer, more comprehensive OMB informational document for projects over $20 million) to accelerate the LPN process. I also told her to work directly with Sector staff to flush out any discrepancies or confusion in the PWs to ensure the matrices/information document was clear. It should also be noted that during HQ PA's visit to PR in Sept./Oct. 2018, I arranged a meeting between Angela and Seema Narine (HQ PA) to get additional guidance on the specific information HQ PA/OMB required on the matrices, etc.

I did have one meeting with LSS earlier in my PR deployment but that meeting provided zero guidance to me; it was sales pitch. I want to state unequivocally that LSS and CI had no input whatsoever into the improved LPN process, nor did they provide any guidance or was any guidance sought from them to improve the LPN process. In fact, LSS initially reached out to Angela, asked her to describe the LPN process, questioned its validity (per Angela's recollection), were given a copy of the LPN Dashboard (which was created in PA Ops), shown where to find the LPN Dashboard on the PR SharePoint site, which they used for their rate time analysis. Angela did offer to work with LSS to integrate the LPN process into Grants Manager *after* they analyzed the current LPN process.

I consider myself to be the consummate team player. But, I take offense when others use my and my teammates' hard work to further their own agendas and justify their existence. When I spoke with LSS and Eli earlier this week, I thought everyone was in agreement that LSS and CI had no input into the LPN Process so it's rather upsetting to see the complete opposite being depicted, particularly since there are several people within PA Ops who have worked tirelessly to make this process a success.

Thank you for taking the time to read my email. I hope you can understand my frustration.

Kristen

Kristen A. Hodge

3

FEMA - C000230

340.626.6467 (M)
kristen.hodge@fema.dhs.gov

---

**From:** Colmenero, Victoria (CTR)
**Sent:** Wednesday, December 5, 2018 2:31 PM
**To:** Starr, Angela (CTR) <angela.starr@associates.fema.dhs.gov>; Hodge, Kristen <Kristen.Hodge@fema.dhs.gov>
**Subject:** LPN Narrative-Reworked

Hi Kristen and Angela,

Thank you for your time today. I've reworked the narrative. I want you two to see it first before I socialize to anyone else.  I've put the narrative in a context of PA-Ops' success story, which was enhanced because of the application of LSS tools.  I hope this is more factual and represents your group well and also motivates other sections to want to apply an LSS approach/tools.

LSS is supposed to be marketing themselves as a tool, a methodology, a capability, NOT a group of 8 individuals, so I've tried to be careful in referencing LSS as a person or a group. The idea is that LSS is an initiative that will be self-sustaining after a slow transition over to FEMA.

I look forward to hearing from you,


Victoria A. Colmenero
Emergency Management Planner
victoria.colmenero@associates.fema.dhs.gov
571-328-2070

4

**FEMA - C000231**

## Lederer, Mara

| | |
|---|---|
| **From:** | Pushkarewicz, Eli |
| **Sent:** | Thursday, November 5, 2020 4:02 PM |
| **To:** | Lederer, Mara |
| **Subject:** | Fw:  LSS Group |
| **Attachments:** | LSS Contract Termination v2.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

I was forwarded this as at the time of the contract not being extended to another traunch I was no longer involved in the JFO direct discussions.

---

**From:** Aldarondo, Tamiris <tamiris.aldarondo@fema.dhs.gov>
**Sent:** Monday, May 20, 2019 11:16 AM
**To:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>
**Subject:** FW: LSS Group

Hi Eli,

I hope you're doing great and enjoying your vacation!
I'm forwarding some information for your awareness. Please feel free to give me a call once you're back.

Thank you,

**Tamiris Aldarondo**
DR 4339 - PR | Continuous Improvement Program
Acting Unit Lead
Phone: 202-538-2651

Click here to find AARs, knowledge products, or give feedback on a disaster operation.

---

**From:** Aldarondo, Tamiris
**Sent:** Friday, May 17, 2019 6:23 PM
**To:** Carreiro, Gretchen <Gretchen.Carreiro@fema.dhs.gov>; Figueroa Salivia, Liani <liani.figueroasalivia@fema.dhs.gov>; Lane, Rhonda <Rhonda.Lane@fema.dhs.gov>; Hurst, Jessica <jessica.hurst@fema.dhs.gov>
**Cc:** Wade, Stephanie A <stephaniea.wade@fema.dhs.gov>; Lenox, Dominique <dominique.lenox@fema.dhs.gov>; Boudrye, Melissa <melissa.boudrye@fema.dhs.gov>; Bonilla Davila, Ana <ana.bonilladavila@fema.dhs.gov>
**Subject:** LSS Group

Good afternoon all,

I hope you're all doing well!
I'm forwarding an email I received today from Barry Angeline, one of the Lean Six Sigma Contractors. As most of you know, our office submitted a request yesterday to terminate the LSS Contract on the basis of government convenience. The request for termination stems from an effort to better utilize Federal funding and be good stewards of tax payer dollars since we have now developed the internal capability to conduct the process-improvement methodologies the contract provided. I was asked this morning by the contractors if Leadership is thinking of cutting the contract, which I did not answer as we've been instructed only to discuss these matters with the COR. This afternoon I received the email

1

**FEMA - C000232**

below.

To make things clear, neither the COS or myself have received any communications or complaints from the LSS team regarding waste, fraud, abuse, and mismanagement associated with the execution of the LSS contract from the team. Furthermore, all actions taken regarding team projects and workload have been directly, and only, related to their performance and conduct. On May 15, Mr. Kwong Hui, who is part of the Prime for this contract, openly acknowledged that the LSS team members' attitudes have been a critical impediment to their performance and that they would like to make changes to the team because of this.

I have discussed these matters with Equal Rights Advisor Lead, Liani Figueroa, and will proceed to document all past performance, conduct, and potential liabilities. You are receiving this email for visibility purposes and to provide guidance in your area of expertise, which we kindly welcome.

