**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| BARRY ANGELINE and MARK ROZYCKI,<br><br>       Plaintiffs,<br><br>v.<br><br>TAMIRIS ALDARONDO JIMENEZ,<br><br>   in her individual personal capacity,<br><br>       Defendant. | Civil Action No:  3:26-cv-01340 |

**FIRST AMENDED COMPLAINT FOR DEFAMATION AND RELATED TORTS**

Plaintiffs Barry Angeline and Mark Rozycki, proceeding pro se, bring this action against Defendant Tamiris Aldarondo Jimenez in her individual personal capacity, and allege as follows:

## I.  NATURE OF THE ACTION

This is an action for defamation, defamation per se, and intentional infliction of emotional distress arising from knowingly false statements Defendant Tamiris Aldarondo Jimenez ("Aldarondo") made to federal investigators of the Federal Emergency Management Agency ("FEMA") Office of Professional Responsibility ("OPR") on October 27, 2020. Forty days before that interview, Aldarondo signed a Warning Acknowledgement Form expressly advising her that knowingly false statements could be used to prosecute her criminally. She made the statements anyway.

This action is brought against Aldarondo in her individual personal capacity only. Plaintiffs do not seek relief from the United States, FEMA, or the Department of Homeland Security ("DHS"). The broader workplace dispute that preceded Aldarondo's defamatory statements is the subject of separate federal proceedings not at issue here. This Complaint is narrowly limited to Defendant's personal, knowingly false statements. On the facts alleged, those statements were

1

personal, made in response to Plaintiffs' protected disclosures, and not undertaken to serve any legitimate FEMA purpose. They therefore fall outside the scope of Aldarondo's federal employment under the applicable scope-of-employment standard and are not entitled to Westfall Act substitution under 28 U.S.C. § 2679(b)(1) and (d).

Defendant's defamatory statements include: (a) fabricating military service for Plaintiff Angeline — who has never served — and attributing weapons-related intimidation to that fabricated background, while simultaneously falsely attributing the same alleged workplace-intimidation conduct to Plaintiff Rozycki's actual military service as a Captain in the 82nd Airborne Division; (b) falsely denying under oath, in two separate FEMA OPR investigations, that she made age-, race-, and gender-based derogatory comments about Plaintiffs, comments that FEMA OPR independently substantiated by a preponderance of the evidence in Case 20200565; (c) falsely attributing Plaintiffs' terminations to "conduct and performance" when the contemporaneous record shows the terminations followed within six days of Plaintiff Angeline's May 17, 2019 written disclosure to Defendant of Plaintiffs' protected Office of Inspector General ("OIG") and Equal Employment Opportunity ("EEO") complaint status; (d) republishing and ratifying false accusations that Plaintiffs sabotaged federal share-drive records after their removal; and (e) falsely denying under oath that her FEMA colleague Eli Pushkarewicz, also assigned to the Continuous Improvement Program ("CIP"), had made identical age-, race-, and gender-based comments about Plaintiffs — comments OPR independently substantiated against Pushkarewicz in Case 20200564.

Each statement was either knowingly false when made or made with reckless disregard for its truth. Each was made for Aldarondo's personal benefit — to deflect accountability for her own

2

substantiated misconduct, to protect her own career and reputation, to justify personnel actions already taken, and to shield a personally aligned colleague.

All of Defendant's false statements share a single mechanism: each one shifts blame from Defendant's own documented professional failures and substantiated misconduct onto Plaintiffs personally. Defendant could not credibly explain her own failure of the Lean Six Sigma ("LSS") Black Belt course she was enrolled in as a student, her own substantiated discriminatory comments, her own attempts to obtain examination answers in advance through prime contractor channels, or her own role in a program that lost its institutional investment in approximately fifty FEMA trainees across the Black Belt and Green Belt cohorts when the contract was prematurely terminated. The pattern reflects a sustained lack of candor in formal proceedings whenever Defendant's personal interests have been at stake.

## II.  JURISDICTION AND VENUE

This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 (diversity of citizenship). Plaintiff Angeline is a citizen of Virginia. Plaintiff Rozycki is a citizen of Georgia. Defendant Aldarondo is a citizen of Puerto Rico. The amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiffs' claimed damages include reputational harm impairing federal contracting opportunities, documented public-relations rehabilitation costs, emotional distress, lost professional opportunities, and impairment of future earning capacity, each of which individually and collectively exceeds the $75,000 threshold.

Venue is proper in the District of Puerto Rico under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims — including the October 27, 2020 OPR interview at issue — occurred in this District, specifically at the FEMA Joint Recovery Office in Guaynabo, Puerto Rico, during Hurricane Maria recovery operations under Disaster Declaration DR-4339.

This action is timely filed. Plaintiffs first learned of the specific false sworn statements alleged herein on or about May 21, 2026, when FEMA produced to Plaintiffs the three FEMA OPR Reports of Investigation (Case Nos. 20200490, 20200564, and 20200565) containing Defendant's October 2020 sworn statements. Those sworn statements were not reasonably discoverable before that production. The one-year statute of limitations for defamation under Puerto Rico law therefore did not begin until on or about May 21, 2026, under the discovery rule applicable to defamation claims arising from confidential investigative records. This Complaint is filed within one year of that date.

Under Puerto Rico law, defamation claims may proceed under both the Libel and Slander Act of 1902, 32 L.P.R.A. §§ 3141–3149, and the general tort provision of the Puerto Rico Civil Code, 31 L.P.R.A. § 5141 (Article 1802). See Gierbolini Rosa v. Banco Popular de Puerto Rico, 930 F. Supp. 712 (D.P.R. 1996). Puerto Rico recognizes the distinction between statements that are defamatory on their face and those requiring extrinsic proof of special damages. Plaintiffs plead their defamation claims under both the Libel and Slander Act and Article 1802 of the Puerto Rico Civil Code.

## III. PARTIES

Plaintiff Barry Angeline is a citizen of Virginia. Angeline was the senior LSS Master Black Belt instructor and technical lead supporting FEMA Hurricane Maria recovery operations in Puerto Rico under a contract held by ATCS, PLC ("ATCS"). Angeline has never served in any branch of the U.S. armed forces and never received military weapons training.

Plaintiff Mark Rozycki is a citizen of Georgia. Rozycki served in a senior leadership role on the LSS team. Rozycki is a United States Army veteran who served as a Captain in the 82nd Airborne Division. He holds a 100% service-connected disability rating from the Department of

Veterans Affairs based on injuries sustained during airborne operations in connection with his military service.

Defendant Tamiris Aldarondo Jimenez is a citizen of Puerto Rico, where she resides. Aldarondo was employed by FEMA as a Program Analyst (GS-13) assigned to the CIP at the Joint Recovery Office in Guaynabo, Puerto Rico. On information and belief, Defendant holds a Juris Doctor degree and is therefore trained in the legal frameworks governing sworn statements, attestations, and the documents she signed in connection with the events alleged. Aldarondo is sued in her individual personal capacity only.

## IV.  FACTUAL ALLEGATIONS

### A.  The Lean Six Sigma Program and Plaintiffs' Role

After Hurricane Maria, FEMA engaged contractors to run a Lean Six Sigma process-improvement program to accelerate disaster recovery in Puerto Rico. Plaintiffs served as senior LSS practitioners under a contract held by prime contractor ATCS, PLC.

Plaintiffs' team was composed primarily of senior professionals over the age of 50, including multiple combat veterans. Plaintiff Angeline was the technical lead; Plaintiff Rozycki served in a senior leadership role.

Beginning November 2018, Aldarondo became the Acting Unit Lead of the CIP and the task monitor for the LSS contract. She exercised supervisory influence over Plaintiffs' work despite having no prior process-improvement experience.

Plaintiffs were embedded in core agency process-improvement operations, instructing FEMA personnel in certification-bearing Lean Six Sigma methodology and training the FEMA employees who would carry that methodology forward in agency operations. Defendant's supervisory access to the contemporaneous evidence of Plaintiffs' performance — end-of-course training evaluations (Exhibit N), the Gomez/Santiago survey she herself commissioned, the prime

5

contractor's contract-renewal record (with no cure notice ever issued), and her own direct observation — heightened her obligation of accuracy in her later sworn statements about that performance.

During Aldarondo's supervision, Plaintiffs and their team raised concerns about program irregularities and made formal whistleblower disclosures. Those underlying disputes are the subject of separate federal proceedings and are referenced only as background to Aldarondo's personal motive.

## B.  The Warning Acknowledgement

On September 17, 2020, at 1:03 p.m., Defendant Aldarondo signed a Warning Acknowledgement Form in FEMA OPR Case 20200565. (Exhibit C at FEMA-C000343).

The Warning Acknowledgement Form stated, in part:

> "You are being interviewed as part of an official Department of Homeland Security, Federal Emergency Management Agency administrative investigation. This is not a criminal investigation. Neither your answers nor any information derived from them may be used against you in criminal proceedings, except to prosecute you for knowingly making false statements. You must answer these questions to the best of your ability. Failure to cooperate with this investigation, including your failure to answer any questions completely and truthfully, may result in disciplinary action, up to and including the termination of your employment."

Forty days later, on October 27, 2020, she made the false statements set forth below.

At the conclusion of her sworn interview, Aldarondo also signed an Official Declaration certifying under penalty of perjury that her statements were "true, accurate and complete to the best of [her] knowledge and belief." (Exhibit C at FEMA-C000351, signed October 28, 2020.)

The Warning Acknowledgement is strong evidence undermining any claim of innocent mistake. Defendant had, just forty days earlier, signed her name to a document stating that knowingly false statements were the precise conduct that could subject her to criminal prosecution

6

under 18 U.S.C. § 1001. Defendant understood the operative language she signed. She made the sworn false statements anyway.