Thank you,

**Tamiris Aldarondo**
DR 4339 - PR | Continuous Improvement Program
Acting Unit Lead
Phone: 202-538-2651

Click here to find AARs, knowledge products, or give feedback on a disaster operation.

---

**From:** Angeline, Barry (CTR)
**Sent:** Friday, May 17, 2019 3:01 PM
**To:** Aldarondo, Tamiris <tamiris.aldarondo@fema.dhs.gov>
**Cc:** Haveman, William (CTR) <william.haveman@associates.fema.dhs.gov>; dan.mccabe@live.com; Oshaben, Michael (CTR) <michael.oshaben@associates.fema.dhs.gov>; Rozycki, Mark (CTR) <mark.rozycki@associates.fema.dhs.gov>; Mark Woodhouse <mtwchw@msn.com>; Wykosky, Jeffrey (CTR) <jeffrey.wykosky@associates.fema.dhs.gov>
**Subject:** URGENT: Whistleblower Status for LSS Group
**Importance:** High

Tami:

This email is being sent on behalf of myself, Bill Haveman, Dan McCabe, Mike Oshaben, Mark Rozycki, Mark Woodhouse, and Jeff Wykosky.

In late 2018, the LSS team alerted Rep. Dana Rohrabacher's office of waste, fraud, abuse, and mismanagement associated with the execution of the LSS contract as well as other irregularities we observed during this recovery.  Subsequently, we began working with Rep. Brad Wenstrup and Rep. Jim Jordan on these issues.  (Rep. Jordan is the ranking member of the House Committee on Oversight and Reform.)   In addition, we have filed three separate claims with the DHS OIG and have met with four local OIG investigators at their request. The third OIG complaint specifically addresses actions that you have taken that raise serious ethics, compliance, and mismanagement concerns.  We have also filed an EEO complaint through our prime contractor, ATCS, related to derogatory remarks that you have made to other people related to our age, race, and gender.

Last month, the DHS Whistleblower Coordinator acknowledged receipt of our claims made to both members of Congress and the OIG.  He has confirmed that the team is protected from retaliatory action per the Whistleblower Protection Act.  The Crowell & Moring law firm in Washington DC will be retained as a preventive measure should any retaliatory action occur.

**Repeatedly and for many months now, we have tried to raise our concerns through FEMA's chain of command up to the FCO's office.  ATCS was also repeatedly warned that this contract was being grossly mismanaged and corrective action needed to be taken.**  These concerns have resulted in no discernable corrective action.  Because the situation is

2

FEMA - C000233

deteriorating, it would be best for all to discuss the issues, develop a productive way ahead, and avoid further escalation/litigation.

Regards,
The LSS Team

3

**FEMA - C000234**

## Lederer, Mara

| | |
|---|---|
| **From:** | Pushkarewicz, Eli |
| **Sent:** | Thursday, November 5, 2020 6:51 PM |
| **To:** | Lederer, Mara |
| **Subject:** | Fw: OKRs |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

See below for another example. Patrick Toughy was the FCO Advisor/ FDRC Coordinator. When I received feedback from stakeholders I forwarded it to Pieter to remediate the issues. You can also note they often did not schedule time with the stakeholders, would walk into offices and ask for immediate time, then take informal feedback as approval.

---

**From:** De Jong, Pieter <pieter.dejong@associates.fema.dhs.gov>
**Sent:** Thursday, October 25, 2018 4:48 PM
**To:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>
**Cc:** Angeline, Barry (CTR) <barry.angeline@associates.fema.dhs.gov>; Bulent Senner <ilps19@me.com>; Bernard Gomez, Christian <Christian.BernardGomez@fema.dhs.gov>; Jeff Wykosky <jwykosky@gmail.com>; Rozycki, Mark (CTR) <mark.rozycki@associates.fema.dhs.gov>; Mccabe, Clifford (CTR) <clifford.mccabe@associates.fema.dhs.gov>; Oshaben, Michael (CTR) <michael.oshaben@associates.fema.dhs.gov>; De Jong, Pieter <pieter.dejong@associates.fema.dhs.gov>; Santiago Rivera, Evelyn <evelyn.santiagorivera@fema.dhs.gov>; Haveman, William (CTR) <william.haveman@associates.fema.dhs.gov>
**Subject:** RE: OKRs

Eli:

Let me circle around with several of the Team members who worked on the last round of revisions.

We will get this right, address your comments and let you know when the revisions are in MAX TRAX for your review.

I'll get back to you tomorrow with an update by early afternoon.

Pieter

1

FEMA - C000235

**From:** Pushkarewicz, Eli
**Sent:** Thursday, October 25, 2018 12:30 PM
**To:** De Jong, Pieter <pieter.dejong@associates.fema.dhs.gov>
**Cc:** Dickerson, Dawn <dawn.dickerson@fema.dhs.gov>; Fox, Russell <Russell.Fox@fema.dhs.gov>; Mabry, Marshall <Marshall.Mabry@fema.dhs.gov>; Haveman, William (CTR) <william.haveman@associates.fema.dhs.gov>; Barry Angeline <bangeline@novaces.com>
**Subject:** FW: OKRs


Pieter,


I reached out to Patrick as there are still a couple areas that are not in alignment with the OKR structure. Please see below email so that we are on the same page regarding the fact that Patrick's feedback should not be interpreted as an endorsement of the LSS OKR content. You can choose to leave your content as is but below is a reiteration of my comments regarding them:

- First you have way to many. You should have no more then 3-5 per objective.
- Under Objective 4 you have "number of RIEs" listed several times
  - once general with a target of 6
  - once stating for sectors and programs with a target of 6
  - then once for external customers
  - I recommend combining the first two bullets
- You have blurred tactics with key results, example "Process Established for Maintaining LSS Integrity via Tollgate Reviews". Additionally I would argue that this KR has no correlation to building Resilience and Sustainability ( which is a mitigation & preparedness objective)
- Additionally the KR language does not describe a measurable outcome for a result. Example "Best practice sharing". A key result is what the outcome is for what you are doing to enhance or develop a process related to best practice sharing. An example would be " Create a standard process for best practice sharing among the five Municipality branches.
  - Another example is you say " active blackbelts"; If I read what you put into the description the language should be " Develop black belts in 70% of Sectors/Sections.
- Has the establishment of a Regular Process Improvement Council been briefed and approved by CI and the COS? If the COS has not concurred **it will not** be briefed to the FCO.
- Here is a link to examples http://okrexamples.co/administrative-operations-okr-examples
- Many of your major muscle movements are not explicitly covered

If you have questions please feel free to call.