### C.  False Statement No. 1: Fabricated Military Service and Weapons Intimidation

During her sworn OPR interview on October 27, 2020, Aldarondo stated, in response to a question about Plaintiff Angeline:

> "Barry and Mark would mention the type of weapons they used to use in the military. I never thought they would act on anything with weapons."

(Exhibit C at FEMA-C000347; see also Exhibit A at FEMA-C000064).

Aldarondo then submitted a written clarification:

> "Barry and Mark would mention the type of weapons they used in the military, as a response to me giving them assertive answers or directions. I perceived this as an act of intimidation, but also trusted that our JRO is a safe space and any violent behavior would not be tolerated."

(Exhibit C at FEMA-C000347; see also Exhibit A at FEMA-C000064).

These statements are false as to both Plaintiffs, on different theories. As to Plaintiff Angeline, the statement is false on its face: Angeline has never served in any branch of the U.S. armed forces. He has no military service record, no DD-214, and no military weapons training. He could not have "mentioned the type of weapons [he] used in the military" because there is no such military service to reference. As to Plaintiff Rozycki, the statement falsely attributes workplace-intimidation conduct to him. Rozycki did serve honorably as a Captain in the 82nd Airborne Division and holds a 100% service-connected disability rating; however, the conversations did not occur as Defendant described, and her false attribution converts an honorable service record into the predicate for a fabricated workplace-violence narrative.

By falsely attributing military service to Angeline, Aldarondo accused him of stolen valor — falsely claiming military service — which is defamation per se because it imputes fraudulent

conduct affecting professional fitness. She compounded the harm by attributing weapons-related intimidation to that fabricated background, imputing potential workplace violence in a federal facility.

Aldarondo's statements were not careless or mistaken. She had supervised Plaintiff Angeline for approximately six months and worked alongside Plaintiff Rozycki, with ample opportunity to know both of their actual backgrounds. Her statements were either knowingly false or made with reckless disregard for the truth.

The internal contradiction in Aldarondo's statement — simultaneously characterizing the alleged conversations as "intimidation" while affirming that the workplace was a "safe space" where she felt no real threat — shows the narrative was constructed, not recounted.

Aldarondo's weapons-intimidation statements were communicated to FEMA OPR investigators, recorded in formal Reports of Investigation, circulated within FEMA, and made part of permanent federal personnel records. These statements have been republished within FEMA and remain reviewable by security and credentialing authorities.

The fabrication is further implausible on its face. Defendant's account places Plaintiff Angeline boasting of military weapons proficiency in the presence of retired United States Army Colonel Daniel McCabe, who served on the same LSS team and worked alongside Plaintiff Angeline during the period at issue (Exhibit J). A civilian contractor would not credibly invent a military background, or boast of weapons used in service, in the presence of a retired Army Colonel whose actual military service is a matter of record. The implausibility of the alleged conduct in the presence of a senior retired officer is itself probative of the falsity of Defendant's account.

**D.  False Statement No. 2: Twin Sworn Denials of Discriminatory Remarks**

During her sworn OPR interview, Aldarondo was asked: "Did you ever make any comments to anyone regarding Barry's age, race or gender?" She answered:

>    "Absolutely not."

(Exhibit C at FEMA-C000347; see also Exhibit A at FEMA-C000064).

When asked separately whether she had ever referred to Plaintiffs as "old white guy[s]" or stated "don't pay attention to the white guys; they have no credibility," Aldarondo answered:

>    "Absolutey [sic] not. They actually refered [sic] to themselves in this
>    manner."

(Exhibit C at FEMA-C000348).

When asked whether she had harassed or discriminated against the LSS team or against Plaintiff Angeline specifically, Aldarondo again answered:

>    "Absolutely not."

(Exhibit C at FEMA-C000349).

Her denial was restated in the OPR Case 20200565 investigation summary: "ALDARONDO made no comments regarding Angeline's race, age or gender." (Exhibit C at FEMA-C000262). She made the same categorical denial repeatedly under oath and again in the summary.

All of these sworn denials were knowingly false. Two FEMA employees who worked under Aldarondo's supervision in the CIP — Christian Bernhard Gomez and Brenda Dorta — testified under penalty of perjury that she made the very statements she denied. FEMA OPR, in Case 20200565, concluded by a preponderance of the evidence that:

>    "A preponderance of the evidence supports ALDARONDO JIMENEZ
>    made inappropriate comments. Specifically, ALDARDONDO [sic]
>    JIMENEZ made comments pertaining to Angeline's age, gender and race.

> Witnesses Gomez and Dorta heard ALDARDONO [sic] JIMENEZ refer to Angeline (and the LSS contractors) as 'a lot of old white guys' and Gomez heard her make jokes about the LSS team and referred to them as 'old white men.'"

(Exhibit C at FEMA-C000266).

The OPR finding establishes, by the agency's own preponderance-of-the-evidence standard, that Defendant made the very statements she denied under oath.

Her categorical denials — "Absolutely not" and "Absolutey [sic] not" — were knowingly false. Two independent FEMA witnesses, Gomez and Dorta, testified against her under penalty of perjury.

Gomez testified, in part:

> "Outside the office, Gomez heard ALDARONDO make jokes about how the LSS team filed lawsuits due to discrimination due to their skin color and age. ALDARONDO replied how could they be discriminated against since they were old white men."

(Exhibit C at FEMA-C000265).

Dorta testified, as summarized by FEMA OPR, that:

> "ALADARONDO made comments about the LSS group, specifically Angeline, pertaining to age, race, specifically the statement 'a lot of old white guys (sic).'"

(Exhibit C at FEMA-C000261).

Dorta also testified that during an icebreaker game between the LSS group and FEMA employees, Aldarondo led the activity and Dorta drew the card "contractors." OPR summarized Dorta's account: after the game finished, Aldarondo asked Dorta to meet her privately, where Aldarondo told Dorta she "should have said 'a lot of old white guys.'" (Exhibit C at FEMA-C000261). Dorta further reported that Aldarondo "made comments she did not like the way they

(LSS group) smelled and Angeline was the least nice out of all the contractors." (Exhibit C at FEMA-C000262).

By falsely denying her conduct under oath — repeatedly, in two separate FEMA OPR investigations — Aldarondo constructively portrayed Plaintiffs as having fabricated their discrimination complaints.

Aldarondo's denials were not made in service of any FEMA interest. Her false denials served only her personal interest in deflecting accountability for the misconduct OPR was about to substantiate against her.

### E. False Statement No. 3: "Conduct and Performance" Attribution

During the same sworn interview, Aldarondo was asked about Plaintiff Angeline's termination:

> "Q: Barry states he was terminated due to a lack of funding/experience. What can you tell me about this? A: I am unaware of this. I thought it was because of conduct and performance."

(Exhibit C at FEMA-C000348).

This sworn statement — falsely attributing Plaintiff Angeline's termination to "conduct and performance" — is defamatory per se because it imputes professional misconduct and unfitness in a federal contracting context. It will follow Plaintiff Angeline through every federal background check and credentialing review.

The statement is contradicted by the contemporaneous record. Prime contractor ATCS's own documented justification for Plaintiff Angeline's May 2019 termination was framed as a contract burn-rate issue, not a misconduct issue. Plaintiffs filed a formal EEO complaint with ATCS on May 15, 2019, and Plaintiff Angeline directly informed Defendant in writing on May 17, 2019, that the LSS team had filed OIG and EEO complaints concerning her conduct. Plaintiffs

11

were terminated within six days. The timeline is documented in the OPR record and contemporaneous emails.

Defendant's sworn attribution of the termination to "conduct and performance" first appeared in agency records on October 27, 2020 — seventeen months after the termination. No contemporaneous (2019) agency or contractor record supports this framing. The seventeen-month gap is itself evidence of post-hoc fabrication.

The earliest agency document framing the terminations as performance-driven was a "Memo_LSS Contractor Performance" memorandum (Exhibit E) transmitted to Defendant on May 24, 2019, at 8:19:55 a.m. — the morning after the terminations had already occurred. (Exhibit C at FEMA-C000356; see also Section IV(J) infra.)

The contemporaneous record affirmatively contradicts the "conduct and performance" framing. In October 2018, FEMA CIP staff including Eli Pushkarewicz circulated a memorandum identifying performance concerns regarding the LSS engagement. Contracting Officer Rahsaan Edwards reviewed those concerns and determined that the issues had been addressed. Mr. Edwards thereafter renewed the LSS contract on three successive occasions — in October 2018, January 2019, and March 2019 — each renewal an official Contracting Officer determination that no conduct or performance problems warranted non-renewal and an effective ratification that the October 2018 concerns had been cured. No cure notice was ever issued. When Defendant later needed damaging information to justify Plaintiffs' May 2019 removal, she dredged up that obsolete October 2018 memorandum — a memorandum the Contracting Officer had three times treated as resolved through successive contract renewals, and the asserted performance basis of which had been cured seven months earlier. The absence of any documented performance concerns

12

during the four months before Plaintiffs' May 17, 2019 disclosure stands in stark contrast to the

sudden derogatory allegations that followed.

Aldarondo had no good-faith basis to attribute the termination to "conduct and

performance." Her sworn statement was either knowingly false or made with reckless disregard

for the contemporaneous facts she had reason to know.

### F. Self-Contradicting Sworn Statements About the LSS Exam Answers

Within her sworn statement, Aldarondo gave multiple inconsistent answers about her request for

the LSS exam answers. She admitted:

> "Because the LSS team was leaving and it was agreed that the FEMA
> Training Department would administer the test. I asked them to send the
> answsers [sic] to the training team."

(Exhibit C at FEMA-C000347.)

She then denied, in the same declaration:

> "Q: Did you ever attempt to get or obtain an advanced copy of the LSS
> final exam? A: No, I only requested a copy for training as I explained
> earlier. For me specifically, no."