-Eli

**From:** Tuohy, Patrick
**Sent:** Thursday, October 25, 2018 9:28 AM
**To:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>; Holt, Brian <brian.holt@fema.dhs.gov>
**Cc:** Boyle, John <john.boyle@fema.dhs.gov>
**Subject:** RE: OKRs

Hi Eli,

I'll be honest here, I only gave a cursory review but process for requesting feedback was not good.  I realize the team is excited and chomping at the bit, however, the team came in unannounced and unscheduled to have John and I react

2

FEMA - C000236

live.  I quickly looked through and my hot take quick notes were that they had too many acronyms and too many key results and that I would review but need time.  A few hours later I was approached while I was in the middle of a conference call to ask if I had reviewed them, I advised  no but they looked good initially and tracking in right direction.

2 Gaps I have is that 1.  I am not a LSS SME.  90% of what I looked at I do not have the baseline knowledge to even know what they mean.   2. Time.  The Advisory group is getting thin, Mr. Boyle is leaving, Im getting pulled into USVI conversation, trainings and all interagency duties.  Therefore,  LSS is low on my priority list.  Please feel free to have CI and you provide feedback.  I need the help.

One update is that Mike is asking planning to be business intelligence unit and to manage OKRs.  He is also wants sectors to own it more.

---

**From:** Pushkarewicz, Eli
**Sent:** Thursday, October 25, 2018 8:46 AM
**To:** Tuohy, Patrick <patrick.tuohy@fema.dhs.gov>; Holt, Brian <brian.holt@fema.dhs.gov>
**Subject:** FW: OKRs

Patrick,

I wanted to check in. Did you review the LSS OKRs, as they stated you approved and told them they were all done correctly? I don't want to give them mixed messages and thought they are still a bit off.

-Eli

---

**From:** De Jong, Pieter
**Sent:** Thursday, October 25, 2018 8:35 AM
**To:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>; Dickerson, Dawn <dawn.dickerson@fema.dhs.gov>; Fox, Russell <Russell.Fox@fema.dhs.gov>; Mabry, Marshall <Marshall.Mabry@fema.dhs.gov>
**Cc:** Haveman, William (CTR) <william.haveman@associates.fema.dhs.gov>; Barry Angeline <bangeline@novaces.com>
**Subject:** FW: OKRs

Eli:

See trailing email from Bill Haveman.

The revised OKRs were reviewed and approved by Patrick

They revisions are in MAX TRAX.

Y/R

Pieter

---

**From:** Haveman, William (CTR)
**Sent:** Wednesday, October 24, 2018 4:13 PM
**To:** De Jong, Pieter <pieter.dejong@associates.fema.dhs.gov>
**Cc:** De Jong, Pieter <pieter.dejong@associates.fema.dhs.gov>; Angeline, Barry (CTR) <barry.angeline@associates.fema.dhs.gov>; Oshaben, Michael (CTR) <michael.oshaben@associates.fema.dhs.gov>; Jeff Wykosky <jwykosky@gmail.com>; Mccabe, Clifford (CTR) <clifford.mccabe@associates.fema.dhs.gov>; Rozycki, Mark (CTR) <mark.rozycki@associates.fema.dhs.gov>
**Subject:** OKRs

3

FEMA - C000237

Good afternoon

We are updating the OKRs with the following changes

Changed number of RIE's to your verbiage.

The ones you are looking for the metrics the metrics were entered as we were trained to do by Mike D'Orville (CIP) they are in the second layer. Let us know if you would like that changed. We met with Patrick Tuohy and he liked the way we did it and said it was the correct way and place for the data.

For the "Establishment of a Regular Process Improvement Council" We chose to leave it in pending our next FCO meeting. This is on the agenda to discuss with Mike Byrne.

The other two that you suggested to remove we feel that though they are internal, they are imperative to the success of building a sustainable LSS presence in FEMA Puerto Rico.

Thanks

Bill

William Haveman

LSS MBB

Lean Six Sigma Program | DR-4336 & DR4339 PR

Dept of Homeland Security | Federal Emergency Management Agency

Ph. 202-705-7351 | (E) william.haveman@associates.fema.dhs.gov

4

## Lederer, Mara

| | |
|---|---|
| **From:** | Pushkarewicz, Eli |
| **Sent:** | Thursday, November 5, 2020 7:49 PM |
| **To:** | Lederer, Mara |
| **Subject:** | FW: Question on the LSS weekly |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Example of communications to LSS when they moved ahead on actions contrary to want they agreed upon with Public Assistance leadership and the COS.

---

**From:** Pushkarewicz, Eli
**Sent:** Monday, September 3, 2018 5:58 PM
**To:** Pieter De Jong (pieter.dejong@associates.fema.dhs.gov) <pieter.dejong@associates.fema.dhs.gov>
**Cc:** DICKERSON, DAWN <dawn.dickerson@fema.dhs.gov>; Barry Angeline <bangeline@novaces.com>
**Subject:** Question on the LSS weekly

Pieter,

I noticed on your weekly report that it was listed "Program Survey123 site inspection program for Health and Social services sector". From previous conversations was it not agreed with PA that all pilot activities were on hold until the LSS team concluded a pilot. Additionally that both Ana and I were waiting on the Transportation pilot schedule?