(Exhibit C at FEMA-C000350).

And in the case summary: "ALDARONDO did not request the LSS exam be sent to her." (Exhibit

C at FEMA-C000262).

Dorta corroborated under oath that Aldarondo requested the exam answers:

> "Everyone in the LSS training course was required to take an exam and at
> one point, ALDARONDO asked for the answers to the exam; however,
> Angeline's boss Mark Rozycki declined to do this."

(Exhibit C at FEMA-C000262).

13

The contradiction in Aldarondo's single sworn statement — simultaneously admitting and denying the exam-answer request — evidences either deliberate falsehood or reckless disregard for the truth.

### G.  Self-Contradicting Sworn Statement Regarding Law School Interference

During her sworn OPR interview, Aldarondo was asked whether her concurrent law school attendance interfered with her LSS Black Belt coursework. She denied it under oath:

> "Q: My understanding is you were enrolled in law school at the same time as you were enrolled in the LSS Black Belt training. Did your law school attendance/coursework interfere with your ability to complete the necessary tasks for the Black Belt training? A: No. I have been in Law School since I started working for FEMA and my course load is lower than the average student, specifically because my job is my priority."

(Exhibit C at FEMA-C000347.)

That sworn denial was knowingly false, and was contradicted by a record created contemporaneously with the training itself — in April 2019, approximately eighteen months before Defendant testified. In a Memorandum for Record prepared contemporaneously with the training and formally submitted as Plaintiffs' third OIG complaint (Exhibit P), Plaintiffs documented that Defendant was "working full time on a law degree and is often seen working on school assignments while in LSS training." The same contemporaneous record documented that during the third week of instruction — a critical week covering complex statistical methods — Defendant stated she "could not attend the full week due to mid-terms," and she was entirely absent from the training that week — not present at the training site at all — as Plaintiffs and the other LSS team members present that week directly observed.

FEMA OPR's own investigative record independently confirmed the interference. The Report of Investigation in Case 20200565 states that Defendant "was a student in the LSS Black Belt course simultaneously while attending law school and failed to complete the required course

assignments." (Exhibit C at FEMA-C000259.) An independent Master Black Belt instructor separately reported that Defendant "admitted that she was more focused on her law degree exams in class than learning the LSS processes." (Exhibit A, ROI 20200490.)

Defendant's decision not to attend the third week of instruction because of her law school midterm examinations, and the resulting interference with her coursework, can be verified by the contemporaneous LSS training and attendance records and by the direct, personal knowledge of Plaintiff Angeline, Plaintiff Rozycki, and the additional LSS team members and instructors who observed Defendant's attendance and conduct throughout the four-week program.

Defendant's false denial is material for two reasons. First, it is a further instance of the documented pattern of lack of candor alleged in Section IV(K): a sworn statement about a matter within Defendant's personal knowledge, contradicted by a contemporaneous 2019 record memorializing Defendant's own stated reason for missing a week of instruction, by the agency's own investigative finding, and by the training records and multiple witnesses. That a contemporaneous record memorialized Defendant's own stated reason — her law school midterms — forecloses any innocent explanation of stress, confusion, or faded recollection when she later denied any interference under oath.

Second, Defendant's false denial forecloses any innocent reading of her separate sworn assertion that her lack of project progress was attributable to the LSS "methodology [that] would have taken months." (Exhibit C at FEMA-C000150; see Section IV(J) infra.) The contemporaneous record establishes that the actual cause of Defendant's failure to progress was her competing law school workload — not the methodology, and not any conduct of the contractors she supervised.

**H.  False Statement No. 4: Share-Drive Sabotage Republication**

On or about June 20, 2019 — about one month after Plaintiffs' removal — Aldarondo forwarded, ratified, and republished an accusation that Plaintiff Angeline was "responsible for" the deletion of a federal share-drive folder containing Green Belt trainee work.

She republished the accusation to federal personnel and into federal records, implying Plaintiff Angeline had committed federal records destruction — conduct that, if true, would impute serious wrongdoing affecting his professional fitness in federal contracting.

The accusation was false. It could not have motivated Plaintiffs' removal, because the alleged deletion necessarily occurred after Plaintiffs were already gone. The accusation is therefore textbook post-hoc justification: a false narrative manufactured after the fact to justify a decision already made.

Defendant republished with reckless disregard for the truth because the documentary record that would have identified the actual deletion actor was readily available to her. Federal share-drives maintain access logs, authentication records, and backups identifying the account and time of any deletion. Defendant did not consult any such record before publishing the accusation; she attributed responsibility to Plaintiff Angeline despite his having had no share-drive access for about one month and despite the documentary record being available to identify the actual actor. Assigning blame to someone who lacked access, without consulting available logs, is itself evidence of reckless disregard for truth.

The deletion for which Defendant blamed Plaintiffs was not sabotage by Plaintiffs. On information and belief, it was a consequence of the agency's own purge of records — a purge undertaken to conceal out-of-scope tasking and Federal Acquisition Regulation ("FAR") compliance issues that Plaintiffs had reported. During that purge, FEMA and ATCS personnel

16

inadvertently deleted the Digital Site Inspection ("DSI") tool, a system valued at approximately $70 million in productivity that would have shortened the Puerto Rico recovery timeline by years.

Defendant blamed Plaintiffs for that deletion to deflect attention from her own exposure: the out-of-scope tasking of contractors, the FAR compliance issues, and the destruction of agency records during the cover-up. By falsely accusing Plaintiffs of sabotage, Defendant projected agency-level misconduct onto Plaintiffs personally.

## I. False Statement No. 5: Sworn Defense of Pushkarewicz

In the same sworn declaration, Aldarondo denied that her colleague Eli Pushkarewicz had ever made age-, race-, or gender-based comments about Plaintiff Angeline:

> "Q: Did Eli ever make any comments to anyone regarding Barry's age, race or gender? A: Absolutely not. Q: Do you believe Eli discriminated/harassed the LSS team, specifically Barry Angeline? A: Absolutely not."

(Exhibit C at FEMA-C000349).

Those denials were knowingly false. In OPR Case 20200564, the agency substantiated by a preponderance of the evidence that Pushkarewicz had made the very comments Aldarondo denied:

> "A preponderance of the evidence supports PUSHKAREWICZ made inappropriate comments. Witnesses Gomez, Rozycki and Oshaben reported they overheard PUSHKAREWICZ make statements that were derogatory in nature regarding Angeline and the LSS team to include 'the old white guys,' 'the straight old white guys,' 'the grumpy old guys' or 'the old guys.'"

(Exhibit B at FEMA-C000099).

Three independent FEMA witnesses corroborated Pushkarewicz's discriminatory comments. Aldarondo's sworn denial that those comments occurred served no FEMA function. It served only to construct mutual cover between Aldarondo and Pushkarewicz — to protect him

17

from accountability for substantiated misconduct, and by extension to bolster her own parallel denials.

## J. Personal Motive: Concealment, Suppression, and Pretext

Aldarondo's false statements were not isolated. They culminate a sustained pattern of self-protective conduct to conceal Defendant's own professional failures and shift their consequences onto Plaintiffs.

While serving as FEMA Acting Unit Lead supervising the LSS contract, Defendant was also enrolled as a student in the LSS Black Belt program Plaintiffs were teaching. Her performance was the worst in the cohort. Of approximately twenty classroom days, Defendant missed about half — a level of absence that would have resulted in any other student's removal; the threshold was no more than three missed days. As a courtesy, and to accommodate her absences, the LSS team offered Defendant up to sixteen private make-up sessions, scheduled at her convenience. She did not attend a single one. The enrollment slots were limited and competitive, and Defendant — as the FEMA Acting Unit Lead responsible for the multimillion-dollar LSS program — controlled access to them and strictly enforced the attendance requirements against other candidates, denying seats to FEMA personnel who sought them. Defendant held others to a standard of attendance and participation she disregarded herself, compiling the worst attendance and the lowest-ranked project in the very program she was charged with leading.

Defendant made no measurable progress on her certification project. Plaintiff Angeline drafted her project charter, and she was assigned among the least demanding projects in the cohort; she nevertheless ranked last of approximately fifty Black Belt and Green Belt students. Her project was classified as a Rapid Improvement Event — a time-boxed methodology designed for quick completion — not a full Define-Measure-Analyze-Improve-Control ("DMAIC") project. Plaintiff Angeline had advised her at the outset that the project was simple and well-matched to the format.

Defendant nevertheless later asserted to OPR investigators that her lack of progress was attributable to the project being "not compatible with DMAIC methodology" and that "the methodology would have taken months" (Exhibit C at FEMA-C000150). That assertion is contradicted by the Rapid Improvement Event classification Defendant herself accepted, by the simple scope of the project (which had been jointly selected by Defendant and FEMA Chief of Staff Ana Bonilla), and by Plaintiff Angeline's contemporaneous instruction that the methodology was appropriate to the project as scoped.

Defendant's OPR assertion that "the methodology would have taken months" carried a further false implication: that the LSS contractors, rather than the FEMA Champion who sponsored the project, had selected the project scope and dictated the methodology. The contract Statement of Work designates FEMA Champions as the project owners; scope selection is an inherently governmental function under the Federal Acquisition Regulation, not delegable to contractors. Defendant's assertion therefore did not merely shift blame for her own failure to progress; it falsely accused contractors under her supervision of a FAR violation that, if true, would impair their ability to obtain further federal work. The accusation is contradicted by the contemporaneous record: Defendant's certification project was jointly selected by Defendant and Ms. Bonilla as the sponsoring Champion (Exhibit A at FEMA-C000036 through FEMA-C000040; FEMA-C000047), not by the LSS contractors.