Let's chat tomorrow morning please.

-Eli

Eli Pushkarewicz
Deployed to DR-4339-PR (CI Unit Lead)
Evaluation and Decision Support
National Preparedness Assessment Division
NPD|FEMA|DHS
Mobile Phone-202-304-9604

FEMA - C000239

## Lederer, Mara

| | |
|---|---|
| **From:** | Pushkarewicz, Eli |
| **Sent:** | Thursday, November 5, 2020 6:51 PM |
| **To:** | Lederer, Mara |
| **Subject:** | Fw: OKRs |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

See below for another example. Patrick Toughy was the FCO Advisor/ FDRC Coordinator. When I received feedback from stakeholders I forwarded it to Pieter to remediate the issues. You can also note they often did not schedule time with the stakeholders, would walk into offices and ask for immediate time, then take informal feedback as approval.

---

**From:** De Jong, Pieter <pieter.dejong@associates.fema.dhs.gov>
**Sent:** Thursday, October 25, 2018 4:48 PM
**To:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>
**Cc:** Angeline, Barry (CTR) <barry.angeline@associates.fema.dhs.gov>; Bulent Senner <ilps19@me.com>; Bernard Gomez, Christian <Christian.BernardGomez@fema.dhs.gov>; Jeff Wykosky <jwykosky@gmail.com>; Rozycki, Mark (CTR) <mark.rozycki@associates.fema.dhs.gov>; Mccabe, Clifford (CTR) <clifford.mccabe@associates.fema.dhs.gov>; Oshaben, Michael (CTR) <michael.oshaben@associates.fema.dhs.gov>; De Jong, Pieter <pieter.dejong@associates.fema.dhs.gov>; Santiago Rivera, Evelyn <evelyn.santiagorivera@fema.dhs.gov>; Haveman, William (CTR) <william.haveman@associates.fema.dhs.gov>
**Subject:** RE: OKRs

Eli:

Let me circle around with several of the Team members who worked on the last round of revisions.

We will get this right, address your comments and let you know when the revisions are in MAX TRAX for your review.

I'll get back to you tomorrow with an update by early afternoon.

Pieter

1

**FEMA - C000240**

**From:** Pushkarewicz, Eli
**Sent:** Thursday, October 25, 2018 12:30 PM
**To:** De Jong, Pieter <pieter.dejong@associates.fema.dhs.gov>
**Cc:** Dickerson, Dawn <dawn.dickerson@fema.dhs.gov>; Fox, Russell <Russell.Fox@fema.dhs.gov>; Mabry, Marshall <Marshall.Mabry@fema.dhs.gov>; Haveman, William (CTR) <william.haveman@associates.fema.dhs.gov>; Barry Angeline <bangeline@novaces.com>
**Subject:** FW: OKRs

Pieter,

I reached out to Patrick as there are still a couple areas that are not in alignment with the OKR structure. Please see below email so that we are on the same page regarding the fact that Patrick's feedback should not be interpreted as an endorsement of the LSS OKR content. You can choose to leave your content as is but below is a reiteration of my comments regarding them:

- First you have way to many. You should have no more then 3-5 per objective.
- Under Objective 4 you have "number of RIEs" listed several times
  - once general with a target of 6
  - once stating for sectors and programs with a target of 6
  - then once for external customers
  - I recommend combining the first two bullets
- You have blurred tactics with key results, example "Process Established for Maintaining LSS Integrity via Tollgate Reviews". Additionally I would argue that this KR has no correlation to building Resilience and Sustainability ( which is a mitigation & preparedness objective)
- Additionally the KR language does not describe a measurable outcome for a result. Example "Best practice sharing". A key result is what the outcome is for what you are doing to enhance or develop a process related to best practice sharing. An example would be " Create a standard process for best practice sharing among the five Municipality branches.
  - Another example is you say " active blackbelts"; If I read what you put into the description the language should be " Develop black belts in 70% of Sectors/Sections.
- Has the establishment of a Regular Process Improvement Council been briefed and approved by CI and the COS? If the COS has not concurred **it will not** be briefed to the FCO.
- Here is a link to examples http://okrexamples.co/administrative-operations-okr-examples
- Many of your major muscle movements are not explicitly covered

If you have questions please feel free to call.

-Eli

**From:** Tuohy, Patrick
**Sent:** Thursday, October 25, 2018 9:28 AM
**To:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>; Holt, Brian <brian.holt@fema.dhs.gov>
**Cc:** Boyle, John <john.boyle@fema.dhs.gov>
**Subject:** RE: OKRs

Hi Eli,

I'll be honest here, I only gave a cursory review but process for requesting feedback was not good.   I realize the team is excited and chomping at the bit, however, the team came in unannounced and unscheduled to have John and I react

2

FEMA - C000241

live.  I quickly looked through and my hot take quick notes were that they had too many acronyms and too many key results and that I would review but need time.  A few hours later I was approached while I was in the middle of a conference call to ask if I had reviewed them, I advised  no but they looked good initially and tracking in right direction.

2 Gaps I have is that 1.  I am not a LSS SME.  90% of what I looked at I do not have the baseline knowledge to even know what they mean.   2. Time.  The Advisory group is getting thin, Mr. Boyle is leaving, Im getting pulled into USVI conversation, trainings and all interagency duties.  Therefore,  LSS is low on my priority list.  Please feel free to have CI and you provide feedback.  I need the help.

One update is that Mike is asking planning to be business intelligence unit and to manage OKRs.  He is also wants sectors to own it more.

---

**From:** Pushkarewicz, Eli
**Sent:** Thursday, October 25, 2018 8:46 AM
**To:** Tuohy, Patrick <patrick.tuohy@fema.dhs.gov>; Holt, Brian <brian.holt@fema.dhs.gov>
**Subject:** FW: OKRs

Patrick,

I wanted to check in. Did you review the LSS OKRs, as they stated you approved and told them they were all done correctly? I don't want to give them mixed messages and thought they are still a bit off.