Plaintiffs' work included substantial out-of-scope tasking that fell outside the contract Statement of Work, which Plaintiffs repeatedly reported to FEMA and ATCS personnel. After Plaintiffs were terminated and made protected disclosures, FEMA and ATCS personnel began purging electronic records to obscure the out-of-scope tasking. This purge included deleting Black Belt project files, removing the names of FEMA officials — including Dominique Lenox, the

19

Deputy Federal Coordinating Officer, and Federal Coordinating Officer Jonathan Hoyes — from training certificates, and scrubbing other documentation reflecting work directed outside the Statement of Work and the FAR. Defendant had personal exposure to the same out-of-scope tasking and FAR compliance issues, and her later defamatory statements blaming Plaintiffs deflected attention from that exposure.

Rather than complete the program on the same terms as other students, Defendant engaged in a series of acts to conceal her failures and compromise the certification program itself. These acts included:

(i) Attempting to obtain the LSS certification examination answers in advance through prime contractor channels. Defendant's sworn admission — "I asked them to send the answsers [sic] to the training team" (Exhibit C at FEMA-C000347) — is corroborated by Dorta's sworn testimony: "ALDARONDO asked for the answers to the exam; however, Angeline's boss Mark Rozycki declined to do this." (Exhibit C at FEMA-C000262). Defendant further stated to Plaintiff Angeline, on more than one occasion, that "it's in everyone's best interest that they pass the LSS Black Belt exam" — a remark consistent with an attempt to ensure that her own anticipated failure of the certification examination would be masked by a class-wide pass rate.

(ii) Attempting to compromise the certification program through three demands: (A) requesting through prime contractor ATCS — and, on information and belief, communicated through Ms. Victoria Colmenero as conduit — that the LSS Black Belt examination testing date be moved several months to delay the examination on which Defendant was at risk of failing; (B) urging that the LSS curriculum be diluted on the asserted ground that it was "too hard" and "too mathy" — a demand directed at the statistical-analysis components core to Lean Six Sigma and not subject to reduction by an enrolled student; and (C) urging that the certification and project-

completion requirements be relaxed. Defendant's attempt to relax the requirements is confirmed in the agency record, which reflects that "ALDARONDO requested the required project be made optional." (Exhibit C at FEMA-C000259.) Each demand was directed at lowering the standard against which Defendant's own performance would be measured.

(iii) Cancelling, without notice to the LSS instructors, the Black Belt presentations to FEMA leadership champions (Exhibit O) scheduled for the last day of the four-week training program. The presentations had been requested by Ms. Bonilla after she observed a separate Black Belt presentation on April 23, 2019. Ms. Bonilla gave the presenters a standing ovation, applauded the team's progress, and announced she would have all sponsoring Champions attend the final-day presentations. Defendant cancelled the report-outs to avoid the embarrassment of FEMA leadership observing her own project ranked last in the cohort. The cancellation prevented FEMA leadership from observing the comparative progress of each Black Belt student, including Defendant, whose project lagged all others.

(iv) Commissioning an April 2019 pulse report (referred to by Plaintiffs as the "secret survey") of FEMA personnel and contractors to assess the LSS training program. The pulse report was administered by Gomez and FEMA employee Evelyn Santiago Rivera (Exhibit M). The results were favorable to the LSS program: the summary findings reflect that at least seventy-eight percent of respondents rated the program "good" to "excellent" and indicated the program needed to be expanded and accelerated. Gomez testified under oath that when he presented the mostly positive results to Defendant, "the decision was already made to cancel the training program." (Exhibit C at FEMA-C000265). When Gomez subsequently raised the existence of the survey with Defendant, she told him it did not exist and walked away. Plaintiffs obtained the favorable results only later through Freedom of Information Act requests.

Prior to Plaintiff Angeline's May 23, 2019 termination, while still working at the Joint Recovery Office in Puerto Rico, Plaintiff Angeline directly asked Defendant whether the survey existed. Defendant told him it did not. The survey existed. Defendant had personally commissioned it and had received the results.

FEMA's production of the OPR investigative record contains no email, transmission record, or other documentation that Defendant distributed the survey results to anyone. Had the results reflected program problems, ordinary supervisory practice would have called for Defendant to share them with the contractors so the problems could be addressed; had the results reflected program success, ordinary supervisory practice would have called for Defendant to share them in recognition of the work. Defendant did neither. She kept the survey close because it was favorable, and Plaintiffs obtained it only later through Freedom of Information Act production (Exhibit M). Defendant's direct misrepresentation to Plaintiff Angeline, separate and apart from her later sworn statements to FEMA OPR, is independent evidence of Defendant's consciousness of guilt, her pattern of lack of candor regarding matters within her personal knowledge, and her active concealment of evidence favorable to Plaintiffs.

(v) Receiving, the morning after Plaintiffs' May 2019 termination, a "Memo_LSS Contractor Performance" memorandum styled as a contemporaneous performance critique. On May 24, 2019, at 8:19:55 a.m. — the very next morning — Plaintiffs' Contracting Officer Representative ("COR") forwarded that memorandum to Defendant. (Exhibit C at FEMA-C000356). The transmission of this memorandum the morning after Plaintiffs were terminated, paired with Defendant's later sworn attribution of those terminations to "conduct and performance," demonstrates the construction of a post-hoc paper trail to justify personnel actions already taken.

(vi) Aligning with prime contractor ATCS employee Victoria Colmenero — assigned to the LSS engagement and co-located with the LSS team at the Joint Recovery Office — who functioned as a conduit between Defendant and ATCS during the period material to this Complaint. Ms. Colmenero lacked the LSS qualifications required by the contract Statement of Work, had no relevant experience in continuous-improvement methodology, and performed no substantive LSS work. Notwithstanding those deficiencies, when ATCS released Plaintiffs in late May 2019 on the asserted ground of contract burn-rate constraints, Ms. Colmenero was retained on the contract through approximately mid-June 2019. Plaintiffs separately had to lock Ms. Colmenero out of the LSS team's shared electronic drive because she repeatedly altered files without permission and added content to LSS deliverables without Plaintiffs' knowledge.

On May 20, 2019 — three days after Plaintiff Angeline's May 17 email to Defendant disclosing the OIG and EEO complaints — Defendant and Ms. Colmenero left the LSS team's work area together for several hours, conduct inconsistent with normal program operations and consistent with coordination outside Plaintiffs' presence. On information and belief, between May 13 and May 16, 2019, Ms. Colmenero communicated to Defendant her advance knowledge of the multi-day ATCS Human Resources investigation then underway into Plaintiffs' age-discrimination complaint against Defendant. That advance knowledge supplied Defendant with motive to construct the retroactive documentary basis described in Section IV(J) and to act on it before Plaintiffs' final May 17, 2019 transmission reached her.

The Colmenero alignment provided Defendant a non-plaintiff source for both information flow into the LSS team's workspace and post-hoc reframing of the LSS team's work product during the period leading to Plaintiffs' removal.

23

Defendant's plan to remove Plaintiffs predated their protected disclosures by approximately six weeks. On April 2, 2019, at 3:28 p.m. — eighteen days after the March 15, 2019 meeting at which Plaintiff Angeline and retired Colonel Daniel McCabe advised Defendant of her own lack of progress and of significant contracting irregularities — Defendant authored an internal email to FEMA CIP staff (FEMA-A000422 through FEMA-A000423, Exhibit F) proposing that the seven-person LSS team "be reduced to 5 people by the end of May." Six weeks later, on May 23, 2019, the two members released were Plaintiff Angeline and Plaintiff Rozycki.

To preempt the favorable end-of-course evaluations Plaintiffs had received, Defendant asserted on multiple occasions between April 10 and April 30, 2019 that the favorable scores were not reliable because students were "intimidated" by Plaintiffs. The assertion contradicted itself: evaluations were anonymous (eliminating any rational basis for student fear), and Defendant herself, during the two weeks of training she attended, completed the same evaluations and submitted favorable scores. The "intimidation" framing was communicated in part through Ms. Colmenero as conduit.

On May 16, 2019, at 16:09:49 ADT, Defendant digitally signed a "To Whom It May Concern" memorandum (Exhibit D) on FEMA CIP letterhead, addressed generically with no specific recipient, requesting termination of the LSS contract on the asserted basis of "Government convenience." That basis is mutually destructive with Defendant's later sworn attribution of Plaintiffs' terminations to "conduct and performance." Termination for the government's convenience is, by definition, a no-fault basis; termination for conduct and performance is a fault-based basis. The two cannot coexist for the same termination of the same contractors. Defendant's reliance on both, at different times and to different audiences, is itself evidence that neither was the actual basis and that the actual basis was Plaintiffs' protected disclosures.

Defendant later offered yet a third, inconsistent characterization of the same personnel action. In her October 29, 2020 written submission to the OPR investigators, describing the very memorandum by which she had requested termination of the LSS contract, Defendant wrote that "Ultimately, I believe the contract was not formally terminated, the Agency decided to simply not renew." (Exhibit C at FEMA-C000352.) Defendant's shifting characterizations — "Government convenience" in her May 16, 2019 memorandum, "conduct and performance" in her October 27, 2020 sworn interview, and a mere non-renewal in her October 29, 2020 written submission — cannot all be true of the same event, and the shifting itself evidences that none was the genuine basis.

The OPR investigative record contains no email, routing slip, transmission receipt, or other documentary evidence that the memorandum was transmitted to any recipient on May 16, 2019. Its first appearance in any transmission record is May 17, 2019 at 6:23 PM — three hours and twenty-three minutes after Plaintiff Angeline's 3:00 PM protected disclosure to Defendant. FEMA's production includes only an image of the memorandum; the native file and metadata documenting its actual creation history have not been produced. The file is identified in the production as "Memo_LSS Contractor Performance v6.docx" — a sixth successive version that cannot be authored on a single face date. The face date positioned the memorandum to predate Plaintiffs' protected disclosure by the minimum interval necessary to support a pretextual performance narrative. In the same May 17 6:23 PM email, Defendant asserted that she had previously discussed terminating the LSS program with FEMA leadership before May 16, 2019; the OPR record contains no contemporaneous documentation of any such discussion. Plaintiffs reserve the right to pursue forensic discovery of the native file and metadata.