-Eli

---

**From:** De Jong, Pieter
**Sent:** Thursday, October 25, 2018 8:35 AM
**To:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>; Dickerson, Dawn <dawn.dickerson@fema.dhs.gov>; Fox, Russell <Russell.Fox@fema.dhs.gov>; Mabry, Marshall <Marshall.Mabry@fema.dhs.gov>
**Cc:** Haveman, William (CTR) <william.haveman@associates.fema.dhs.gov>; Barry Angeline <bangeline@novaces.com>
**Subject:** FW: OKRs

Eli:

See trailing email from Bill Haveman.

The revised OKRs were reviewed and approved by Patrick

They revisions are in MAX TRAX.

Y/R

Pieter

---

**From:** Haveman, William (CTR)
**Sent:** Wednesday, October 24, 2018 4:13 PM
**To:** De Jong, Pieter <pieter.dejong@associates.fema.dhs.gov>
**Cc:** De Jong, Pieter <pieter.dejong@associates.fema.dhs.gov>; Angeline, Barry (CTR) <barry.angeline@associates.fema.dhs.gov>; Oshaben, Michael (CTR) <michael.oshaben@associates.fema.dhs.gov>; Jeff Wykosky <jwykosky@gmail.com>; Mccabe, Clifford (CTR) <clifford.mccabe@associates.fema.dhs.gov>; Rozycki, Mark (CTR) <mark.rozycki@associates.fema.dhs.gov>
**Subject:** OKRs

FEMA - C000242

Good afternoon
We are updating the OKRs with the following changes
Changed number of RIE's to your verbiage.
The ones you are looking for the metrics the metrics were entered as we were trained to do by Mike D'Orville (CIP) they are in the second layer. Let us know if you would like that changed. We met with Patrick Tuohy and he liked the way we did it and said it was the correct way and place for the data.
For the "Establishment of a Regular Process Improvement Council" We chose to leave it in pending our next FCO meeting. This is on the agenda to discuss with Mike Byrne.
The other two that you suggested to remove we feel that though they are internal, they are imperative to the success of building a sustainable LSS presence in FEMA Puerto Rico.
Thanks
Bill

William Haveman
LSS MBB
Lean Six Sigma Program | DR-4336 & DR4339 PR
Dept of Homeland Security | Federal Emergency Management Agency
Ph. 202-705-7351 | (E) william.haveman@associates.fema.dhs.gov

4

FEMA - C000243

**Lederer, Mara**

---

| | |
|---|---|
| **From:** | Pushkarewicz, Eli |
| **Sent:** | Thursday, November 5, 2020 4:00 PM |
| **To:** | Lederer, Mara |
| **Subject:** | Fw: PR LSS team experience |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

The email below is from the Director of ORR Doctrine and Policy. It was collected per the request of the Puerto Rico JRO after the several of the LSS contractors reported they had gone to OIG, and I was asked to forward additional statements from key field stakeholders documenting the wide spread performance issues.

-Eli

---

**From:** Applebee, Brian
**Sent:** Wednesday, May 29, 2019 10:22 AM
**To:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>
**Subject:** PR LSS team experience

Eli,

This note is regarding a previous conversation we had in Puerto Rico about the Lean Six Sigma contract team. The concern I had at the time was my lack of understanding at how they, the contractors, were assisting the JRO in change management. When I was asked to come down to PR to help with the incident strategic planning effort, I was excited that we were given the opportunity to inculcate a campaign-style planning effort to outline the long-term FEMA Recovery operations. Surveying the planning team and the JRO construct in total, there was a deep need for managing change in approaches.

I met a couple of times with the contract team; once with the entire team, and once with a few of the "lead thinkers". I tried to convey that a team of experts in efficiency improvement and change management would greatly help with the inculcation process we needed to get started. The LSS team seemed more interested in selling their LSS methodology than finding and addressing problems with the change management of FEMA recovery programs and operations becoming outcome driven. Maybe there was something lost in the translation, or possibly an unwillingness to stray from or adapt the LSS doctrinal methodology. Over the three weeks we were there assisting with getting the PR Annual Implementation Plan established, there was no involvement from the LSS team from my perspective.

Where I thought these LSS experts would be perfect to assist in planning process and execution improvement, I saw little value from the team. Again, it may have been a misunderstanding on my part as to the LSS team's role and function at the JRO, but they seemed most interested in their "brand" and methodology.

Please let me know if I can be of further assistance.

-Brian

Brian T. Applebee
Acting Director, Doctrine and Policy Office
Office of Response and Recovery
FEMA

1

**FEMA - C000244**

O: (202) 646-4273
C: (202) 365-9403
Brian.Applebee@fema.dhs.gov

FEMA - C000245

# Lederer, Mara

**From:** Pushkarewicz, Eli
**Sent:** Thursday, November 5, 2020 6:40 PM
**To:** Lederer, Mara
**Subject:** Fw: DRAFT - LSS Talking Points
**Attachments:** Talking Points - Video Message to Lean Six Sigma Champions Training Participants v1.docx; Talking Points - FCO Monday Minute - Lean Six Sigma v1.docx

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

FSA as you can see the COS was concerned with performance issues in relation to FCO/COS decisions on moving forward with the LSS training.

---

**From:** Arcurio, Josie <Josie.Arcurio@fema.dhs.gov>
**Sent:** Thursday, November 1, 2018 10:37 PM
**To:** Mabry, Marshall <Marshall.Mabry@fema.dhs.gov>; McRae, Maurice <maurice.mcrae@fema.dhs.gov>; Dugan, Dennis <dennis.dugan@fema.dhs.gov>; Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>; Fox, Russell <Russell.Fox@fema.dhs.gov>; Santiago De Jesus, Guanina <guanina.santiagodejesus@fema.dhs.gov>; Dickerson, Dawn <dawn.dickerson@fema.dhs.gov>
**Cc:** Bonilla Davila, Ana <ana.bonilladavila@fema.dhs.gov>
**Subject:** RE: DRAFT - LSS Talking Points

Edits attached – my only concern with sending this now is that the contractor has to provide remediation results by next week – this going out may give the wrong message that we are continuing regardless of performance issues…….  Thoughts?