The downstream consequences of Defendant's personal-cover construction were borne by Plaintiffs and by FEMA itself. When the contract was prematurely terminated in the wake of Defendant's actions, approximately fifty FEMA trainees across the Black Belt and Green Belt cohorts who had invested classroom time in the LSS programs lost the opportunity to obtain certification, and FEMA lost the institutional investment it had already paid for.

The favorable contemporaneous evidence Defendant ignored or suppressed was substantial and converging: approximately seventy FEMA leadership Champions rated Plaintiffs' instruction outstanding; approximately forty-five Black Belt and Green Belt candidates rated the program favorably in end-of-course evaluations; the April 2019 Gomez/Santiago pulse report Defendant herself commissioned reflected at least seventy-eight percent favorable responses; and Ms. Bonilla gave the team a standing ovation after observing a presentation on April 23, 2019. All of this evidence Defendant suppressed, disregarded, or contradicted under oath.

The cumulative pattern — attempted examination-answer theft, attempted dilution of certification requirements, cancellation of leadership-facing report-outs, suppression of favorable survey results, alignment with a non-qualified prime-contractor employee, post-hoc performance documentation, selective reliance on aligned witnesses while ignoring favorable ones, the share-drive accusation, and the false sworn defense of a colleague — establishes that Defendant was constructing personal cover. None of it served FEMA. All of it served Defendant herself.

### K.  Pattern of Lack of Candor

Lack of candor — a documented pattern of knowing misrepresentation in formal proceedings that emerges when personal interests collide with the obligation to tell the truth — is recognized as misconduct in federal personnel systems.

Defendant's conduct establishes such a pattern. Every false sworn statement alleged in Sections C through I materially misrepresents a fact for which Defendant had personal accountability and shifts that accountability onto Plaintiffs or a personally aligned colleague.

Specifically, Defendant's pattern of lack of candor includes:

(i) Sworn fabrication of military service for Plaintiff Angeline, and false attribution of workplace-intimidation conduct to Plaintiff Rozycki's actual military service — to construct an unfavorable threat narrative about contractors who had documented Defendant's own substantiated misconduct.

(ii) Twin categorical sworn denials of substantiated discriminatory comments, made repeatedly across two separate FEMA OPR investigations — to deflect accountability for her own substantiated conduct.

(iii) Sworn denial that her colleague Pushkarewicz had made identical discriminatory comments — conduct OPR independently substantiated against Pushkarewicz — to construct mutual cover.

(iv) Sworn attribution of Plaintiffs' terminations to "conduct and performance" — to retroactively reframe a termination occurring days after Plaintiffs' protected disclosures as a merit-based separation.

(v) Internally contradicted sworn statements about the LSS examination answers — simultaneously admitting and denying the request — to avoid acknowledging her attempted compromise of the certification program in which she was personally failing.

(vi) Sworn denial that her concurrent law school attendance interfered with her LSS coursework — directly contradicted by a contemporaneous 2019 record memorializing her own

27

stated reason for missing a week of instruction, by the agency's own investigative finding, and by the training records — to conceal the actual cause of her documented failure to progress.

(vii) Suppression of favorable April 2019 survey results that Defendant herself commissioned — to conceal evidence that contradicted the narrative she would later present to OPR.

(viii) Republication of the false share-drive sabotage accusation against Plaintiffs — to retroactively construct a justification for personnel actions already taken and to deflect responsibility for the agency's own purge of records, the out-of-scope tasking and FAR compliance issues Plaintiffs had reported, and the inadvertent destruction of the Digital Site Inspection tool during that purge.

Defendant's pattern of lack of candor extends beyond the OPR investigations to other formal federal proceedings in which she has made written statements material to her personal interests that are directly contradicted by contemporaneous communications from the United States' own counsel. In a federal contract appeal proceeding in 2026 (NoMuda, Inc. v. Department of Homeland Security, Civilian Board of Contract Appeals ("CBCA") Docket No. 7999), Defendant submitted a written statement to FEMA Office of Chief Counsel attorney Katlyn Har attesting to "never being terminated" from her FEMA position — a written denial of her own termination and subsequent reinstatement. That denial is directly contradicted by two contemporaneous written communications from Assistant United States Attorney John J. ("Jack") Bardo, counsel of record for the United States in parallel federal litigation, who confirmed in writing in December 2025 that Defendant no longer worked at FEMA and in writing in January 2026 that she had returned. Whether Defendant's 2026 written statement was hypertechnical, materially misleading, or affirmatively false, it reflects the same operative pattern as her 2020 OPR

28

statements: when Defendant's personal interests are at stake in a federal proceeding, she makes written statements directly contradicted by the United States' own contemporaneous record.

Defendant's pattern of self-protective misconduct is independently corroborated by FEMA's own records. A September 26, 2025 memorandum authored by FEMA Senior Advisor Mike Kangior and addressed to the Senior Official Performing the Duties of the FEMA Administrator (the "Richardson memorandum," Exhibit Q) set forth findings of fact concerning the Puerto Rico investigation into whistleblower retaliation and discrimination, and recommended Defendant's termination from federal employment. The memorandum's findings independently corroborate the allegations of this Complaint.

As to the discriminatory remarks Defendant denied under oath, the memorandum found that "Christian Bernhard Gomez and Brenda Dorta independently reported that Aldarondo routinely made disparaging remarks behind the team's back in Spanish, typically mocking their age, race, and gender," and that Defendant "repeatedly referred to LSS staff as 'the old white guys.'" As to the survey Defendant concealed, the memorandum found that Defendant "conducted a secret survey in April 2019, directing staff not to disclose it to the LSS team," and told her team its purpose was to show that "those old white guys will be surprised by how they are not well respected" — findings that further establish the malice and consciousness of guilt alleged herein.

As to Defendant's law school interference, addressed in Section IV(G), the memorandum independently found that Defendant "missed almost half of the classroom instruction in her own BB training, including an entire week for law school midterm exams during critical statistics instruction," and that "training records reveal Aldarondo's chronic absenteeism and email records document her law schoolwork during federal duty hours." As to the pretextual termination memorandum addressed in Section IV(J), the memorandum found that Defendant "backdated a

'To Whom It May Concern' memorandum to create a false paper trail justifying program termination," and "suppressed documentation of program success to justify retaliatory actions against the LSS team."

The Richardson memorandum was accepted into the federal appeal-file record in NoMuda, Inc. v. Department of Homeland Security, CBCA Docket No. 7999, by order of Board Judge Daniel B. Volk dated June 11, 2026 (CBCA Dkt. 55), and its authenticity was not disputed by the United States in Angeline v. Mullin, No. 1:23-cv-00722 (RDM), ECF No. 64 at 5 (D.D.C. June 23, 2026).

The pattern is material to this defamation action because it forecloses every available innocent reading of Defendant's OPR statements. A single false statement might be explained as stress, confusion, or honest mistake. A sustained pattern of materially false statements, each one shifting blame from Defendant's own documented failures onto Plaintiffs personally, cannot. Defendant's conduct evidences knowledge of falsity and reckless disregard for truth as a baseline practice when her personal interests are at stake.

## L.  Selective Information-Gathering Demonstrates Malice

Before and during Plaintiffs' removal and the ensuing investigations, Aldarondo relied for damaging information on a narrow set of individuals while declining to seek input from the broader population of FEMA personnel and trainees who worked successfully with Plaintiffs.

Aldarondo did not solicit input from Gomez, Dorta, Santiago, or other FEMA witnesses who later corroborated Plaintiffs' professionalism. She ignored approximately seventy Champions and forty-five Black Belt and Green Belt candidates who provided favorable evaluations (Exhibits N and O), as well as the Puerto Rico Central Office for Recovery, Reconstruction, and Resiliency ("COR3"), Deloitte, and Cyberricade — all of which sought to continue working with Plaintiffs. She disregarded Ms. Bonilla's contemporaneous endorsement of the LSS team's instructional

work, evidenced by Ms. Bonilla's April 23, 2019 standing ovation and her direction that all sponsoring Champions attend the final-day presentations. She disregarded her own commissioned April 2019 Gomez/Santiago pulse report (the "secret survey," Exhibit M), which reflected at least seventy-eight percent favorable responses, and the end-of-course evaluations she herself had completed and submitted favorably during the period she did attend training.

Instead, Defendant relied on a narrow set of personally aligned sources: her colleague Eli Pushkarewicz, whose substantiated discriminatory conduct she later defended under oath as alleged in Section IV(I), and her subordinate FEMA employee Michelle Ortiz, whose shared certification project with Defendant was flagged as distressed and who therefore had a personal stake aligned with Defendant's in supplying unfavorable feedback about Plaintiffs.

The contemporaneous LSS Project Tracker further documents the selection bias. Defendant's shared Black Belt certification project with Ms. Ortiz was identified on the tracker as "Chief of Staff Office Optimization," Project ID 014/014.1. The April 10, 2019 version of the tracker (Exhibit K) reflects that the project was flagged in red as distressed during the period when Plaintiffs were teaching the Black Belt course. By the June 7, 2019 version of the same tracker (Exhibit L) — produced after Plaintiffs' May 23, 2019 termination — the color coding had been removed, eliminating the visual evidence of Defendant's project distress from the contemporaneous record. Defendant ordered the removal of the color coding, characterizing the visual display as "mean."