---

**From:** Mabry, Marshall
**Sent:** Thursday, November 1, 2018 5:29 PM
**To:** Arcurio, Josie <Josie.Arcurio@fema.dhs.gov>; McRae, Maurice <maurice.mcrae@fema.dhs.gov>; Dugan, Dennis <dennis.dugan@fema.dhs.gov>; Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>; Fox, Russell <Russell.Fox@fema.dhs.gov>; Santiago De Jesus, Guanina <guanina.santiagodejesus@fema.dhs.gov>; Dickerson, Dawn <dawn.dickerson@fema.dhs.gov>
**Cc:** Bonilla Davila, Ana <ana.bonilladavila@fema.dhs.gov>
**Subject:** FW: DRAFT - LSS Talking Points

Hi All,
Please review these two talking point docs for Mike Byrne and get back to me tomorrow morning on any points to incorporate. Thanks for all your support. /m



Marshall Mabry    845-325-0283
FEMA  Region II     DR-4339-PR
marshall.mabry@fema.dhs.gov
Continuous Improvement Program

1

**FEMA - C000246**

2

**FEMA - C000247**

**Lederer, Mara**

| | |
|---|---|
| **From:** | Pushkarewicz, Eli |
| **Sent:** | Thursday, November 5, 2020 6:37 PM |
| **To:** | Lederer, Mara |
| **Subject:** | Fw: LSS Contract followup |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Please see below. It details information related to the FCO having requested the contractors be documented for poor performance. While in DC I met with the COR and the Prime to discuss the issues. The Prime then traveled to PR to meet with the FCO and discuss the performance improvement plan the Prime proposed. To note a key condition was that they were to "ensure the contractors are self-sufficient in that the CI Unit will only be required to provide operational oversight and the COS office only strategic guidance and approval of projects. LSS will no longer require the significant manpower and management actions that its current performance necessitates."

---

**From:** Pushkarewicz, Eli
**Sent:** Monday, November 5, 2018 8:28 AM
**To:** Tim McCormick <tmccormick@atcsplc.com>
**Subject:** Re: LSS Contract followup

Morning,

I sent your first email to Shirley to schedule . Travel safe !

Eli Pushkarewicz
Deployed to DR-4339-PR (CI Unit Lead)
Evaluation and Decision Support
National Preparedness Assessment Division
NPD|FEMA|DHS
Mobile Phone-202-304-9604

---

**From:** Tim McCormick <tmccormick@atcsplc.com>
**Sent:** Monday, November 5, 2018 8:26:48 AM
**To:** Pushkarewicz, Eli
**Cc:** Carreiro, Gretchen; Dickerson, Dawn; De Jong, Pieter
**Subject:** Re: LSS Contract followup

Eli,

Either Wednesday or Thursday would be the best days for me to meet with CAD leadership.

Thanks!

Tim

Thanks!

1

**FEMA - C000248**

Tim McCormick
Vice President, Emergency Management Services

2553 Dulles View Drive, Suite 300 | Herndon, VA 20171

703-887-1533
atcsplc.com
CLIENT ▪ EMPLOYEE ▪ COMPANY ▪ COMMUNITY

---

**From:** Tim McCormick
**Sent:** Monday, November 5, 2018 8:07:34 AM
**To:** Pushkarewicz, Eli
**Cc:** Carreiro, Gretchen; Dickerson, Dawn; pieter.dejong@associates.fema.dhs.gov
**Subject:** Re: LSS Contract followup

Eli,

I'm on the 8:00 JetBlue flight to San Juan this morning. My return is set for 7:00 PM on Thursday.  Safe travels.  See you in San Juan.

Thanks!

Tim McCormick
Vice President, Emergency Management Services
2553 Dulles View Drive, Suite 300 | Herndon, VA 20171
703-887-1533
atcsplc.com
CLIENT ▪ EMPLOYEE ▪ COMPANY ▪ COMMUNITY

---

**From:** Pushkarewicz, Eli <eli.pushkarewicz@fema.dhs.gov>
**Sent:** Monday, November 5, 2018 7:59:07 AM
**To:** Tim McCormick
**Cc:** Carreiro, Gretchen; Dickerson, Dawn
**Subject:** Re: LSS Contract followup

Tim,

I am headed to PR for a unexpected trip this week. See below from Shirley regarding when you would like to meet with Mike. I will then schedule it with the CI Unit lead, COS and VTC Mike in from PR.

-Eli

Eli Pushkarewicz
Deployed to DR-4339-PR (CI Unit Lead)
Evaluation and Decision Support
National Preparedness Assessment Division
NPD|FEMA|DHS
Mobile Phone-202-304-9604

---

**From:** Rivera Ayala, Shirley
**Sent:** Monday, November 5, 2018 7:56:57 AM

2

FEMA - C000249

**To:** Pushkarewicz, Eli
**Subject:** RE: LSS Contract followup

Good morning Eli,

I showed the email to Mr. Byrne. He was very pleased with the actions. The meeting with Tim can be a VTC. He doesn't have to come to USVI.

Could you please share with me his travel schedule so that I can accommodate this meeting on Mr. Byrne's calendar?

Thanks!