## M.  Conduct Outside Scope of Federal Employment

Knowingly false statements under oath to federal investigators are not part of any FEMA program duty and were not necessary or incidental to any task Defendant was employed to perform. Defendant's statements were motivated by her interest in deflecting accountability for her own conduct, not by any purpose to serve FEMA. Under the applicable scope-of-employment

31

standard, statements made for self-protective reasons in a formal investigative setting concerning the employee's own conduct are not conduct of the kind the employee was employed to perform. Truthfulness in response to a federal investigator is a baseline condition of federal employment, not a discretionary act within a federal employee's job; conduct no federal employee is ever authorized to undertake cannot, as a matter of agency law, satisfy the scope-of-employment test. FEMA has no institutional interest in Defendant lying to FEMA's own investigators about FEMA's own contractors, particularly where FEMA's investigators were FEMA employees, the substantiating witnesses were FEMA employees, and the substantiated findings against Defendant were issued by FEMA OPR. The United States cannot be substituted as the proper defendant in Defendant's place because the conduct at issue was neither authorized by the United States nor undertaken in service of any federal purpose.

Fabricating a military background for a civilian contractor, attributing weapons-related intimidation to that fabrication, and reporting it to federal investigators as threat information did not serve any FEMA function. The same is true of her false attribution of intimidation to another contractor's actual honorable military service. That conduct exists solely to damage Plaintiffs' reputations and construct after-the-fact justification for personnel actions already taken; it is not the kind of conduct FEMA employed Defendant to perform.

Defendant's sworn statements to federal investigators falsely denying her colleague's substantiated misconduct served personal alliance with that colleague, not any FEMA function. Defending a colleague from accountability for substantiated discriminatory conduct, by making sworn statements that conflict with the agency's own substantiated findings, is not conduct of the kind a supervisor is employed to perform on behalf of the federal employer.

32

A sustained pattern of lack of candor in formal proceedings whenever an employee's personal interests are at stake is not conduct undertaken to serve the federal employer.

Defendant's defamatory statements were motivated by personal animus, personal embarrassment over substantiated discriminatory conduct, personal interest in deflecting accountability, personal interest in concealing her own failures in the LSS Black Belt program in which she was enrolled as a student, personal alliance with a colleague who had committed identical misconduct, and a deliberate effort to blame Plaintiffs for the agency's own purge of records — including the inadvertent loss of the approximately $70 million Digital Site Inspection tool — to avoid responsibility for the out-of-scope tasking, FAR compliance issues, and destruction of agency records that Plaintiffs had reported. They were not made in service of any duty owed to FEMA, the United States, or the public. They were made in service of Defendant herself and a personally aligned colleague.

A federal employee acting within the scope of employment cannot, by definition, be acting to retroactively legitimize potential agency violations of federal anti-retaliation law. Federal employers are not permitted to retaliate against employees or their agents for protected disclosures. Sworn statements that retroactively recharacterize a personnel action taken shortly after protected disclosures as merit-based do not serve any legitimate federal-employer function; they serve only the personal interests of the actors whose conduct is implicated. To the extent Defendant's sworn statements attributing Plaintiffs' terminations to "conduct and performance" retroactively legitimized personnel actions that occurred days after Plaintiffs' protected disclosures, those statements served personal interests, not federal interests, and were not made within the scope of any federal function.

33

Every act of concealment alleged herein affirmatively harmed FEMA. The suppression of the favorable Gomez/Santiago survey deprived FEMA leadership of contemporaneously favorable evidence about a program FEMA had invested in. The false denials of substantiated discriminatory comments contaminated FEMA OPR's records with false statements that the agency had to investigate and document. The false sworn defense of Pushkarewicz against his own substantiated misconduct further contaminated FEMA records. The deployment of the May 24, 2019 performance memorandum the morning after Plaintiffs were terminated, and the false attribution of those terminations to "conduct and performance," constructed a post-hoc paper trail that mischaracterized agency action in the agency's own records.

As alleged in Section IV(J), the most concrete agency-level harm caused by Defendant's self-protective conduct was the loss of FEMA's institutional investment in the approximately fifty Black Belt and Green Belt trainees enrolled in the LSS certification programs. This harm flowed directly from Defendant's conduct and ran counter to every FEMA interest. No FEMA function is served by sabotaging FEMA's own institutional investment in personnel certification.

Under the Westfall Act, 28 U.S.C. § 2679(b)(1), the United States is substituted as defendant only where the federal employee's alleged conduct was within the scope of employment. Whether conduct falls within scope turns on the law of respondeat superior of the place where the conduct occurred. Puerto Rico scope-of-employment doctrine reflects the standard articulated in Restatement (Second) of Agency § 228: conduct is within scope only where it is of the kind the employee was employed to perform, occurs substantially within authorized time and space limits, and is motivated at least in part by a purpose to serve the employer. A certification of scope by the Attorney General or designee under 28 U.S.C. § 2679(d)(1) is subject to judicial review. Gutierrez de Martinez v. Lamagno, 515 U.S. 417 (1995); Osborn v. Haley, 549 U.S. 225 (2007); Wood v.

34

United States, 995 F.2d 1122 (1st Cir. 1993); Davric Maine Corp. v. U.S. Postal Serv., 238 F.3d 58 (1st Cir. 2001). Plaintiffs reserve the right to challenge any certification of scope of employment in this action and to seek judicial review of any such certification. Plaintiffs contend that any certification of scope of employment would be improper on the facts alleged because Defendant's challenged statements were knowingly false, personally motivated, and not undertaken to serve any legitimate FEMA purpose.

Defendant's conduct also implicates 28 U.S.C. § 2680(h), which excludes intentional torts — including libel and slander — from FTCA coverage. The challenged statements are personally motivated, knowingly false (or made with reckless disregard for the truth), and were made to deflect accountability for Defendant's own substantiated misconduct rather than to serve any FEMA function. Those statements fall outside the scope of Defendant's federal employment, and substitution of the United States as defendant under the Westfall Act would not be proper.

**N.  Damages**

Defendant's defamatory statements have caused substantial and ongoing harm to Plaintiffs, including the following distinct categories of damages:

(a) Reputational injury. Plaintiffs have suffered direct reputational injury within the federal consulting and contracting community. Defendant's false sworn statements — attributing weapons-related intimidation to a civilian contractor, falsely characterizing termination as misconduct-driven, and republishing accusations of federal records sabotage — carry uniquely severe reputational consequences in security-conscious federal environments where such allegations are treated with particular weight.

(b) Impairment of professional opportunities and ability to obtain employment. Plaintiff Angeline has experienced ongoing difficulty obtaining federal consulting work since Defendant's false statements entered federal personnel records. Specific opportunities and relationships

impaired include those involving COR3, Deloitte, Cyberricade, and other federal consulting prospects. The "conduct and performance" attribution alone — reviewable by federal contracting and credentialing authorities — is a continuing obstacle to professional reengagement.

(c) Mandatory reputational rehabilitation costs. The reputational damage — portraying Plaintiff Angeline as a military impostor (stolen valor), a workplace violence risk, and a saboteur of federal records — was severe enough that Plaintiff Angeline retained a professional public-relations firm to rehabilitate his standing in the federal consulting and homeland-security community. These costs are documented, ongoing, and would not have been necessary but for Defendant's false statements.

(d) Federal-facility access impairment. Plaintiff Angeline has been subjected to enhanced security screening at federal facilities, including DHS and the Pentagon, and has been denied normal access to FEMA headquarters that would be expected of a consultant of his standing. When FEMA Acting Administrator David Richardson sought to consult with Plaintiff Angeline on agency-improvement matters, the meeting could not be held on FEMA premises and was conducted offsite. The access impairment is traceable to Defendant's October 2020 sworn statements attributing weapons intimidation to Plaintiff Angeline.

(e) Emotional distress and personal harm. Both Plaintiffs have suffered emotional distress, humiliation, and anxiety as a direct and proximate result of Defendant's false statements.

(f) Impairment of future earning capacity. Defendant's false statements have impaired Plaintiffs' future federal consulting prospects and earning capacity.

(g) Particular harm to Plaintiff Rozycki as a service-disabled veteran. Defendant's false statements have caused particular harm to Plaintiff Rozycki, a service-disabled veteran of the 82nd Airborne Division, by weaponizing his actual military service in permanent federal records.

Defendant transformed an honorable record of service-connected sacrifice into the predicate for a fabricated workplace-violence allegation that follows Plaintiff Rozycki indefinitely.

(h) Collateral agency harm caused by Defendant's false accusation. The share-drive deletion for which Defendant blamed Plaintiffs resulted in the permanent loss of the DSI tool, valued at approximately $70 million in productivity, which would have shortened the Puerto Rico recovery timeline by years. This loss — directly traceable to the purging of records that Defendant's false accusation was designed to conceal — is a concrete measure of the harm flowing from Defendant's conduct and demonstrates that her defamatory statements were part of a broader cover-up.

## V.  CAUSES OF ACTION
### COUNT I — Defamation Per Se
*(Fabricated Military Service as to Plaintiff Angeline and False Attribution of Workplace*

*Intimidation to Plaintiff Rozycki's Actual Military Service)*

Plaintiffs incorporate by reference all preceding paragraphs.

Defendant's sworn statement at FEMA-C000347 (Exhibit C) — "Barry and Mark would mention the type of weapons they used to use in the military. I never thought they would act on anything with weapons." — along with her written clarification characterizing the alleged statements as "an act of intimidation," states two false claims, one as to each Plaintiff.

### A. As to Plaintiff Angeline — Fabricated Military Service and Weapons Intimidation

As to Plaintiff Angeline, Defendant's statements are false on their face. Plaintiff Angeline has never served in any branch of the U.S. armed forces. He has no military service record and no military weapons training. He could not have "mentioned the type of weapons [he] used in the military" because there is no such military service to reference.