Best Regards,


## Shirley M. Rivera Ayala
Special Assistant to the Acting CAD Director/FCO-FDRC, Michael F. Byrne
Department of Homeland Security
Federal Emergency Management Agency
DR-4336-Irma - PR
DR-4339-Maria - PR
DR-4335-Irma - VI
DR-4340-Maria – VI

FEMA Cell: (202) 717-6464
Email: shirley.riveraayala.2@fema.dhs.gov




*"FEMA's mission is to support our citizens and first responders to ensure that as a nation we work together to build, sustain, and improve our capability to prepare for, protect against, respond to, recover from, and mitigate all hazards."*


*This communication, along with any attachments, is For Official Use Only and is intended for internal use by the originating agency. It is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information. It should not be forwarded without permission from the originator. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, use or copying of this message is strictly prohibited. If you have received this in error, please reply immediately to the sender and delete this message. Thank you.*

---

**From:** Pushkarewicz, Eli
**Sent:** Friday, November 2, 2018 7:58 AM

FEMA - C000250

**To:** Rivera Ayala, Shirley <shirley.riveraayala.2@fema.dhs.gov>
**Subject:** FW: LSS Contract followup

**From:** Pushkarewicz, Eli
**Sent:** Thursday, November 1, 2018 5:58 PM
**To:** Arcurio, Josie <Josie.Arcurio@fema.dhs.gov>; Bonilla Davila, Ana <ana.bonilladavila@fema.dhs.gov>; McRae, Maurice <maurice.mcrae@fema.dhs.gov>
**Cc:** Mabry, Marshall <Marshall.Mabry@fema.dhs.gov>; Dickerson, Dawn <dawn.dickerson@fema.dhs.gov>; Fox, Russell <Russell.Fox@fema.dhs.gov>
**Subject:** LSS Contract followup

Good afternoon,

I met with the LSS contract prime late this afternoon. Key takeaways:

* They concured with every item listed in the memo as requiring immediate remediation.
* After receiving the memo they did a QAQC review of products and concur the documents were below performance expectations.
* They were made aware that failure to execute the upcoming trainings and/or unexceptable remediation will result in termination of the contract.
* Tim is deploying an analyst immediately to fix their product issues and to ensure they execute the upcoming training to our extreme satisfaction.
* We will receive a remediation plan no later then Weds 11/7.
* Tim will travel to PR (or USVI) next week to discuss the remediation plan with Byrne then to ensure the implementation. (pending COS concurrence I will reach out to Shirley to schedule)
* The remediation plan will address project management, professional performance, product quality, and customer service.
* Moving forward the prime will ensure the contractors are self-sufficient in that the CI Unit will only be required to provide operational oversight and the COS office only strategic guidance and approval of projects. LSS will no longer require the significant manpower and management actions that its current performance necessitates.

Please let me know if there are any questions and if you would like me to relay the above to Byrne. Once I receive the remediation plan I will forward it to the group.

-Eli

Eli Pushkarewicz
Deployed to DR-4339-PR (CI Unit Lead)
Evaluation and Decision Support
National Preparedness Assessment Division
NPD|FEMA|DHS
Mobile Phone-202-304-9604

FEMA - C000251

**FEMA Continuous Improvement Program**

To Whom It May Concern:

This document outlines the request to terminate the current CaPP MOBIS (Lean Six Sigma) contract number HSFE80-16-A-004, task order number 70FB8018F00000070.  Request for termination is based on Government convenience in accordance with section I of the Federal Acquisition Regulations (FAR). We are requesting termination to be effective by May 27, 2019.

The request for termination stems from an effort to better utilize Federal funding and be good stewards of tax payer dollars. FEMA's Recovery Operations for DR-4339-PR have progressed to a point where we have now developed the internal capability to conduct process-improvement methodologies. Therefore, we no longer require the services provided by the Lean Six Sigma Contract.

In addition to no longer needing the services provided, there have been concerns which further advanced the request to terminate. The main concerns regarding contractor conduct and performance are: ineffective stakeholder engagement, consistent unwillingness to follow the chain of command, disrespectful attitude towards Green Belt trainees and Continuous Improvement leadership, and consistent push back on directions or assignments.

Further details regarding these areas of concern and the communication of those to the COR, Prime, and LSS team members is available upon request.

Best regards,

TAMIRIS ALDARONDO

Digitally signed by TAMIRIS ALDARONDO
Date: 2019.05.16 16:09:49 -04'00'

_____

DEPARTMENT OF HOMELAND SECURITY
Federal Emergency Management Agency

## NON-DISCLOSURE NOTICE MEMORANDUM

You are assisting in an ongoing official inquiry being conducted on behalf of the Federal Emergency Management Agency (FEMA). As this inquiry is sensitive in nature, you are hereby instructed not to disclose information relating to this official inquiry to any other person(s), except as may be appropriate under applicable law.

Failure to comply with this directive may subject you to disciplinary action under appropriate charges, such as failure to follow instructions or interfering with or impeding an official investigation.

These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.

Christian Bernard Gomez
_____
Print Name

_____
Signature

11/06/2020
_____
Date

FEMA Form 115-045-005-003 (6/20)

**FEMA - C000253** Page 1 of 1

DEPARTMENT OF HOMELAND SECURITY
## Federal Emergency Management Agency

## OFFICIAL DECLARATION

Name:  Christian Bernard Gomez                Position:  Program Analyst

Organizational unit assigned: Continuous Improvement Program

Work phone:  +1 (202) 679-6473    Email address: Christian.BernardGomez@fema.dhs.gov

Work address: #50 PR-165, Suite 3 Guaynabo, PR 00968-8024

### STATEMENT

Interview conducted on November 6, 2020 at 2pm via Microsoft Teams (MT) video by
Investigator Mara Lederer.

Q: Do you understand the non-disclosure agreement that you reviewed and signed?
A: Yes.

Q: What is your title, position/organizational unit/grade with FEMA?
A: Program Analyst/Continuous Improvement Program/IC-0343-11

Q: What is your work number?
A: 202.679.6473

Q: What is your work address?
A: #50 PR-165, Suite 3
Guaynabo, PR 00968-8024

Q: When did you work on DR-4339?
A: I started working on that disaster March 2018.