Defendant's statements imputed to Plaintiff Angeline the fraudulent misrepresentation of military service — commonly known as "stolen valor" — conduct that is defamatory per se because it accuses a civilian of falsely claiming military credentials. The statements simultaneously imputed potential workplace-violence conduct on the basis of that fabricated military background.

**B. As to Plaintiff Rozycki — False Attribution of Workplace Intimidation to Actual Military Service**

As to Plaintiff Rozycki, Defendant's statements are independently defamatory on a different theory. Plaintiff Rozycki did serve honorably as a Captain in the 82nd Airborne Division and holds a 100% service-connected disability rating. Defendant did not fabricate his military service; she falsely attributed workplace-intimidation conduct to him based on it.

Defendant's sworn statement falsely characterized Plaintiff Rozycki as having referenced military weapons in workplace conversations "as a response to" Defendant giving "assertive answers or directions" — conduct that did not occur as Defendant described and that is inconsistent with Plaintiff Rozycki's actual professional conduct and service record. By converting an honorable service record into the predicate for a fabricated workplace-violence narrative, Defendant weaponized Plaintiff Rozycki's service and imputed conduct injurious to his professional reputation.

**C. Common Elements**

The statements were of and concerning Plaintiffs. Defendant identified each Plaintiff by first name ("Barry" and "Mark") and described conduct she attributed to them.

The statements were published to third parties. Defendant communicated them to FEMA OPR investigators Mara Lederer and Michael Tenant. They were memorialized in formal Reports

of Investigation, circulated within FEMA, and are reviewable by security and credentialing authorities outside FEMA.

The statements are defamatory per se — that is, defamatory on their face and actionable without proof of special damages — as to both Plaintiffs because they impute (a) fraudulent conduct affecting professional fitness (as to Angeline), (b) misuse of military service to intimidate a civilian supervisor (as to Rozycki), and (c) the implication of potential criminal workplace-violence conduct in a federal facility (as to both).

Defendant knew the statements were false, or made them with reckless disregard for their truth or falsity. As alleged in Section IV(B), Defendant signed the Warning Acknowledgement Form (Exhibit C at FEMA-C000343) forty days before making these statements. She had supervised Plaintiff Angeline for approximately six months and worked alongside Plaintiff Rozycki, and had ample opportunity to know their actual backgrounds.

The statements are false. Plaintiff Angeline never served in any branch of the United States armed forces and has no military service record, no DD-214, and no military weapons training; he could not have referenced weapons used in military service because no such service exists. Plaintiff Rozycki did serve honorably, but did not make the weapons-related statements Defendant attributed to him. Defendant, who had supervised Plaintiff Angeline for approximately six months and worked alongside Plaintiff Rozycki, knew or recklessly disregarded these facts.

Plaintiffs have suffered substantial reputational, professional, and emotional harm as a direct and proximate result of Defendant's false statements. The harm to Plaintiff Rozycki is particularly acute because Defendant weaponized his actual honorable service as the basis for a fabricated workplace-violence narrative.

**COUNT II — Defamation Per Se**

*(Twin Sworn Denials of Substantiated Discriminatory Remarks and False Sworn Defense of*

*Substantiated Colleague Misconduct)*

Plaintiffs incorporate by reference all preceding paragraphs.

In two separate sworn investigations — OPR Cases 20200490 and 20200565 — Defendant categorically denied under oath, repeatedly, that she had made age-, race-, or gender-based derogatory remarks about Plaintiffs.

Defendant's denials were specifically of and concerning Plaintiffs. The questions to which she responded named Plaintiff Angeline by his first name and referenced Plaintiffs and the LSS team as the alleged subjects of the denied conduct.

Defendant's denials were published to third parties. She communicated them directly to OPR investigators Lederer and Tenant. The denials were memorialized in formal Reports of Investigation in two separate FEMA OPR cases, circulated within FEMA, and are reviewable by federal contracting and credentialing authorities outside FEMA.

FEMA OPR, in Case 20200565, substantiated by a preponderance of the evidence that Defendant did make such remarks. Two independent FEMA witnesses — Gomez and Dorta — testified under penalty of perjury to the specific discriminatory statements Defendant denied.

Defendant also denied under oath that her colleague Eli Pushkarewicz had made age-, race-, or gender-based comments about Plaintiff Angeline. In a separate OPR investigation, Case 20200564, FEMA OPR substantiated by a preponderance of the evidence that Pushkarewicz had made the very comments Defendant denied. Three independent witnesses corroborated Pushkarewicz's misconduct.

40

By falsely denying her own substantiated conduct — and by falsely denying her colleague's substantiated conduct — Defendant constructively portrayed Plaintiffs as having fabricated their discrimination complaints.

Defendant's false denials were not made in service of any FEMA function. The denials served only Defendant's personal interest in deflecting accountability for the misconduct OPR was about to substantiate against her, and her personal alliance with a colleague substantiated for identical misconduct.

Defendant's false denials are part of a documented pattern of lack of candor by Defendant in federal proceedings whenever her personal interests are at stake — a pattern independently evidenced by a 2026 written statement Defendant made in CBCA Docket No. 7999 denying her own termination and reinstatement, directly contradicted by contemporaneous written communications from the United States' own counsel of record in parallel federal litigation. The pattern forecloses any innocent reading of Defendant's OPR statements as products of stress, confusion, or mistaken recollection.

Defendant knew her sworn denials were false. As alleged in Section IV(B), she signed the Warning Acknowledgement Form (Exhibit C at FEMA-C000343) on September 17, 2020. She had made the conduct she was denying. Forty days later she denied it anyway.

The denials are false. FEMA OPR substantiated by a preponderance of the evidence in Case 20200565 that Defendant made the age-, race-, and gender-based remarks she denied, and two FEMA witnesses — Gomez and Dorta — testified to those remarks under penalty of perjury. Defendant's sworn denial that Pushkarewicz made identical remarks is likewise contradicted by OPR's substantiated finding in Case 20200564. Defendant knew her denials were false when made.

41

Plaintiffs have suffered reputational and professional harm as a direct and proximate result.

## COUNT III — Defamation Per Se

*(False Sworn Attribution of Plaintiffs' Termination to Their Own Misconduct — Lack of Candor*

*Defamation)*

Plaintiffs incorporate by reference all preceding paragraphs.

Defendant made a sworn statement to federal investigators that Plaintiff Angeline's May 2019 termination was "because of conduct and performance." (Exhibit C at FEMA-C000348).

The statement was specifically of and concerning Plaintiff Angeline. It identified him by name in the question to which Defendant was responding and attributed misconduct to him in particular.

The statement was published to OPR investigators (Lederer and Tenant), memorialized in a formal Report of Investigation, circulated within FEMA, and is reviewable by federal contracting, credentialing, and security authorities outside FEMA. The statement has been and continues to be communicated to third parties beyond Defendant.

The statement is defamatory per se because it imputes professional misconduct and unfitness in a federal contracting context. It will follow Plaintiff Angeline through every federal background check, security review, and credentialing inquiry.

The statement is false. The contemporaneous record establishes that Plaintiff Angeline's termination followed within six days of his May 17, 2019 written disclosure to Defendant of Plaintiffs' then-pending OIG and EEO complaints. The prime contractor's own documented justification was framed in burn-rate terms, not misconduct terms.

The proximity timeline is documented and specific:

42

(a) on or about March 15, 2019, at approximately 1700 hours, Plaintiff Angeline and retired United States Army Colonel Daniel McCabe — both serving as Defendant's LSS Black Belt coaches — met with Defendant at her workspace in the Joint Recovery Office and, during a 45-minute meeting, reviewed Defendant's project status, noted her lack of progress and missed class time, advised her of make-up sessions, and offered to assist her with a Rapid Improvement Event; during that meeting Defendant inquired whether she could split her certification project with FEMA employee Michelle Ortiz, and Plaintiff Angeline informed her that splitting the project was not permitted;

(b) beginning in mid-March 2019 — immediately following the March 15 meeting — Defendant initiated the sequence of acts to compromise the LSS program described in Section IV(J);

(c) on or about April 26, 2019, Plaintiff Angeline contacted FEMA's Whistleblower Protection Coordinator to formally place Plaintiffs' protected disclosures on record and confirm Plaintiffs' whistleblower status;

(d) on May 13, 2019, Plaintiffs and other LSS team members met for approximately three hours with four United States Department of Homeland Security Office of Inspector General field agents at OIG offices in San Juan, Puerto Rico, reporting in detail the program malfeasance attributable to Defendant; this meeting was the in-person follow-up to the third of a series of OIG complaints Plaintiffs had filed in April and early May 2019 (Exhibit P) regarding the LSS engagement and Defendant's role in it;

(e) on or about May 13, 2019, an LSS team member contacted prime contractor ATCS's human resources function to report age-based harassment by Defendant; ATCS human resources thereafter individually interviewed members of the LSS team over a multi-day period

43

concluding on or about May 15, 2019; also on May 15, 2019, Plaintiffs internally circulated among themselves a working draft of protected-disclosure correspondence (Exhibit H) intended for senior FEMA leadership, which Plaintiffs later elected to send directly to Defendant on May 17, 2019 to resolve the matters internally without further escalation; the May 15, 2019 drafts reflect that Plaintiffs' protected-disclosure correspondence was already in active preparation prior to the period during which Defendant began constructing the retroactive documentary basis described in Section IV(J); also on May 17, 2019, before Plaintiffs' 3:00 PM email, an ATCS Project Manager warned ATCS leadership: "I suggest amputating liberally." (May 17, 2019 ATCS internal email, Plaintiff records);

(f) on May 17, 2019, at 3:00 p.m., Plaintiff Angeline sent an email to Defendant Aldarondo as the sole named recipient (Exhibit G) (with the LSS team copied), subject line "URGENT: Whistleblower Status for LSS Group," expressly informing Defendant that (i) Plaintiffs had filed three separate complaints with the DHS OIG; (ii) the third such complaint "specifically addresses actions that you have taken that raise serious ethics, compliance, and mismanagement concerns"; and (iii) Plaintiffs had filed an EEO complaint regarding "derogatory remarks that you have made to other people related to our age, race, and gender";

(g) within three business days of Defendant's receipt of the May 17 email, prime contractor ATCS executives mobilized — demanding the Black Belt examination answer key on May 20, 2019, and scheduling an unscheduled and irregular emergency trip to Puerto Rico on May 21, 2019;

44

(h) on May 22, 2019, the ATCS Program Director arrived in Puerto Rico and announced — for the first time — a purported "burn rate" problem with the LSS contract that he claimed required releasing Plaintiffs;

(i) on May 23, 2019, Plaintiffs were terminated from the LSS contract — within six days of Plaintiffs' May 17 disclosure to Defendant;

(j) on May 24, 2019, at 8:19:55 a.m. — the morning after the terminations — the "Memo_LSS Contractor Performance" memorandum was forwarded to Defendant (Exhibit C at FEMA-C000356), supplying the substantive content that would later be used to retroactively characterize the terminations as performance-driven;

(k) on June 15, 2019, the entire LSS contract was prematurely terminated — fifteen days before the next contract option period would have renewed; and

(l) on October 27, 2020 — seventeen months after the terminations — Defendant gave the sworn statement attributing the terminations to "conduct and performance."