Q: What was your position?
A: Initially I was a local hire for the LSS program. In August 2018 I was unofficially
moved from the LSS program to CIP.

Q: Who oversaw DR4339 as it related to LSS/CIP at FEMA?
A:Originally, we were supposed to be under the COS (Josey) and then it moved to the COS
for DR4339 Ana Bonilla. Around August 2018, LSS moved under CIP-Eli. He was the Lead at
the time and then he transitioned out DR4339. Dawn Dickerson took over then Marshal Mabry
(temporary assigned) and then in December 2018, Tamaris (Tammy) Aldarondo took over as
the Lead.

Q: The complaint that was filed alleges a hostile work environment and discrimination
towards subcontractors working on the Lean Six Sigma (LSS) group on the LSS/CIP on the
FEMA contract. What can you tell me about this?
A: I sat next to Tammy in the office. It was not a positive environment towards the
contractors.
-I heard because they were "old white men" they didn't connect with the FEMA team (most
of the team was young-30s while the contractors were in their 50s/60s.
-There was a level of dislike and animosity towards the LSS team to include Barry
Angeline from FEMA staff.
-I think that because they were older, they felt that they were condescending towards the
group.

Initials:  CBG

**FEMA - C000254**

Name:   Christian Bernard Gomez

-I felt the LSS group was knowledgeable about their craft and serious in training.
-Once people were in training, I believe that people thought they could slack off.
-Either Tammy or Eli reprimanded the LSS team that they were loud, but I think that some of them were hard of hearing and the employees made it sound like they were arguing. I realized that it wasn't arguing but they couldn't hear each other well.
-I noticed a difference in the knowledge base and the professional approach. There was animosity between the teams-CIP wanted a more social science/investigative approach and LSS team wanted it more methodical/scientific approach.
-There was a lot of movement within CIP which caused things to be confusing. Eli was a HQ and wanted the LSS Team to do work that was not in the SOW. I felt Eli's didn't have the best interest of the project at heart and he wanted to get rid of the LSS group.
The original SOW did not include details pertaining to the extensiveness of the LSS training.
-LSS was brought in to teach tools to improve CIP processing; however, initially it was set up to teach awareness training but ultimately FEMA wanted the LSS group to provide "black belt" training which was much more extensive/intensive.

Q: Were you aware of any ongoing concerns/issues pertaining to DR4339, specifically regarding Barry Angeline?
A: He made a lot of jokes, some people didn't like his sense of humor and didn't understand it. He is a very outspoken person on the team; however, I feel the entire team was targeted.
-I feel like any decision the LSS team made, there was always an issue/conflict. The team was being criticized and second guessed. They received negative feedback from the CIP team had negative things to say about the training; however, people on other teams had no issues.

Q: Did you overhear Tammy refer to Barry and Mark Rozycki as "old white guys" and "don't pay attention to the white guys; they have no credibility."?
A: Not in a work environment; however, outside of work I heard both Eli and Tammy making statements to the effect: joking about the LSS team making lawsuits and that they were discriminated against skin color/age. They responded how they can be discriminated old white men.
-Barry and Mark Woodhouse were labeled as sexist-Tammy, Vivian Kiflai and Michele Ortiz (FEMA): they felt the conduct they received was sexist towards them.
-I was tasked along with Evelyn Santiago to investigate the feedback/perception of the training with the contractors and FEMA personnel to determine if the contract was going to continue. I felt when we presented the results to Tammy and Michele, which were mostly favorable, the decision was already made to cancel the training program.

Q: Did you overhear Eli Pushkarewicz refer to Barry as "the old guys", "that washed up team of old guys" and the "straight old white guys"?
A: I heard the comment outside of work about the old white guys, but I can't speak to the other statements.

Q: Did Tammy's conduct involve unreasonably interfering with Barry Angeline's work performance, or created an intimidating, hostile, or offensive work environment based on an individual's protected basis? If she did, how?
A: No, but I feel it was clearly a toxic work environment.

Q: Was there anything in writing stating the requirements for Unit Lead?

Initials:   CBG

FEMA - C000255

Name:  Christian Bernard Gomez

A: I don't know. Evelyn has 40 years of experience in process improvement and interviewed for the position and was told she didn't have the experience. Tammy didn't have the background/experience above Evelyn to get that position.
-Tammy is very close with Eli and if he wasn't making the decision, he had input into her being offered a position.

Q: Did Eli's conduct involve unreasonably interfering with Barry Angeline's work performance, or created an intimidating, hostile, or offensive work environment based on an individual's protected basis? If she did, how?
A: I know Eli had more direct communication with the LSS team, but I can't provide an example of this occurring.

Q: Do you feel that either Tammy or Eli attempted to "tank" or make the program fail for any reason?
A: Yes.
-Difference in the methods of how the program should approach process improvement.
-The people on Eli's team were people Eli liked but the contractors were not included in that dynamic.
- I feel like there was disconnect because Eli/Cadre. They didn't want to work that hard to implement the LSS processes because the methods were so different.
-The LSS team made comments that they knew how to implement the process but FEMA employees including Eli and Tammy would say "you don't understand how FEMA works."

Q: Who else do you think I should speak to?
A: Evelyn possibly.

Q: Is there anything else you would like to add that I did not ask you that you feel is relevant to the investigation at hand?
A: No.


**END OF STATEMENT**

I have read this statement. It is true, accurate and complete to the best of my knowledge and belief. I have been given an opportunity to make any corrections, additions, or deletions. I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.


CHRISTIAN BERNARD GOMEZ  Digitally signed by CHRISTIAN BERNARD GOMEZ
Date: 2020.11.06 16:21:17 -04'00'
_____        _____
Signature                                      Date


Mara Lederer                              MARA F LEDERER  Digitally signed by MARA F LEDERER
                                                      Date: 2020.11.06 15:25:52 -05'00'
_____        _____
Investigator Name                        Investigator's Signature


Initials:  CBG

FEMA - C000256