The events identified at sub-items (c) through (e) — Plaintiff Angeline's April 26, 2019 contact with the FEMA Whistleblower Protection Coordinator, the May 13, 2019 OIG field-agent meeting, the May 13, 2019 ATCS human-resources discrimination report, and the May 15, 2019 internal circulation of the draft protected-disclosure correspondence — were not concealed events. Multiple FEMA personnel and prime-contractor personnel co-located with Defendant at the Joint Recovery Office were aware of one or more of these activities in the days preceding May 16, 2019. On information and belief, Defendant herself became aware of one or more of these convergent disclosure activities before May 16, 2019, through the conduit described in Section IV(J)(vi) and through ordinary information flow within the Joint Recovery Office, supplying Defendant with the

45

motive and occasion to act before the protected-disclosure correspondence reached her in final form on May 17, 2019.

Defendant was the sole substantive recipient of the May 17, 2019 email. The email was addressed to Defendant by name; no other FEMA or DHS personnel were addressees. From May 17, 2019 until approximately 4:30 p.m. on May 23, 2019, when Plaintiff Angeline forwarded notice of the disclosures to senior FEMA leadership at the Joint Recovery Office, Defendant alone among FEMA personnel had been informed in writing that her own conduct was the subject of an active third OIG complaint and an active EEO complaint. The chronology forecloses any defense that Defendant lacked notice of Plaintiffs' protected status when the personnel actions occurred.

Defendant knew her sworn statement was false, or made it with reckless disregard for the contemporaneous facts. As alleged in Section IV(B), she signed the Warning Acknowledgement Form forty days before making the statement. (Exhibit C at FEMA-C000343).

The statement at issue in this count is particularly difficult to characterize as within the scope of Defendant's federal employment. The statement is not about Defendant's own conduct or her own management decisions; it is a sworn factual claim about the reasons a third-party prime contractor terminated its subcontractor. Defendant had no FEMA function that required or authorized her to falsely characterize the basis for Plaintiff Angeline's termination from ATCS. On the facts alleged, the statement served only Defendant's personal interest in retroactively reframing a termination occurring days after Plaintiffs' protected disclosures as a merit-based separation, not any legitimate FEMA purpose.

The statement is false. Plaintiff Angeline's termination was not for conduct or performance. The contemporaneous record shows the termination followed within six days of his May 17, 2019 protected disclosure; the prime contractor's own documented justification was

46

framed in contract burn-rate terms, not misconduct; and the "conduct and performance" characterization first appeared in Defendant's sworn statement seventeen months later, with no contemporaneous record supporting it.

Plaintiff Angeline has suffered substantial reputational, professional, and emotional harm as a direct and proximate result.

**COUNT IV — Defamation Per Se**

*(Share-Drive Sabotage Republication)*

Plaintiffs incorporate by reference all preceding paragraphs.

Defendant republished and ratified false accusations that Plaintiff Angeline was "responsible for" the deletion of federal share-drive records following his removal from the FEMA operation.

The accusations were specifically of and concerning Plaintiff Angeline, who was identified as the alleged actor responsible for the share-drive deletion.

Defendant's republication was a publication to third parties. Defendant forwarded and ratified the accusations to federal personnel and caused them to be incorporated into federal records, where they remain available to and reviewable by federal contracting and credentialing authorities outside FEMA.

Those accusations imputed criminal conduct (destruction of federal records) and conduct injurious to professional reputation in a federal contracting context.

The accusations were false. The accusations could not have been a contemporaneous concern at the time of Plaintiff Angeline's removal because the alleged conduct would have occurred only after he was already gone. Defendant had no good-faith basis to attribute share-drive sabotage to Plaintiff Angeline after his removal, and the documentary record that would have

identified any actual deletion actor — share-drive access logs, user-authentication records, and backups — was available to her but was not consulted.

Defendant acted with knowledge of falsity or reckless disregard for the truth. As with her other false statements, the Warning Acknowledgement she signed on September 17, 2020 (Exhibit C at FEMA-C000343) is strong evidence undermining any claim of innocent mistake.

The accusation is false. The alleged share-drive deletion necessarily occurred after Plaintiff Angeline's removal, when he had no access to the drive, and therefore could not have been attributable to him; the documentary record that would have identified the actual deletion actor — access logs, authentication records, and backups — was available to Defendant but was not consulted before she republished the accusation.

Plaintiffs have suffered substantial reputational, professional, and emotional harm as a direct and proximate result.

## COUNT V — Intentional Infliction of Emotional Distress

Plaintiffs incorporate by reference all preceding paragraphs.

Defendant's conduct toward Plaintiffs is extreme and outrageous. Defendant: (a) fabricated military service for Plaintiff Angeline and attributed weapons intimidation to that fabricated background, while weaponizing Plaintiff Rozycki's actual military service by attributing the same intimidation to him — communicating that narrative to federal investigators in a security-conscious federal environment; (b) falsely denied under oath, in two federal investigations, conduct her own employer's investigative office substantiated against her by a preponderance of the evidence; (c) falsely defended a colleague under oath against substantiated misconduct, knowing she was constructing mutual cover; (d) falsely attributed Plaintiffs' terminations to "conduct and performance" in sworn federal records that follow Plaintiffs through every federal background check; and (e) did all of the foregoing forty days after signing a Warning

Acknowledgement Form advising that knowingly false statements could subject her to criminal prosecution.

A reasonable person, knowing all the circumstances, would regard Defendant's conduct as exceeding all bounds of decency and as intolerable in a civilized society. Federal employees do not fabricate military service for civilians or deploy fabricated weapons-intimidation narratives against contractors who have documented their substantiated discriminatory conduct. The combination of fabrication, deployment of fabricated material into federal records that follow Plaintiffs indefinitely, and personal motive supports a finding of extreme and outrageous conduct.

Defendant's conduct was intentional or in reckless disregard of the probability of causing severe emotional distress. She had supervised Plaintiff Angeline for approximately six months and knew the impact her fabricated statements would have. She made them anyway.

Plaintiffs have suffered severe emotional distress as a direct and proximate result, including the distress of knowing that fabricated weapons-intimidation narratives sit in permanent federal records reviewable by security and credentialing authorities, and that their terminations have been falsely recharacterized as misconduct-driven.

## VI. RESERVATION OF RIGHT TO AMEND

Plaintiffs file this Complaint based on the documentary record currently available to them, including the three Reports of Investigation produced by FEMA OPR (Cases 20200490, 20200564, and 20200565); the May 17, 2019 email from Plaintiff Angeline to Defendant; the contemporaneous OIG complaints filed in April and May 2019; the May 16, 2019 "To Whom It May Concern" memorandum (Exhibit D); the May 24, 2019 performance memorandum (Exhibit E at FEMA-C000361 through C000367); the suppressed April 2019 Gomez/Santiago pulse report (the "secret survey," Exhibit M); end-of-course training evaluations (Exhibit N); and other materials Plaintiffs have obtained through Freedom of Information Act requests. Plaintiffs reserve

the right to amend this Complaint upon receipt of further documentary evidence through discovery, pending Freedom of Information Act productions, and the disclosure of materials currently in the possession of FEMA, the Department of Homeland Security, prime contractor ATCS, PLC, and other entities possessing relevant records. Such amendments may include additional specific false statements made by Defendant and additional documentary corroboration of the allegations pleaded herein.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Enter judgment in favor of Plaintiffs and against Defendant on all Counts;

B. Issue a declaratory judgment that Defendant Aldarondo's conduct alleged herein was outside the scope of her federal employment, that substitution of the United States under the Westfall Act, 28 U.S.C. § 2679, is improper, and that this action may proceed against Defendant in her individual personal capacity;

C. Award compensatory damages in an amount to be proven at trial, including damages for reputational harm, emotional distress, lost professional opportunities, public-relations rehabilitation costs, and impairment of future earning capacity;

D. Award pre- and post-judgment interest, costs, and reasonable expenses; and

E. Grant such other and further relief as the Court deems just and proper.

## VIII.  JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

Dated: July 9, 2026

**Barry Angeline, Plaintiff Pro Se**
43374 Carys Brook Court, Ashburn, VA 20147
(703) 994-6732  |  barry.angeline@gmail.com

**Mark Rozycki, Plaintiff Pro Se**
121 Pin Oak Way, Hamilton, GA 31811
(706) 457-2270  |  markrozycki@gmail.com

51